# 23-7834

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

---

**Gordon Clark (*individual capacity*), Gordon Clark (*as Lillian's husband*), Gordon Clark (*as sole fiduciary, sole beneficiary, and sole creditor of the Estate of Lillian J. Clark*), and Estate of Lillian J. Clark,**

Plaintiff-Appellant,

v.

**Santander Bank, N.A., Timothy Wennes, Pierre Habis, Kenneth O'Neill, Wells Fargo & Company, Scott Powell (*as former CEO of Santander, and as COO of Wells Fargo*), Bendett & McHugh, PC, Adam L. Bendett, Jeffrey M. Knickerbocker, Mark A. Piech, Joseph Abraham, Dominick D. Neveux, John Doe(s), and Jane Doe(s),**

Defendants-Appellees.

---

On Appeal from the United States District Court
for the District of Connecticut

---

**Appendix of Plaintiff-Appellant Gordon Clark**

Gordon Clark, Pro Se
70 Elm Street, Enfield, CT 06082
860.833.3195

**1**

## **TABLE OF CONTENTS**

1. District Court Docket Sheet - ECF No. 209 ………...………….….......... 4

2. Orders being appealed ………………………………………….…...... 27

     ECF No. 200 …..……………………….………………………… 27

     ECF No. 201 ……………………....…………………………… 75

     ECF No. 205 ………....…………………………………….…… 76

     ECF No. 206 …………..………………………………….……… 77

3. Notice of Appeal - ECF No. 203 ………..………………………….. 78

4. Notice of Amended Appeal - ECF No. 207 ………..……………….... 81

5. Exhibits …………………………………………………………… 84

     Exhibit 1: Face to the Name (Lillian & Gordon Clark) ...…........... 84

     Exhibit 2: Fiduciary's Certificate ……………………………... 86

     Exhibit 3: Santander Bank branch closings article ...……………. 88

     Exhibit 4: Santander Bank $550 Million Settlement article …….. 92

     Exhibit 5: Santander Bank's exit from mortgage market ...…..… 95

     Exhibit 6: May 1, 2019 – Santander Bank Demand Letter ……… 101

     Exhibit 7: Town of Enfield - Zero property taxes due …………... 103

     Exhibit 8: Santander Bank, N.A.'s Complaint …………………... 105

     Exhibit 9: Defendants' Answer (Jury Demand) …………........…. 114

     Exhibit 10: Santander's Reply (no fraud nor mutual mistake) ….. 118

**2**

Exhibit 11: Certificate of Closed Pleadings ……….……...…..… 123

Exhibit 12: Closing Statement ……………………….…………….. 125

Exhibit 13: *Connecticut v. Hahn*, 207 Conn. 555 (1988). ……..... 135

Exhibit 14: *Harlach v. Metropolitan*, 221 Conn. 185 (1992). ..…… 138

Exhibit 15: *JPMorgan v. Virgulak*, 341 Conn. 750 (2022). …….. 141

Exhibit 16: Chapter 13 Bankruptcy - ECF No. 196  ...............….. 156

Exhibit 17: Brief on Preclusion Doctrine - ECF No. 197 ............. 162

Exhibit 18: Adversary Proceeding Complaint - ECF No. 198 ...... 178

Exhibit 19: Motion for Writ of Mandamus ……………………... 181

Exhibit 20: Motion for Reconsideration …………………….....… 239

Exhibit 21: Civil Interlocutory Appeals in Federal Court ….......... 251

Exhibit 22: Overview of Ripeness Doctrine ………………........ 259

Exhibit 23: *Lowenschuss v. Kane*, 520 F.2d 255 (1975) ............. 262

Exhibit 24: Judge Posner retirement article ……….…………..… 268

Exhibit 25: Access to Justice in the United States …....………… 272

Exhibit 26: Letter from Birmingham Jail ………….……………..… 286

6. Certificate of Service ……………………………………………... 293

APPEAL,EFILE,PROSE,REFCNF,TOF

# U.S. District Court
## District of Connecticut (New Haven)
## CIVIL DOCKET FOR CASE #: 3:22−cv−00039−SVN

| | |
|---|---|
| Clark et al v. Santander Bank, N.A. et al | Date Filed: 01/10/2022 |
| Assigned to: Judge Sarala V. Nagala | Jury Demand: Plaintiff |
| Demand: $2,878,000 | Nature of Suit: 370 Other Fraud |
| Cause: 28:1332 Diversity−Fraud | Jurisdiction: Diversity |

**Plaintiff**

**Gordon Clark**  represented by  **Gordon Clark**
Gordon Clark
70 Elm Street
Enfield, CT 06082
860−833−3195
Email: gordon@christianeconomics.net
PRO SE

**Plaintiff**

**Estate of Lillian J. Clark**

V.

**Defendant**

**Santander Bank, N.A.**  represented by  **Jeffrey M. Knickerbocker**
Brock and Scott, PLLC
270 Farmington Ave
Suite 151
Farmington, CT 06032
860−474−8939
Email: JEFFREY.KNICKERBOCKER@BROCKANDSCOTT.COM
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
Saul Ewing, LLP
131 Dartmouth Street
Ste 501
Boston, MA 02116
617−912−0947
Email: patrick.tracey@saul.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Timothy Wennes**  represented by  **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Pierre Habis**  represented by  **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Kenneth O'Neill**          represented by    **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wells Fargo & Company**    represented by    **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean R. Higgins**
K&L Gates LLP
1 Congress Street
Suite 2900
Boston, MA 02114
617−261−3128
Email: sean.higgins@klgates.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scott Powell**             represented by    **Jeffrey M. Knickerbocker**
*as former CEO of*                             (See above for address)
*Santander*                                    *LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean R. Higgins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Bendett & McHugh, PC**     represented by    **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Adam L. Bendett**           represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jeffrey M.**               represented by   **Jeffrey M. Knickerbocker**
**Knickerbocker**                             (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Mark A. Piech**            represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Joseph Abraham**           represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dominick D. Neveux**       represented by   **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**John Doe**                 represented by

**6**

**Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Jane Doe**                    represented by  **Jeffrey M. Knickerbocker**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Scott Powell**                represented by  **Jeffrey M. Knickerbocker**
*as COO of Wells Fargo*                        (See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Patrick S. Tracey**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sean R. Higgins**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 01/10/2022 | 1 | COMPLAINT against All Defendants, filed by Gordon Clark. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Fazekas, J.) Modified on 1/18/2022 to correct filer(Fazekas, J.). (Entered: 01/11/2022) |
| 01/10/2022 | 2 | Order on Pretrial Deadlines: Amended Pleadings due by 3/11/2022. Discovery due by 7/12/2022. Dispositive Motions due by 8/16/2022.<br>Signed by Clerk on 01/10/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/10/2022 | 3 | ELECTRONIC FILING ORDER FOR COUNSEL − PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER<br>Signed by Judge Sarala V. Nagala on 01/10/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/10/2022 | 4 | STANDING PROTECTIVE ORDER<br>Signed by Judge Sarala V. Nagala on 01/10/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/11/2022 | 5 | NOTICE TO COUNSEL/SELF−REPRESENTED PARTIES : Counsel or self−represented parties initiating or removing this action are responsible for serving all parties with attached documents and copies of 4 Standing Protective Order, 3 Electronic Filing Order, 1 Complaint filed by Lillian J. Clark, 2 Order on Pretrial Deadlines<br>Signed by Clerk on 01/11/2022.(Fazekas, J.) (Entered: 01/11/2022) |
| 01/11/2022 |  | Request for Clerk to issue summons as to Santander Bank, N.A.. (Bozek, M.) (Entered: 01/11/2022) |

| | | |
|---|---|---|
| 01/11/2022 | | Request for Clerk to issue summons as to Timothy Wennes. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Pierre Habis. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Kenneth O'Neill. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Wells Fargo & Company. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Scott Powell. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Bendett & McHugh, PC. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Adam L. Bendett. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Jeffrey M. Knickerbocker. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Mark A. Piech. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Joseph Abraham. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Dominick D. Neveux. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | | Request for Clerk to issue summons as to Jane Doe, John Doe. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 6 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Santander Bank, N.A.* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 7 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Timothy Wennes* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 8 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Pierre Habis* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 9 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Kenneth O'Neill* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 10 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Wells Fargo & Company* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 11 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Scott Powell* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 12 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Bendett & McHugh, PC* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 13 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Adam L. Bendett* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 14 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Jeffrey M. Knickerbocker* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 15 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Mark A. Piech* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |

| 01/11/2022 | 16 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Joseph Abraham* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| --- | --- | --- |
| 01/11/2022 | 17 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Dominick D. Neveux* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/11/2022 | 18 | ELECTRONIC SUMMONS ISSUED in accordance with Fed. R. Civ. P. 4 and LR 4 as to *Jane Doe, John Doe* with answer to complaint due within *21* days. *Gordon Clark* *70 Elm Street* *Enfield, CT 06082*. (Bozek, M.) (Entered: 01/11/2022) |
| 01/14/2022 | 19 | SUMMONS Returned Executed by Estate of Lillian J. Clark, Gordon Clark. Joseph Abraham served on 1/12/2022, answer due 2/2/2022; Adam L. Bendett served on 1/12/2022, answer due 2/2/2022; Bendett & McHugh, PC served on 1/12/2022, answer due 2/2/2022; Jeffrey M. Knickerbocker served on 1/12/2022, answer due 2/2/2022; Dominick D. Neveux served on 1/12/2022, answer due 2/2/2022; Mark A. Piech served on 1/12/2022, answer due 2/2/2022. (Imbriani, Susan) (Entered: 01/18/2022) |
| 01/14/2022 | 20 | JUDICIAL NOTICE of the Proper and Lawful Service of six summonses and complaints by Gordon Clark, Estate of Lillian J. Clark re 19 Summons Returned Executed, (Imbriani, Susan) (Entered: 01/18/2022) |
| 01/20/2022 | 21 | Consent to Electronic Notice by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 22 | MOTION to participate in electronic filing by Gordon Clark.Responses due by 2/10/2022 (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 23 | NOTICE of Pro Se Appearance by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 24 | Plaintiff's Judicial Notice to Superior Court of Hartford by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 25 | Judicial Notice of the proper and lawful service of an additional five summonses and complaints by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 26 | Judicial Notice of Unsolicited Legal Advice from Attorney of K&L Gates, LLP by Gordon Clark (Imbriani, Susan) (Entered: 01/20/2022) |
| 01/20/2022 | 28 | SUMMONS Returned Executed by Gordon Clark. Jane Doe served on 1/14/2022, answer due 2/4/2022; John Doe served on 1/14/2022, answer due 2/4/2022; Pierre Habis served on 1/14/2022, answer due 2/4/2022; Kenneth O'Neill served on 1/14/2022, answer due 2/4/2022; Santander Bank, N.A. served on 1/14/2022, answer due 2/4/2022; Timothy Wennes served on 1/14/2022, answer due 2/4/2022. (Imbriani, Susan) (Entered: 01/24/2022) |
| 01/21/2022 | 27 | ORDER granting Plaintiff's Motion to Participate in Electronic Filing (ECF No. 22 ). Signed by Judge Sarala V. Nagala on 1/21/22. (Marks, Joshua) (Entered: 01/21/2022) |
| 01/21/2022 | 33 | ELECTRONIC FILING ORDER − PLEASE ENSURE COMPLIANCE WITH COURTESY COPY REQUIREMENTS IN THIS ORDER. SELF−REPRESENTED FILERS ARE REQUIRED TO COMPLY WITH THE JUDGE'S STANDARD ELECTRONIC FILING ORDER WHICH IS ATTACHED. Signed by Judge Sarala V. Nagala on 1/21/2022.(Bozek, M.) (Entered: 01/25/2022) |
| 01/24/2022 | 29 | NOTICE of Appearance by Patrick S. Tracey on behalf of Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes (Tracey, Patrick) (Entered: 01/24/2022) |
| 01/24/2022 | 30 | Corporate Disclosure Statement by Santander Bank, N.A.. (Tracey, Patrick) (Entered: 01/24/2022) |
| 01/25/2022 | 31 | NOTICE of Appearance by Sean R. Higgins on behalf of Scott Powell, Wells Fargo & Company (Higgins, Sean) (Entered: 01/25/2022) |
| 01/25/2022 | 32 | NOTICE of Appearance by Jeffrey M. Knickerbocker on behalf of Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech (Knickerbocker, Jeffrey) (Entered: 01/25/2022) |
| 01/25/2022 | 34 | JUDICIAL NOTICE of Attorney Sean Higgins of K&L Gates, LLP refusal to accept service of process for defendants Wells Fargo and Scott Powell by Gordon Clark (Imbriani, Susan) |

| | | (Entered: 01/25/2022) |
|---|---|---|
| 01/25/2022 | 35 | JUDICIAL NOTICE of the proper and lawful service of the final two summonses and complaints by Gordon Clark (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 36 | SUMMONS Returned Executed by Gordon Clark. Scott Powell served on 1/24/2022, answer due 2/14/2022. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 37 | SUMMONS Returned Executed by Gordon Clark. Wells Fargo & Company served on 1/24/2022, answer due 2/14/2022. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 38 | Summons Returned Unexecuted by Gordon Clark as to Scott Powell. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/25/2022 | 39 | Summons Returned Unexecuted by Gordon Clark as to Wells Fargo & Company. (Imbriani, Susan) (Entered: 01/25/2022) |
| 01/26/2022 | 40 | MOTION for Extension of Time until 3/15/2022 to File Responsive Pleading to 1 Complaint by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 01/26/2022) |
| 01/26/2022 | 41 | OBJECTION re 40 MOTION for Extension of Time until 3/15/2022 to File Responsive Pleading to 1 Complaint filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 01/26/2022) |
| 01/27/2022 | 42 | ORDER granting in part and denying in part Defendants' Motion for Extension of Time (ECF No. 40 ). Any response to the complaint shall be filed no later than **February 25, 2022**. Defendants are reminded that going forward, any motion for an extension of time shall comply with Connecticut Local Rule of Civil Procedure 7(b)2 and include whether the Plaintiffs have been informed of the request for additional time, and Plaintiffs position on such request. Signed by Judge Sarala V. Nagala on 1/27/22. (Marks, Joshua) (Entered: 01/27/2022) |
| 01/27/2022 | | Answer deadline updated for Joseph Abraham to 2/25/2022; Adam L. Bendett to 2/25/2022; Bendett & McHugh, PC to 2/25/2022; Jane Doe to 2/25/2022; John Doe to 2/25/2022; Pierre Habis to 2/25/2022; Jeffrey M. Knickerbocker to 2/25/2022; Dominick D. Neveux to 2/25/2022; Kenneth O'Neill to 2/25/2022; Mark A. Piech to 2/25/2022; Santander Bank, N.A. to 2/25/2022; Timothy Wennes to 2/25/2022. See 42 order. (Bozek, M.) (Entered: 01/28/2022) |
| 01/29/2022 | 43 | MOTION to Stay by Gordon Clark, Estate of Lillian J. Clark.Responses due by 2/19/2022 (Clark, Gordon) (Entered: 01/29/2022) |
| 02/01/2022 | 44 | ORDER denying Plaintiffs' Motion for Stay (ECF No. 43 ). Plaintiffs request the Court enter an order staying two pending Connecticut state court actions solely because Mr. Clark "is not capable of simultaneously administering and litigating" three separate actions. However, under the Anti−Injunction Act, a federal district court is not allowed to grant an injunction staying proceedings in a state court action except "as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283. Other Courts in this District have held that a federal court is without power to enjoin a concurrently pending foreclosure action in Connecticut state court. *See Rhodes v. Advanced Prop. Mgmt. Inc.*, No. 3:10−CV−826 JCH, 2011 WL 3204597, at *2 (D. Conn. July 26, 2011); *Chekroun v. U.S. Small Bus. Admin.*, No. CIV.A3:97CV2625(AWT), 1998 WL 231158, at *3 (D. Conn. May 4, 1998).<br><br>Similarly, here Plaintiffs have presented no evidence that any of the narrow exceptions set forth in 28 U.S.C. § 2283 apply to the present action. Therefore, this Court is without power to enjoin the state court proceedings, and Plaintiffs' motion must be DENIED. Signed by Judge Sarala V. Nagala on 2/1/22. (Marks, Joshua) (Entered: 02/01/2022) |
| 02/03/2022 | 45 | Corporate Disclosure Statement by Wells Fargo & Company. (Higgins, Sean) (Entered: 02/03/2022) |
| 02/11/2022 | 46 | Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 02/11/2022) |
| 02/11/2022 | 47 | ORDER. Santander Bank, N.A. shall file any opposition to Plaintiffs' Emergency Motion to Preserve All Records (ECF No. 46) no later than **February 18, 2022**.<br>Signed by Judge Sarala V. Nagala on 2/11/22. (Marks, Joshua) (Entered: 02/11/2022) |

| 02/11/2022 | | Set Deadline as to 46 Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order. Response due by 2/18/2022. See 47 Order. (Bozek, M.) (Entered: 02/14/2022) |
|---|---|---|
| 02/14/2022 | 48 | NOTICE by Gordon Clark, Estate of Lillian J. Clark (Clark, Gordon) (Entered: 02/14/2022) |
| 02/14/2022 | 49 | MOTION to Dismiss by Scott Powell, Wells Fargo & Company.Responses due by 3/7/2022 (Higgins, Sean) (Entered: 02/14/2022) |
| 02/14/2022 | 50 | Memorandum in Support re 49 MOTION to Dismiss filed by Scott Powell, Wells Fargo & Company. (Attachments: # 1 Exhibit 1; Lien by Clark on His Wife's Home)(Higgins, Sean) (Entered: 02/14/2022) |
| 02/14/2022 | 51 | NOTICE by Scott Powell, Wells Fargo & Company re 49 MOTION to Dismiss *to Self−Represented Litigants Regarding Motions to Dismiss as required by Local Rule 12* (Higgins, Sean) (Entered: 02/14/2022) |
| 02/18/2022 | 52 | Memorandum in Opposition re 46 Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order filed by Santander Bank, N.A.. (Tracey, Patrick) (Entered: 02/18/2022) |
| 02/18/2022 | 53 | AFFIDAVIT re 52 Memorandum in Opposition to Motion Signed By Patrick S. Tracey filed by Santander Bank, N.A.. (Tracey, Patrick) (Entered: 02/18/2022) |
| 02/22/2022 | 54 | REPLY to Response to 46 Emergency MOTION for *Defendant Santander Bank, N.A. to* Preserve All Records Order filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 02/22/2022) |
| 02/23/2022 | 55 | ORDER denying Plaintiffs' Motion to Preserve all Records (ECF No. 46 ). In their motion, Plaintiffs request the Court order Defendant Santander preserve "all U.S. Residential Mortgage and HELOC records and all related employment records." ECF No. 46 at 2. In examining a request for a preservation order, Courts in this District apply a balancing test and consider the "specific, significant, and imminent threat of loss or destruction of evidence against the burden that preserving that evidence would impose." *Jumpp v. Anaya*, No. 3:13 CV 1228 JBA, 2015 WL 2237516, at *1 (D. Conn. May 1, 2015).<br><br>Here, Plaintiff requests in his motion, and reaffirms in his reply, that he seeks a court order requiring Santander to preserve *all* residential mortgage and HELOC records, as well as all related employment records, regardless of whether the documents have any relation to the present litigation. ECF No. 46 at 2; ECF No. 54 at 6. Such a broad order would place a serious burden on Santander. Additionally, given Santander's representations in its response (ECF No. 52 ), there is little chance that any of the relevant documents will be destroyed. Plaintiffs provide no evidence that Santander has destroyed any relevant documents, nor do Plaintiffs provide any evidence that Santander is planning on destroying any relevant documents. Further, in its response, Santander represents that a broad preservation letter has been circulated within the company to ensure that no relevant documents are destroyed.<br><br>Finally, as Santander points out, "the obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001). At this point in the litigation, it is clear that Santander is on notice that all relevant information must be preserved, and Santander has acknowledged as much through the circulation of preservation letters. Thus, the risk that any information will be destroyed or deleted "has been diminished, if not eliminated." *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, No. 3:06CV1380(AHN), 2008 WL 11376620, at *3 (D. Conn. Nov. 5, 2008). Therefore, the burden that the broad order requested here would place on Santander far outweighs the risk of destruction of relevant documents. The Plaintiffs' motion is DENIED. Signed by Judge Sarala V. Nagala on 2/23/22. (Marks, Joshua) (Entered: 02/23/2022) |
| 02/24/2022 | 56 | First Corporate Disclosure Statement *for Bendett & McHugh, PC* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 02/24/2022) |
| 02/24/2022 | 57 | First MOTION to Dismiss *Complaint* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech.Responses due by 3/17/2022 (Attachments: # 1 Memorandum in Support of Motion to Dismiss, # 2 Exhibit A − State Court Docket, # 3 Exhibit B − Redacted Mortgage Deed, # 4 Exhibit C − Motion from State Court)(Knickerbocker, Jeffrey) (Entered: 02/24/2022) |

| 02/24/2022 | 58 | First NOTICE by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech re 57 First MOTION to Dismiss *Complaint to Self Represented Party Concerning the Motion to Dismiss* (Knickerbocker, Jeffrey) (Entered: 02/24/2022) |
|---|---|---|
| 02/25/2022 | 59 | MOTION to Dismiss by Santander Bank, N.A..Responses due by 3/18/2022 (Attachments: # 1 Memorandum in Support)(Tracey, Patrick) (Entered: 02/25/2022) |
| 02/25/2022 | 60 | NOTICE by Santander Bank, N.A. *to Self−Represented Litigant Concerning Motion to Dismiss* (Tracey, Patrick) (Entered: 02/25/2022) |
| 03/03/2022 | 61 | Emergency MOTION for Extension of Time until March 17, 2022 *for Superior Court* Evidentiary Hearing 49 MOTION to Dismiss by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 03/03/2022) |
| 03/03/2022 | 62 | Joint MOTION for Rule 16 Conference *with Request for Expedited Consideration (jointly filed by all defendants)* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell, Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 03/03/2022) |
| 03/04/2022 | 63 | ORDER granting Defendants' request for a Rule 16 conference. The Court will hold a Rule 16 conference on March 15, 2022, at 10:00 am, at the Abraham A. Ribicoff Federal Courthouse, 450 Main Street, Hartford Connecticut, in Courtroom One.<br><br>It is further ORDERED that all deadlines on all pending motions are hereby VACATED. The Court will set a new briefing schedule at the Rule 16 conference. Signed by Judge Sarala V. Nagala on 3/4/22. (Marks, Joshua) (Entered: 03/04/2022) |
| 03/04/2022 | 64 | ORDER finding as moot Plaintiffs' Request for an Extension of time (ECF No. 61 ) in light of the Court's order granting a Rule 16 conference and vacating all current deadlines. Signed by Judge Sarala V. Nagala on 3/4/22. (Marks, Joshua) (Entered: 03/04/2022) |
| 03/04/2022 | 65 | NOTICE OF E−FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE. ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Rule 16 Conference set for 3/15/2022 10:00 AM in Courtroom One, 450 Main St., Hartford, CT before Judge Sarala V. Nagala. (Velez, F.) (Entered: 03/07/2022) |
| 03/10/2022 | 66 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Pending Amended Motion to Strike the Complaint in Superior Court* (Clark, Gordon) (Entered: 03/10/2022) |
| 03/11/2022 | 67 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Revised Grievance Complaints Against 5 Attorneys of Bendett & McHugh, P.C.* (Clark, Gordon) (Entered: 03/11/2022) |
| 03/15/2022 | 69 | ORAL MOTION for Extension of Time to Respond to 57 First MOTION to Dismiss *Complaint*, 49 MOTION to Dismiss , 59 MOTION to Dismiss by Gordon Clark, Estate of Lillian J. Clark. (Bozek, M.) (Entered: 03/18/2022) |
| 03/15/2022 | 70 | Consent ORAL MOTION to Stay Discovery by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell, Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes.Responses due by 4/5/2022. (Bozek, M.) (Entered: 03/18/2022) |
| 03/15/2022 | 71 | Minute Entry. Proceedings held before Judge Sarala V. Nagala: granting 69 Oral Motion for Extension of Time to Respond to 57 First MOTION to Dismiss Complaint, 49 MOTION to Dismiss, 59 MOTION to Dismiss; granting 70 Consent Oral Motion to Stay Discovery; Motion Hearing held on 3/15/2022 re 69 ORAL MOTION for Extension of Time to Respond to 57 First MOTION to Dismiss Complaint, 49 MOTION to Dismiss, 59 MOTION to Dismiss filed by Gordon Clark, Estate of Lillian J. Clark, 70 Consent ORAL MOTION to Stay Discovery filed by John Doe, Pierre Habis, Wells Fargo & Company, Jeffrey M. Knickerbocker, Santander Bank, N.A., Jane Doe, Dominick D. Neveux, Joseph Abraham, Adam L. Bendett, Kenneth O'Neill, Scott Powell, Bendett & McHugh, PC, Mark A. Piech, Timothy Wennes; Rule 16 Conference held on 3/15/2022. 27 minutes (Court Reporter: Melissa Cianciullo.) (Bozek, M.) (Entered: 03/18/2022) |

| 03/16/2022 | 68 | ORDER. As discussed at the Rule 16 conference, Plaintiffs shall file an amended complaint no later than **April 5, 2022**. Upon the filing of Plaintiffs' amended complaint, Defendants' answer or other responsive motions shall be due as provided in the Federal and Local Rules of Civil Procedure. Additionally, on consent of all parties, all discovery in this case, including the requirement to file a Rule 26(f) report, shall be stayed pending resolution of any future motions to dismiss the complaint filed by Defendants. Signed by Judge Sarala V. Nagala on 3/16/22. (Marks, Joshua) (Entered: 03/16/2022) |
| --- | --- | --- |
| 03/16/2022 | | Set Deadline per 68 Order: Amended Pleadings due by 4/5/2022. (Bozek, M.) (Entered: 03/17/2022) |
| 04/05/2022 | 72 | AMENDED COMPLAINT against All Defendants, filed by Estate of Lillian J. Clark, Gordon Clark.(Clark, Gordon) (Entered: 04/05/2022) |
| 04/08/2022 | 73 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Notice of Assignment of Grievance Complaints Against 5 Attorneys* (Clark, Gordon) (Entered: 04/08/2022) |
| 04/08/2022 | 74 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Motion for Reconsideration−Reargument with the Superior Court* (Clark, Gordon) (Entered: 04/08/2022) |
| 04/12/2022 | 75 | ORDER. As discussed during the hearing on March 15, 2022, Plaintiff need not file with this Court notices concerning his filings in other fora, including in the state court or with the Statewide Bar Grievance Committee, as those tribunals are distinct from this Court. Signed by Judge Sarala V. Nagala on 4/12/22. (Marks, Joshua) (Entered: 04/12/2022) |
| 04/14/2022 | 76 | NOTICE by Gordon Clark, Estate of Lillian J. Clark re 75 Order, *of Plaintiffs' Understanding of Judicial Notice Filings* (Clark, Gordon) (Entered: 04/14/2022) |
| 04/14/2022 | 77 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *of Plaintiffs' Superior Court Filing of Objection to Summary Judgment* (Clark, Gordon) (Entered: 04/14/2022) |
| 04/14/2022 | 78 | MOTION for Admonishment of Bendett & McHugh, P.C. Defendants Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 04/14/2022) |
| 04/14/2022 | 79 | MOTION to Vacate *Stay of Discovery* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 04/14/2022) |
| 04/15/2022 | 80 | ORDER denying Plaintiffs' Motion for Admonishment (ECF No. 78 ). Under Federal Rule of Civil Procedure 11(c)(2), if Defendants are contemplating filing a motion for sanctions, they are required to provide notice to Plaintiffs, offer Plaintiffs the opportunity to correct what Defendants believe to be wrongful conduct, and provide a copy of the proposed motion to Plaintiffs in advance of filing. The conduct outlined by Plaintiffs in their motion appears to be no more than that required under Rule 11. If Defendants elect to file the motion, Plaintiffs will have the opportunity to file an opposition at that time. Signed by Judge Sarala V. Nagala on 4/15/22. (Marks, Joshua) (Entered: 04/15/2022) |
| 04/15/2022 | 81 | ORDER. The Court clarifies its previous orders to Plaintiffs concerning filings from other tribunals. Specifically, Mr. Clark may file any orders or decisions issued by the state court or Statewide Bar Grievance Committee if they bear on issues in the present case. Mr. Clark shall not file in this Court either his filings or the filings of any other parties made in other fora, as the Court can access those filings through public sources. If the Court is unable to access these filings from public sources and they are deemed necessary to issues in the present case, the Court will request such records from the appropriate party or parties. Signed by Judge Sarala V. Nagala on 4/15/22. (Marks, Joshua) (Entered: 04/15/2022) |
| 04/19/2022 | 82 | Amended MOTION to Dismiss *Amended Complaint* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech.Responses due by 5/10/2022 (Attachments: # 1 Memorandum in Support Motion to Dismiss Amended Complaint, # 2 Exhibit A − State Foreclosure Docket, # 3 Exhibit B − Mortgage Deed, # 4 Exhibit C − Admission that Federal Case related to State Case)(Knickerbocker, Jeffrey) (Entered: 04/19/2022) |
| 04/19/2022 | 83 | MOTION to Dismiss *Plaintiff's First Amended Complaint* by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes.Responses due by 5/10/2022 (Tracey, Patrick) (Entered: 04/19/2022) |
| 04/19/2022 | 84 | Memorandum in Support re 83 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 04/19/2022) |

| 04/19/2022 | 85 | NOTICE by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes *to Self−Represented Litigant Concerning Motion to Dismiss* (Tracey, Patrick) (Entered: 04/19/2022) |
| --- | --- | --- |
| 04/19/2022 | 86 | Amended NOTICE by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech re 82 Amended MOTION to Dismiss *Amended Complaint to self represented Plaintiff* (Knickerbocker, Jeffrey) (Entered: 04/19/2022) |
| 04/19/2022 | 87 | MOTION to Dismiss by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company.Responses due by 5/10/2022 (Higgins, Sean) (Entered: 04/19/2022) |
| 04/19/2022 | 88 | Memorandum in Support re 87 MOTION to Dismiss filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 04/19/2022) |
| 04/19/2022 | 89 | NOTICE by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company *to Self−Represented Litigants Regarding Motions to Dismiss as required by Local Rule 12* (Higgins, Sean) (Entered: 04/19/2022) |
| 05/03/2022 | 90 | First MOTION for Sanctions *Pursuant to Rule 11 For Plaintiff's Refusal to Follow Court Orders* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech.Responses due by 5/24/2022 (Knickerbocker, Jeffrey) (Entered: 05/03/2022) |
| 05/04/2022 | 91 | ORDER finding as moot ECF Nos. 49 , 57 , and 59 in light of the filing of the Amended Complaint (ECF No. 72 ) and the subsequent renewed motions to dismiss (ECF Nos. 82 , 83 , and 87 ). Signed by Judge Sarala V. Nagala on 5/4/22. (Marks, Joshua) (Entered: 05/04/2022) |
| 05/05/2022 | 92 | Joint Memorandum in Opposition *to Plaintiffs' Motion* re 79 MOTION to Vacate *Stay of Discovery* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Tracey, Patrick) (Entered: 05/05/2022) |
| 05/09/2022 | 93 | Emergency MOTION for Extension of Time to File Response/Reply *Objections to Three Motions to Dismiss* as to 87 MOTION to Dismiss , 82 Amended MOTION to Dismiss *Amended Complaint*, 83 MOTION to Dismiss *Plaintiff's First Amended Complaint* until May 31, 2022 by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/09/2022) |
| 05/10/2022 | 94 | ORDER granting Plaintiffs' Motion for Extension of Time (ECF No. 93 ). Any oppositions to Defendants' Motions to Dismiss (ECF Nos. 82 , 83 , and 87 ) are due no later than **May 31, 2022**.<br><br>The parties are reminded, however, that under District of Connecticut Local Rule 7(b) "all motions for extension of time shall be filed at least three (3) business days before the deadline sought to be extended." All future motions for extension of time in this matter shall be made in accordance with the Local Rules. Signed by Judge Sarala V. Nagala on 5/10/22. (Marks, Joshua) (Entered: 05/10/2022) |
| 05/10/2022 | 95 | OBJECTION re 93 Emergency MOTION for Extension of Time to File Response/Reply *Objections to Three Motions to Dismiss* as to 87 MOTION to Dismiss , 82 Amended MOTION to Dismiss *Amended Complaint*, 83 MOTION to Dismiss *Plaintiff&#0 filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A.. (Tracey, Patrick) (Entered: 05/10/2022)* |
| 05/10/2022 | | Set Deadline as to 83 MOTION to Dismiss *Plaintiff's First Amended Complaint*, 82 Amended MOTION to Dismiss *Amended Complaint*, 87 MOTION to Dismiss . Response due by 5/31/2022. See 94 Order. (Bozek, M.) (Entered: 05/11/2022) |
| 05/12/2022 | 96 | Emergency MOTION for Cease and Desist Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/12/2022) |
| 05/12/2022 | 97 | First MOTION for Sanctions by Gordon Clark, Estate of Lillian J. Clark.Responses due by 6/2/2022 (Clark, Gordon) (Entered: 05/12/2022) |
| 05/12/2022 | 98 | MOTION for Subpoena and Expedited Hearing Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/12/2022) |

| 05/17/2022 | 99 | Joint MOTION Rule 16 Conference and Expedited Consideration by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes.Responses due by 6/7/2022 (Tracey, Patrick) (Entered: 05/17/2022) |
|---|---|---|
| 05/18/2022 | 100 | ORDER denying Defendants' Request for a Rule 16 Status Conference. The Court has received each of the motions filed by the Plaintiffs and the Defendants in this action. Many of these motions have opposition deadlines that have not yet passed. The Court will review and render its decision on each of these motions, including the two pending motions for sanctions, in due course. As such, the Court does not believe that it will be a productive use of the Court's or the parties' time to hold another Rule 16 Conference at this time. Signed by Judge Sarala V. Nagala on 5/18/22. (Marks, Joshua) (Entered: 05/18/2022) |
| 05/19/2022 | 101 | REPLY to Response to 79 MOTION to Vacate *Stay of Discovery* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/19/2022) |
| 05/24/2022 | 102 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Grievance Complaints, Superior Court Order, etc.* (Clark, Gordon) (Entered: 05/24/2022) |
| 05/24/2022 | 103 | Memorandum in Opposition *to Bendett & McHugh Defendants' Motion for Sanction* re 90 First MOTION for Sanctions *Pursuant to Rule 11 For Plaintiff's Refusal to Follow Court Orders* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/24/2022) |
| 05/31/2022 | 104 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Notice of Appointment, Replies to Statewide Bar, Motions & Depositions* (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 105 | Memorandum in Opposition *to Santander Bank N.A. Defendants' Motion to Dismiss* re 83 MOTION to Dismiss *Plaintiff's First Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 106 | Memorandum in Opposition *to Bendett & McHugh Defendants' Motion to Dismiss* re 82 Amended MOTION to Dismiss *Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 107 | Memorandum in Opposition *to Wells Fargo Defendants' Motion to Dismiss* re 87 MOTION to Dismiss filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 05/31/2022) |
| 05/31/2022 | 108 | MOTION to Amend/Correct *Complaint* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 6/21/2022 (Attachments: # 1 Second Amended Complaint)(Clark, Gordon) (Entered: 05/31/2022) |
| 06/01/2022 | 109 | ORDER. In light of the recent activity in this action, the Court will hold a Zoom status conference on **Friday June 3, 2022, at 11:00 am**. At this conference the parties should be prepared to discuss Plaintiffs' motion to vacate the stay of discovery (ECF No. 79 ). Signed by Judge Sarala V. Nagala on 6/1/22. (Marks, Joshua) (Entered: 06/01/2022) |
| 06/01/2022 | 110 | Emergency MOTION for Hearing re 109 Order, *Request to Reschedule Zoom Status Conference* by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 06/01/2022) |
| 06/01/2022 | 111 | ORDER granting Defendants' Emergency Motion to Re−schedule Status Conference (ECF No. 110 ). The status conference previously scheduled for June 3, 2022, is reschedule to **Monday June 6, 2022, at 2:00 pm**. Signed by Judge Sarala V. Nagala on 6/1/22. (Marks, Joshua) (Entered: 06/01/2022) |
| 06/02/2022 | 112 | NOTICE OF E−FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 6/6/2022 at 02:00 PM via Zoom before Judge Sarala V. Nagala. (Bozek, M.) (Entered: 06/02/2022) |

| 06/02/2022 | | NOTICE regarding hearing via Zoom: The status conference scheduled for 6/6/2022 at 2:00 PM will be conducted via Zoom. The video link is https://www.zoomgov.com/j/1607492267?pwd=bmFnWmZtbk1FZEhmTVZIS3lueE1NUT09 and call in numbers are 1–669–254–5252 US (San Jose) or 1–646–828–7666 US (New York).<br><br>Meeting ID: 160 749 2267<br><br>Meeting Password: 536968<br><br>Please note: Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, screenshots, streaming, and rebroadcasting in any form, of court proceedings. The Judicial Conference of the United States, which governs the practices of the federal courts, has prohibited it. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the court. (Bozek, M.) (Entered: 06/02/2022) |
| 06/02/2022 | 113 | Memorandum in Opposition *to Plaintiffs' Motion* re 97 First MOTION for Sanctions filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/02/2022) |
| 06/02/2022 | 114 | Memorandum in Opposition *to Plaintiffs' Motion* re 98 MOTION for Subpoena and Expedited Hearing Order filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/02/2022) |
| 06/02/2022 | 115 | Memorandum in Opposition *to Plaintiffs' Motion* re 96 Emergency MOTION for Cease and Desist Order filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/02/2022) |
| 06/06/2022 | 116 | ORDER. On the status conference that took place on June 6, the Court instructed Defendants to order and file a copy of the transcript of the proceedings. The Court believes it is more appropriate for **all** parties to split the cost of the transcript. Thus, Plaintiffs and Defendants are instructed to split the cost of ordering the transcript of the status conference. Signed by Judge Sarala V. Nagala on 6/6/22. (Marks, Joshua) (Entered: 06/06/2022) |
| 06/06/2022 | 117 | Minute Entry. Proceedings held before Judge Sarala V. Nagala: denying 79 Motion to Vacate Stay of Discovery, denying 90 Motion for Sanctions, denying 96 Motion for Cease and Desist Order, denying 97 Motion for Sanctions, denying 98 Motion for Subpoena and Expedited hearing Order, taking under advisement 108 Motion to Amend/Correct Complaint; Status Conference held on 6/6/2022; Motion Hearing held on 6/6/2022 re 79 MOTION to Vacate *Stay of Discovery* filed by Gordon Clark, Estate of Lillian J. Clark, 90 First MOTION for Sanctions *Pursuant to Rule 11 For Plaintiff's Refusal to Follow Court Orders* filed by Jeffrey M. Knickerbocker, Bendett & McHugh, PC, Dominick D. Neveux, Mark A. Piech, Joseph Abraham, Adam L. Bendett, 96 Emergency MOTION for Cease and Desist Order filed by Gordon Clark, Estate of Lillian J. Clark, 97 First MOTION for Sanctions filed by Gordon Clark, Estate of Lillian J. Clark, 98 MOTION for Subpoena and Expedited Hearing Order filed by Gordon Clark, Estate of Lillian J. Clark, and 108 MOTION to Amend/Correct *Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. 49 minutes (Court Reporter: Melissa Cianciullo.) (Bozek, M.) (Entered: 06/10/2022) |
| 06/13/2022 | 118 | ORDER. In this action, Plaintiff Gordon Clark represents himself *pro se* and purports to represent Plaintiff Estate of Lillian J. Clark. In *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997), the U.S. Court of Appeals for the Second Circuit held that "an administratrix or executrix of an estate may not proceed pro se when the estate has beneficiaries or creditors other than the litigant." The Court requested and obtained the Petition/Administration or Probate of Will for the Estate of Lillian J. Clark filed on July 19, 2021, in North Central Connecticut Probate Court. It appears to list a number of heirs and beneficiaries of the estate besides Plaintiff Gordon Clark. In light of this information, the Court must consider whether the Estate of Lillian J. Clark may continue to proceed *pro se* in this matter. *See Guest v. Hansen*, 603 F.3d 15, 20 (2d Cir. 2010) (noting that the Court must consider "whether all parties before the court are properly represented even in cases where the parties themselves do not raise the issue").<br><br>To that end, by **June 27, 2022**, Plaintiffs shall submit a brief no longer than 8 pages in length addressing their position on whether the Estate of Lillian J. Clark can continue to proceed *pro* |

| | | |
|---|---|---|
| | | *se* in this action. By **July 12, 2022**, Defendants shall submit any responses to Plaintiff's submission. Any brief submitted by a Defendant shall be no longer than 8 pages in length.Signed by Judge Sarala V. Nagala on 6/13/22. (Marks, Joshua) (Entered: 06/13/2022) |
| 06/14/2022 | 119 | REPLY to Response to 87 MOTION to Dismiss filed by Scott Powell(as former CEO of Santander), Wells Fargo & Company. (Higgins, Sean) (Entered: 06/14/2022) |
| 06/15/2022 | 120 | Memorandum in Opposition *to Plaintiff's Motion to File Amended Complaint* re 108 MOTION to Amend/Correct *Complaint* filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 06/15/2022) |
| 06/21/2022 | 121 | ORDER. On June 6, 2022, in ECF No. 116, the Court ordered that Plaintiffs and Defendants split the cost of ordering the transcript of the status conference that took place that day. To clarify, the Court orders that Plaintiffs collectively pay 50%, and Defendants collectively pay 50%, of the cost of the transcript.<br>Signed by Judge Sarala V. Nagala on 6/21/2022.(Bozek, M.) (Entered: 06/21/2022) |
| 06/21/2022 | 122 | First MOTION to Seal Entries Indicated in Motion by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 06/21/2022) |
| 06/24/2022 | 123 | ORDER. The Court has reviewed the Motion to Seal (ECF No. 122 ) and it appears that appended to the Motion to Seal is a "Memorandum of Law in Support of Defendant's Motion To Dismiss" which differs in certain respects from the memorandum of law the Bendett & McHugh Defendants filed in support of their pending motion to dismiss. (ECF No. [82−1]). No later than **June 27, 2022**, the Bendett & McHugh Defendants shall file a notice on the docket detailing why they attached a memorandum in support of their motion to dismiss to their motion to seal and what effect they believe this filing should have on the currently pending motion to dismiss. Signed by Judge Sarala V. Nagala on 6/24/22. (Marks, Joshua) (Entered: 06/24/2022) |
| 06/27/2022 | 124 | Amended MOTION to Seal *CORRECTED TO REMOVE EXTRANEOUS PAGES* ITEMS INDICATED IN MOTION by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 06/27/2022) |
| 06/27/2022 | 125 | RESPONSE re 118 Order,,,,,, *Plaintiffs' Brief in Support of Estate Appearing Pro Se* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 06/27/2022) |
| 06/28/2022 | 126 | ORDER finding as moot Motion to Seal (ECF No. 122 ) in light of the filing of the Bendett & McHugh Defendants' Amended Motion to Seal. (ECF No. 124 ) Signed by Judge Sarala V. Nagala on 6/28/22. (Marks, Joshua) (Entered: 06/28/2022) |
| 06/28/2022 | 127 | ORDER denying Motion to Seal. The motion to seal requests that the Court seal, in their entirety, fourteen separate docket entries. The motion fails, however, to provide any particularized support "demonstrating that sealing is supported by clear and compelling reasons and is narrowly tailored to serve those reasons." D. Conn. L. Civ. R. 5(e)3. Thus, the Court is without an adequate basis on which to grant the motion.<br><br>This motion is denied without prejudice to Defendants renewing the motion, with a properly supported motion, providing reasons why the docket entries in question should be sealed, as well as a showing that the requested relief is narrowly tailored to serve those reasons. If it is not necessary to seal an entire docket entry, Defendant shall submitted proposed redacted versions of the documents, leaving unredacted any information that does not need to be sealed. Signed by Judge Sarala V. Nagala on 6/28/22. (Marks, Joshua) (Entered: 06/28/2022) |
| 06/29/2022 | 128 | REPLY to Response to 108 MOTION to Amend/Correct *Complaint Reply to Santander Bank Defendants' Objection to Motion to File Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 06/29/2022) |
| 07/12/2022 | 129 | RESPONSE re 125 Response *to Plaintiffs' Brief in Support of Estate Appearing Pro Se* filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 07/12/2022) |
| 07/12/2022 | 130 | RESPONSE re 125 Response *TO PLAINTIFFS BRIEF IN SUPPORT OF THE ESTATE OF LILLIAN J. CLARK APPEARING PRO SE* filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 07/12/2022) |

| 07/12/2022 | <u>131</u> | First RESPONSE re 118 Order,,,,,, <u>125</u> Response filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 07/12/2022) |
|---|---|---|
| 07/12/2022 | <u>132</u> | First RESPONSE re 118 Order,,,,,, <u>125</u> Response *(Revised to fix title)* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech. (Knickerbocker, Jeffrey) (Entered: 07/12/2022) |
| 07/13/2022 | 133 | The Court has reviewed the parties' filings in response to its request for briefing on whether Mr. Clark may continue to represent the estate of Lillian Clark *pro se*. To appear in a matter *pro se* means to appear "for one's self"; thus, "a person may not appear on another person's behalf in the other's cause." *Iannaccone v. Law*, 142 F.3d 553, 558 (2d Cir. 1998). Therefore, the threshold question in determining whether a litigant may appear *pro se* is a determination "whether a given matter is plaintiff's own case or one that belongs to another." *Id.* In the context of an estate, a party seeking to proceed pro se must demonstrate: (1) he has been appointed administrator or executor of the estate; (2) he is the sole beneficiary of the estate; and (3) the estate has no other creditors. *Davis v. Yale New Haven Hosp.*, No. 3:16−CV−01578 (VLB), 2017 WL 6459499, at *4 (D. Conn. Dec. 11, 2017). Without such a showing, anyone attempting to proceed pro se on behalf of an estate would in reality be proceeding on behalf of another. *Id.* Simply put, the executor of an estate "may not proceed pro se when the estate has beneficiaries or creditors other than the litigant." *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).

In the present action, there can be no dispute that Mr. Clark is not the sole beneficiary of the estate. In his filing in support of proceeding *pro se*, Mr. Clark noted that there are several specific items totaling approximately $900 that have been left to persons other than Mr. Clark. ECF No. <u>125</u> 12. While it is true that $900 does not seem to be a particularly large amount, and likely constitutes but a small part of the estate, Mr. Clark has provided no case law, and the Court has been unable to locate any, supporting the proposition that the amount of money left to other beneficiaries is relevant to the inquiry. Rather, the rule announced in *Pridgen* is clear: unless the estate has *no* other beneficiaries, it cannot proceed pro se.

Mr. Clark also cannot proceed *pro se* on behalf of the estate, as the estate has creditors other than Mr. Clark. Nearly the entire litigation presently before this Court relates to Santander Bank's efforts to foreclose on Ms. Clark's former house. The house is the property of the estate and thus Santander is a creditor on the estate. Again, whether Mr. Clark believes Santander's claim to the house to be correct or incorrect appears to be of no relevance. The estate has "creditors other than the litigant," which prevents Mr. Clark from proceeding *pro se* on behalf of it. *Pridgen*, 113 F.3d at 393.

It is thus ORDERED that no later than **August 15, 2022**, Mr. Clark obtain representation to pursue any claims made on behalf of the estate. If an attorney for the estate has not entered an appearance on the docket by August 15, all claims brought on behalf of the estate will be dismissed. Signed by Judge Sarala V. Nagala on 7/13/22. (Marks, Joshua) (Entered: 07/13/2022) |
| 07/27/2022 | <u>134</u> | OBJECTION re 133 Order,,,,,,,,,,, *Plaintiffs' Objection to Court Order − Document 133* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 07/27/2022) |
| 07/27/2022 | <u>135</u> | MOTION for Reconsideration re 133 Order,,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 133* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 07/27/2022) |
| 07/29/2022 | 136 | ORDER. Defendants shall file any opposition to Plaintiff's motion for reconsideration, either jointly or separately, no later than **August 12, 2022**. Signed by Judge Sarala V. Nagala on 7/29/22. (Marks, Joshua) (Entered: 07/29/2022) |
| 07/29/2022 |  | Set Deadline as to <u>135</u> MOTION for Reconsideration re 133 Order, *Motion for Reconsideration−Reargument of Court Order − Document 133*. Responses due by 8/12/2022. See 136 order. (Bozek, M.) (Entered: 08/01/2022) |
| 08/12/2022 | <u>137</u> | Joint Memorandum in Opposition re <u>135</u> MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 133* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 08/12/2022) |

| 08/15/2022 | 138 | REPLY to Response to 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 133 Reply to Defendants' Joint Objection to Motion for Reconsideration* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 08/15/2022) |
|---|---|---|
| 08/15/2022 | 139 | Emergency MOTION to Stay re 133 Order,,,,,,,,,,, 134 Objection, 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 133*, 138 Reply to Response to Motion, *Emergency Motion to Stay USDC Proceeding Pending Superior Court Ruling* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 9/5/2022 (Clark, Gordon) (Entered: 08/15/2022) |
| 08/19/2022 | 140 | Joint Memorandum in Opposition re 139 Emergency MOTION to Stay re 133 Order,,,,,,,,,,, 134 Objection, 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 133*, 138 Reply to Response to Motion, filed by Jane Doe, John Doe, Pierre Habis, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 08/19/2022) |
| 08/23/2022 | 141 | TRANSCRIPT of Proceedings: Type of Hearing: Status Conference. Held on 6/6/2022 before Judge Sarala V. Nagala. Court Reporter: Melissa J. Cianciullo. **IMPORTANT NOTICE − REDACTION OF TRANSCRIPTS:** To remove personal identifier information from the transcript, a party must electronically file a Notice of Intent to Request Redaction with the Clerk's Office within seven (7) calendar days of this date. If no such Notice is filed, the court will assume redaction of personal identifiers is not necessary and the transcript will be made available through PACER without redaction 90 days from today's date. The transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. The policy governing the redaction of personal information is located on the court website at www.ctd.uscourts.gov. Redaction Request due 9/13/2022. Redacted Transcript Deadline set for 9/23/2022. Release of Transcript Restriction set for 11/21/2022. (Cianciullo, Melissa) (Entered: 08/23/2022) |
| 08/26/2022 | 142 | REPLY to Response to 139 Emergency MOTION to Stay re 133 Order,,,,,,,,,,, 134 Objection, 135 MOTION for Reconsideration re 133 Order,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 133*, 138 Reply to Response to Motion, *Reply to Defendants' Joint Objection to Motion to Stay 140* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 08/26/2022) |
| 08/29/2022 | 143 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Settlement Negotiations* (Clark, Gordon) (Entered: 08/29/2022) |
| 08/29/2022 | 144 | ORDER. Based on Plaintiff's recent filing discussing settlement negotiations between Plaintiff and Defendant Santander Bank, the Court will refer this matter to a U.S. Magistrate Judge for purposes of a settlement conference. Signed by Judge Sarala V. Nagala on 8/29/22. (Marks, Joshua) (Entered: 08/29/2022) |
| 08/29/2022 | 145 | ORDER REFERRING CASE to Magistrate Judge Thomas O. Farrish to conduct a settlement conference. Signed by Judge Sarala V. Nagala on 8/29/2022.(Bozek, M.) (Entered: 08/29/2022) |
| 08/30/2022 | 146 | ORDER: Telephonic pre−settlement conference set for September 8, 2022 at 9:00 a.m. before Judge Thomas O. Farrish. Please call in to the Court's conference call line at 1−888−557−8511 and enter the pass code of 4478772# when prompted. A date for the settlement conference will be set during the telephone call. Because the parties will likely be ordered to attend the conference, either in−person or via videoconference, counsel are instructed to obtain their client's schedules over the next ninety days and have them available during the pre−conference. Counsel should also have their own calendars available to aid in scheduling. During the telephone call, counsel should be prepared to discuss what, if any, information needs to be exchanged and anything else that needs to be accomplished prior to the settlement conference to maximize its chances of success. If either counsel has a firm, unavoidable conflict at the appointed date and time, e.g., a previously−scheduled appearance in another court, s/he should not file a motion for continuance on the docket but rather should call Chambers at 860−240−3605 as soon as possible with opposing counsel on the line to work out an alternate day and time for the pre−conference with Judge Farrish's law clerk. Signed by Judge Thomas O. Farrish on 8/30/22.(Wood, R.) (Entered: 08/30/2022) |
| 08/30/2022 | 147 | STATUS REPORT by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth |

| | | O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 08/30/2022) |
|---|---|---|
| 09/01/2022 | 148 | AMENDED ORDER − The pre−settlement conference call has been rescheduled to September 9, 2022 at 1:30 p.m. with Judge Farrish, re 146 Order.<br>Signed by Judge Thomas O. Farrish on 9/1/22.(Wood, R.) (Entered: 09/01/2022) |
| 09/09/2022 | 149 | Minute Entry for proceedings held before Judge Thomas O. Farrish: Telephonic Pre−Settlement Conference held on 9/9/2022. Judge Farrish directed the plaintiff to submit an *ex parte* letter of no more than five pages, addressed to his chambers at 450 Main St., Hartford, CT, 06103. The letter should explain, in a civil and respectful tone, (1) the facts and law that cause the plaintiff to believe that he will prevail on his claims; (2) the plaintiff's assessment of each side's damage claims; and (3) what the plaintiff would be willing to accept by way of a settlement. Judge Farrish will review the letter and, if he concludes that a mediation would be productive, will contact the parties to discuss scheduling. Time 15 minutes (Wood, R.) Modified on 9/12/2022 to include Judge's Order (Wood, R.). (Entered: 09/12/2022) |
| 09/22/2022 | 150 | SETTLEMENT CONFERENCE ORDER. Judge Farrish will conduct a settlement conference over Zoom on Tuesday, October 25, 2022 at 1:00 p.m. The courtroom deputy will e−mail the connection information to Mr. Clark and to defendants' appearing counsel by Microsoft Outlook Calendar invitation. Any party wishing to submit a written mediation statement in advance of the conference may do so by 5:00 p.m. on October 18, 2022. Mediation statements are limited to ten double−spaced pages and may be submitted on an *ex parte* basis via e−mail to TOF_Settlement@ctd.uscourts.gov. It is so ordered.<br>Signed by Judge Thomas O. Farrish on 9/22/22.(Wood, R.) (Entered: 09/22/2022) |
| 09/28/2022 | 151 | AMENDED ORDER − The settlement conference on October 25, 2022 will start at 2:00 p.m. with Judge Farrish. Please note the new start time, re 150 Order.<br>Signed by Judge Thomas O. Farrish on 9/28/22.(Wood, R.) (Entered: 09/28/2022) |
| 10/17/2022 | 152 | Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 11/7/2022 (Attachments: # 1 Amended Second Amended Complaint)(Clark, Gordon) (Entered: 10/17/2022) |
| 10/17/2022 | 153 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice in Reference to Recent Filings & Settlement Conference* (Clark, Gordon) (Entered: 10/17/2022) |
| 10/18/2022 | 154 | ORDER granting 135 Motion for Reconsideration but denying the requested relief.<br><br>The standard for granting a motion for reconsideration is strict "and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked." *Shrader v. CSX Tansp., Inc.*, 70 F.3d 225, 257 (2d Cir. 1995); *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012) ("It is well settled that [a motion for reconsideration] is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a second bite at the apple." (citation and internal quotation marks omitted)). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992).<br><br>Here, Plaintiff contends that the Court failed to adequately consider that the only other beneficiary in Mrs. Clark's will, her twin sister, predeceased her, thus making Mr. Clark the sole beneficiary of the estate. ECF No. 135 at 4. Further, Mr. Clark contends that no one, including Santander Bank, filed a claim against the estate in probate court, and thus the estate has no creditors. *Id.* Therefore, Plaintiff asserts, as there are no other creditors or beneficiaries, he can represent the estate *pro se*. While Plaintiff should have raised these arguments during the initial briefing of this issue, the Court nonetheless believes these arguments warrant further consideration, especially in light of Plaintiff's *pro se* status, and thus grants Plaintiff's motion for reconsideration.<br><br>Upon reconsideration, however, the Court adheres to its previous decision. The definitions of "creditor" and "claim" as they relate to an estate are set forth in Connecticut General Statute § 45a−353(d) and (e). A "creditor" is defined as "any person having a claim." A "claim" is defined as "all claims against a decedent (1) existing at the time of the decedent's death or (2) |

arising after the decedent's death, including, but not limited to, claims which are mature, unmatured, liquidated, unliquidated, contingent, founded in tort, or in the nature of exoneration, specific performance or replevin."

Under these broad definitions, Santander is a creditor against the estate, as it had a claim against Mrs. Clark for a debt she allegedly owed Santander at the time of her death. *See Santander Bank, N.A. v. Clark et al*, No. HHD−CV19−6120472−S, Complaint. While Plaintiff presents arguments that Santander's claim may ultimately be unsuccessful because it never filed a claim against the estate in probate court, that does not change the fact that it is a creditor under Connecticuts expansive definition of the term, for purposes of whether Mr. Clark can represent the estate *pro se* in this action. This case cannot be described solely as Mr. Clark's own because "*possible* creditors... will be affected by the outcome of the proceedings." *Iannaccone v. Law*, 142 F.3d 553, 559 (2d Cir. 1998) (emphasis added). Santander is at least a "possible" creditor of the estate. Thus, the Court adheres to its earlier decision that Mr. Clark may not represent the estate *pro se*. *See Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997).

Thus, it is ORDERED that no later than **November 18, 2022** Mr. Clark obtain representation to pursue any claims made on behalf of the estate. If an attorney for the estate has not entered an appearance on the docket by November 18, all claims brought on behalf of the estate will be dismissed. Signed by Judge Sarala V. Nagala on 10/18/22. (Marks, Joshua) (Entered: 10/18/2022)

| | | |
|---|---|---|
| 10/18/2022 | 155 | ORDER denying as moot 139 Motion for Stay. Plaintiff requests that the Court stay this case pending a decision of the Superior Court of Hartford on a motion to dismiss filed in a related state court action. While Plaintiff has presented no legal basis supporting the argument that such a stay is warranted, the Court notes that on September 29, 2022, the Hartford Superior Court entered an order denying Plaintiff's motion to dismiss. *Santander Bank, N.A. v. Clark et al*, HHD−CV19−6120472−S, Entry No. 231. As a result, Plaintiff's motion for a stay is denied as moot. Signed by Judge Sarala V. Nagala on 10/18/22. (Marks, Joshua) (Entered: 10/18/2022) |
| 10/21/2022 | 156 | OBJECTION re 154 Order on Motion for Reconsideration,,,,,,,,,,,,,,, *Plaintiffs' Objection to Court Order − Document 154* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 10/21/2022) |
| 10/21/2022 | 157 | MOTION for Reconsideration re 154 Order on Motion for Reconsideration,,,,,,,,,,,,,, *Motion for Reconsideration−Reargument of Court Order − Document 154* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 10/21/2022) |
| 10/25/2022 | 158 | Minute Entry for proceedings held before Judge Thomas O. Farrish: Settlement Conference held on 10/25/2022. The case did not settle. Total Time: 1 hour and 9 minutes (Wood, R.) (Entered: 10/25/2022) |
| 10/28/2022 | 159 | ORDER denying Motion for Reconsideration. ECF No. 157 . As detailed in the Court's order on Mr. Clark's previous motion for reconsideration, the standard for granting such a motion is strict. The Court has now examined the question at issue twice and arrived at the same conclusion both times. Plaintiff's most recent memorandum does not point to a change in controlling law, new evidence not previously available, or a clear error that must be corrected to prevent manifest injustice. *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992). Instead, Plaintiff's motion for reconsideration largely restates the same arguments made in his first motion for reconsideration and alleges that the controlling Second Circuit precedents were decided incorrectly. Thus, Plaintiff's motion for reconsideration must be denied.<br><br>The Court further notes that while it appreciates Plaintiff's position on this issue, the issue has now been fully litigated and this case must progress forward. As such, absent a showing of a change in controlling authority, the Court will not entertain further motions for reconsideration on this issue. Signed by Judge Sarala V. Nagala on 10/28/22. (Marks, Joshua) (Entered: 10/28/2022) |
| 11/02/2022 | | Judge Thomas O. Farrish no longer assigned to case. Referral Completed. (Bozek, M.) (Entered: 11/02/2022) |
| 11/03/2022 | 161 | First MOTION for Extension of Time to File Response/Reply as to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File* |

| | | |
|---|---|---|
| | | *Second Amended Complaint* until November 21, 2022 by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 11/03/2022) |
| 11/04/2022 | 162 | OBJECTION re 161 First MOTION for Extension of Time to File Response/Reply as to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* until November 21, 2022 *Plaintiffs' Objection to Wells Fargo Defendants' Motion for Extension of Time* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/04/2022) |
| 11/04/2022 | 163 | ORDER granting Motion for Extension of Time. Wells Fargo and Scott Powell shall file their opposition to Plaintiff's Amended Motion to Amend no later than **November 21, 2022**. Signed by Judge Sarala V. Nagala on 11/4/22. (Marks, Joshua) (Entered: 11/04/2022) |
| 11/04/2022 | | Set Deadline as to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint.* Opposition due by 11/21/2022. (Bozek, M.) (Entered: 11/08/2022) |
| 11/07/2022 | 164 | Joint Memorandum in Opposition re 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 11/07/2022) |
| 11/09/2022 | 165 | ORDER. Judge Nagala's chambers has received an envelope from Plaintiff Marked "For Settlement Purposes Only Not For Docket." Given this marking on the envelope, the Court has not reviewed the letter. Settlement conferences are intentionally scheduled in front of Magistrate Judges to assure that the District Judge presiding over the case is considering only the evidence and other information properly put before the Court during the course of the litigation, and is not informed of the confidential discussions that take place during the settlement conference. For this reason, Judge Nagala will not be reviewing this letter from Plaintiff and advises the Plaintiff that, in the future, he should refrain from sending such information to Judge Nagala. Signed by Judge Sarala V. Nagala on 11/9/22. (Marks, Joshua) (Entered: 11/09/2022) |
| 11/10/2022 | 166 | Emergency MOTION for Settlement Conference With Different USDC Magistrate Judge Order by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/10/2022) |
| 11/11/2022 | 167 | Memorandum in Opposition re 166 Emergency MOTION for Settlement Conference With Different USDC Magistrate Judge Order filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 11/11/2022) |
| 11/14/2022 | 168 | REPLY to Response to 166 Emergency MOTION for Settlement Conference With Different USDC Magistrate Judge Order filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/14/2022) |
| 11/14/2022 | 169 | MOTION for Order to Show Cause *as to Why Attorney Sean R. Higgins Defamatory Conduct Should Not Be Subject to Sanctions* by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 11/14/2022) |
| 11/15/2022 | 170 | ORDER denying Plaintiffs' Emergency Motion for Settlement Conference with Different USDC Magistrate Judge. ECF No. 166 . The Court has received and reviewed Plaintiffs' request for a new settlement conference with a different Magistrate Judge. The Court notes that, in ECF No. 165, it made clear that it did not review the materials sent to chambers because it intentionally did not want to be informed about confidential settlement discussions. The order made clear that Plaintiff should refrain from sending such information to Judge Nagala in the future. Nonetheless, Plaintiff has now filed a motion discussing details of the settlement conference on the public docket, in direct contravention of the Court's desire to be insulated from settlement discussions. Although the Court grants Plaintiff latitude as a *pro se* litigant, **the Court will consider imposing sanctions on Plaintiff if he continues to disregard orders of the Court.**<br><br>Upon review of Plaintiff's submission, Plaintiff appears to complain largely about the process employed during settlement conferences in this district writ large. Since the pandemic began, all of the court's magistrate judges have regularly conducted settlement conferences via Zoom. Additionally, settlement conferences involve the magistrate judge speaking with each party individually in an attempt to arrive at settlement terms acceptable to all parties. Thus, as Plaintiff's complaints are primarily inherent in the process of a settlement conference and |

| | | |
|---|---|---|
| | | would occur with any magistrate judge, it does not appear that referral to a new magistrate judge would be an efficient use of the Court's resources. The motion for settlement conference with another magistrate judge is DENIED, without prejudice to renew at a later stage of the case should circumstances warrant it. Signed by Judge Sarala V. Nagala on 11/15/22. (Marks, Joshua) (Entered: 11/15/2022) |
| 11/15/2022 | 171 | ORDER denying Plaintiff's Motion for Order to Show Cause why Attorney Higgins Should not be Sanctioned. ECF No. 169 . In response to Plaintiff's motion for a settlement conference with a new magistrate judge, the Wells Fargo Defendants, through Attorney Higgins, filed a short opposition laying out their position as to why the Plaintiff's motion should be denied. In doing so, Attorney Higgins was advocating for his client and nothing more. Nothing in this opposition appears to the Court improper or otherwise out of line. Thus, Plaintiff's motion for an order to show cause is DENIED. Signed by Judge Sarala V. Nagala on 11/15/22. (Marks, Joshua) (Entered: 11/15/2022) |
| 11/17/2022 | 172 | NOTICE OF APPEAL as to 154 Order on Motion for Reconsideration, 159 Order on Motion for Reconsideration by Gordon Clark. Filing fee $ 505, Manual Receipt# 730539. (Mendez, D) (Entered: 11/17/2022) |
| 11/17/2022 | 173 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 172 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none (Mendez, D) (Entered: 11/17/2022) |
| 11/18/2022 | 174 | Emergency MOTION to Stay *USDC Proceedings Pending Appeal* by Gordon Clark, Estate of Lillian J. Clark.Responses due by 12/9/2022 (Clark, Gordon) (Entered: 11/18/2022) |
| 11/21/2022 | 175 | ORDER. Defendants shall file any opposition to Plaintiff's Motion to Stay no later than **December 9, 2022**. Signed by Judge Sarala V. Nagala on 11/21/22. (Marks, Joshua) (Entered: 11/21/2022) |
| 11/21/2022 | 176 | Memorandum in Opposition re 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint* filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 11/21/2022) |
| 11/21/2022 | | Set Deadline as to 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal*. Responses due by 12/9/2022. (Bozek, M.) (Entered: 11/22/2022) |
| 12/01/2022 | 177 | REPLY to Response to 152 Amended MOTION to Amend/Correct 108 MOTION to Amend/Correct *Complaint Amended Motion to File Second Amended Complaint Reply to Defendants' Oppositions to Amended Motion to File Second Amended Complaint* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 12/01/2022) |
| 12/09/2022 | 178 | Memorandum in Opposition re 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal* filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 12/09/2022) |
| 12/09/2022 | 179 | Joint Memorandum in Opposition re 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal* filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Santander Bank, N.A., Timothy Wennes. (Tracey, Patrick) (Entered: 12/09/2022) |
| 12/19/2022 | 180 | REPLY to Response to 174 Emergency MOTION to Stay *USDC Proceedings Pending Appeal* filed by Gordon Clark, Estate of Lillian J. Clark. (Clark, Gordon) (Entered: 12/19/2022) |
| 06/06/2023 | 181 | Third MOTION for Rule 16 Conference by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Attachments: # 1 Exhibit A – Memo of Decision in State Foreclosure Case)(Knickerbocker, Jeffrey) (Entered: 06/06/2023) |
| 06/07/2023 | 182 | ORDER granting 181 Motion for Rule 16 Conference. The Court will hold an in person status conference on **June 28, 2023, at 1:00 pm**. |

| | | |
|---|---|---|
| | | In advance of this conference and no later than **June 21, 2023**, all parties shall submit briefing on the issue of whether this Court retains jurisdiction to rule on the pending motions to dismiss and to amend the complaint in this action, in light of the pendency of Plaintiff's appeal at the Second Circuit and that court's denial of Wells Fargo's motion to dismiss. While the Court will not set a specific page limit for this briefing, the Court encourages brevity.<br><br>After reviewing the briefing filed on June 21, if any party wishes to file an opposition, such opposition shall be filed no later than **June 26, 2023**. Signed by Judge Sarala V. Nagala on 6/7/23. (Marks, Joshua) (Entered: 06/07/2023) |
| 06/09/2023 | 183 | NOTICE OF E−FILED CALENDAR: THIS IS THE ONLY NOTICE COUNSEL/THE PARTIES WILL RECEIVE.ALL PERSONS ENTERING THE COURTHOUSE MUST PRESENT PHOTO IDENTIFICATION. Status Conference set for 6/28/2023 at 01:00 PM in Courtroom One, 450 Main St., Hartford, CT before Judge Sarala V. Nagala. (Bozek, M.) Modified on 6/9/2023 to correct hearing type (Bozek, M.). (Entered: 06/09/2023) |
| 06/09/2023 | 184 | Docket Entry Correction re 183 Calendar Entry. Modified docket text to correct hearing type. Changed from show cause hearing to status conference. (Bozek, M.) (Entered: 06/09/2023) |
| 06/21/2023 | 185 | RESPONSE re 182 Order on Motion for Conference,,, filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 06/21/2023) |
| 06/21/2023 | 186 | RESPONSE re 182 Order on Motion for Conference,,, *Brief on Second Circuit Jurisdiction* filed by Gordon Clark, Estate of Lillian J. Clark. (Attachments: # 1 Exhibit Brief on Second Circuit Jurisdiction)(Clark, Gordon) (Entered: 06/21/2023) |
| 06/26/2023 | 187 | RESPONSE re 186 Response filed by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Pierre Habis, Jeffrey M. Knickerbocker, Dominick D. Neveux, Kenneth O'Neill, Mark A. Piech, Scott Powell(as COO of Wells Fargo), Scott Powell(as former CEO of Santander), Santander Bank, N.A., Wells Fargo & Company, Timothy Wennes. (Higgins, Sean) (Entered: 06/26/2023) |
| 06/26/2023 | 188 | RESPONSE re 185 Response, *Opposition to Defendants' Memorandum of Law* filed by Gordon Clark, Estate of Lillian J. Clark. (Attachments: # 1 Exhibit Opposition to Defendants' MOL)(Clark, Gordon) (Entered: 06/26/2023) |
| 06/28/2023 | 189 | Minute Entry for proceedings held before Judge Sarala V. Nagala held on 6/28/2023: Status Conference and Motion Hearing; d iscussed various motions which were all taken under advisement. Defense Counsel, Tracey, will file notice regarding additional authority by end of week. Time: 54 minutes.(Court Reporter Denae Hovland) (Velez, F.) (Entered: 06/28/2023) |
| 06/29/2023 | 190 | First NOTICE OF COMPLIANCE WITH PRETRIAL ORDER by Joseph Abraham, Adam L. Bendett, Bendett & McHugh, PC, Jeffrey M. Knickerbocker, Dominick D. Neveux, Mark A. Piech *FILED IN COMPLIANCE WITH ORDER TO SUPPLY AUTHORITIES* (Attachments: # 1 Exhibit A − Indicative ruling from different case)(Knickerbocker, Jeffrey) (Entered: 06/29/2023) |
| 07/26/2023 | 191 | ORDER. In light of Defendants' filing at ECF No. 181 informing the Court that the underlying foreclosure action in the Connecticut Superior Court has been resolved, no later than **August 16, 2023**, the parties shall submit briefing, not to exceed ten pages, discussing whether any of Plaintiff's pending and/or proposed claims are barred by the doctrines of collateral estoppel or res judicata.<br><br>Plaintiff may wish to contact the New Haven Legal Assistance Association's Federal Pro Se Program at nhlegal.org/federalprose to inquire whether it may be able to assist with this briefing. Plaintiff is informed that the Federal Pro Se Program is a limited−scope program that provides brief legal counseling, and that availability of such counseling is dependent upon the current resources of the Program. Signed by Judge Sarala V. Nagala on 7/26/23. (Marks, Joshua) (Entered: 07/26/2023) |
| 08/09/2023 | 192 | RESPONSE re 191 Order,,, filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 08/09/2023) |

| 08/10/2023 | 193 | Emergency MOTION to Stay re 191 Order,,, *Pro Se Plaintiff's Emergency Motion to Stay August 16, 2023 Brief Deadline* by Gordon Clark.Responses due by 8/31/2023 (Clark, Gordon) (Entered: 08/10/2023) |
| --- | --- | --- |
| 08/14/2023 | 194 | ORDER denying 193 Emergency Motion to Stay. The Court interprets Plaintiff as asking the Court to extend the August 16, 2023, briefing deadline regarding whether any of Plaintiff's pending and/or proposed claims are barred by the doctrines of collateral estoppel or res judicata. Plaintiff seeks an extension of this deadline until the resolution of his pending motion for reconsideration *en banc* with the Connecticut Appellate Court. The Court denies Plaintiff's motion, as he is free to address the impact, if any, of his motion for reconsideration *en banc* on whether the preclusion doctrines apply to bar his claims in the instant action. The briefing deadline shall remain **August 16, 2023**. Signed by Judge Sarala V. Nagala on 8/14/2023. (Parfenoff, Ivan) (Entered: 08/14/2023) |
| 08/16/2023 | 195 | RESPONSE re 191 Order,,, by Jane Doe, John Doe, Pierre Habis, Jeffrey M. Knickerbocker, Kenneth O'Neill, Santander Bank, N.A., Timothy Wennes. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Tracey, Patrick) (Entered: 08/16/2023) |
| 08/16/2023 | 196 | NOTICE by Gordon Clark *Judicial Notice of Pro Se Plaintiff's Chapter 13 Bankruptcy Filing* (Clark, Gordon) (Entered: 08/16/2023) |
| 08/16/2023 | 197 | RESPONSE re 191 Order,,, *Pro Se Plaintiff's Brief on Preclusion Doctrines* filed by Gordon Clark. (Clark, Gordon) (Entered: 08/16/2023) |
| 08/18/2023 | 198 | NOTICE by Gordon Clark *Judicial Notice of Pro Se Plaintiff's Adversary Proceeding Complaint Filing* (Attachments: # 1 Exhibit Adversary Proceeding Cover Sheet – Exhibit A, # 2 Exhibit Adversary Proceeding Complaint – Exhibit B)(Clark, Gordon) (Entered: 08/18/2023) |
| 08/23/2023 | 199 | RESPONSE re 196 Notice (Other) filed by Scott Powell(as COO of Wells Fargo), Wells Fargo & Company. (Higgins, Sean) (Entered: 08/23/2023) |
| 10/27/2023 | 200 | For the reasons described in the attached ruling, Defendants' motions to dismiss–—ECF Nos. 82, 83, and 87–—are GRANTED as to Plaintiff Clark. As an indicative ruling, the Court holds that it would also grant the motions to dismiss as to the Estate Plaintiff's claims. Plaintiff Clark's motion to stay these proceedings pending the appeal, ECF No. 174, is denied; to the extent necessary, as an indicative ruling, the Court holds that it would also deny the motion to stay proceedings as to the Estate Plaintiff. Finally, Plaintiff Clark's motions for leave to amend the complaint, ECF Nos. 108 and 152, are denied. As an indicative ruling, the Court holds that it would deny the pending motions for leave to amend as to the Estate Plaintiff as well.

Plaintiffs may file a Fourth Amended Complaint by **November 27, 2023**, consistent with this ruling. Signed by Judge Sarala V. Nagala on 10/27/2023. (Parfenoff, Ivan) Modified on 12/13/2023 to correct typo (Velez, Frances). (Entered: 10/27/2023) |
| 10/27/2023 | 201 | ORDER. Per the Court's ruling, ECF No. 200, Plaintiffs may file an amended complaint by **November 27, 2023**, without seeking leave of Court, but must consult with the Federal Pro Se Program to draft such an amended complaint. Signed by Judge Sarala V. Nagala on 10/27/2023. (Parfenoff, Ivan) (Entered: 10/27/2023) |
| 10/30/2023 | | Set deadline: amended complaint due by 11–27–2023 per 200 order. (Shafer, J.) (Entered: 10/30/2023) |
| 11/17/2023 | 202 | NOTICE by Gordon Clark, Estate of Lillian J. Clark *Judicial Notice of Petition & Writ of Mandamus Filed with Supreme Court of CT* (Attachments: # 1 Exhibit Judicial Notice of Petition & Writ of Mandamus Filed with Supreme Court of CT)(Clark, Gordon) (Entered: 11/17/2023) |
| 11/17/2023 | 203 | NOTICE OF APPEAL as to 200 Order on Motion to Dismiss, Order on Motion to Amend/Correct, Order on Motion to Stay, 201 Order, by Gordon Clark. Filing fee $ 505, receipt number 609488. (Mendez, D) (Entered: 11/17/2023) |
| 11/17/2023 | 204 | CLERK'S CERTIFICATE RE: INDEX AND RECORD ON APPEAL re: 203 Notice of Appeal. The attached docket sheet is hereby certified as the entire Index/Record on Appeal in this matter and electronically sent to the Court of Appeals, with the exception of any manually filed documents as noted below. Dinah Milton Kinney, Clerk. Documents manually filed not included in this transmission: none. (Mendez, D) (Entered: 11/17/2023) |

| 12/13/2023 | 205 | ORDER. On October 27, 2023, the Court granted Defendants' motions to dismiss, ECF Nos. 82, 83, and 87, and thereby dismissed Plaintiff Gordon Clark's claims against those Defendants, ECF No. 200. To the extent the Order was an indicative ruling in light of Plaintiffs' pending interlocutory appeal in the Second Circuit concerning Plaintiff Gordon Clark's ability to represent the Estate Plaintiff *pro se*, the Court explained that it would grant Defendants' motions to dismiss the Estate Plaintiff's claims if the Court of Appeals were to remand for that purpose.<br><br>Accordingly, insofar as the Court has dismissed Plaintiff Gordon Clark's claims, and Plaintiffs did not file a Fourth Amended Complaint by November 27, 2023, *see* ECF No. 200 at 47; ECF No. 201, the Order dismissing Plaintiff Gordon Clark's claims is final. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff Gordon Clark. The Court finds that there is no just reason for delay as to entering final judgment solely as to the claims brought by Plaintiff Gordon Clark alone. *See* Fed. R. Civ. P. 54(b). To the extent the Court's ruling is an indicative ruling as to the Estate Plaintiff's claims, the Court's decision is not final and no judgment shall enter as to the Estate Plaintiff's claims at this time. Signed by Judge Sarala V. Nagala on 12/13/2023. (Parfenoff, Ivan) (Entered: 12/13/2023) |
| 12/13/2023 | | Docket Entry Correction re 200 Order on Motion to Dismiss: Edited docket entry to reflect correct motions that were granted. (Velez, Frances) (Entered: 12/13/2023) |
| 12/15/2023 | 206 | PARTIAL JUDGMENT in favor of defendants against plaintiff Gordon Clark.<br>Appeal forms may be obtained at<br>http://www.ctd.uscourts.gov/forms/all−forms/appeals_forms.<br>Signed by Clerk on 12−15−2023. (Shafer, J.) (Entered: 12/15/2023) |
| 12/18/2023 | 207 | Amended NOTICE by Gordon Clark re 205 Order,,,,, 204 Clerk's Certificate re: Notice of Appeal, 206 Judgment, 203 Notice of Appeal *Notice of Amended Appeal to the U.S. Court of Appeals for the 2nd Circuit* (Clark, Gordon) (Entered: 12/18/2023) |

## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| GORDON CLARK, | ) | 3:22-CV-0039 (SVN) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| SANTANDER BANK N.A., *et al.*, | ) | |
| *Defendants*. | ) | October 27, 2023 |

## RULING AND ORDER ON PLAINTIFFS' MOTION FOR STAY PENDING APPEAL, DEFENDANTS' MOTIONS TO DISMISS, AND PLAINTIFFS' MOTIONS FOR LEAVE TO AMEND COMPLAINT

Sarala V. Nagala, United States District Judge.

In this action, *pro se* Plaintiff Gordon Clark and the estate of Lillian J. Clark, Gordon Clark's deceased wife, allege violations of several federal, state, and common law rights stemming from Defendants' alleged actions in connection with the repossession of the Clarks' home. In short, the Amended Complaint alleges that through a series of actions, Defendants Wells Fargo and Scott Powell ("the Wells Fargo Defendants"); Santander Bank, N.A., and Timothy Wennes, Pierre Habis, and Kenneth O'Neill ("the Santander Defendants"); and Bendett & McHugh P.C., along with Adam L. Bendett, Jeffrey M. Knickerbocker, Mark A. Piech, Joseph Abraham, and Dominick D. Neveux ("the Bendett Defendants"), worked collectively to unlawfully and fraudulently foreclose on the Clarks' home. Defendants have moved to dismiss the complaint in its entirety for various reasons. For the reasons detailed below, the Court agrees with Defendants that the Amended Complaint must be dismissed. Plaintiffs have also moved for leave to amend their complaint; as the Court finds that the proposed amendments, and any amendments related to the conduct Plaintiffs allege, would be futile, Plaintiffs' motions for leave to file the proposed Second Amended Complaint are denied, but the Court will allow Plaintiffs leave to file a proposed Third Amended Complaint consistent with this ruling.

## I.  FACTUAL BACKGROUND

The facts alleged in the Amended Complaint, ECF No. 72, are accepted as true for the purpose of the present motion to dismiss.[1]  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court may also consider the attachments to the complaint in deciding a motion to dismiss.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

Gordon and Lillian Clark[2] were married for twenty-seven years before she passed away in October of 2020.  Am. Compl., ECF No. 72 ¶ 1.[3]  Prior to her death, Lillian owned a home located at 70 Elm Street in Enfield, Connecticut.  *Id.*, Ex. F.  On March 21, 2008, Lillian obtained a home equity line of credit ("HELOC") secured by a mortgage on the property.  *Id.*  The loan is presently owned by Santander.  *See* Am. Compl. at 21 ¶ 4.  Plaintiffs contend that the mortgage was defective because it did not contain a property description, though it identified the property as 70 Elm Street. *Id.* ¶ 28(3); *id.*, Ex. F.  On February 12, 2012, Plaintiff Clark filed a notice of lien in the amount of $300,000 against the property.  Am. Compl., Ex. E.

On May 1, 2019, Santander Bank, N.A. sent a letter addressed to "Lillian Byron f/k/a Lillian Clark" stating that Santander had recently been notified by the Town of Enfield that Lillian was delinquent on property taxes, the payment of which was a term of Santander's HELOC loan. *Id.* ¶ 28(1); Am. Compl, Ex. C.  The letter stated that, if a lump sum payment of $37,575.86 was not paid by May 20, 2019, Santander would "exercise its rights to accelerate the amount secured by the collateral and institute a lawsuit to foreclose on the collateral."  *Id.*  According to Plaintiffs, however, the Clarks were current on their property taxes before this letter was sent.  *Id.* ¶ 28(2).

---

[1] The Amended Complaint contains many facts that are irrelevant to the instant action.  For purposes of simplicity, the Court recounts only those facts that may bear on the legal issues in the instant litigation.

[2] For ease of reference, the Court will refer to Gordon Clark as "Plaintiff," and will refer to Lillian Clark by her first name.  Where necessary, the Court will refer to Plaintiff Estate of Lillian J. Clark as the "Estate Plaintiff."

[3] The Amended Complaint has several sets of paragraphs with duplicative paragraph numbering.  For purposes of the factual background section, the Court's citations are to the numbered paragraphs contained in the Amended Complaint's Statement of Facts section, which begin at ECF No. 72, page 11.

Plaintiff repeatedly called, emailed, and mailed letters to Santander and its executives, including to Defendant Powell, who was at the time Santander's Chief Executive Officer and later became Wells Fargo's Chief Operating Officer, and the other individual Santander Defendants, demanding that the erroneous foreclosure letter be withdrawn, but Santander would not withdraw it. *Id.* at 22 ¶¶ 9–10; *id.* at 1–2 ¶ 1; *id.* at 3 ¶ 4; *id.* at 4 ¶ 10.

Instead, on November 22, 2019, Santander Bank, NA ("Santander") filed a complaint against Lillian in Connecticut Superior Court, seeking reformation of the mortgage issued on the home, as well as foreclosure of that mortgage. *Id.* ¶¶ 26–27. Because Plaintiff had a lien on the property, he was also named as a co-defendant in the foreclosure action. *See Santander Bank N.A. v. Lillian Clark, et al.*, Connecticut Superior Court, Housing Session, Case No. HHD-CV19-6120472-S. Plaintiffs contend that this action was filed despite Lillian never having missed a payment on the mortgage, *id.* ¶ 28(1), and despite that Santander did not have a valid interest in the property, *id.* ¶ 28(3). Plaintiff alleges he has a valid and secured first lien on the property ahead of Santander. *Id.* ¶ 28(4). Plaintiffs further allege that Defendant Bendett & McHugh, as well as several of its attorneys named in this lawsuit (Defendants Adam Bendett, Jeffrey Knickerbocker, Dominick Neveux, Joseph Abraham, and Mark Piech), knew that the foreclosure suit was meritless, yet proceed anyway. *Id.* ¶¶ 29–30, 38. Lillian bequeathed her home to Plaintiff when she passed away in October of 2020, during the pendency of the state foreclosure suit. *Id.* at 12 ¶ 8.

On May 2–4, 2023, the Superior Court for the Judicial District of Hartford has held a trial in the underlying foreclosure action and entered judgment in favor of Santander, ordering a foreclosure by sale. *See Santander Bank N.A. v. Lillian Clark, et al.*, HHD-CV-19-6120472S; ECF No. 195-3. The Connecticut Appellate Court has since affirmed this decision, dismissing the

appeal as "frivolous." *Santander Bank N.A. v. Lillian Clark, et al.*, Appeal No. AC-46473; ECF No. 195-4 at 2.

Separately, the Amended Complaint alleges that Plaintiff submitted complaints to banking regulators about Defendants Wells Fargo and Powell allegedly committing financial fraud, and then was subsequently denied the opportunity to open two business checking accounts with Wells Fargo for no legitimate reason. Am. Compl., Counts Sixteen, Seventeen, & Eighteen, ¶¶ 3–6. Plaintiff was later able to open the accounts at another bank. *Id.* ¶ 7.

Although the Amended Complaint spans forty-three pages, this is the sum total of the relevant facts. To the extent any further information in the Amended Complaint is relevant to the Court's decision, it will be discussed below. Based on these facts, Plaintiffs have brought the following claims against all Defendants except Wells Fargo and, in certain instances, except Defendant Powell: theft of real property by financial fraud (Count One); negligence (Count Two); abuse of process (Count Three); and "gross, malicious, intentional, negligent, incompetent, reprehensible, unconscionable, and repeated infliction of physical, mental, and emotional distress" (Count Seven). Plaintiffs have also brought the following claims against the Santander Defendants: financial fraud, under 18 U.S.C. § 1005 (Count Four); mortgage fraud, under 18 U.S.C. § 1005 (Count Five); mail fraud, under 18 U.S.C. § 1341 (Count Six); age discrimination, under the Fair Housing Act, 42 U.S.C. §§ 3601–3631 *et seq.* (Count Eight); race discrimination, under the Fair Housing Act (Count Nine); redlining, under the Fair Housing Act (Count Ten); breach of contracts (Count Eleven); breach of oral contracts (Count Twelve); assumption of duty (Count Thirteen); breach of the covenant of good faith and fair dealing (Count Fourteen); violation of the Fair Debt Collection Practices Act ("FDCPA") (Count Fifteen); and false advertising under the Lanham Act (Count Twenty-One). Plaintiffs allege the following claims against Powell and

Wells Fargo: financial fraud, under 18 U.S.C. § 1005 (Count Sixteen); mail fraud, under 18 U.S.C. § 1341 (Count Seventeen); and retaliation by financial fraud, under 18 U.S.C. § 1005 (Count Eighteen). Finally, Plaintiffs allege a financial fraud claim under 18 U.S.C. § 1005 against the Bendett & McHugh Defendants (Count Nineteen), and a conspiracy to commit financial fraud claim under 18 U.S.C. § 1005 against all Defendants (Count Twenty).

## II.    PROCEDURAL HISTORY

Plaintiffs initiated this action in January of 2022, and then moved to stay the action because Plaintiff Clark was also litigating two related matters in Connecticut state court. ECF No. 44. The Court denied the motion for a stay, and Plaintiffs filed the operative Amended Complaint in April of 2022. ECF No. 72. All Defendants moved to dismiss the Amended Complaint. *See* ECF No. 82 (Bendett & McHugh Defendants' motion to dismiss); ECF No. 83 (Santander Defendants' motion to dismiss); ECF No. 87 (Wells Fargo Defendants' motion to dismiss). In May of 2022, Plaintiffs moved for leave to file a Second Amended Complaint. ECF No. 108. These motions are addressed in this ruling.

Separately, the Court *sua sponte* raised a concern about whether Plaintiff Clark, as a *pro se* litigant, could represent the Estate of Lillian Clark in this action, and requested briefing from the parties on this issue. *See* ECF No. 118. The Court concluded, both initially and upon reconsideration, that Plaintiff Clark could not represent the Estate of Lillian Clark *pro se* because, although he is the executor of the estate, the estate has beneficiaries and creditors other than Plaintiff Clark, under the broad definition of the term "creditor" in Connecticut law. ECF Nos. 133, 154, 159. The Court therefore ordered Plaintiff Clark to obtain legal representation for the Estate Plaintiff by November 18, 2022, or the claims brought by the Estate Plaintiff would be dismissed. ECF No. 154. The day before the dismissal was to take effect, Plaintiff Clark filed an

interlocutory appeal of this issue, ECF No. 172, along with an "emergency" motion to stay the district court proceedings pending the outcome of the appeal, ECF No. 174. Given the filing of the interlocutory appeal, the Court did not formally dismiss the claims brought by the Estate Plaintiff. The motion to stay the district court proceedings remains pending.

The Court declines to stay its proceedings during the pendency of the appeal, and therefore denies Plaintiffs' motion to stay. "As a general matter, '[t]he filing of a notice of appeal is an event of jurisdictional significance—it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal.'" *United States v. Rogers*, 101 F.3d 247, 251 (2d Cir. 1996) (quoting *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982)) (alterations in original). In this case, Plaintiff has filed an interlocutory appeal as to whether he may represent Lillian's estate *pro se*. As to this issue, the Court has no jurisdiction. *See id.* ("A district court does not regain jurisdiction until the issuance of the mandate by the clerk of the court of appeals."). Because the Amended Complaint brings claims other than those brought on behalf of the estate, however, the Court retains jurisdiction to adjudicate those matters.

Thus, the Court must next consider whether stay the action, even as to claims brought on behalf of Plaintiff, while the appeal is pending. The Court must consider four factors in determining whether to stay a case pending appeal: "(1) likelihood of success in the appeal; (2) whether the requesting party would be irreparably injured without a stay; (3) whether a stay will substantially injure the other parties interested in the proceedings; and (4) the public interests at play." *Ferring B.V. v. Allergan, Inc.*, 343 F. Supp. 3d 284, 291 (S.D.N.Y. 2018). The first two factors "are the most salient concerns." *Sutherland v. Ernst & Young LLP*, 856 F. Supp. 2d 638, 640 (S.D.N.Y. 2012). Further, the factors are a "sliding scale" in which "the necessary level or

degree of possibility of success will vary according to the court's assessment of the other stay factors." *Thapa v. Gonzales*, 460 F.3d 323, 334 (2d Cir. 2006) (cleaned up). Finally, the moving party "bears the burden of proving that a stay should be granted, and stays pending an appeal are only granted in limited circumstances." *In re Taub*, 470 B.R. 273, 277 (E.D.N.Y. 2012).

The Court does not find that a stay is appropriate here. First, Plaintiffs have not demonstrated a likelihood of success on appeal. "The single most important factor is likelihood of success on the merits." *In re Baker*, No. 05-CV-3487 (CPS), 2005 WL 2105802, at *3 (E.D.N.Y. Aug. 31, 2005). In their reply brief in support of their motion to stay proceedings, Plaintiffs argue that the existence of the appeal proves its likelihood of success. ECF No. 180 at 5. However, as Defendants point out, there are open questions as to whether the Court's decision is final for purposes of appellate jurisdiction and, in any event, Second Circuit precedent appears to foreclose the merits of the issue. Wells Fargo Memo. in Opp. To Motion to Stay, ECF No. 178 at 4–6 (citing *Pridgen v. Andresen*, 113 F.3d 391, 393 (2d Cir. 1997)). For these reasons, Plaintiffs have not met their burden demonstrating a likelihood of success on appeal.

Second, Plaintiffs will not suffer irreparable injury without a stay. The issue on appeal is not case dispositive: Plaintiffs' remaining claims are distinct from those brought on behalf of the estate. This weighs in favor of denying Plaintiffs' motion to stay. *See Ferring B.V.*, 343 F. Supp. 3d at 291 (finding irreparable injury where pending appeal was dispositive).

Finally, while the "third and fourth factors are less critical than the first and second"—and Defendants make no arguments as to these factors—the Court will discuss both factors briefly. *Gabay v. Roadway Movers, Inc.*, No. 1:22-CV-6901 (JLR), 2023 WL 3569351, at *2 (S.D.N.Y. May 19, 2023) (citing *Meyer v. Valanick*, 203 F. Supp. 3d 393, 395 (S.D.N.Y. 2016)). Concerning the third factor, the Court notes that whether a stay injures Defendants "depends on how long it

takes the Court of Appeals to render a decision on [Plaintiff's] interlocutory appeal, which no one can predict." *Meyer*, 203 F. Supp. 3d at 396. The Court notes that appellees' brief was due in the Second Circuit on October 25, 2023, suggesting that the appeal is moving along. Still, when it will be fully resolved is unknown. Concerning the fourth factor, the Court finds that the public interest weighs against granting a stay because proceeding on Plaintiff Clark's non-appealed claims is an efficient use of judicial resources.

Thus, because the first two critical factors, and the fourth factor, weigh in favor of proceeding on the remaining claims, and because the third factor does not tip strongly in favor of either party, the Court denies Plaintiffs' motion to stay the proceedings.

As to how to proceed with the claims brought by the Estate Plaintiff, given that the issue of whether Plaintiff Clark may represent the estate of his late wife *pro se* is pending appeal, the Court proceeds with the ruling below as an indicative ruling under Federal Rule of Civil Procedure 62.1. Specifically, the Court notes that it would grant Defendants' motions to dismiss the Estate Plaintiff's claims and deny the Estate Plaintiff's motion for leave to amend, if the Court of Appeals remands for that purpose, for the reasons explained below.

As the Court has denied Plaintiffs' motion to stay these proceedings, it will move forward with consideration of Defendants' motions to dismiss and Plaintiffs' motion for leave to amend the complaint. In considering these motions, the Court is mindful of its duty to construe the pleadings of a *pro se* litigant liberally. *Sykes v. Bank of Am.,* 723 F.3d 399, 403 (2d Cir. 2013); *see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

## III.    SUBJECT MATTER JURISDICTION

The Court first addresses Defendants' arguments concerning its subject matter jurisdiction.

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by Constitution and statute." *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (cleaned up).  A federal court must dismiss an action whenever it determines that it lacks subject matter jurisdiction over the action, Fed. R. Civ. P. 12(h)(3).  Federal courts have original jurisdiction over civil actions arising under the Constitution, laws, and treaties of the United States, 28 U.S.C. § 1331, and diversity jurisdiction over all civil actions "where the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between... citizens of different States[,]" 28 U.S.C. § 1332(a).  Here, Plaintiffs are not diverse from many of the Defendants, as they are all alleged to be Connecticut citizens.  Therefore, the Court's subject matter jurisdiction must arise from a federal question.  If claims that fall under the Court's original jurisdiction are dismissed, the Court may decline to exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(c)(3).

Plaintiffs have alleged claims under various federal statutes:  18 U.S.C. §§ 1005 and 1341, the Fair Housing Act, the FDCPA, and the Lanham Act.  The Court therefore examines first whether Plaintiffs have alleged plausible claims under any of these statutes.  It concludes Plaintiffs have not.

### A.  Alleged Violations of Federal Criminal Statutes

First, Plaintiffs' causes of action brought under the federal criminal laws of the United States fail because these statutes do not create private rights of action.  Specifically, Plaintiffs assert claims for attempted theft by financial fraud in violation of 18 U.S.C. § 1005 (Count One), financial fraud in violation of 18 U.S.C. § 1005 (Counts Four, Sixteen, and Nineteen), mortgage

fraud in violation of 18 U.S.C. § 1005 (Count Five), mail fraud in violation of 18 U.S.C. § 1341 (Counts Six and Seventeen), retaliation by financial fraud in violation of 18 U.S.C. § 1005 (Count Eighteen), and conspiracy to commit financial fraud in violation of 18 U.S.C. § 1005 (Count Twenty).

It is well-established, however, that "federal criminal statutes do not provide private causes of action." *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009) (summary order); *Xu v. Neubauer*, 166 F. Supp. 3d 203, 207 (D. Conn. 2015) (same). Plaintiffs' claims for financial fraud, mail fraud, mortgage fraud, retaliation through financial fraud, and conspiracy to commit financial fraud pleaded under the federal criminal statutes must therefore fail, because the federal criminal statutes Plaintiffs cite do not provide private rights of action.

Moreover, even if such claims were cognizable under common law fraud theories, causes of action alleging fraudulent conduct are subject to Rule 9(b)'s heightened pleading standard, which requires that a party alleging fraud "state with particularity the circumstances constituting the fraud or mistake." The Second Circuit has noted that one of the goals of Rule 9(b)'s heightened pleading standard is to "provid[e] a defendant fair notice of plaintiff's claim, to enable preparation of defense." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987). Thus, when it comes fraud, "bare-bones allegations do not satisfy Rule 9(b)." *Lundy v. Cath. Health Sys. of Long Island Inc.*, 711 F.3d 106, 119 (2d Cir. 2013). To satisfy Rule 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 99 (2d Cir. 2023).

None of Plaintiffs' fraud claims meet this standard.  Specifically, Count One contains only conclusory allegations about alleged bad faith conduct by Santander and the Bendett Defendants. In Counts Four and Six, Plaintiffs allege only that Santander has "failed to validate the alleged debt and has continued to send monthly false and deceptive statements of account to the Plaintiffs." Am. Compl. Count Four ¶ 4, Count Six ¶ 4.  The Amended Complaint does not say how these actions or statements were fraudulent.  Conclusory allegations that the statements were false and fraudulent does not provide Defendants with sufficient notice to defend against the claim.

Count Five alleges that Santander is "knowingly attempting to foreclose on an admitted defective/invalid alleged mortgage that contains no valid legal property description and was not in default at the time." *Id.* Count Five ¶ 4.  It is unclear precisely what claim Plaintiffs assert through Count Five.  Connecticut law does not recognize a private cause of action for mortgage fraud. *See Edwards v. McMillen Cap., LLC*, No. CV155008533S, 2016 WL 7196319, at *1 (Conn. Super. Ct. Nov. 4, 2016).  Even were this not the case, Count Five fails to provide any information regarding what statements Plaintiffs believe were fraudulent, why they were untrue, and who said them.  The same is true for Counts Sixteen, Seventeen, Eighteen, and Nineteen, which relate to Wells Fargo's alleged failure to open business checking accounts for Plaintiff Clark after his complaints of fraud, and Count Twenty, which relates to an alleged conspiracy by all Defendants to commit financial fraud.

Because Plaintiffs cannot use criminal statutes to assert a private cause of action under federal law, and because Plaintiff Clark's fraud claims fail to meet the heightened pleading requirements of Rule 9(b), Counts One, Four, Five, Six, Sixteen, Seventeen, Eighteen, Nineteen,

and Twenty must be dismissed.  This is an indicative ruling with respect to the Estate Plaintiff's claims.

## B.  Alleged Violations of Fair Housing Act

Next, Plaintiffs allege violations of the Fair Housing Act, claiming that Santander Bank and its executives—Defendants Powell, Wennes, Habis, and O'Neill—committed age discrimination against Lillian by denying her requested increases of credit on her home equity line of credit and denying her a personal loan when she was 92 years old, Am. Compl. at 29 (Count Eight); committed race discrimination against Plaintiff Clark, who is of Asian descent, by providing him bad customer service at a bank branch in Enfield, Connecticut, including by not returning his phone calls until an African-American bank manager prompted a return phone call to him, *id.* at 30–32 (Count Nine); and committed "redlining" by denying Lillian the increases in her home equity line of credit and a personal loan, *id.* at 32–33 (Count Ten).

These claims, too, fail at the threshold.  First, as to the allegations that Lillian was denied increases in her home equity line of credit and was denied a personal loan, Plaintiff Clark has no standing to assert these claims on Lillian's behalf.  The doctrine of standing "limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016).  In that vein, federal court jurisdiction "can be invoked only when the plaintiff himself has suffered some threatened or actual injury resulting from the putatively illegal action."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (cleaned up).  Here, Plaintiff Clark cannot assert Lillian's claims for alleged age discrimination and redlining.

As an indicative ruling, the Court further notes that it would dismiss these claims if they are properly pursued by Plaintiff Clark in a *pro se* capacity representing the Estate Plaintiff, as

well.  For purposes of this indicative ruling, the Court assumes without deciding that the Estate

Plaintiff has standing to pursue the age discrimination and redlining claims on behalf of Lillian.

The Court treats the claims as brought under the Fair Housing Act, as that is how Plaintiffs have

labeled them, and under the Equal Credit Opportunity Act ("ECOA"), which prohibits

discrimination against any applicant for credit on the basis of, among other categories, age.  *See*

15 U.S.C. § 1691(a).  To state a claim for relief under Section 3605 of the Fair Housing Act, a

plaintiff must plead that she is (1) a member of a protected class; (2) she attempted to engage in a

"residential real estate-related transaction" and met all relevant qualifications for doing so; (3) that

the defendant refused to transact business with the applicant despite her qualifications; and (4) that

the defendant continued to engage in the type of transaction in question with other parties with

similar qualifications.  *Johnson v. Citibank*, 234 F.3d 1262, at *2 (2d Cir. 2000) (summary order).

A "residential real estate-related transaction" means, among other things, the "making or

purchasing of loans or providing other financial assistance . . . for purchasing, constructing,

improving, repairing, or maintaining a dwelling" or "secured by residential real estate."  42 U.S.C.

§ 3605(b)(1).  The ECOA provides that it is unlawful for "any creditor to discriminate against any

applicant, with respect to any aspect of a credit transaction . . . on the basis of race, color, religion,

national origin, sex or marital status, or age (provided the applicant has the capacity to contract)."

15 U.S.C. § 1691(a).

 Regardless of the labeling, in order to survive dismissal, the Amended Complaint must

"contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its

face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  However,

the Court is not "bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions," *id.*, and "a formulaic recitation of the elements of a cause of action will not do," *Iqbal*, 556 U.S. at 678. Consequently, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

Here, the Amended Complaint alleges in its age discrimination and redlining[4] counts only that Lillian, who was 92 years old, "had good credit," and had a home in a "working-class and blue-collar town," with "between $70,000 and $100,000 of additional home equity," yet Santander "repeatedly denied" her "an additional $10,000 increase on her HELOC, and also repeatedly denied her a $10,000 personal loan." Am. Compl., at 29, 32–33. The Amended Complaint lacks any details concerning Lillian's applications for these loans, including the dates when she applied for them and the reasons for the alleged denials. As for the Fair Housing Act claim, it also fails to allege that Santander continued to conduct business with younger people. Regarding the redlining claim, the allegations are vague and conclusory, and cannot support a plausible claim under either statute. *See Jackson v. Wells Fargo Home Mortg.*, No. 15-CV-5062 (PKC) (ST), 2018 WL 8369422, at *5 (E.D.N.Y. Aug. 10, 2018), *aff'd,* 811 Fed. Appx. 27 (2d Cir. 2020) (summary order) (holding that conclusory and speculative assertions that the plaintiff's membership in a protected class led to her being denied a loan and of "redlining" did not state a plausible claim). Moreover, the Amended Complaint lacks any allegations about specific actions taken by the individual Santander Defendants, Wennes, Habis, and O'Neill. Even drawing all inferences in favor of the Estate Plaintiff, the Court is unable to conclude that the sparse, conclusory allegations

---

[4] The Court construes the "redlining" as asserting that Lillian was not offered the loan increase or personal loan because of her property's location in a "working-class" and "blue-collar town," as the Amended Complaint asserts. The Court assumes, without deciding, that redlining can form the basis of a Fair Housing Act or ECOA violation. As described above, the redlining claim fails for other reasons.

in the Amended Complaint state a plausible claim of discrimination by Santander or the individual Santander Defendants under either the Fair Housing Act or the ECOA.

Finally, Plaintiff Clark has alleged that Santander committed race discrimination against him under the Fair Housing Act because he is Asian and was subject to poor customer service at his local Santander Bank branch because of his race.  *See* Am. Compl. Count Nine.  Specifically, Plaintiff Clark alleges that various bank managers refused to listen to him when he attempted to inform them that there was an issue with the property taxes on the home.  *Id.* Count Nine ¶ 7.  This meant that Plaintiff Clark repeatedly returned to the local bank branch to complain about the tax issue until an African-American bank manager finally offered to help him.  *Id.* ¶ 9.  After receiving help, Plaintiff was finally able to resolve the property tax issue.  *Id.* ¶ 11.

These allegations fail to state a claim under the Fair Housing Act or the ECOA.  First, there are no allegations suggesting that Plaintiff Clark was attempting to engage in a residential real estate transaction or a credit transaction.  Additionally, aside from Plaintiff Clark's allegation that he is Asian and that the bank manager who ultimately helped him is African-American, there are insufficient allegations from which the Court could plausibly infer that he received poor customer service—to the extent such treatment could form the basis of a cognizable discrimination claim—on account of his race.  Finally, Plaintiff does not allege that the individual Santander Defendants were in any way involved in the actions alleged to be discriminatory.  The Court cannot conclude that the allegations of the Amended Complaint state a plausible race discrimination claim under the Fair Housing Act or the ECOA.

For these reasons, Counts Eight, Nine, and Ten against the Santander Defendants under the Fair Housing Act (and the ECOA) must be dismissed.  This is an indicative ruling with respect to the Estate Plaintiff's claims.

C.  Alleged Violations of the Fair Debt Collection Practices Act

Plaintiffs also allege that the Santander Defendants and Bendett Defendants have attempted to collect purported debts from Plaintiff by sending false and deceptive account statements to Plaintiff on a monthly basis, as well as repeatedly calling Plaintiff despite being asked in writing to discontinue calling him.  Am. Compl. Count Fifteen ¶¶ 4–5.  As this count is alleged against both the Santander Defendants and the Bendett Defendants, the Court will take the allegations against each in turn.

*1.  Santander Defendants*

Plaintiffs allege that Santander violated the FDCPA by collecting a debt that Plaintiffs owed directly to it.  Plaintiffs have failed to state a plausible claim against the Santander Defendants under the FDCPA.

The FDCPA provides that a "debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt."  15 U.S.C § 1692e.  Crucially, under the FDCPA, a "debt collector" is defined as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted *to be owed or due another*."  15 U.S.C. § 1692a(6) (emphasis added).  A "creditor," by contrast, is fined as "any person who offers or extends credit creating a debt or to whom a debt is owed."  15 U.S.C. § 1692a(4).  According to the Amended Complaint, Santander attempted to collect a debt owed directly to it.  Therefore, Santander did not act as a debt collector under the FDCPA, and Plaintiffs' claims against Santander in Count Fifteen fail as a matter of law.  *See Maguire v. Citicorp Retail Servs., Inc.*, 147 F.3d 232, 235 (2d Cir. 1998) ("As a general matter, creditors are not subject to the FDCPA").  Plaintiffs also do not allege any facts suggesting that

the individual Santander Defendants were involved in the alleged FDCPA violation, so the claim against them must also fail.  This is an indicative ruling with respect to the Estate Plaintiff's claim.

### 2. *Bendett Defendants*

While the Amended Complaint is less clear as to how an FDCPA claim relates to the Bendett Defendants, it appears Plaintiffs claim that the Bendett Defendants violated the FDCPA by instituting litigation on Santander's behalf to foreclose on the Clarks' home, despite knowing that such an action was improper.  The Bendett Defendants argue that any such claim is untimely, and the Court agrees.

An FDCPA claim must be brought "within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).  When an FDCPA claim is based on the commencement of litigation to collect a debt, the violation occurs on the date when the purportedly improper lawsuit is filed.  *See Costello v. Wells Fargo Bank NA*, No. 3:21-CV-01388 (VAB), 2022 WL 1912870, at *11 (D. Conn. June 3, 2022); *Egbarin v. Lewis, Lewis & Ferraro LLC*, No. Civ.A. 3:00-CV-1043 (JCH), 2006 WL 236846, at *9 (D. Conn. Jan. 31, 2006) ("FDCPA claims based on the filling of a lawsuit generally accrue when a claim is filed, not when judgment is rendered").  Here, the Amended Complaint alleges the underlying foreclosure action was filed on November 22, 2019. Am. Compl. ¶ 26.  The instant action was not filed until January 10, 2022, more than two years later.  Thus, any claims against the Bendett Defendants under the FDCPA are time barred and must be dismissed. Moreover, even were the claim not time-barred, the Amended Complaint's allegations are vague and conclusory, asserting only that the account statements—which it is far from clear the Bendett Defendants sent—were "false and deceptive," without describing *how* they were false and deceptive.  As a result, Count Fifteen fails in its entirety and all claims asserted thereunder are dismissed.  This is an indicative ruling with respect to the Estate Plaintiff's claim.

### D.  Alleged Violations of the Lanham Act

The final federal claim alleged by Plaintiffs is a claim for false advertising under 15 U.S.C. § 1125(a)(1)(B) ("the Lanham Act").  Plaintiffs attach a screenshot of Santander's website and allege that Santander claims to have excellent customer service, but Plaintiffs claim they never received customer services approaching the level that Santander advertised.  Am. Compl. Count 21 ¶ 5.  The Lanham Act provides, in pertinent part, that:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which-- . . .
> (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  Plaintiff claims Santander violated this provision through its advertising of better customer service than offered.

The Court will assume without deciding that Plaintiffs acted in reliance on Santander's website's representations when choosing to do business with Santander.  Even so, Plaintiffs' claims do not survive.  In *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 129, 131–32 (2014), the U.S. Supreme Court discussed the class of persons whose interests "fall within the zone of interests protected by" the Lanham Act and concluded:  "to come within the zone of interests in a suit for false advertising under § 1125(a), a plaintiff must allege an injury to a commercial interest in reputation or sales."  Consumers are "not under the Act's aegis."  *Id.* at 132.  Put simply, the Supreme Court was clear that "a consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act."  *Id.*  As Plaintiffs are consumers seeking

to recover under the Lanham Act for allegedly false advertising by Santander, their claim in Count Twenty-One must be dismissed.[5]  This is an indicative ruling with respect to the Estate Plaintiff's claim.

### E.  Supplemental Jurisdiction

As set forth above, the Court has concluded that all of the federal claims in the Amended Complaint must be dismissed.  Thus, only Plaintiffs' state law claims remain, and the Court must decide whether to exercise supplemental jurisdiction over the remaining state law claims.  A district court has supplemental jurisdiction over claims that "are so related to claims in the action within [the court's] original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."  28 U.S.C. § 1367(a).  For purposes of § 1367(a), claims form part of the "same case or controversy" if they "derive from a common nucleus of operative fact."  *Shahriar v. Smith & Wollensky Restaurant Grp., Inc.*, 659 F.3d 234, 245 (2d Cir. 2011) (quoting *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004)).

If the claims form part of the same case or controversy, a district court retains discretion to decline to exercise supplemental jurisdiction only in certain limited circumstances:  when the state law claims raise novel or complex issues of state law; when such claims substantially predominate over the claims over which the district court has original jurisdiction; when the district court has dismissed all claims over which it has original jurisdiction; and, in exceptional circumstances, when there are other compelling reasons for declining jurisdiction.  28 U.S.C. § 1367(c); *Shahriar*, 659 F.3d at 245 ("the discretion to decline supplemental jurisdiction is available *only if* founded upon an enumerated category of subsection 1367(c)") (emphasis in original).  Even where one of

---

[5] To be clear, as with each of the claims discussed herein, this ruling relates only to Plaintiffs' federal claim.  This ruling says nothing as to whether Plaintiffs do, or can, state a claim for false advertising, or any other potential claim, under state law; the Court holds only that Plaintiffs' claims, as far as they allege violations of federal law, fail to state a claim upon which relief can be granted.

the § 1367(c) factors is applicable, however, a district court "should not decline to exercise supplemental jurisdiction unless it also determines that doing so would not promote the values . . . [of] economy, convenience, fairness, and comity." *Id.* (quoting *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 214 (2d Cir. 2004)) (citation omitted).

Although all of the claims over which this Court has original jurisdiction have been dismissed, the Court will exercise supplemental jurisdiction over the remaining state law claims. All of Plaintiffs' claims arise from the same general nucleus of operative fact related to the foreclosure on the Clarks' home. The Bendett Defendants urge the Court to decline supplemental jurisdiction, but do not analyze how the factors of economy, convenience, fairness, and comity apply here. Given that this case has been pending in this Court since January of 2022, economy considerations weigh in favor of the exercise of supplemental jurisdiction, rather than requiring the parties to start over in state court.

## IV.   PERSONAL JURISDICTION OVER DEFENDANTS WENNES, HABIS, AND O'NEILL

Before examining the remaining state law claims, the Court first addresses the argument of the individual Santander Defendants—Wennes, Habis, and O'Neill—that the Amended Complaint must be dismissed as to them because the Court lacks personal jurisdiction over them. The Court agrees, and dismisses these Defendants from this suit.

Federal Rule of Civil Procedure 12(b)(2) permits a defendant to raise lack of personal jurisdiction as a defense through a motion to dismiss. A plaintiff bears the burden of establishing personal jurisdiction over the defendant. *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993). The showing a plaintiff must make "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013). While a plaintiff

20

**46**

bears the "ultimate burden" of establishing jurisdiction over a defendant by a preponderance of the evidence, until an evidentiary hearing is held, the plaintiff "need make only a *prima facie* showing by its pleadings and affidavits that jurisdiction exists." *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986). This *prima facie* showing requires "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012) (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)). Here, neither party has requested, and the Court has not held, an evidentiary hearing. Thus, Plaintiffs are required to make only a *prima facie* showing that this Court possesses personal jurisdiction over the individual Santander Defendants.

"Personal jurisdiction over a defendant in a diversity action is determined by the law of the forum in which the court sits." *CutCo Indus., Inc.*, 806 F.2d at 365. Under the law of both the Connecticut Supreme Court and the Second Circuit, personal jurisdiction presents a two-step analysis: first, the Court must determine whether Connecticut's long-arm statute supports the Court's exercise of personal jurisdiction over the foreign defendant; second, the Court must determine whether such exercise of personal jurisdiction comports with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Thomason v. Chemical Bank*, 234 Conn. 281, 285–86 (1995) (stating that the Connecticut long-arm statute permits a trial court to exercise personal jurisdiction over a foreign defendant "only if the defendant's intrastate activities meet the requirements both of our statute and of the due process clause of the federal constitution"); *Chloé*, 616 F.3d at 163–64 ("To determine personal jurisdiction over a non-domiciliary . . . the Court must engage in a two-step analysis. . . . First, we apply the forum state's long-arm statute. . . . If the long-arm statute permits personal jurisdiction, the second step is to

analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution.") (citations omitted).

In moving to dismiss the Amended Complaint, the individual Santander Defendants contend that Connecticut's long-arm statute does not support the Court's exercise of personal jurisdiction over them, and that, even if it did, such exercise of personal jurisdiction would violate the Fourteenth Amendment's Due Process Clause. In response, Plaintiffs argue that the Court has personal jurisdiction over the individual Santander Defendants because Plaintiffs have filed suit against these Defendants in their "corporate capacities." Opp. to Santander Defs.' Mot. to Dismiss, ECF No. 105 at 4. The Court concludes that it does not have personal jurisdiction over Defendants Wennes, Habis, and O'Neill; the Amended Complaint's claims against these Defendants is dismissed.[6]

Connecticut's long-arm statute governing personal jurisdiction in suits against foreign individuals provides, in pertinent part, that a court may exercise personal jurisdiction over any nonresident individual who, in person or through an agent:

> (1) transacts any business within the state;
> (2) commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act;
> (3) commits a tortious act outside the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if such person or agent (A) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (B) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce;
> (4) owns, uses or possesses any real property situated within the state; or
> (5) uses a computer, as defined in subdivision (1) of subsection (a) of section 53-451, or a computer network, as defined in subdivision (3) of subsection (a) of said section, located within the state.

---

[6] Plaintiff also mentions "Defendant John or Jane Doe," an "unknown employee of Santander Bank, N.A.," who "placed a value on Lillian J. Clark's life of approximately 31 cents an hour," in the "Parties" section of the Amended Complaint. *See* ECF No. 72 at 4. As Plaintiffs have not identified the Doe Defendant and does not provide any specific factual allegations related to the Doe Defendant, that Defendant is likewise dismissed from this action.

Conn. Gen. Stat. § 52-59b(a).

The individual Santander Defendants contend that they fit none of these provisions, and that Plaintiffs' only allegations concerning them are that they vaguely conspired with others to steal the Clarks' home and allowed "harassing phone calls" to continue after being told to cease and desist. Am. Compl., Count Fifteen, ¶ 5. The Amended Complaint does not allege sufficient facts for the Court to find that the individual Santander Defendants transacted business in Connecticut, so as to satisfy the long-arm statute. Section 52-59b(a)(1) "authorizes jurisdiction over nonresidents who transact any business within the state provided that the cause of action arises out of such transaction." *New London Cnty. Mut. Ins. Co. v. Nantes*, 303 Conn. 737, 745 (2012). An individual transacts business under this section by engaging in "a single purposeful business transaction." *Id.* Plaintiffs have not adequately alleged a single purposeful business transaction conducted by any of the three individual Santander Defendants. For instance, there are no particular allegations as to any of these Defendants' roles in the foreclosure of the Clarks' home. Moreover, Plaintiffs have not plausibly alleged that these Defendants committed a tortious act either within or outside of the state, nor that they regularly do or solicit business, or engage in any persistent course of conduct or derive substantial revenue from goods used or services rendered in Connecticut. Finally, Plaintiffs have not alleged that these Defendants own, use, or possess real property in Connecticut or use a computer or computer network within the State. For these reasons, the exercise of personal jurisdiction under Connecticut's long-arm statute would be improper.

The exercise of personal jurisdiction over the individual Santander Defendants would, likewise, violate due process. "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which [the individual] has established no meaningful contacts, ties, or relations." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471–

72 (1985) (citation and internal quotation marks omitted). For a court to exercise personal jurisdiction over a defendant consistent with constitutional due process, the defendant must have sufficient "minimum contacts" with the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (citation and internal quotation marks omitted). The requisite minimum contacts may be satisfied in one of two ways: (1) the court may exercise *general* personal jurisdiction if the defendant's "affiliations with the [forum] State are so continuous and systematic as to render them essentially at home in the forum state"; or (2) the court may exercise *specific* personal jurisdiction if the action arises out of or relates to the defendant's contacts with the forum, even if such contacts are limited to a single or an occasional act within the forum. *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (citations and internal quotation marks omitted).

Plaintiffs, for their part, argue that the Court may exercise personal jurisdiction over the individual Santander Defendants because Santander Bank, N.A. operates in Connecticut, and that the individual Santander Defendants operated as its agents in foreclosing on the Clarks' home. This argument misses the mark. First, the focus must be on the individual Santander Defendants' conduct—not on that of Santander Bank itself. There are no allegations in the Amended Complaint that rise to the level of asserting that the individual Santander Defendants' affiliations with Connecticut are so continuous and systematic as to render them "essentially at home" in Connecticut. Indeed, all of the individual Santander Defendants are alleged to be citizens of Massachusetts. *See* Am. Compl. at 3–4. Nor are there sufficient allegations to support the exercise of specific personal jurisdiction, as the Amended Complaint does not allege anything about the individual Santander Defendants' roles in the foreclosure process.

Plaintiffs' allegations against the individual Santander Defendants are simply too vague and nonspecific to make even a *prima facie* showing of personal jurisdiction. All claims against Defendants Wennes, Habis, and O'Neill are therefore dismissed under Rule 12(b)(2). This is an indicative ruling with respect to the Estate Plaintiff's claims.

## V.   REMAINING STATE LAW CLAIMS

The Court addresses each of the remaining state law claims below, grouping related claims into a single discussion where possible. Due to the nature of the claims, and their interplay with each other, the claims below are examined in roughly, though not precisely, the order they are asserted by Plaintiffs. The Court finds that all of the remaining state law claims are barred by the doctrines of *res judicata* (claim preclusion), collateral estoppel (issue preclusion), or should otherwise be dismissed because they fail to state a claim for relief.

### A.   Preclusion

#### 1.   *Legal Standard*

Pursuant to the U.S. Constitution's Full Faith and Credit Clause, U.S. Const., Art. IV, § 1, and the corresponding Full Faith and Credit Statute, 28 U.S.C. § 1738, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." *Migra v. Warren City Sch. Dist. Bd. of Educ.*, 465 U.S. 75, 81 (1984). In analyzing preclusion doctrines, a court must apply the preclusion law of the state that rendered the decision. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996). Thus, Connecticut law dictates the preclusive effect of a prior state action.

"Claim preclusion (res judicata) and issue preclusion (collateral estoppel) have been described as related ideas on a continuum." *Carnemolla v. Walsh*, 75 Conn. App. 319, 327 (2003). Claim preclusion prevents a litigant from "reasserting a claim that has already been decided on the

merits," while issue preclusion prevents a party from "relitigating an issue that has been determined in a prior suit." *Id.* Issue preclusion is therefore "an aspect" of claim preclusion. *Id.* Both doctrines "protect the finality of judicial determinations, conserve the time of the court, and prevent wasteful relitigation." *Bruno v. Geller*, 136 Conn. App. 707, 721 (2012).

"The doctrine of [claim preclusion] holds that an existing final judgment rendered upon the merits without fraud or collusion, by a court of competent jurisdiction, is conclusive of causes of action and of facts or issues thereby litigated as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction." *Powell v. Infinity Ins. Co.,* 282 Conn. 594, 600 (2007). Essentially, "the modern rule of claim preclusion is that a judgment against the plaintiff is preclusive not simply when it is on the merits but when the procedure in the first action afforded the plaintiff a fair opportunity to get to the merits." *Weiss v. Weiss*, 297 Conn. 446, 459 (2010) (cleaned up).

A "transactional test" guides the application of claim preclusion. *Powell*, 282 Conn. at 604. Specifically, the claim that is extinguished by the judgment in the first action includes "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose." *Id.* "What factual grouping constitutes a transaction is to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understating or usage." *Orselet v. DeMatteo*, 206 Conn. 542, 545–46 (1988) (cleaned up).

### 2.  State Court Ruling

Following a trial in the state court foreclosure action, the state court found, by a preponderance of the evidence, that Santander prevailed on its claims for reformation of the mortgage and foreclosure.  *See* State Court Ruling, Bendett Defendants' Br. Regarding Collateral Estoppel, ECF No. 195-3.  Specifically, the court found that the absence of a property description in the recorded mortgage documents was a mutual mistake given that the property at issue was identified in the note and the mortgage, and thus deemed reformation of the mortgage appropriate. *Id.* at 4–7.  Next, as to the foreclosure count, the court found that Santander had proven the elements of foreclosure under Connecticut law:  it was the owner of the note at the time it commenced the foreclosure action and the mortgagor, Lillian, had defaulted on her obligations under the note.  *Id.* at 8–9.

The state court then proceeded to consider the Clarks' thirty special defenses[7] to determine whether any would defeat a finding of liability.  *Id.* at 10.  In its analysis, the state court noted that the typical defenses to a foreclosure action could be payment, discharge, release, satisfaction, or various equitable defenses, such unconscionability, abandonment of security, usury, and the mortgagor being prevented from fulfilling a condition of the mortgage on account of accident, mistake, or fraud.  *Id.*  While the Clarks advanced some of these typical defenses, they also advanced others, including several that exactly match Plaintiffs' causes of action in the instant suit,

---

[7]  The special defenses asserted by the Clarks were:  (1) failure to join an indispensable party; (2) admitted/invalid/defective/unenforceable alleged mortgage; (3) defendant [Gordon Clark] is valid, secured and enforceable first lien position; (4) accord and satisfaction; (5) consent; (6) negligence; (7) contributory negligence; (8) promissory estoppel; (9) equitable estoppel; (10) laches; (11) failure to state a claim upon which relief can be granted; (12) financial fraud; (13) mortgage fraud; (14) mail fraud; (15) lack of standing; (16) lack of subject matter jurisdiction; (17) payment; (18) multiple breaches of contract; (19) multiple breaches of novated (oral) contract; (20) release; (21) discharge; (22) waiver; (23) sham complaint; (24) statute of frauds; (25) statute of limitations; (26) illegality; (27) abandonment of alleged security; (28) unclean hands; (29) violation of the fair debt collection practices act; and (30) violation of the Connecticut Unfair Trade Practices Act.  ECF No. 195-2 at 3–26; ECF No. 195-3 at 11–12.

such as "negligence," "financial fraud," "mortgage fraud," "mail fraud," "multiple breaches of contract," "multiple breaches of novated (oral) contract," and "violation of the [F]air [D]ebt [C]ollection [P]ractices [A]ct." *Id.* at 11–12. Other special defenses asserted by the Clarks included "sham complaint," "illegality," "and unclean hands." *Id.* Ultimately, the state court rejected all of the special defenses, concluding that the Clarks had not met their burden of proof as to any. *Id.* at 12.

### 3. Discussion

The Court finds that claim preclusion applies to bar those claims in the instant action that are duplicative of the Clarks' special defenses in the state court action, because the federal action arises out of the same set of transactions as the Clarks' defenses in the state action. In particular, the Clarks' defenses in the state action related to allegedly improper actions by the Bendett Defendants on behalf of Santander to foreclose on the property. In this action, Plaintiffs are pursuing affirmative claims based on the same allegedly improper actions by Santander and the Bendett Defendants. Indeed, several of Plaintiffs' claims in this action exactly mirror their affirmative defenses in the state action. The state court adjudicated the merits of those special defenses, finding that the Clarks had not supplied any evidence to support those claims. Because both actions involve the same parties and reiterate many of the same legal theories based on the same factual assertions, applying claim preclusion promotes judicial economy by preventing inconsistent judgment with the state court and by preventing Plaintiffs from harassing Santander and the Bendett Defendants with a duplicative lawsuit. Thus, to the extent any of Plaintiffs' claims

arise out of the same operative facts as the state court action—or rely on similar legal theories as to the affirmative defenses—claim preclusion applies.[8]

### B. Count Two:  Negligence

Count Two alleges that all Defendants, except Wells Fargo, were negligent.  Plaintiffs allege that these Defendants have a "moral and lawful duty to act with reasonable care towards their fellow man/woman" and breached that duty.  Am. Compl. at 25 (Count Two).  The only specific factual allegation in this count is that Santander Bank caused the alleged default by sending the "threatening, erroneous foreclosure letter . . . and by their unwillingness and willful negligent incompetence to rightfully" withdraw the letter after being repeatedly asked by Plaintiffs. *Id.*

As discussed above, claim preclusion applies to Plaintiffs' negligence claim because it is nearly identical to the negligence-based affirmative defense the Clarks presented at state court: both assert negligence against Santander for "sending a threatening *erroneous foreclosure letter*." ECF No. 72 at 25; ECF No. 195-2 at 7.  Thus, because the state court adjudicated this claim and rejected it, claim preclusion prevents Plaintiffs from relitigating the claim in federal court.

Further, to the extent the claim applies to Santander's conduct in the state court action itself, the claim is barred under the litigation privilege doctrine.  The Connecticut Supreme Court "has established a rule of 'absolute immunity,'" also referred to as the "litigation privilege," which "protects the statements or actions that any individual makes, in the context of a judicial proceeding, from giving rise to most types of tort claims."  *Costello v. Wells Fargo Bank Nat'l*

---

[8] The Court recognizes that the Clarks were positioned as defendants in the state court action and are positioned as plaintiffs in this action.  Because the Clarks bore the burden of proof on their special defenses in the state court action, however, the Court considers those defenses as akin to affirmative claims, for claim preclusion purposes.  As the state court found that the Clarks had presented no evidence sustaining their defenses and therefore entered judgment against them, the rationale behind claim preclusion—conserving resources and avoiding duplicative litigation—applies here.

*Ass'n*, No. 16-CV-1706 (VAB), 2017 WL 3262157, at \*14 (D. Conn. July 31, 2017) (citing *MacDermid, Inc. v. Leonetti*, 310 Conn. 616, 627 (2013)), *aff'd*, 739 F. App'x 77 (2d Cir. 2018) (summary order). "The purpose of affording absolute immunity to those who provide information in connection with judicial and quasi-judicial proceedings is that in certain situations the public interest in having people speak freely outweighs the risk that individuals will occasionally abuse the privilege by making false and malicious statements." *Scholz v. Epstein*, 341 Conn. 1, 10 (2021). Federal courts in Connecticut "routinely apply the state's litigation privilege to claims that challenge representations made in underlying state court litigation." *Weldon v. MTAG Servs., LLC*, No. 3:16-CV-783 (JCH), 2017 WL 776648, at \*10 (D. Conn. Feb. 28, 2017).

The litigation privilege applies to claims "premised on factual allegations that challenge the defendant's participation in a properly brought judicial proceeding." *Scholz*, 341 Conn. at 14. In applying the litigation privilege to such claims, the Connecticut Supreme Court has reasoned that these causes of action do not "involve consideration of whether the underlying purpose of the litigation was improper" and, as a result, they are "entitled to absolute immunity, even if the plaintiff alleges that the [defendant's] conduct constituted an improper use of the courts." *Id.* Relevant here, the Connecticut Supreme Court has favorably cited law applying the doctrine to common law negligence claims. *See Simms v. Seaman*, 308 Conn. 523, 567 (2013) (citing *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 401–02 (D.N.J. 2009) (applying litigation privilege to a negligence claim)). To the extent Plaintiffs premise Count Two on the foreclosure suit initiated by Defendants, Count Two is barred by the litigation privilege doctrine.

Count Two also fails to state a cognizable claim for relief. Initially, the count only contains specific allegations against Santander; as it fails to explain how any other Defendant may have been negligent, it cannot stand as against any other Defendant. Moreover, it is wholly conclusory

in alleging the allegations of duty, breach of duty, and causation as to all defendants. Its allegations are merely legal conclusion masquerading as factual allegations, and therefore must fail. *See Iqbal*, 556 U.S. at 678. This is an indicative ruling with respect to the Estate Plaintiff's claim.

### C. Count Three: Abuse of Process

In Count Three, Plaintiffs allege that the Santander Defendants and the Bendett Defendants committed abuse of process by threatening or filing "a foreclosure lawsuit against the Plaintiffs" without a "legitimate, lawful, []or legal basis . . . ." Am. Compl. Count Three. The Court dismisses Count Three.[9]

First, as discussed above, claim preclusion applies to bar Count Three. Though labeled as financial fraud, the Clarks' twelfth special defense in the state court action is nearly identical to Plaintiffs' abuse of process allegations in Count Three. The state court rejected all the Clarks' special defenses, including the twelfth special defense, in state court. Because Count Three is nearly identical to the twelfth special defense that the state court rejected, and because Plaintiffs' federal action arises out of claims and facts that were adjudicated in the state case, Count Three is barred under claim preclusion.

Even if Count Three were not barred under claim preclusion, however, Plaintiffs fail to state a claim for relief. "An action for abuse of process lies against any person using 'a legal process against another in an improper manner or to accomplish a purpose for which it was not designed.'" *Mozzochi v. Beck*, 204 Conn. 490, 494 (1987) (quoting *Varga v. Pareles*, 137 Conn. 663, 667 (1951)). Plaintiffs' dispute with the merits of the foreclosure action does not give rise to a claim that Santander or the Bendett Defendants used the action in an improper manner to accomplish a purpose for which it was not designed. In fact, as Santander points out, Santander

---

[9] The Court notes that Connecticut courts do not apply the litigation privilege doctrine to claims for abuse of process. *Scholz*, 341 Conn. at 10.

has a legitimate purpose behind its state court foreclosure action:  "attempting to recover money owed on a defaulted HELOC loan."  ECF No. 84 at 17.  Plaintiffs allegations that Santander and the Bendett Defendants committed abuse of process because the Defendants "ha[d] no legitimate, lawful, []or legal basis" to foreclose against him are simply conclusory legal statements, unsupported by the factual allegations in the complaint.  Am. Compl. Count Three.  Thus, Plaintiffs fail to state a claim for relief under Count Three.  This is an indicative ruling with respect to the Estate Plaintiff's claim.

D.  <u>Counts Eleven through Fourteen:  Breaches of Contract, Assumption of Duty, and Breach of the Implied Covenant of Good Faith and Fair Dealing</u>

Plaintiffs asserts a series of common law and breach of contract claims against the Santander Defendants.  Am. Compl. Counts Eleven through Fourteen.  These claims must be dismissed because they are barred under the doctrine of claim preclusion.  Further, Count Fourteen is barred under the litigation privilege doctrine.  And even if the claims were not barred, Plaintiffs also fail to state a claim for relief as to these counts.

*1.  Claim Preclusion and Litigation Privilege*

In Count Eleven, Plaintiffs allege Santander "breached [its] moral and lawful duty" to not breach their contract.  In support of Count Eleven, Plaintiffs allege that Santander failed to:  (1) "give proper notice of default;" (2) "send a legal breach letter;" (3) "give at least 30 days to cure alleged default;" (4) "make contractual absolute obligation advances;" and (5) "change payments to interest only upon request."  *Id.*  In Count Twelve, Plaintiffs allege Santander "breached [its] moral and lawful duty to not breach their" oral contract to "pay back when you can;" in Count Thirteen, Plaintiffs allege Santander beached its "assumed [] duty/obligation/agreement" to allow Plaintiffs to "pay back when [they] can;" and in Count Fourteen, Plaintiffs allege that Santander

Defendants breached the "implied covenant of good faith and fair dealing" by making misrepresentations to the state court. Am. Compl. Counts Eleven–Fourteen.

The Clarks advanced similar claims as special defenses in the state action. The Clarks' eighteenth special defense asserted "multiple breaches of contract," their nineteenth special defense asserted that the Santander Defendants breached their oral contract to allow the Clarks to "pay back when [they] can;" and the Clarks' twenty-eighth defense asserted that the Santander Defendants breached the contract and their "implied duty of good faith and fair dealing." ECF No. 195-2 at 20, 23–24.

The court in the state action considered these defenses and rejected all of them. As to the oral contract between Plaintiffs and the Santander Defendants, the state court held that the Clarks "failed to meet the burden of proof as it relates to these special defenses." ECF No. 195-3 at 13. In particular, the court noted that the Connecticut Statute of Frauds does not enforce oral agreements related to real estate. *Id.* (citing Conn. Gen. Stat. § 52-550(a)). As to the remainder of the special defenses, including the Clarks' defenses related to alleged contract violations, "there simply was no evidence offered to support the defenses." *Id.*

As discussed above, the federal action arises out of the same transaction as the state action. As such, because Plaintiffs had the opportunity to litigate these claims at the state court, and because the state court rejected them in hand, claim preclusion applies. Further, as discussed above, the issues in this case are identical to  the issues raised in the special defenses—the Clarks essentially reproduced their contract claims in this action as special defenses in the state action.

For these reasons, Counts Eleven through Fourteen in the Amended Complaint must be dismissed on claim preclusion grounds.

Further, Count Fourteen is barred under the litigation privilege doctrine.  As discussed above, the litigation privilege extends to statements and actions made during the course of litigation.  Count Fourteen is based on allegedly dishonest statements made by Defendants during the course of the state case.  For the same reasons discussed above, the litigation privilege applies, and Plaintiffs are barred from bringing Count Fourteen.  This ruling is indicative as to the Estate Plaintiff's claims.

### 2.  Failure to State a Claim

Even assuming they were not barred by claim preclusion, Plaintiffs fail to state a claim for relief in Counts Eleven through Fourteen.

First, Plaintiffs' claims for breach of alleged oral contracts in Counts Twelve and Thirteen fail to state a claim for relief because oral contracts regarding real estate are unenforceable under the Connecticut Statute of Frauds.  Conn. Gen. Stat. § 52-550(a).

Next, Count Eleven, alleging "multiple breaches of contract," similarly fails to state a claim for relief because Plaintiffs' allegations are conclusory and Plaintiffs have not alleged any basis for relief.  Plaintiffs allege that the Santander Defendants breached a contracted by failing to:  (1) "give proper notice of default;" (2) "send a legal breach letter;" (3) "give at least 30 days to cure alleged default;" (4) "make contractual absolute obligation advances;" and (5) "change payments to interest only upon request."  Am. Compl. Count Eleven.  However, Plaintiffs include no information regarding the contract or contractual provisions that Defendants may have violated.  Rather, Plaintiffs urge the Court to accept their conclusion that Santander violated a contractual provision without providing any information as to the legal basis for relief or factual circumstances

supporting their claim.  Without any factual allegations supporting a legal basis for their claims, Plaintiffs' allegations fail.

Count Fourteen, alleging breach of the implied covenant of good faith and fair dealing, fails because Plaintiffs do not have a viable breach of contract claim.  *See Conn. Children's Med. Ctr. v. Continental Casualty Co.*, 581 F.Supp.3d 385, 393 (D. Conn. 2022); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 116 (D. Conn. 2014) ("In the absence of a breach of an express duty under the [contract], however, there is no independent cause of action for the breach of the implied covenant of good faith and fair dealing.").

The Court thus dismisses Counts Eleven through Fourteen in their entirety.  This is an indicative ruling with respect to the Estate Plaintiff's claims.

### E.  Count Seven:  Emotional Distress

In Count Seven, Plaintiffs allege that the Santander Defendants and the Bendett Defendants committed "gross, malicious, intentional, negligent, incompetent, reprehensible, unconscionable, and repeated infliction of physical, mental, and emotional distress, pain, and suffering."  Am. Compl. Count Seven.  The Court dismisses Count Seven because Plaintiffs fail to state a basis for relief.

While it is unclear what cause of action Plaintiffs bring in Count Seven, construing the allegations liberally, the Court understands Plaintiffs to bring claims for intentional and negligent infliction of emotional distress.

#### 1.  *Intentional Infliction of Emotional Distress*

To state a claim for intentional infliction of emotional distress ("IIED"), Plaintiffs must plausibly allege:  "(1) that the actor intended to inflict emotional distress; or that he knew or should have known that emotional distress was a likely result of his conduct; (2) that the conduct was

extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." *Strano v. Azzinaro*, 188 Conn. App. 183, 187 (2019).

First, Plaintiffs' claim for intentional infliction of emotional distress is barred by claim preclusion.  In the state court action, the Clarks claimed that Santander "knowingly, intentionally, purposely, and maliciously filed an erroneous, baseless, meritless, frivolous, bad faith, and fraudulent/sham foreclosure lawsuit."  ECF 195-2 at 17.  Then, as part of the Second Special Defense, the Clarks asserted that because of Santander's "unconscionable" conduct that Lilian succumbed to death because of the "extremely painful, stressful, and heartbreaking ordeal."  *Id.* at 29.  This is essentially an IIED claim.  And because claim preclusion applies to facts and issues decided in the state case—and those that arise out of the same transaction—Plaintiffs' IIED claim is barred.

Second, the claim is barred under the litigation privilege doctrine.  Connecticut courts regularly apply the litigation privilege to IIED claims that are based on statements and actions made during the course of litigation.  *See Dorfman v. Smith*, 342 Conn. 582, 592 (2022) (noting that "absolute immunity extends to an array of retaliatory civil actions," including "intentional infliction of emotional distress arising from statements made during judicial proceedings"); *Simms*, 308 Conn. at 570 (holding that litigation privilege barred a plaintiff's claim of intentional infliction of emotional distress); *Stone v. Pattis*, 144 Conn. App. 79, 99 (2013)  ("We conclude . . . that the allegations supporting [the] claim of negligent infliction of emotional distress are based on communications protected by absolute immunity from suit.").  Plaintiffs base Count Seven on the actions of the Defendants in litigating the foreclosure and default action.  ECF No. 72 at 28–29

(Count Seven).  Because Plaintiffs cannot base an IIED claim on statements and actions made during the course of litigation, the litigation privilege doctrine bars Count Seven.

Finally, Count Seven fails to state a claim for relief.  The only conduct Plaintiffs could point towards is the foreclosure action initiated by the Santander Defendants, but Plaintiffs cannot demonstrate that a routine foreclosure action rises to the level of "extreme and outrageous" conduct necessary to maintain an IIED action.  *See Heim v. Calif. Fed. Bank*, 78 Conn. App. 351, 371 (2003) ("The act of filing a lawsuit, even if wrongfully motivated, does not transgress the bounds of socially tolerable behavior or make the average member of the community raise their hand and exclaim, 'Outrageous!'.").  For these reasons, Plaintiffs' fail to state a claim for relief for IIED. This is an indicative ruling with respect to the Estate Plaintiff's claims.

### 2.   *Negligent Infliction of Emotional Distress*

To state a claim for negligent infliction of emotional distress ("NIED"), a plaintiff must plausibly allege:  "(1) the defendant's conduct created an unreasonable risk of causing the plaintiff emotional distress; (2) the plaintiff's distress was foreseeable; (3) the emotional distress was severe enough that it might result in illness or bodily harm; and (4) the defendant's conduct was the cause of the plaintiff's distress."  *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 444 (2003).

This claim, like the IIED claim, is barred by claim preclusion, for the same reasons described above.  Plaintiffs' NIED claim is also barred under the litigation privilege doctrine. "Connecticut appellate courts have consistently held that claims of negligent infliction of emotional distress premised on communications made during and relevant to an underlying judicial proceeding are afforded absolute immunity."  *Dorfman*, 342 Conn. at 612–13.  Just as Plaintiffs' IIED claim is barred by the privilege doctrine, so too is their NIED claim, which is

based on the same facts alleged in Count Seven.  For these reasons, the entirety of Count Seven is barred by the litigation privilege doctrine.

Further, Plaintiffs' NIED claim fails to state a claim for relief because neither the Santander nor the Bendett Defendants created an *unreasonable* risk of causing Plaintiffs emotional distress by filing the foreclosure action.  The foreclosure action is an appropriate legal mechanism for asserting repossession of the property when a term of the mortgage has been breached.  Even taking as true Plaintiffs' pleadings that Plaintiffs suffered emotional distress—and acknowledging that the loss of a home could certainly cause significant stress—Plaintiffs' NIED claim must fail because it was not "foreseeable that the [Plaintiffs] *reasonably* would suffer severe emotional distress beyond that normally associated with litigation." *Wilson v. Jefferson*, 98 Conn. App. 147, 163 (2006).  The Santander Defendants' use of the legal process to enforce their property rights— without more—cannot constitute NIED.  *See id.*

Thus, the Court dismisses Count Seven.  This is an indicative ruling with respect to the Estate Plaintiff's claim.

### F.   In Sum

In summary, none of Plaintiff's remaining state law claims survive dismissal.  As an indicative ruling, the Court finds that none of the Estate Plaintiff's remaining state law claims survive dismissal, either.  There being no viable claims, the Amended Complaint is dismissed in its entirety as to Plaintiff, and, as an indicative ruling, would be dismissed in full as to the Estate Plaintiff as well.

## VI.   MOTIONS TO AMEND

In addition to the pending motions to dismiss, Plaintiffs have filed two separate motions to amend the complaint.  As the Court has not yet entered a scheduling order, these motions to amend

are governed by Federal Rule of Civil Procedure 15(a)(2).  That rule provides that a party may amend its pleading with the opposing party's consent or the court's leave, and further provides that the court "should freely give leave when justice so requires."  *Id.*  Rule 15(a)(2) "is a liberal and permissive standard, and the only grounds on which denial of leave to amend has long been held proper are upon a showing of undue delay, bad faith, dilatory motive, [or] futility."  *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 115 (2d Cir. 2021) (alteration in original; citation and internal quotation marks omitted), *cert. denied*, 142 S. Ct. 1112 (2022).

Relevant here, a proposed amendment is considered futile if it "fails to state a claim or would be subject to a successful motion to dismiss on some other basis."  *Nwachukwu v. Liberty Bank*, No. 3:16-CV-704 (CSH), 2016 WL 3647837, at *2 (D. Conn. July 1, 2016) (citing, among others, *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002)).  *See also Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 99 (2d Cir. 2010) (affirming district court's denial of leave of amend complaint as futile because the proposed amended complaint did not cure the original complaint's subject matter jurisdictional defects); *Blanchard v. Doe*, No. 17-CV-6893 (PKC) (JO), 2019 WL 2211079, at *3–4 (E.D.N.Y. May 22, 2019) (denying leave to amend complaint because proposed amended claims would fail due to the defendants' official immunities and reasoning that "an amendment is futile if it would fail to state a plausible claim for relief or if an affirmative defense, *e.g.*, the defendant's immunity, is apparent").

Thus, a proposed amended complaint is futile "if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)."  *Lucente*, 310 F.3d at 258.  "Put differently, a proposed claim is futile if, accepting the facts alleged by the party seeking amendment as true and construing them in the light most favorable to that party, it does not 'plausibly give rise to an

entitlement to relief.'"  *Brach Fam. Found., Inc. v. AXA Equitable Life Ins. Co.*, No. 16-CV-740 (JMF), 2018 WL 1274238, at *1 (S.D.N.Y. Mar. 9, 2018) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

Plaintiffs have filed two motions to amend their complaint to add four additional defendants and assert new counts against defendants both new and old.  The Court will address each proposed amended complaint in turn.

### A.  Plaintiffs' First-Proposed Amended Complaint

Plaintiffs filed their first motion for leave to amend on May 31, 2022.  The Court will refer to this proposal as the May 31, 2022 Proposed Amended Complaint ("PAC").  Plaintiffs propose to add five additional defendants—Defendant Ridgely Whitmore Brown and Defendant Law Office of Ridgely Whitmore Brown (together "the Ridgely Defendants"); Defendant Sean R. Higgins and Defendant K&L Gates, LLP (together "the K&L Gates Defendants"); and Defendant Wells Fargo, N.A.—and seven additional counts (Counts Twenty-Two through Twenty-Eight). ECF No. 108 at 4; ECF No. 108-1 at 1–2.  Plaintiffs add no relevant new allegations to their statement of facts.  Instead, Plaintiffs include under each count new facts relevant to Plaintiffs' new claims.  Therefore, the Court will walk through each count in Plaintiffs' May 31, 2022 PAC.

As to Counts One through Twenty-One, Plaintiffs bring the same counts and allegations as in the operative complaint.  To the extent the Court has already discussed how Plaintiffs cannot bring these claims or have failed to state a claim for relief, the same analysis applies to the May 31, 2022, PAC.  For the reasons already discussed, these counts are futile.

In Count Twenty-Two, Plaintiffs bring a "Breach of Confidence" claim against the Ridgely Defendants for discussing the federal case with opposing counsel.  ECF No. 108-1 at 48–53.  A breach of confidence claim arises in the context of an attorney-client relationship, wherein "[e]very

client has a right to expect that his lawyer will not disclose his secrets." *Goldberg v. Corporate Air, Inc.*, 189 Conn. 504, 512 (1983), *rev'd on other grounds*, *Burger & Burger, Inc. v. Murren*, 202 Conn. 660 (1987). Assuming Plaintiffs had established an attorney-client relationship for the purposes of the presumption for the right of confidence,[10] Plaintiffs cannot establish that the Ridgely Defendants breached that confidence. Even drawing all inferences in Plaintiffs' favor, none of the alleged communications between the Ridgely Defendants and opposing counsel indicate that the Ridgely Defendants divulged any confidences. Thus, Count Twenty-Two is futile for failure to state a claim.

In Count Twenty-Three, Plaintiffs bring an invasion of privacy claim against the K&L Gates Defendants for the same communications that formed the basis of Plaintiffs' Count Twenty-Two. ECF No. 108-1 at 53–58. Connecticut law recognizes four categories that may form the basis of an invasion of privacy claim: "(a) unreasonable intrusion upon the seclusion of another; (b) appropriation of the other's name or likeness; (c) unreasonable publicity given to the other's private life; or (d) publicity that unreasonably places the other in a false light before the public." *Goodrich v. Waterbury Republican-American, Inc.*, 188 Conn. 107, 128 (1982).

Plaintiffs do not explain under which category they bring their invasion of privacy claim. The Court notes that Plaintiffs allegations obviously cannot support a claim for the final three categories. Further, the Court finds that Plaintiffs cannot state a claim for unreasonable intrusion. While Connecticut courts have yet to firmly establish the elements of this cause of action, they turn to the Restatement, which explains that to state a claim for unreasonable intrusion a plaintiff must allege "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion

---

[10] The Court notes that Plaintiffs deny establishing any attorney-client relationship with Attorney Ridgely. Without an attorney-client relationship, Plaintiffs cannot bring a breach of confidence claim.

of his privacy, if the intrusion would be highly offensive to a reasonable person." *Parnoff v. Aquarion Water Co. of Connecticut*, 188 Conn. App. 153, 172 (2019) (quoting Restatement (Second) of Torts § 652B). Plaintiffs cannot establish that the K&L Defendants intruded into the seclusion of another or that any intrusion was highly offensive. First, the K&L Defendants merely communicated with an attorney who appeared to potentially be opposing counsel, which does not rise to the level of an intrusion. Second, run-of-the-mill conferencing with opposing counsel, while obviously distressing to Plaintiff Clark, is not highly offensive to a reasonable person. Accordingly, the Court finds that proposed Count Twenty-Three is futile for failure to state a claim.

In Count Twenty-Four, Plaintiffs bring a tortious interference claim against the K&L Defendants for the same communications that formed the basis of the previous two claims. ECF No. 108-1 at 58–62. To state a claim for tortious interference, Plaintiffs must allege: "(1) a business relationship between the plaintiff and another party; (2) the defendant's intentional interference with the business relationship while knowing of the relationship; and (3) as a result of the interference, the plaintiff suffers actual loss." *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 27 (2000). Plaintiffs fail to state a claim for relief because Plaintiffs never established the requisite business relationship with the Ridgely Defendants to form the basis of a tortious interference claim. In fact, Plaintiffs disclaim as much. However, even if the Court assumes Plaintiffs satisfy the first element, Plaintiffs cannot establish the other two. The K&L Defendants' normal communications with potential opposing counsel cannot be construed as interfering with Plaintiffs' business relationship with the Ridgely Defendants. The K&L Defendants engaged in routine discussions with opposing counsel as to the contours of the case. And even if the Court assumes the K&L Defendants' actions constitute interference, Plaintiffs cannot demonstrate harm caused by the K&L Defendants. Plaintiffs have alleged that they would not hire the Ridgely

Defendants after learning that the Ridgely Defendants had reached out the K&L Defendants. Thus, it was not the K&L Defendants that harmed Plaintiffs, but Plaintiffs' own decision not to hire counsel. For these reasons, Count Twenty-Four is futile for failure to state a claim.

In Count Twenty-Five, Plaintiffs bring a civil conspiracy claim against the four new defendants based on the same communications. ECF No. 108-1 at 63–67. "The [elements] of a civil action for conspiracy are: (1) a combination between two or more persons, (2) to do a criminal or an unlawful act or a lawful act by criminal or unlawful means, (3) an act done by one or more of the conspirators pursuant to the scheme and in furtherance of the object, (4) which act results in damage to the plaintiff." *Harp v. King*, 266 Conn. 747, 779 (2003) (internal quotation marks omitted). "There is, however, no independent claim of civil conspiracy. Rather, the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort." *Macomber v. Travelers Property and Cas. Corp.*, 277 Conn. 617, 636 (2006) (quoting *Harp*, 266 Conn. at 779 n.37). Because, as discussed above and below, Plaintiffs cannot sustain *any* independent tort claim, Plaintiffs cannot bring an action for civil conspiracy.

In Count Twenty-Six, Plaintiffs bring a conspiracy to interfere with civil rights claim under 42 U.S.C. § 1985 for the same communications between the four new defendants. ECF No. 108-1 at 67–72. "The four elements of a § 1985(3) claim are: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right of a citizen of the United States." *Mian v. Donaldson, Lufkin & Jenrette Secs. Corp*, 7 F.3d 1085, 1087 (2d Cir. 1993). First, Plaintiffs cannot establish a conspiracy. None of the communications

between the four defendants evidences or raises the suspicion of any agreement between the parties. Rather, the emails and voice-messages reflect normal communications between opposing parties that occur in the course of litigation. Second, Plaintiffs have not indicated, nor has the Court identified, any denial of equal protection of the laws. Rather, as discussed above, the communications reflect normal discussion had by attorneys during the course of litigation. Thus, the Court finds Count Twenty-Six futile because Plaintiffs have failed to state a claim for relief.

In Count Twenty-Seven, Plaintiffs bring an abuse of process claim against the four new defendants for the same communications. ECF No. 108-1 at 72–77. "An action for abuse of process lies against any person using 'a legal process against another in an improper manner or to accomplish a purpose for which it was not designed.'" *Mozzochi v. Beck*, 204 Conn. 490, 494 (1987) (quoting *Varga v. Pareles*, 137 Conn. 663, 667 (1951)). Because the four new defendants only engaged in out of court communications, Plaintiffs cannot bring an abuse of process claim against those defendants for those communications. For these reasons, the Court finds that Count Twenty-Seven is futile for failure to state a claim for relief.

In Count Twenty-Eight, Plaintiffs bring a legal malpractice claim against the four defendants for the same communications. ECF No. 108-1 at 77–81. "Generally, a plaintiff alleging legal malpractice must prove all of the following elements: '(1) the existence of an attorney-client relationship; (2) the attorney's wrongful act or omission; (3) *causation*; and (4) damages.'" *Bozelko v. Papastavros*, 323 Conn. 275, 283 (2016) (quoting *Grimm v. Fox*, 303 Conn. 322, 329 (2012)) (emphasis in original). First, as discussed above Plaintiffs cannot establish an attorney-client relationship with the K&L Defendants. Further, Plaintiffs have specifically disclaimed an attorney-client relationship with the Ridgely Defendants. Second, even if the Court assumes an attorney-client relationship, Plaintiffs have not alleged a wrongful act or admission

given that Plaintiffs have alleged that the four defendants engaged in everyday communications that arise during the course of litigation. Finally, Plaintiffs have not explained how they were injured as a result of these communications, nor how the communications caused that injury. Plaintiffs themselves chose not to retain counsel—thus any injury from lack of counsel is self-imposed.

In sum, the Court finds that the entirety of Plaintiff Clark's first-proposed Second Amended Complaint is futile for failure to state a claim. This ruling is indicative as it applies to the Estate Plaintiff's claims.

### B. Plaintiffs' Second-Proposed Amended Complaint

Plaintiffs offered a second-proposed Second Amended Complaint on October 17, 2022, which the Court will refer to as the October 17, 2022 PAC. In this PAC, Plaintiffs remove all four new attorney defendants added in the first-proposed complaint, while still adding Defendant Wells Fargo Bank, N.A. ECF No. 152 at 1–2. Plaintiffs also remove five counts—Breach of Confidence, Invasion of Privacy, Tortious Interference, Civil Conspiracy, and Abuse of Process—and add two new counts—Wrongful Death, and violations of the Connecticut Unfair Trade Practices Act ("CUTPA"). *Id.* at 2.

First, to the extent Plaintiffs have not substantively changed any of the counts alleged in the operative complaint or the May 31, 2022, PAC, the Court denies these amendments as futile for all the reasons already discussed.

Second, Plaintiffs bring a new claim under Count Two for the wrongful death of Lillian against all Defendants except the Wells Fargo Defendants. ECF No. 152-1 at 26–27. The Court notes that no common law wrongful death action exists—the cause of action exists solely to the extent allowed by statute. *Soto v. Bushmaster Firearms Int'l, LLC*, 331 Conn. 53, 109 n.34 (2019).

Assuming Plaintiffs bring their claim under the wrongful death statute, the Court finds that Plaintiffs fail to state a claim for relief, principally because Plaintiffs' allegations do not support the inference that Defendants' actions prematurely caused the death of Lillian. As Plaintiffs have alleged, Lillian suffered from Parkinson's disease for many years before succumbing to the illness at age 92. Plaintiffs have not explained how Defendants' actions *caused* the premature or untimely death of Lillian Clark.

Finally, Plaintiffs bring a new claim under Count Twenty-Five for violations of CUTPA against all Defendants. ECF No. 152-1 at 47–48. Plaintiffs allege the Defendants violated CUTPA by interfering with Plaintiffs' property rights in the foreclosed home. *Id.* Under the CUTPA, "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). Plaintiffs argue that Defendants have violated these provisions through the default and foreclosure action. However, as the Court has discussed in the context of Plaintiffs' numerous other counts, Plaintiffs have not identified any unfair or deceptive act on the part of Defendants. Rather, Defendants engaged in routine foreclosure proceedings and default actions in foreclosing on Plaintiffs' property. For these reasons, the Court finds that County Twenty-Five is futile for failure to state a claim.

In sum, for all the reasons discussed above, the Court finds that Plaintiffs' October 31, 2022, PAC is futile for failure to state a claim. This ruling is indicative as to the Estate Plaintiff's claims.

## C. Granting Plaintiffs a Chance to Amend

Despite the Court denying leave to amend, the Court recognizes that a *pro se* complaint should not be dismissed without the Court granting leave to amend at least once. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). As Plaintiffs now have the benefit of the Court's rulings as to their

claims, the Court finds that they should be allowed one opportunity to amend their complaint in an effort to remedy the deficiencies addressed in this ruling. Thus, Plaintiffs may file an amended complaint by **November 27, 2023**, without seeking leave of Court, but must consult with the Federal Pro Se Program to draft such an amended complaint. Plaintiffs shall title their amended complaint "Fourth Amended Complaint" for ease of reference, and are warned that they should not include in any amended complaint any claims under the federal criminal statutes or any claims that are barred by preclusion doctrines or the litigation privilege. Should Defendants believe that the claims in the Fourth Amended Complaint are subject to dismissal, they may file motions to dismiss.

### VII. CONCLUSION

For the reasons discussed herein, Defendants' motions to dismiss—ECF Nos. 82, 83, and 84—are GRANTED as to Plaintiff Clark. As an indicative ruling, the Court holds that it would also grant the motions to dismiss as to the Estate Plaintiff's claims. Plaintiff Clark's motion to stay these proceedings pending the appeal, ECF No. 174, is denied; to the extent necessary, as an indicative ruling, the Court holds that it would also deny the motion to stay proceedings as to the Estate Plaintiff. Finally, Plaintiff Clark's motions for leave to amend the complaint, ECF Nos. 108 and 152, are denied. As an indicative ruling, the Court holds that it would deny the pending motions for leave to amend as to the Estate Plaintiff as well.

Plaintiffs may file a Fourth Amended Complaint by November 27, 2023, consistent with this ruling.

**SO ORDERED** at Hartford, Connecticut, this 27th day of October, 2023.

      _/s/ Sarala V. Nagala_____
      SARALA V. NAGALA
      UNITED STATES DISTRICT JUDGE

Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Fri 10/27/2023 10:56 AM

To:CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**District of Connecticut**

**Notice of Electronic Filing**

The following transaction was entered on 10/27/2023 at 10:56 AM EDT and filed on 10/27/2023

| | |
|---|---|
| **Case Name:** | Clark et al v. Santander Bank, N.A. et al |
| **Case Number:** | 3:22-cv-00039-SVN |
| **Filer:** | |
| **Document Number:** | 201(No document attached) |

**Docket Text:**
ORDER. Per the Court's ruling, ECF No. 200, Plaintiffs may file an amended complaint by November 27, 2023, without seeking leave of Court, but must consult with the Federal Pro Se Program to draft such an amended complaint. Signed by Judge Sarala V. Nagala on 10/27/2023. (Parfenoff, Ivan)

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker    JEFFREY.KNICKERBOCKER@BROCKANDSCOTT.COM, jmknicker@yahoo.com, wbecf@brockandscott.com

Sean R. Higgins    sean.higgins@klgates.com

Patrick S. Tracey    patrick.tracey@saul.com

Gordon Clark    gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

**Activity in Case 3:22-cv-00039-SVN Clark et al v. Santander Bank, N.A. et al Order**

CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

Wed 12/13/2023 4:39 PM

To:CMECF@ctd.uscourts.gov <CMECF@ctd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

**U.S. District Court**

**District of Connecticut**

**Notice of Electronic Filing**

The following transaction was entered on 12/13/2023 at 4:38 PM EST and filed on 12/13/2023

| | |
|---|---|
| **Case Name:** | Clark et al v. Santander Bank, N.A. et al |
| **Case Number:** | 3:22-cv-00039-SVN |
| **Filer:** | |
| **Document Number:** | 205(No document attached) |

**Docket Text:**
**ORDER. On October 27, 2023, the Court granted Defendants' motions to dismiss, ECF Nos. 82, 83, and 87, and thereby dismissed Plaintiff Gordon Clark's claims against those Defendants, ECF No. 200. To the extent the Order was an indicative ruling in light of Plaintiffs' pending interlocutory appeal in the Second Circuit concerning Plaintiff Gordon Clark's ability to represent the Estate Plaintiff *pro se*, the Court explained that it would grant Defendants' motions to dismiss the Estate Plaintiff's claims if the Court of Appeals were to remand for that purpose.**

**Accordingly, insofar as the Court has dismissed Plaintiff Gordon Clark's claims, and Plaintiffs did not file a Fourth Amended Complaint by November 27, 2023, *see* ECF No. 200 at 47; ECF No. 201, the Order dismissing Plaintiff Gordon Clark's claims is final. The Clerk is directed to enter judgment in favor of Defendants and against Plaintiff Gordon Clark. The Court finds that there is no just reason for delay as to entering final judgment solely as to the claims brought by Plaintiff Gordon Clark alone. *See* Fed. R. Civ. P. 54(b). To the extent the Court's ruling is an indicative ruling as to the Estate Plaintiff's claims, the Court's decision is not final and no judgment shall enter as to the Estate Plaintiff's claims at this time. Signed by Judge Sarala V. Nagala on 12/13/2023. (Parfenoff, Ivan)**

**3:22-cv-00039-SVN Notice has been electronically mailed to:**

Jeffrey M. Knickerbocker     JEFFREY.KNICKERBOCKER@BROCKANDSCOTT.COM, jmknicker@yahoo.com, wbecf@brockandscott.com

Sean R. Higgins     sean.higgins@klgates.com

Patrick S. Tracey     patrick.tracey@saul.com

Gordon Clark     gordon@christianeconomics.net

**3:22-cv-00039-SVN Notice has been delivered by other means to:**

# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

Gordon Clark, and the Estate of Lillian J. Clark

v.

Santander Bank, N.A., Scott Powell (as former CEO of Santander), Timothy Wennes, Pierre Habis, Kenneth O'Neill, John or Jane Doe (of Santander Bank, N.A.), Wells Fargo & Company, Scott Powell (as COO of Wells Fargo), Bendett & McHugh, P.C., Adam L. Bendett, Jeffrey M. Knickerbocker, Dominick D. Neveux, Joseph Abraham, and Mark A. Piech

CIVIL NO. 3:22-cv-39-SVN

## PARTIAL JUDGMENT

This action having come before the Court on defendants' motions to dismiss before the Honorable Sarala V. Nagala, United States District Judge; and the Court having considered the full record of the case including applicable principles of law, having issued a Ruling and Order (Dkt. 200) granting defendants' motions as to plaintiff Gordon Clark, and issuing an Order (Dkt. 205) directing the Clerk to enter judgment in favor of defendants pursuant to Federal Rule of Civil Procedure 54(b) as the Court sees no just reason to delay judgment solely as to the claims brought by plaintiff Gordon Clark alone; it is hereby

ORDERED, ADJUDGED and DECREED that partial judgment is hereby entered in favor of defendants against plaintiff Gordon Clark.

Dated at Hartford, Connecticut, this 15th day of December, 2023.

DINAH MILTON KINNEY, Clerk

By ___/S/ Jeremy J. Shafer_____
Jeremy Shafer
Deputy Clerk

EOD: 12-15-2023

**77**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

NOV 17 2023 PM12:29
FILED-USDC-CT-HARTFORD

Gordon Clark (*in his individual capacity*), and )
Gordon Clark (*in his capacities as husband;* )
*sole fiduciary, sole beneficiary, and sole* )
*creditor of the Estate of Lillian J. Clark*), )
                                 )
       Plaintiffs, )

       vs. )

Santander Bank, N.A., )
Scott Powell (*as former CEO of Santander*), )
Timothy Wennes, )
Pierre Habis, )
Kenneth O'Neill, )
John/Jane Doe(s) (*of Santander Bank, N.A.,*) )
Wells Fargo & Company, )
Wells Fargo Bank, N.A., )
Scott Powell (*as COO of Wells Fargo*), )
Bendett & McHugh, P.C., )
Adam L. Bendett, )
Jeffrey M. Knickerbocker, )
Dominick D. Neveux, )
Joseph Abraham, and )
Mark A. Piech, )
                                   )
       Defendants. )

Civil Case No. 3:22-CV-00039-SVN

November 17, 2023

# NOTICE OF APPEAL
# TO THE UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

Notice is hereby given that the above-named Plaintiffs in the above-named case appeals to the *United States Court of Appeals for the Second Circuit* two (2) orders (ECF No. 200 & 201) entered in this action on October 27, 2023, which ordered *pro se* Plaintiff Gordon Clark to do the following:

> "As Plaintiffs now have the benefit of the Court's rulings as to their claims, the Court finds that they should be allowed one opportunity to amend their complaint in an effort to remedy the deficiencies addressed in this ruling. Thus, Plaintiffs may file an amended complaint by November 27, 2023, without seeking leave of Court, but must consult with

1

the Federal Pro Se Program to draft such an amended complaint. Plaintiffs … are warned that they should not include in any amended complaint any claims under the federal criminal statutes or any claims that are barred by preclusion doctrines or the litigation privilege."

"Plaintiffs may file … Amended Complaint by November 27, 2023, consistent with this ruling." ECF No. [200 & 201].

Thank you for your time, consideration, and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on November 17, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

2

# CERTIFICATE OF SERVICE

I, Plaintiff Gordon Clark, certify that a copy of the above **NOTICE OF APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT** will be served via *electronic service* on November 17, 2023, to the following:

Patrick S. Tracey, Esq. *(Santander Bank, N.A. named Defendants)*
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq. *(Bendett & McHugh, P.C. named Defendants)*
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
1 Congress Street, Suite 2900
Boston, MA 02114
**Served via Electronic Service**


Dated and signed at Enfield, Connecticut, on November 17, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

3

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| Gordon Clark (*in his individual capacity*), and ) | Civil Case No. 3:22-CV-00039-SVN |
| Gordon Clark (*in his capacities as husband;* ) | |
| *sole fiduciary, sole beneficiary, and sole* ) | **USCA Case No. 23-7834** |
| *creditor of the Estate of Lillian J. Clark*), ) | |
| ) | |
| Plaintiffs, ) | December 18, 2023 |
| ) | |
| vs. ) | |
| ) | |
| Santander Bank, N.A., ) | |
| Scott Powell (*as former CEO of Santander*), ) | |
| Timothy Wennes, ) | |
| Pierre Habis, ) | |
| Kenneth O'Neill, ) | |
| John/Jane Doe(s) (*of Santander Bank, N.A.,*) ) | |
| Wells Fargo & Company, ) | |
| Wells Fargo Bank, N.A., ) | |
| Scott Powell (*as COO of Wells Fargo*), ) | |
| Bendett & McHugh, P.C., ) | |
| Adam L. Bendett, ) | |
| Jeffrey M. Knickerbocker, ) | |
| Dominick D. Neveux, ) | |
| Joseph Abraham, and ) | |
| Mark A. Piech, ) | |
| ) | |
| Defendants. ) | |

# NOTICE OF AMENDED APPEAL
# TO THE UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

***Notice of Amended Appeal*** is hereby given that the above-named Plaintiffs in the above-named case appeals to the *United States Court of Appeals for the Second Circuit* four (4) orders (ECF No. 200, 201, 205, and 206) entered in this action on October 27, 2023 (ECF No. 200 & 201), December 13, 2023 (ECF No. 205), and December 15, 2023 (ECF No. 206). All of which, *for all intents and purposes*, are the same order and/or judgment against *pro se* Plaintiff Gordon Clark (Mr. Clark), that Mr. Clark intends to appeal in his *Brief and Appendix* with the *United States Court of Appeals for the Second Circuit*, which are due on or before March 1, 2024 (**Please see: USCA Case No. 23-7834**).

Thank you for your time, consideration, and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.


Dated and signed at Enfield, Connecticut, on December 18, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

## CERTIFICATE OF SERVICE

I, Plaintiff Gordon Clark, certify that a copy of the above **NOTICE OF AMENDED APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT** will be served via *electronic service* on December 18, 2023, to the following:

Patrick S. Tracey, Esq. *(Santander Bank, N.A. named Defendants)*
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via *Electronic Service***

Jeffrey M. Knickerbocker, Esq. *(Bendett & McHugh, P.C. named Defendants)*
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via *Electronic Service***

Sean R. Higgins, Esq. *(Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
1 Congress Street, Suite 2900
Boston, MA 02114
**Served via *Electronic Service***


Dated and signed at Enfield, Connecticut, on December 18, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit 1

## Face to the Name
## Lillian and Gordon Clark
## (An Uncommon, Unbreakable, and Eternal Love)



My Precious Lilli-Bella • The Most Beautiful Girl in the World • 1929 • Bronx, NY



Gordon & Lilli-Bella • Our Wedding Day • February 14, 1993



Lilli-Bella • The Love of My Life • February 3, 2018 • Her Beloved Home



Lilli-Bella & Gordon • 10th Wedding Anniversary • February 14, 2003 • Gramercy Tavern • New York, NY

# Exhibit 2

| FIDUCIARY'S PROBATE CERTIFICATE<br>PC-450  REV. 7/15 | **STATE OF CONNECTICUT**<br>**COURT OF PROBATE** | |
|---|---|---|

| **COURT OF PROBATE, North Central Connecticut** | **DISTRICT NO. PD11** | |
|---|---|---|
| ESTATE OF/IN THE MATTER OF<br><br>Lillian J. Clark, AKA Lillian Jennie Clark   (21-0414) | | DATE OF CERTIFICATE<br><br>November 8, 2023 |
| FIDUCIARY'S NAME AND ADDRESS<br><br>Gordon Clark, 70 Elm Street, Enfield, CT 06082 | FIDUCIARY'S POSITION OF TRUST<br><br>Executor | DATE OF APPOINTMENT<br><br>August 6, 2021 |

*The undersigned hereby certifies that the fiduciary in the above-named matter has accepted appointment, is legally authorized and qualified to act as such fiduciary because the appointment is unrevoked and in full force as of the above date of certificate.*

**This certificate is valid until June 28, 2024.**

*Other limitation, if any, on the above certificate:*

IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed the seal of this Court on the above date of certificate.

Chandler Davis, Chief Clerk

**Court Seal**

**NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED**

FIDUCIARY'S PROBATE CERTIFICATE
PC-450

# Exhibit 3

**FOR THE EXCLUSIVE USE OF**

From the Boston Business Journal:
https://www.bizjournals.com/boston/news/2023/06/25/branch-closures-santander.html?
utm_source=sy&utm_medium=nsyp&utm_campaign=yh

SUBSCRIBER CONTENT:

**Banking & Financial Services**

# In six months, there have been 46 applications for branch closures. Most are from one local bank



Santander Bank is located in Boston's Financial District.

GARY HIGGINS

 By Meera Raman – Reporter, Boston Business Journal
Jun 23, 2023

There have been 46 applications for bank branch closures in Massachusetts since the start of the year—and 33 are from Santander Bank.

At this point last year, there had only been 27 applications for branch closures filed through the federal Office of the Comptroller of the Currency (OCC). Some local banks are state-chartered, so their branch closures are not available through the OCC.

Experts agree that banks are trying to downsize their physical branches, but are struggling with the balance of mobile banking and in-person banking.

"Banks are redrawing their maps, but no one has given them the instructions on how to do that," said Chris Marinac, director of research at Janney Montgomery Scott.

**Santander's 'change of heart'?**

Santander leads the pack of planned branch closures, with 72% of the applications.

The Spanish bank entered the retail and commercial banking business in the United States in 2010 with the acquisition of Sovereign Bank. In October 2013, Sovereign's name was changed to Santander. The bank chose the Northeast corridor for expansion, but Marinac believes that "they have had a change of heart back home at the parent company."

"I just think they made a decision back home that they needed to focus on their home country. They are less interested in the U.S., the U.S. has got tons of competition," Marinac said.

Since it entered the Massachusetts market, the bank has racked up the second-highest number of branches in the state, with 166 at the end of last year, tied with Bank of America. Providence-based Citizens Bank led the pack with 206.

But, the bank hasn't always had it easy. It had a rocky start after establishing Boston as its U.S. headquarters. It went through three CEOs between 2013 and 2015, repeatedly failed the Federal Reserve's stress tests, and lost deposits. Still, Santander remains the third-largest bank in state with $27 billion in Mass. deposits as of last December.

The bank has been applying to close many of its branches, and cites the rise of online banking as the reason.

"Like many industries, our customers' preferences have changed, with more customers choosing to bank with us online," the bank previously said in a statement to the Business Journal. "Therefore, we are reimagining the customer and employee experience by simplifying our processes, refining our branch footprint, and increasing our investment in digital capabilities to align with the evolving needs of our customers."

The move to mobile banking appears to be paying dividends for Santander. The bank ranked in second place in mobile satisfaction among regional banks in the most recent JD Power Survey. In addition, more than 1 million customers used the bank's digital channels in April, which was a new record, according to the bank.

The bank did not respond to a question asking how many branch closures it plans to have this year.

## Mobile up, branches down

Since 2009, Massachusetts has seen a 13% decrease in the number of physical bank branches, with 1,962 as of mid-2022 and 2,245 as of mid-2009, according to data from the Federal Deposit Insurance Corp. The largest declines were seen during and after the height of the pandemic.

Since the beginning of the pandemic, branches across the state have been shuttered. Since March 2020, there have been 284 branch closures in the state. Citizens closed 41, Bank of America closed 42, and Santander closed 41.

But 113 branches have also opened in the state since March 2020, led by JPMorgan & Chase Co., which has been expanding quickly since the bank entered the retail market in 2018. JPMorgan has already opened 30 branches and plans to open 90 branches in the state by the end of 2025.

Branch closures in the state are being led by a "change in customer preference," said Kathleen Murphy, president and CEO of the Massachusetts. Bankers Association.

According to an Oct. 2022 American Bankers Association study, 72% of banking customers use a mobile app or online banking on a computer. Those findings are consistent with a 2021 FDIC survey that found the use of mobile banking increased sharply between 2017 and 2021, becoming the most prevalent primary method of account access.

With the rise of online banking, banks have a larger reach to customers through their mobile devices. While mobile banking works well for day-to-day transactions, it doesn't eliminate the need for physical branches, Marinac said.

"Technology has fundamentally changed how the banking industry works, and the banking business is trying to catch up, but they don't have it figured out," said Suzanne Moot, a local banking consultant.

"Instead of figuring it out first, then closing branches, they are doing it the other way around," she added.

**Subscribe to the Morning Edition or Afternoon Edition for the business news you need to know, all free.**

# Exhibit

# 4

MARKETS

# Santander Settles Predatory Auto-Lending Claims for $550 Million

Consumer-finance company was accused of making loans that borrowers couldn't afford to repay



Santander is one of the largest subprime auto lenders in the U.S.
PHOTO: JOHN LAMPARSKI/SOPA IMAGES/LIGHTROCKET/GETTY IMAGES

By *Ben Eisen* Follow and *AnnaMaria Andriotis* Follow
Updated May 19, 2020 2:34 pm ET

Santander Consumer USA Inc. has reached a $550 million deal with nearly three dozen states to settle charges of predatory auto lending to low-income and subprime borrowers.

The settlement, announced Tuesday, resolves charges that one of the largest subprime auto lenders in the U.S. made loans borrowers couldn't afford to repay. The states also claim that Santander failed to monitor dealers that falsified borrowers' incomes and other information when submitting loan applications.

"Over the last several years, we have strengthened our risk management across the board—improving our policies and procedures to identify and prevent dealer misconduct, and tightening standards to ensure affordability," Santander said in a written statement.

Thirty-three states and the District of Columbia accused Santander of extending loans that were too big relative to borrowers' incomes, charging excessive fees and failing to monitor dealership loan-approval practices.

California Attorney General Xavier Becerra said Santander profited by extending high-interest loans to buyers "who were doomed from the start" to default.

TRENDS IN AUTO LENDING

- Auto Lenders Try to Lure Borrowers With Generous Terms—For Some
- People Need Loans as Pandemic Spreads. Lenders Are Making Them Tougher to Get.
- Car Dealers Push Online Sales to Make Up for Coronavirus Losses
- Dealerships Give Car Buyers Some Advice: Just Stop Paying Your Loan
- The Seven-Year Auto Loan: America's Middle Class Can't Afford Its Cars

The settlement includes $65 million of restitution for consumers. It also involves some $433 million in loan forgiveness, including for customers who have had cars repossessed but still owe money to Santander. The lender also agreed to waive balances for customers who have very low credit scores and who had stopped paying their loans as of the end of last year.

In addition to the penalty, Santander agreed to factor its borrowers' ability to repay its loans into its underwriting. It agreed not to fund loans that, when combined with other debt payments and monthly costs, would eat up a borrower's entire income.

Most auto-loan financing is arranged through dealerships, and lenders that fund the loans are supposed to carefully review borrowers' applications.

Lenders have been approving consumers for auto loans that they can't afford, including loans with larger monthly payments than borrowers' incomes, The Wall Street Journal reported last year. Consumers are increasingly signing up for loans that are larger than their car's purchase price, the Journal reported, increasing their chances of default.

Consumer lawyers say the practices often result in repossessed cars and damaged credit scores that make it harder for people to qualify for affordable financing.

Santander didn't verify several numbers in consumers' auto-loan applications that would have determined whether they could afford the financing, the states said in their complaints. It accepted stated-income loans without requiring documentation from dealers or consumers that would prove the income listed on the application, the states said.

Loan applicants' housing costs were also rarely verified, and Santander didn't have measures in place to catch falsified figures, the states alleged. When a loan application didn't include housing costs, Santander would assume a lower figure than what was reasonable for the area, according to the complaints.

The settlement highlights lenders' reliance on dealerships to boost loan sales. There was internal tension at Santander over how to handle dealerships that were found to have falsified applications, according to the states' complaints. The lender, the states said, tracked problematic dealers but often failed to cut ties with them if they were delivering enough profitable loans.

Santander's loans, which often come with double-digit interest rates, are typically packaged into bonds and sold to investors. Last year, Santander issued $8.3 billion worth of these bonds, more than twice the amount of the next largest subprime auto lender, according to data from Finsight.

Santander in 2017 settled claims stemming from its subprime auto-lending practices with the attorneys general of Delaware and Massachusetts.

**Write to** Ben Eisen at ben.eisen@wsj.com and AnnaMaria Andriotis at annamaria.andriotis@wsj.com

*Appeared in the May 20, 2020, print edition as '.'*

# Exhibit

# 5

# Santander will exit U.S. home lending, review commercial segments

By **Laura Alix**

**February 02, 2022, 5:31 p.m. EST2 Min Read**

Banco Santander plans to exit U.S. residential mortgage lending and review its stateside presence in certain commercial segments as part of a broader overhaul of its American franchise.

Santander will focus on growing its U.S. auto lending and consumer lending segments, the Spanish banking giant said Wednesday. It also plans to concentrate on banking middle-market clients in this country, and on working with corporate clients across its global footprint.

The changes are part of a multiyear effort, internally called One Santander, that has already included an exit from retail banking in Puerto Rico and the downsizing of the company's Northeast U.S. branch footprint.



*Boston-based Santander Bank plans to stop originating new mortgages and home equity loans, while also making more auto loans, under a plan announced Wednesday.*
*Ron Antonelli/Bloomberg*

"We are simplifying our business to focus on those areas where we can be successful with clients and deliver solid returns," Tim Wennes, president and CEO of Santander Bank and its U.S. holding company, said in an interview.

Profits from Santander's U.S. business more than doubled to $2.3 billion last year on higher revenues and a lower cost of credit, Banco Santander said Wednesday. Its U.S. businesses contributed 22% of the parent company's profits in 2021, up from 7% in 2019, Executive Chairman Ana Botin said during a conference call.

Last year, Madrid-based Banco Santander announced a buyout of the minority shareholders in Santander Consumer USA, its Dallas-based auto lending unit. That process was completed on Monday, according to disclosures filed with the Securities and Exchange Commission.

Santander's U.S. holding company is also awaiting regulatory approval of its acquisition of Amherst Pierpont Securities, a New York-based independent broker-dealer. That deal, first announced in July 2021, is expected to give Santander a larger foothold in fixed-income trading, which surged during the pandemic.

Santander Bank, which has $89.5 billion of assets, said that it plans to stop originating new mortgages and home equity loans later this month because of a lack of scale in those areas. The company reasoned that its capital and resources could be better spent on more profitable growth areas, such as auto lending and priority segments within commercial lending, Wennes said.

"We didn't see a clear path to above cost-of-capital returns and made a decision to stop new originations," Wennes said. The decision should have no immediate impact on customers in Santander's mortgage servicing portfolio, he added.

Over time, Santander intends to originate more auto loans on the balance sheet of its Boston-based bank, and to use retail deposits gathered through the bank to fund prime auto loans originated by Santander Consumer, according to the company.

Santander's U.S. consumer banking unit will also continue to focus on making unsecured personal loans, issuing credit cards and offering small-business loans, the company said.

While Santander is reviewing certain segments within commercial and industrial lending, the company said it intends to ramp up its middle-market business banking. And through its corporate and investment bank, Santander plans to connect with larger international corporate clients that have connections in some of its other markets, like Spain and Chile, the company said.

Laura Alix
Staff Writer, American Banker

**97**



Important
information about
your Santander
Home Equity
Line of Credit.

Lillian J Clark
70 Elm St
Enfield, CT 06082-3631

February 3, 2022

Dear Lillian J Clark,

As of February 11th, Santander will no longer be taking applications for new mortgages or home equity lines of credit.
Please let us reassure you that **this move won't affect your current home equity line of credit in any way**.

· You'll continue to be our valued client

· Your interest rate will not be impacted by this change

· Your repayment terms will remain the same

· You'll continue to enjoy all the same benefits and services

Your business is important to us, and we appreciate the opportunity to meet your needs. We've prepared some
detailed answers to questions you may have about this business decision.

Please scan the QR code below or visit SantanderBank.com/home-lending-changes to learn more.

Thank you for being a valued client.

Sincerely,

Stuart Bernstein
Santander Head of Branch Banking and Santander Private Client



Santander Bank, N.A. is a Member FDIC and a wholly owned subsidiary of Banco Santander, S.A. ©2022 Santander Bank, N.A. All rights reserved.
Santander, Santander Bank and the Flame Logo are trademarks of Banco Santander, S.A. or its subsidiaries in the United States or other countries.
All other trademarks are the property of their respective owners.

**98**

HELOC

Please Sign In and use this article's on page print button to print this article.

**Banking & Financial Services**

# Santander to lay off 53 in Conshohocken as it exits U.S. residential mortgage business



Santander Bank plans to lay off 53 local employees as part of a broader plan to exit the residential mortgage and home equity origination space in the United States.

MICHAEL POTTER


By Jeff Blumenthal – Reporter, Philadelphia Business Journal
a day ago

**IN THIS ARTICLE**

**Residential Real Estate**
Industry

**Michael Pagano**
Person

Santander Bank plans to lay off 53 employees in Conshohocken as part of a broader plan to exit the residential mortgage and home equity origination space in the United States.

The Boston-based bank, a subsidiary of Spanish banking giant Santander Group (NYSE: SAN), said the cuts will involve almost 400 employees, or 4.5% of its approximately 8,700 workers.

In a letter submitted to the Pennsylvania Department of Labor and Industry, Michael Pagano, head of employee relations at Santander, said workers were notified by Feb. 2 and placed on a paid notice period until their effective termination date on or after April 8. At that point, they will be eligible for severance benefits. Pagano said while the layoffs are permanent, the affected employees can apply for existing vacancies within the company.

In a statement, Santander said that its U.S. strategy is to simplify, focusing on at-scale businesses that can

achieve profitable growth. The bank said it stopped new originations of home mortgages and home equity loans because the company hadn't achieved scale in those areas and the capital and resources could be better spent on areas, such as auto lending and segments of business and commercial banking.

In August, Santander paid $2.5 billion to buy out the minority stake in its Dallas-based auto financing unit, Santander Consumer (NYSE: SC). Later in the year, executives discussed plans to beef up commercial lending in the Philadelphia region and across its footprint.

"We will discontinue residential mortgage and home equity originations as we continue to focus on investing in products that have scale and that leverage our core strengths," a spokeswoman said via email. "This move will allow us to unlock capital to fuel our growth and help Santander U.S. continue to deliver attractive, sustainable returns. We remain committed to our clients, small businesses and the communities we serve and are ensuring that our current clients and those in our pipeline are not impacted."

While the bank is discontinuing new originations, it said there will be no immediate impact to existing home loan clients. It will continue to service our existing and pending home loans while evaluating strategic options for the remaining book of business.

While it might seem odd to exit the residential mortgage business as it has been booming during the pandemic, activity began to wane in the second half of 2021. The Mortgage Bankers Association said it expects originations to decline 33% year-over-year to $2.59 trillion in 2022 — citing higher rates, lower volumes, and fiercer competition.

Santander said U.S. business more than doubled to $2.3 billion in 2021, contributing almost 22% of Santander Group's global profits. It said that number is up from 7% in 2019.

Santander, which remains the seventh-largest deposit taker in the Philadelphia region, has also been saving money but pruning its retail branch network. It has closed 13 local branches since the start of 2021, leaving it with 60.

# Exhibit

# 6

**Santander**

Santander Bank, N.A.
Collections Operations
450 Penn Street
Reading, PA 19602
Mail Code: 10-421-MC3

May 1, 2019

Lillian Byron f/k/a Lillian Clark
70 Elm St.
Enfield, CT  06082

Property Address 70 Elm St., Enfield, CT  06082

Dear Lillian Byron:

Santander Bank, N.A. has recently been notified by the Town of Enfield Tax Authority regarding the outstanding delinquent/unpaid taxes on the property located at 70 Elm St., Enfield, CT  06082. In accordance with the terms of your HELOC, for loan account 5139015544, you are obligated to pay all property taxes as they become due.

**What you need to know**

- Santander Bank, N.A. has paid the delinquent/unpaid taxes in the amount of $171.18 to the Town of Enfield, on 10/05/2015, $22,605.40 to A1Z LLC on 10/05/2015, $14,799.28 to the Town of Enfield on 08/17/2018 in order to protect the Bank's interest of the collateral.
- You are required to pay the total amount of $37,575.86 no later than 05/20/2019 in order to cure the default of the HELOC as outlined in the Mortgage/Deed of Trust agreement to the address listed below:

> Santander Bank, N.A.
> Mail Code: 10-421-MC3
> 450 Penn Street
> Reading, PA 19602
> ATTN: Tianna Agosto

- The payment must be made payable to Santander Bank, N.A. either by cashier's check, certified check or money order. Please include your loan account number on the check for reference purposes.

**What happens next**

- If the Bank does not receive payment by 05/20/2019, the Bank will exercise its rights to accelerate the amount secured by the collateral and institute a lawsuit to foreclose on the collateral.

**If you have questions**

- If you have any questions regarding this letter, please contact the Collections Default Department at 1-800-929-0234.
  - Monday through Thursday 8:00AM to 8:00PM ET
  - Friday 8:00AM to 6:00PM ET
  - Saturday 8:00AM to 1:00PM ET

Sincerely

Melissa Hinsey
Collections Operations
Santander Bank, N.A

Santander Bank, N.A. is a Member FDIC and wholly owned subsidiary of Banco Santander, S.A. ©2008 Santander Bank, N.A. All rights reserved. Santander, Santander Bank and the Flame logo are trademarks of Banco Santander, S.A. or its subsidiaries in the United States or other countries. All other trademarks are the property of their respective owners.

MK1419  144902  03/18

Consumer FCL Paid TAX/HOA 01.29.19

# Exhibit 7



# Town of Enfield

| Town of Enfield |
|---|
| 820 Enfield St |
| |
| 820 Enfield St, CT 06082 |
| 860-253-6340 |

## Bill Information



### Taxpayer Information

| | | | | |
|---|---|---|---|---|
| Bill # | 2017-1-0012701 (REAL ESTATE) | | Town Benefit | 1,000.00 |
| Unique ID | 000600020110-LIEN | | Elderly Benefit | (C) 1,000.00 |
| District/Flag | District: 2 | | | |
| Name | CLARK LILLIAN J | | Assessment | 101,440 |
| Care of/DBA | | | Exemption | 0 |
| Address | | | Net | 101,440 |
| Detail Information | 70 ELM ST | | | |
| Volume/Page | 0/0 | | | Town 33.4 |
| | | | Mill Rate | |

### Bill Information As of  05/07/2019

| Installment | Due Date | Town | District | | Total Due | |
|---|---|---|---|---|---|---|
| Inst #1 | 07/01/2018 | 694.05 | 682.69 | | Tax/ Princ/ Bond Due | 0.00 |
| Inst #2 | 01/01/2019 | 694.05 | | | | |
| Inst #3 | | | | | Interest Due | 0.00 |
| Inst #4 | | | | | | |
| Total Adjustments | | 0.00 | 0.00 | | Lien Due | 0.00 |
| Total Installment + Adjustment | | 1,388.10 | 682.69 | | Fee Due | 0.00 |
| Total Payments | | 2,070.79 | | | Total Due Now | 0.00 |
| | | | | | Balance Due | 0.00 |

*** Note: This is not a tax form, please contact your financial advisor for information regarding tax reporting. ***

### Payment History

| Payment Date | Type | Tax/Principal/Bond | Interest | Lien | Fee | Total |
|---|---|---|---|---|---|---|
| 04/30/2019 | PAY | 694.05 | 41.64 | 24.00 | 0.00 | 759.69 |
| 08/22/2018 | PAY | 1,376.74 | 41.30 | 0.00 | 0.00 | 1,418.04 |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| *** Total payments made to taxes in | 2018 | $1,418.04 |
|---|---|---|

# Exhibit 8

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

| | | |
|---|---|---|
| RETURN DATE: DECEMBER 17, 2019 | : | SUPERIOR COURT |
| SANTANDER BANK, N.A. | : | J.D. OF HARTFORD |
| VS. | : | AT HARTFORD |
| CLARK, LILLIAN J., ET AL | : | NOV 1 9 2019 |

### COMPLAINT

## COUNT 1- REFORMATION OF MORTGAGE

1.  On March 21, 2008, Lillian J. Clark owed Sovereign Bank $100,000.00, as evidenced by a promissory note for said sum dated on said date, and payable to the order of Sovereign Bank with interest from said date, in monthly installments of principal and interest.

2.  On said date, by a deed of that date, said Lillian J. Clark, to secure said note, mortgaged to Sovereign Bank the premises known as 70 Elm Street, Enfield, Connecticut, and described in Exhibit A attached hereto and made a part hereof.

3.  Said mortgage deed was recorded on the Enfield Land Records on April 7, 2008 in Volume 2392 at Page 47.   Said Mortgage correctly identifies the secured premises as 70 Elm Street, Enfield, CT, however, no property description was attached to the Mortgage Deed.

4.  Upon information and belief, the legal description attached hereto as Exhibit A provides an accurate legal description of the mortgage premises.

5.  Reformation of said mortgage to provide a detailed legal description as attached

hereto as Exhibit A would visit no prejudices upon any subsequent encumbrances because said mortgage correctly references the street address of the mortgage premises.

## COUNT II – FORECLOSURE OF THE MORTGAGE AS REFORMED

1.    On March 21, 2008, Lillian J. Clark owed Sovereign Bank $100,000.00, as evidenced by a promissory note for said sum dated on said date, and payable to the order of Sovereign Bank with interest from said date, in monthly installments of principal and interest.

2.    On said date, by a deed of that date, said Lillian J. Clark, to secure said note, mortgaged to Sovereign Bank the premises known as 70 Elm Street, Enfield, Connecticut, and described in Exhibit A attached hereto and made a part hereof.

3.    Said mortgage deed was recorded on the Enfield Land Records on April 7, 2008 in Volume 2392 at Page 47.   Said Mortgage correctly identifies the secured premises as 70 Elm Street, Enfield, CT, however, no property description was attached to the Mortgage Deed.

4.    Sovereign Bank merged into and is now known as Santander Bank, N.A.

5.    On or before October 29, 2019, the Plaintiff became and at all times since then has been the party entitled to collect the debt evidenced by said note and is the party entitled to enforce said mortgage.  The unpaid balance due pursuant to the terms of said note is $80,897.23, plus interest from May 10, 2019 and late charges and collection costs, that have not been paid although due and payable.

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

6.      Said note and mortgage are now in default by virtue of nonpayment of the monthly installments of principal and interest due on June 10, 2019 and each and every month thereafter, and the Plaintiff has exercised its option to declare the entire balance of said note due and payable.

7.      The following encumbrances of record upon the property sought to be foreclosed are prior in right to the Plaintiff's mortgage and are not affected by this action:

(a)      Any taxes due the Town of Enfield that remain outstanding and properly perfected as of the date hereof pursuant to applicable law.

8.      On the aforementioned piece of property, the following interests are claimed which are subsequent to Plaintiff's said mortgage:

(a)      The Defendant, Midland Funding, LLC may claim an interest in said premises by virtue of a Judgment Lien in the amount of $14,304.93 dated April 18, 2012 and recorded May 2, 2012 in Volume 2552 at Page 644 of the Enfield Land Records.

(b)      The Defendant, Unifund Corporation, may claim an interest in said premises by virtue of a Judgment Lien in the amount of $5,090.00 dated October 14, 2015 and recorded October 19, 2015 in Volume 2630, Page 528 of the Enfield Land Records.

(c)      The Defendant, Saint Francis Hospital, may claim an interest in said premises by virtue of a Judgment Lien in the amount of $1,463.05 dated July 22, 2016 and

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

recorded July 28, 2016 in Volume 2646, Page 1143 of the Enfield Land Records.

(d)     The Defendant, Gordon Alexander Clark, may claim an interest in said premises by virtue of a Lien in the amount of $300,000.00 dated February 12, 2012 and recorded February 13, 2012 in Volume 2546, Page 1107 of the Enfield Land Records.

9.     Upon information and belief, the Defendant, Lillian J. Clark is the owner of record and in possession of said premises.

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

WHEREFORE, the Plaintiff claims **AS TO COUNT I:**

1.    Reformation of the mortgage by adding the legal description attached hereto as Exhibit A to said mortgage.

**AS TO COUNT II:**

1.    A foreclosure of said mortgage as reformed.
2.    Immediate possession of the mortgaged premises.
3.    A deficiency judgment. **No deficiency will be sought against any person whose obligation under the subject promissory note has been heretofore or hereafter discharged in bankruptcy.**
4.    The appointment of a receiver to collect rents and profits accruing from the premises.
5.    Reasonable attorney's fees and costs.
6.    Such other relief and further equitable relief as may be required.

**NOTICE:  THE LAW FIRM OF BENDETT & MCHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

This action is within jurisdiction of the Superior Court.

Dated at Farmington, Connecticut, _____NOV 1 9 2019_____

> THE PLAINTIFF,
> SANTANDER BANK, N.A.
>
> By_____
>     Dominick Neveux
> Bendett & McHugh, P.C.
> Its Attorneys
> 270 Farmington Avenue, Suite 151
> Farmington, CT 06032
> (860) 677-2868
> Juris No. 102892

A TRUE COPY
ATTEST:

JOHN T. FIORILLO
CONNECTICUT STATE MARSHAL

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

RETURN DATE: DECEMBER 17, 2019 : SUPERIOR COURT

SANTANDER BANK, N.A. : J.D. OF HARTFORD

VS. : AT HARTFORD

CLARK, LILLIAN J., ET AL : NOV **1 9** 2019

## STATEMENT OF AMOUNT IN DEMAND

    The amount, legal interest or property in demand is $15,000.00 or more, exclusive of interest and costs.

PLAINTIFF,
SANTANDER BANK, N.A.

Dominick Neveux
Bendett & McHugh, P.C.
Its Attorneys
270 Farmington Avenue, Suite 151
Farmington, CT 06032
(860) 677-2868
Juris No. 102892

CLC/1162FC-20198219

Rev.053119

A TRUE COPY
ATTEST:

JOHN T. FIORILLO
CONNECTICUT STATE MARSH

Exhibit A

I *the said releasor have or ought to have in or to* a certain piece or parcel of land with buildings and improvements thereon and appurtenances thereto, situated on the Southerly side of Elm Street known as No. 70 Elm Street, in the Town of Enfield, County of Hartford and State of Connecticut bounded and described as follows:

NORTHERLY  –  By Elm Street a distance of Eighty-Five (85.00) feet;

EASTERLY  –  By land now or formerly of Clarence Provencher, Et Al a distance of One Hundred Sixty-Four and forty-two hundredths (164.42) feet;

SOUTHERLY  –  By land now or formerly of John Nareski, Et Ux a distance of Eighty-Five (85.00) feet;

WESTERLY  –  By land now or formerly of Frank Ruggiero a distance of One Hundred Sixty-Eight and ninety hundredths (168.90) feet.

Reference is hereby made to a map entitled "Map of Land in Enfield, Conn. for Clarence D. Provencher Scale 1 inch equals 50 feet Mar. 1955 Wm E. Savage, Jr. Land Surveyor Thompsonville, Conn." on file in the Town Clerk's Office of said Town of Enfield, Book of Maps, Volume 5, Page 156, upon which map the above premises appears as the Westerly portion of land therein shown and to which reference is made for a more particular description.

7.

# Exhibit 9

| | | |
|---|---|---|
| **Docket No. HHD-CV19-6120472-S** | ) | **Return Date: December 17, 2019** |
| | ) | Superior Court |
| Santander Bank, N.A. | ) | Judicial District of Hartford |
| vs. | ) | at Hartford |
| Clark, Lillian J., et al. | ) | **April 29, 2022** |
| | ) | |

## <u>DEFENDANTS' ANSWER, AFFIRMATIVE/SPECIAL DEFENSES, COUNTERCLAIM, AND JURY DEMAND</u>

The Defendants, Gordon Clark (Mr. Clark), and Lillian J. Clark, hereby files *Defendants' Answer, Affirmative/Special Defenses, Counterclaim, and Jury Demand*.

## <u>ANSWER</u>

### <u>COUNT ONE: REFORMATION OF MORTGAGE</u>

1.) Denied.

2.) Denied.

3.) Denied.

4.) Denied.

5.) Denied.

### <u>COUNT TWO: FORECLOSURE OF THE MORTGAGE AS REFORMED</u>

1.) Denied.

2.) Denied.

3.) Denied.

4.) Without knowledge.

5.) Denied.

6.) Denied.

1

**115**

*alleged* mortgage.

2.) Compensatory damages.

3.) CUTPA double, or treble *punitive damages*.

4.) Legal fees and costs of litigation, under CUTPA.

5.) Such other and further relief as this Court may determine is just and equitable under CUTPA.

**COUNT TWO:**
**VIOLATIONS OF THE**
**CONNECTICUT UNFAIR TRADE PRACTICES ACT (CUTPA)**

1.) Denial of the equitable remedy of foreclosure and invalidation of the *alleged* note and *alleged* mortgage.

2.) Compensatory damages.

3.) CUTPA double, or treble *punitive damages*.

4.) Legal fees and costs of litigation, under CUTPA.

5.) Such other and further relief as this Court may determine is just and equitable under CUTPA.

**JURY DEMAND**

1.) The Counterclaimants demand a jury trial of the material facts in this matter.

**CERTIFICATION**

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as ***required by law***, a copy of *Defendants' Answer, Affirmative/Special Defenses, Counterclaim, and Jury Demand* has been mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, and the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull.

30

**116**

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via *USPS Certified Mail***

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, Connecticut 06103-1840
**Mailed via *USPS Certified Mail***

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on April 29, 2022, by Defendant and Counterclaimant Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

31

**117**

# Exhibit 10

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

| | | |
|---|---|---|
| DOCKET NO: HHD-CV-19-6120472-S | : | SUPERIOR COURT |
| SANTANDER BANK, N.A. | : | J.D. OF HARTFORD |
| VS | : | AT HARTFORD |
| CLARK, LILLIAN J., ET AL | : | MAY 18, 2022 |

**PLAINTIFF'S REPLY TO DEFEDNANT'S SPECIAL DEFENSES, MATTERS IN AVOIDANCE, ANSWER AND SPECIAL DEFENSES TO COUNTER CLAIMS**

**I. REPLY TO SPECIAL DEFENSES**

    Santander Bank, N.A., (the "Plaintiff") respectfully replies that pursuant to Practice Book § 10-56, Plaintiff generally denies the allegations of Defendant Gordon Clark ("Defendant's") special defenses and leaves Defendant to his proof.

**II. MATTERS IN AVOIDANCE**

    Pursuant to Practice Book § 10-57, Plaintiff pleads the following matters in avoidance.

1.   As to all special defenses, Defendant's breach of the obligations under the Note and Mortgage are fatal to Defendant's alleged defenses.

2.   Defendant's failure to pay taxes when due and failure to offer a deed in lieu preclude Defendant from seeking any set-off.

**NOTICE: THE LAW FIRM OF BENDETT & MCHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY WHICH DISCHARGED THIS DEBT, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

### III. ANSWER TO THE COUNTERCLAIMS.

**Count One**

1.  As to paragraph 1 Plaintiff is without sufficient knowledge to admit or deny and leaves Defendant to his facts.

2.  As to Paragraphs 2 and 3, the allegations are denied as the court has denied a motion to dismiss and motion to strike based on an alleged lack of property description, further the mortgage includes the property address and citation to a document on the land records.

3.  As to Paragraph 4, Plaintiff admits it has a pending reformation count, but denies its mortgage is "invalid, defected and unenforceable."

4.  As to Paragraph 5, Plaintiff admits its complaint does not contain the words "mutual mistake" or "fraud," but denies the remainder of the allegations.

5.  As to Paragraphs 6, 7, and 8, Plaintiff denies the allegations contained therein.

**Count Two**

1.  As to paragraph 1, 2, 3, 4, 5 and 6, the allegations contained therein are denied.

### IV. SPECIAL DEFENSES TO THE COUNTERCLAIM.

1.  As to both counts, the note and mortgage were breached by the borrower's failure to pay property taxes, and this breach has been admitted by Defendant in the Answer, on page

2

**120**

23, paragraph 2 where Defendant admits that the taxes were so far behind that the Town of Enfield conducted a "tax lien foreclosure sale where the property was sold in April 2015 to the highest bidder . . . ."

2. As to both counts, any damages are a direct and proximate result of Defendant failing to promptly pay property taxes as required by the Note and Mortgage.

3. As to both counts, any damages are a direct and proximate result of Defendant failing to turn the property over to Plaintiff after the breach of the borrower's obligation to pay property taxes.

Respectfully submitted,
PLAINTIFF

//414128
By_____
Jeffrey M. Knickerbocker, Esq.
Bendett & McHugh, P.C.
Its Attorneys

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

3

**CERTIFICATION**

      I hereby certify that a copy of the above was mailed or electronically delivered on May 18, 2022 to all counsel and pro se parties of record and that written consent for electronic delivery was received from all counsel and pro se parties of record who were electronically served, as follows:

LILLIAN J CLARK
70 ELM STREET
ENFIELD, CT 06082

GORDON ALEXANDER CLARK
70 ELM STREET
ENFIELD, CT 06082

//414128
_____
Jeffrey M. Knickerbocker
Commissioner of the Superior Court

Bendett & McHugh, P.C., 270 Farmington Avenue, Suite 151, Farmington, CT 06032 • TEL (860) 677-2868 • TDD/TYY PLEASE FIRST DIAL 711

# Exhibit 11

**CERTIFICATE OF
CLOSED PLEADINGS**
JD-CV-11  Rev. 10-20
P.B. §§ 14-4, 14-8, 14-9

For information on ADA accommodations,
contact a court clerk or go to: *www.jud.ct.gov/ADA.*

STATE OF CONNECTICUT
**SUPERIOR COURT**
*www.jud.ct.gov*



| Name of case *(Plaintiff v. Defendant)* | Docket number |
|---|---|
| **SANTANDER BANK, N.A.  v. CLARK, LILLIAN J Et Al** | **HHD-CV-19-6120472-S** |

☒ Judicial District   ☐ Housing Session   ☐ Geographical Area number

Address of court *(number, street, town and zip code)*
**95 WASHINGTON STREET HARTFORD, CT 06106**

**I certify that the pleadings in this case are closed on the issue(s) as to all parties.**

Name of person making certification
**JEFFREY MARKS KNICKERBOCKER / BENDETT & MCHUGH PC**

Signature
▶ **414128**

☐ Plaintiff   ☐ Defendant
☒ **Attorney for Plaintiff**   ☐ Attorney for Defendant

**The pleadings being closed, the case will proceed as a(n):** *(Select all that apply)*

☐ Jury Trial *(Also file a Claim for Jury (Form JD-CL-53), with statutory fee.)*
☐ Hearing in Damages to the Court
☐ Hearing in Damages to the Jury *(Also file a Claim for Jury (Form JD-CL-53) with statutory fee.)*
☐ Administrative Appeal: *(Select applicable box)*   ☐ Record   ☐ Non-record
☒ **Non-Jury Matter** *(court trial)*

**A. If case is privileged, then complete this section.**

1. Basis of privilege under Section 14-9 of the Connecticut Practice Book:  *(Select all that apply)*

☐ hearing under the fair employment practices act or the labor relations act;
☐ an action brought by or on behalf of the state, other than actions upon probate bonds;
☐ appeal from the employment security board of review;
☐ appeal from probate or from the doings of commissioners appointed by court of probate;
☐ action brought by receiver of insolvent corporation by order of court;
☐ action by or against any person sixty-five years of age or older or who reaches such age while the action is pending;
☐ appeal from findings, orders, or other actions of the public utilities control authority;
☐ equitable action tried to the court in which the essential claim asserted is for a permanent injunction and any claim for damages or other relief, legal or equitable, is merely in lieu of, or supplemental to, the claim for injunction;

☐ habeas corpus proceeding;
☐ motion to dissolve temporary injunction;
☐ motion for temporary injunction;
☐ writ of ne exeat, prohibition, or mandamus;
☐ application for appointment of receiver;
☐ disclosure by garnishee;
☐ action by or against executor, administrator, or trustee in bankruptcy or insolvency;
☐ hearing to the court in damages on default or case where there is an issue as to damages after the court has granted a summary judgment on the issue of liability;
☐ case remanded by the ☐ Supreme Court   ☐ Appellate Court for a new trial or case in which a verdict has been set aside, a new trial granted, or a mistrial declared.

2. If privilege is other than those specified in Section 14-9 of the Connecticut Practice Book, state ground of claim and authority:

**Privileged pursuant to Conn. Gen. Stat. § 52-192**

**B. Relief requested. Excluding interest and costs, the amount, legal interest, or property in demand is:**

*(Select one amount)*
☒ $15,000 or more.   **OR**   ☐ less than $15,000.

*(Select if applicable)*
☒ I am claiming other relief in addition to, or instead of, money damages.

## Certification

I certify that a copy of this document was or will immediately be mailed or delivered electronically or non-electronically on *(date)* ___Apr-10-2023___ to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties of record who received or will immediately be receiving electronic delivery.

Name and address of each party and attorney that copy was or will be mailed or delivered to*

**LILLIAN J CLARK (Self Represented) - 70 ELM STREET ENFIELD, CT 06082
GORDON ALEXANDER CLARK (Self Represented) - 70 ELM STREET ENFIELD, CT 06082**

*If necessary, attach additional sheet or sheets with name and address which the copy was or will be mailed or delivered to.

| Signed *(Signature of filer)*  ▶ *414128* | Print or type name of person signing **JEFFREY MARKS KNICKERBOCKER** | Date signed **Apr-10-2023** |
|---|---|---|
| Mailing address *(Number, street, town, state and zip code)* **270 FARMINGTON AVE SUITE 151 FARMINGTON, CT 06032** | **124** | Telephone number **860-255-5008** |

# Exhibit 12

# CLOSING STATEMENT
Superior Court of Hartford
Judge Claudia A. Baio
May 4, 2023

Thank you, Judge Baio, for this opportunity to make a closing statement, I *sincerely* appreciate it.

This *tragic and avoidable* case that began over four (4) years ago, that is, shortly after an *erroneous, unjust, and malicious* May 1, 2019, letter was improperly address to Lillian Bryon and not Lillian Clark, and sent via *USPS First Class Mail* from Plaintiff *Santander Bank* demanding $37,575.86 in a lump sum in less than 19 days or face foreclosure from a 91-year-old woman battling daily and courageously against Parkinson's disease since 2009, and who had never missed a payment, and was current on her property taxes. This is certainly not right nor just to anyone with a conscience, and it is definitely illegal, and immoral; and *anyone who rationalizes, justifies, excuses, cover-ups, and/or turns a blind eye* to this reprehensible behavior is *condoning and enabling* this ongoing wrongdoing with impunity. This ongoing *painful and heart-wrenching trauma* is certainly about what unjustly, illegally, and immorally happened to my ***most beautiful, beloved, and precious*** wife of 27-years, Lillian Clark, in the last 8 years of her *precious* life that most certainly shortened her lifespan, and *likely* mine as well, which can be traced back to wrongdoings by the Plaintiff beginning in 2012. The Defendants have experienced over ten (10) years of unnecessary suffering and pain that continues to this day, all due to the Plaintiff's wrongful acts of ageism, sexism, racism, negligent incompetence, greed, power, and/or malice.

However, the much broader issue that effects all Americans, not just the Defendants, is whether or not truth or facts matter anymore in the United States of America, or are we all barreling down the road into a post-truth world, where our media is fill with false conspiracy theories, and the Internet is taken over by AI (Artificial Intelligence); and our courts, despite the efforts of many honorable people in the legal profession, appears to becoming increasingly places where the rich use their immense power and battery of lawyers to *hide the truth, and twist and contort the law, and manipulate the court rules and procedures,* which results in countless injustices to the poor and unrepresented. More specifically to this case, is the question of whether or not *the facts still matter or has the banks captured the courts?*, as one experienced and well-known Connecticut foreclosure attorney told and confirmed to me over the phone about 2 years ago, when this attorney surprisingly, boldly, unequivocally, and unashamedly stated, "***The facts don't matter, because the courts favor the banks***." It is certainly *tragic* the number of lies that we are all inundated with daily, especially, for our *precious and vulnerable* children; however, if lies, half-truths, ***which are whole-lies***, and/or material omissions, such as limiting proper, lawful, and reasonable discovery continues to infect our *beloved,* yet *imperfect* courts, we as a nation, and as a country, and as a people are *sadly* lost. And it will only be a matter of time, until authoritarian rule engulfs our *beloved,* yet *imperfect* nation, and fully corrupts our *beloved,* yet *imperfect* courts, but I digress.

1

In the matter before this Court today, I could stand here for hours repeating every detail of this case, all of which I have lived, suffered through, and continue to suffer, and have first-hand knowledge of it all. However, out of respect for this Court, and Judge Claudia Baio, who appears to have a sound understanding of the facts in this matter, I will attempt to keep my remaining closing statement relatively brief. Nonetheless, with all due respect to this Court, and to Judge Baio, the Defendants still assert and maintain their multiple Objections, which include, but are not limited to, the denial to stay the *Remote Court Trial* pending Appeal, the denial of a jury trial, the denial of discovery, the denial of my exhibits, the denial of a subpoena of Joanna Wheeler, the denial of a continuance, etc.

The simple, unequivocal, and undeniable facts in this matter include, but are not limited to the following:

> Despite Plaintiff *Santander Bank, N.A.*, and its *Representative Attorneys'* **ongoing efforts to deceive, obfuscate, and to evade the material facts and relevant law in this case**, *Santander Bank*, and its *Representative Attorneys* will **never be able to change nor honestly deny any of the simple and basic material facts in this case**, some of which are:

>> 1. The Defendants had **never missed a payment** before receiving *Santander Bank, N.A.'s erroneous, baseless, and meritless* letter dated May 1, 2019, **inexplicably** addressed to Lillian Byron, **not to Lillian Clark**, *threatening to foreclose* if a *lump sum payment* of **$37,575.86** was not paid *in less than 20 days*, by May 20, 2019.

>> 2. The Defendants were also **current on their property taxes** before receiving *Santander Bank, N.A.'s erroneous, baseless, and meritless* letter dated May 1, 2019, **inexplicably** addressed to Lillian Byron, **not to Lillian Clark**, *threatening to foreclose* if a *lump sum payment* of **$37,575.86** was not paid *in less than 20 days*, by May 20, 2019.

>> 3. *Santander Bank, N.A.*, has *admitted against interests* that they have a *defective/invalid alleged mortgage* that contains **no valid legal property description whatsoever** and that **was not and could not be in default** on or around May 1, 2019, and is an allege mortgage that *cannot be lawfully amended/reformed without the Defendants' consent*, *which the Defendants do not and will not grant*.

>> 4. Consequently, by the *rule of law* Defendant Gordon Clark is the **only one** in a **valid and secured first lien position**, by being **first in time, first in right**; and therefore, Mr. Clark is the **only one** who has a **valid and secured lien to foreclose lawfully and rightfully** if Mr. Clark chooses to do so.

Santander Bank is a failing and corrupt bank which has never recovered from the 2008 Financial Banking and Mortgage Crisis whose business model consistently allows wrongful acts of ageism, sexism, racism, negligent incompetence, greed, power, and/or malice to be inflicted upon their *so-called* customers.

2

Case in point, on May 20, 2020, it was reported by *The Wall Street Journal* that *Santander Consumer USA Holdings, Inc's*, which is **also** a subsidiary (as is *Santander Bank, N.A.*) of Spain-headquartered parent company, *Banco Santander*, had reached a $550 million settlement with nearly three dozen *U.S. states attorney generals* to settle charges of *predatory auto lending* to low-income and subprime borrowers.

In this specific case before this court today, Santander Bank erroneously*, unjustly, and maliciously* sent said May 1, 2019, letter threatening foreclosure, which can be described only as an extortion letter, or what some would call a shakedown, if nearly $40,000 was not paid in less than 19 days.  Not a 60-day notice of default letter sent via USPS Certified Letter as required by Connecticut law, but instead a fraudulent letter filled with errors, and addressed to Lillian Bryon, not Lillian Clark.

On or around February 2, 2022, *Santander Bank, N.A.*, **abruptly, suddenly, inexplicably, and publicly** announced their *exit* from the *U.S. Residential Mortgage and HELOC* lending market, which was only twenty-three (23) days **after** the Defendants filed their federal Complaint with the USDC on January 10, 2022, which is still pending.

On November 22, 2019, *Santander Bank, N.A.*, filed a *2-count Complaint* against the Defendants with the *Superior Court in Hartford*.

> *Count 1* of said *Santander Bank, N.A.'s 2-count Complaint* is: *Reformation of Mortgage*; and *Count 2* of said *Santander Bank, N.A.'s 2-count Complaint* is: *Foreclosure of the Mortgage as Reformed*.

Plaintiff *Santander Bank N.A.* **admits** to the following:

> 1.) ***Factually, undisputedly, and unequivocally admits that its alleged mortgage deed contains no legal property description whatsoever*** (**Please see: Complaint, Page 1, Paragraph 3**).

> 2.) ***Factually, undisputedly, and unequivocally admits its Complaint contains no claim nor proof of fraud*** by the Defendants (**Please see: Plaintiff's Answer, Page 2, Paragraph 4**).

> 3.) ***Factually, undisputedly, and unequivocally admits its Complaint contains no claim nor proof of a mutual mistake*** (**Please see: Plaintiff's Answer, Page 2, Paragraph 4**).

Defendants assert Thirty (30) affirmative/special defenses, which include, but is not limited to, multiple breaches of written and oral contract, such as:

> 1. *Santander Bank, N.A.* has a *moral and lawful duty* to not breach their contract.

3

**128**

2. *Santander Bank, N.A. breached their moral and lawful duty* to not breach their contract.

3. *Santander Bank, N.A.* failed to give proper *notice of default*.

4. *Santander Bank, N.A.* failed to send a *legal breach letter*.

5. *Santander Bank, N.A.* failed to give at least *60 days* to cure *alleged* default in their May 1, 2019, letter.

6. *Santander Bank, N.A.* failed to make contractual *absolute obligation advances*.

7. *Santander Bank, N.A.* failed to change payments to *interest only* upon request.

8. *Santander Bank, N.A. **reneged*** on their novated (oral) ***"pay back when you can"*** agreements, which were *given twice* on or around October 2015 and on or around October 2018.

*Once again*, Santander Bank, N.A., ***admits against interest*** that *Santander Bank, N.A.'s alleged mortgage* contains ***no legal property description whatsoever***.

The *Supreme Court of Connecticut* decided, in **State of Connecticut v. Hahn**, the following:

*"… **we must decide whether a mortgage deed that contains no description of the mortgaged property can reasonably be held to be "fully drawn with respect to every essential feature thereof." We conclude that it cannot.** Whether we turn to the requirements of our recordation statutes; General Statutes §§ 47-5, 47-10 and 47-36c; or to those of the statute of frauds; General Statutes § 52-550; **it is evident that a mortgage is unenforceable without identification of the mortgaged property.**"*

The *Supreme Court of Connecticut* decided in **Harlach v. Metropolitan Property**, the following:

*"**Reformation is appropriate in cases of mutual mistake—…. [R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other**. … **Here, there was neither claim nor proof of a mutual mistake, fraud or inequitable conduct on the part of either party. Since none of these elements was present, application of the equitable principle of reformation was not proper**."*

4

**129**

The *Supreme Court of Connecticut* decided in **JPMorgan Chase Bank v. Robert J. Virgulak, et al.**, the following:

*"The Supreme Court, held that: **no mutual mistake warranted reformation of mortgage, and trial court could not foreclose mortgage without first reforming it**.*

*"... that **'[t]he court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it [was] entitled to the equitable remedy of reformation of the mortgage deed ....'"***

***"... did not abuse its discretion by declining to reform the mortgage deed because the plaintiff did not meet its burden of proving by clear and convincing evidence that the mortgage deed did not conform to the parties' agreement; ..."***

***REFORMATION IS NOT GRANTED FOR THE PURPOSE OF ALLEVIATING A HARD OR OPPRESSIVE BARGAIN, ...***

***Additionally, "[w]here fraud is absent, it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be clear so as to leave no room for doubt." There is no allegation of fraud in this case."***

***""We have stated the standard of proof for reformation in different ways but all with the same substantive thrust: evidence should be clear, substantial and convincing." "This is the quality of the evidence required in cases of this type." "The burden of proof on the issue of reformation is [on] the party seeking it." Id."***

***"The court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it is entitled to the equitable remedy of reformation of the mortgage deed ....."***

***"... as the trial court correctly noted, the evidence presented on that specific question fell short of the very high burden required to demonstrate mutual mistake."***

***"THIS COURT REPEATEDLY HAS WARNED THAT THE POWER OF COURTS TO REFORM WRITTEN INSTRUMENTS IS ONE THAT SHOULD BE EXERCISED CAUTIOUSLY.***

***("[T]HIS STANDARD OF PROOF SHOULD OPERATE AS A WEIGHTY CAUTION UPON THE MINDS OF ALL JUDGES, AND IT FORBIDS RELIEF WHENEVER THE EVIDENCE IS \*768 LOOSE, EQUIVOCAL OR CONTRADICTORY" (stating that reformation will not be granted "unless the proof of mutual mistake [is] of the clearest and most satisfactory character"... [c]are is all the more necessary when the asserted mistake relates to a writing, because the law of contracts ... attaches great weight to the written expression of an agreement")."***

5

*"TO BE SURE, IDENTIFYING THE OBLIGATION SECURED BY A MORTGAGE DEED IS NOT A TECHNICAL OR SCRIVENER'S ERROR. Reforming the mortgage deed in the manner sought by the plaintiff without establishing that the change effects the original intention of the parties changes the defendant's \*769 obligations and creates a new contract between her and the plaintiff. This court has cautioned that "[a]n obstacle to reformation [that] we find insurmountable arises from the fundamental principle that there can be no reformation unless there is an antecedent agreement upon which the minds of the parties have met. Consequently, "a definite agreement on which the minds of the parties have met must have [preexisted] the instrument in question." Id. It is axiomatic that a "court cannot supply an agreement [that] was never made, for it is [a court's] province to enforce contracts, not to make or alter them."*

*"The defendant had no burden to demonstrate what other purpose or intent motivated her to sign the mortgage deed. It is the plaintiff, as the party seeking reformation, that must prove the preexisting agreement that it seeks to effectuate, and it must do so by clear and convincing evidence. It did not do so to the satisfaction of the trial court, and we cannot conclude that the trial court's findings in this regard were clearly erroneous."*

Consequently, since there is **no legal property description whatsoever** in *Santander Bank, N.A.'s admitted invalid/defective alleged mortgage*, and no claims by *Santander Bank, N.A.* of any *mutual mistake or fraud* by the Defendants, based on the previously and above cited and relevant *Supreme Court of Connecticut* legal authorities/case law citations, *Count 1, Reformation of Mortgage,* of said *Santander Bank, N.A.'s 2-count Complaint*, filed with the *Superior Court of Hartford*, **fails to state a claim upon which relief can be granted**; and consequently, the *Superior Court of Hartford* should *strike Count 1* from said *Complaint*; and therefore, *Count 2, Foreclosure of the Mortgage as Reformed*, of said *Santander Bank, N.A.'s 2-count Complaint* is moot.

On Monday, March 7, 2022, on or around 12:00 PM, Judge Mark H. Taylor of the *Superior Court of Hartford* presided over a *Remote Evidentiary Hearing* in this matter, where Mr. Knickerbocker, **knowingly, purposely, and falsely** stated *on and for the record* during said proceeding that the *admitted invalid/defective alleged mortgage* has a reference to the *legal property description* in the *Town of Enfield Land Records, Book 767, Page 310* when Mr. Knickerbocker **knowingly knew that this was a false statement**.

Instead, Mr. Knickerbocker's *knowingly erroneous and false* reference to the *Town of Enfield Land Records, Book 767, Page 310* in **open court** is **not** a reference to any *legal property description whatsoever*, but it is **actually** the witnessed and notarized *Certificate of Change of Name* that was filed by Mr. Clark's *beloved, precious, and deceased* wife, Lillian Clark, that she recorded with the *Town of Enfield Land Records* on March 3, 1993, shortly after our *Wedding Day* of February 14, 1993.

Yet, *once again*, Mr. Knickerbocker *audaciously* brought *fraud before the Superior Court of Hartford*, **in open court no less**, which should not be surprising *in the least* to Mr. Clark, since Mr. Clark has unfortunately had to *repeatedly experience* and *endure* Santander Bank's and Mr.

Knickerbocker's ***never-ending and ongoing abuse of the legal process*** in Mr. Knickerbocker's and *Santander Bank, N.A.'s **unjust and illegal*** attempt to ***steal*** the Defendants' property. All done by the Plaintiff *Santander Bank*, their representatives at *Bendett & McHugh, P.C.*, and *especially*, by Mr. Knickerbocker's ***complete disregard*** of the *material facts* in this case, along with ***complete contempt*** for the Defendants, in addition to ***complete disdain*** for basic *Contract Law*, *Property Law*, the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct*.

Based on the ***erroneous, baseless, meritless, frivolous, bad faith, and fraudulent/sham foreclosure lawsuit*** filed in the *Superior Court of Hartford* by *Santander Bank, N.A.* and its attorneys at *Bendett & McHugh, P.C.*, as well as all the material facts and relevant law referenced above, and the ongoing ***reprehensible, egregious, and unrepentant behavior*** by *Santander Bank, N.A.*, their *chosen* representatives at *Bendett & McHugh, P.C.*, and *especially*, by Mr. Knickerbocker over the past 3+ years, *it is clear* that *Santander Bank, N.A.* and their attorneys ***do not*** *have clean hands in this matter* before this Court.

The ***Clean Hands Doctrine***, which is one of the Defendants' thirty (30) Affirmative/Special Defenses, reads as follows:

> *"The clean hands doctrine is based on the maxim of **equity** that states that one "who comes into equity must come with clean hands." This doctrine requires the court to deny **equitable relief** to a **party** who has violated **good faith** with respect to the subject of the **claim**. The purpose of the doctrine is to prevent a party from obtaining relief when that party's own wrongful conduct has made it such that granting the relief would be against good conscience. It is an **affirmative defense** that the **defendant** may claim."*

But instead, *Santander Bank, N.A.* and their attorneys have *repeatedly* attempted to ***abuse the legal process*** in an ***unjust and illegal*** attempt to ***steal*** the Defendants' property, in ***complete disregard*** of the *material facts* in this case, along with ***complete contempt*** for the Plaintiffs and the *Superior Court of Hartford*, in addition to ***complete disdain*** for basic *Contract Law*, *Property Law*, the *Connecticut Attorney's Oath*, and the *Rules of Professional Conduct*. All while *surreptitiously* attempting to use *court rules and procedures* that the Defendants ***do not fully understand***, in *Santander Bank, N.A.'s* and their attorneys' ongoing attempt to deny the Defendants their *U.S. Constitution guaranteed right to **due process of law***, which is certainly ***not*** *moral, ethical, lawful, just, right, legal, nor equitable* in *any way, shape, or form*.

Court actions, legal filings, and court rules and procedures are *supposed* to be used as a *lawful and civilized way* to resolve disputes ***based on truth***; *not used as tools* to undermine the *Rule of Law*, nor thwart the truth, nor bully and trick your adversary, nor to prevail ***at any cost*** *based on lies*.

Nonetheless, *Santander Bank, N.A.*, a $50 billion national bank, and their *chosen* attorneys from *Bendett & McHugh, P.C.* ***knowingly, intentionally, and purposely filed*** an ***erroneous, baseless, meritless, frivolous, bad faith, and fraudulent/sham*** *foreclosure lawsuit* against the Defendants based on an *admitted invalid/defective alleged* mortgage, in an ***unlawful, unjust, wrongful, and illegal*** attempt to ***steal*** the Defendants' property. When the Defendants had ***never*** missed a

payment and were **current** on our property taxes. All while Mr. Clark's 92-year-old *beloved* wife of 27 years was *courageously and daily* battling Parkinson's disease for her *precious* life, while we were both *desperately hoping and praying* that she would not be **unjustly evicted** out of her *beloved and humble* home of 65 years that her *beloved* Papa helped her build; and that she would not be forced into a nursing home to **die alone** without Mr. Clark by her side, due to COVID-19 restrictions.

All of which, is **reprehensible behavior** by *Santander Bank, N.A.*, their *chosen law firm Bendett & McHugh, P.C.*, along with their founders, partners, and attorneys, and *especially*, by Mr. Knickerbocker. All *at the ongoing expense of the Defendants*, while Mr. Knickerbocker and his accomplices and co-conspirators at *Santander Bank, N.A.* and *Bendett & McHugh, P.C.* **with impunity** and *at any cost* continue to *line their own pockets with ill-gotten gains*, while attempting to **steal** the Defendants' property for their client, *Santander Bank, N.A.*

> As *Saint Paul*, formerly known as *Saul of Tarsus*, wrote to *Saint Timothy* nearly 2,000 years ago, **after** *Saint Paul's conversion and repentance* on the *Road to Damascus*:
>
> **"For the love of money is the root of all evil ..."**
>
> 1 Timothy 6:10

Simply put, the Plaintiff Santander Bank has not met its burden of proof to reform the alleged mortgage, by neither claiming nor proving a mutual mistake and/or fraud by the Defendants. The Defendants had never missed a payment before receiving the erroneous and threatening May 1, 2019, letter from Santander Bank, and were current on their property taxes at that time. And the refusal to withdraw said erroneous and threatening May 1, 2019, letter caused, through contributory negligence, the subsequent withholding of payment, and alleged default, beginning in June 2019. Therefore, based on all the aforementioned facts and law, and the Defendants' thirty (30) Affirmative/Special Defenses, including *abandonment of alleged security*, and violations of the *Connecticut Unfair Trade Practices Act*, among many more facts detailed in the Defendants' pleadings, the Plaintiffs have failed to meet their burden of proof and have failed to state a claim upon which relief can be granted by this Court.

In closing, banks are extremely important and powerful institutions that nearly all of us rely upon; and therefore, banks are entrusted with immense power and privilege. However, with said immense power and privilege comes immense responsibilities, duties, and laws to abide by or what can be called being held to a *higher standard* in the public's interest, **NOT** a lower standard, and certainly **NOT ABOVE THE LAW**. And therefore, when any bank, such as Plaintiff Santander Bank has clearly and repeatedly harmed the Defendants for years, if the courts prove to be unwilling and/or unable to hold such a bank accountable when they have clearly done wrong, then the *Rule of Law* is further undermined, and the banks will continue to indiscriminately, blatantly, and with impunity inflict untold intentional pain and suffering on people, like my most beautiful, Lilli, in what should have been the most peaceful, restful, and

8

blessed time of her life, which Plaintiff Santander Bank egregiously and reprehensibly robbed from her.

Lastly, the Defendants *respectfully* ask this trial court to consider all the material facts AND the *letter ALONG WITH the spirit of the law* in this case, knowing that, *"Under Connecticut Law, foreclosure is an **"equitable"** action, which means the judge must consider any reasons why it would be unfair for the foreclosure to proceed."*

Nonetheless, as Judge Baio, has repeatedly reminded me, if I do not agree with her decision, I can file an Appeal, which I certainly will do, if necessary, but it is the Defendants' sincere hope and prayer that this nearly eleven (11) year nightmare, and nearly four (4) year court proceedings will *finally* be put to an end by this trial court rightly and justly by ruling on the Defendants' behalf.

Thank you, Judge Baio, for your time and consideration, and blessing *always* to you and yours. Please continue to stay healthy and be safe.

9

# Exhibit 13

207 Conn. 555 (1988)

### STATE OF CONNECTICUT

### v.

### RAY DAVID HAHN

Supreme Court of Connecticut.

Argued April 14, 1988. Decision
released May 24, 1988.

PETERS, C. J., SHEA, CALLAHAN, GLASS and HULL, JS.

556  *556 *Michael J. McClary,* with whom, on the brief, was *John J. Keefe, Jr.,* for the appellant (defendant).

*James A. Killen,* deputy assistant state's attorney, with whom, on the brief, were *John J. Kelly,* chief state's attorney, *Domenick Galluzzo,* deputy chief state's attorney, *James G. Clark,* assistant state's attorney, *Cathryn Krinitsky,* deputy assistant state's attorney, and *Jack Fischer,* legal intern, for the appellee (state).

PETERS, C. J.

The dispositive issue in this appeal is whether improper notarization of an incomplete mortgage deed constitutes forgery in the second degree, as defined by General Statutes § 53a-139 (a) (1),[1] in light of an information charging the defendant with false completion of a mortgage deed. The state alleged that the defendant, Ray David Hahn, with intent to defraud, deceive or injure Peter T. Dallicker, Martha H. Dallicker and Gerda Larras, had falsely completed their mortgage deed to the Dartmouth Plan, Inc. (Dartmouth Plan), by having added

557  his name as notary and having falsely acknowledged that these individuals had personally *557 appeared before him to execute this written instrument. After a jury verdict finding the defendant guilty as charged, the defendant unsuccessfully moved the trial court for a new trial or a judgment of acquittal. The defendant has appealed from the trial court's judgment of conviction. We find error.

The jury could reasonably have found the following facts. The defendant was employed as the credit manager of East Coast Siding Company (East Coast Siding), a contracting firm engaged in making home improvements. He had become a notary public at his employer's request. As credit manager, he processed credit applications submitted by the company's sales representatives. For mortgage financing, East Coast Siding relied upon the Dartmouth Plan. Such mortgages were initiated by having a sales representative ask his customers to sign a form denominated "Mortgage Deed" that designated the Dartmouth Plan as mortgagee. After notarization of the customers' signatures by the defendant, and the addition of the signatures of one or more witnesses, the mortgage was then forwarded to the Dartmouth Plan, which undertook to make the relevant credit checks of prospective mortgagors. Upon approval of credit, the Dartmouth Plan inserted the description of the mortgaged property in the mortgage deed and saw to its recordation.

The underlying transaction that led to the charges against the defendant arose out of a home improvement contract entered into in early September, 1985, between East Coast Siding and Peter and Martha Dallicker, and their son, Peter Dallicker, Jr. The Dallickers had contacted Sears, Roebuck and Company (Sears) in response to a Sears advertisement, and Sears, in accordance with prior arrangements of which the Dallickers were unaware, had forwarded their call to East Coast Siding. As the result of negotiations with an East Coast

558  Siding sales representative, the *558 Dallickers agreed to purchase windows and gutters to be installed at their New Fairfield family home, of which Gerda Larras was a co-owner. Although the Dallickers had expected financing for this acquisition to be arranged in accordance with their unsecured Sears line of credit, they unwittingly signed a document entitled "Mortgage Deed" that named the Dartmouth Plan as mortgagee.

The East Coast Siding sales representative forwarded a bundle of papers signed by the Dallickers to the East Coast Siding home office. There, the mortgage deed bearing their signatures, and that of Gerda Larras, was "witnessed" by Mark Scafariello, East Coast Siding's general manager, and then forwarded to the Dartmouth Plan. Because the mortgage deed did not then contain the requisite notarization, an employee of the Dartmouth Plan, Nancy Perretta, asked the defendant to come to the Dartmouth Plan office in Rocky Hill on September 3, 1985, to remedy this omission. In Perretta's presence, the defendant added his name as notary public in the acknowledgement portion of the mortgage deed. None of the mortgagors whose signatures he was acknowledging was then present. Thereafter Perretta signed her name to the deed as a witness to the signatures of the mortgagors, although at trial she testified that she was witnessing the defendant's notarization. No description whatsoever of the Dallicker property was on the deed at that time. At some time thereafter, that information was inserted into the mortgage deed and it was recorded by the town clerk in New Fairfield on November 23, 1985.[2]

559  *559 On this factual showing, the defendant was convicted of forgery in the second degree. In this appeal, the defendant claims the trial court erred: (1) in denying his motions for acquittal; (2) in charging the jury about various allegedly irrelevant aspects of the forgery statute; and (3) in denying his motion for a mistrial. Since we agree with the first claim of error, we need not address the latter two.

The defendant claims that the trial court should have ordered his acquittal because the evidence was insufficient to prove the charge against him, namely that he had falsely completed an incomplete mortgage deed with intent to defraud, deceive or injure, in violation of General Statutes § 53a-139 (a) (1). In assessing this claim, we need to refer to the precise contours of the charge against the defendant, which the state amplified in a long form information filed in response to a court order by *Geen, J.,* granting the defendant's motion for a bill of particulars and for a statement of essential facts.[3] The state accused the defendant of having *"falsely completed said written instrument"* [the mortgage deed from Peter T. Dallicker, Martha H. Dallicker and Gerda Larras] when he added/inserted his name as Notary and he acknowledged that Peter T. Dalliker [sic], Martha H. Dalliker [sic] and Gerda Larras personally appeared before him in the County of Fairfield, Connecticut and that they executed said instrument on September 3, 1985, *thereby transforming an incomplete written instrument into a complete mortgage deed* without the authority of anyone entitled to grant it, *so that such complete mortgage deed appeared on said land records* and purported to be

560  in all respects an authentic creation of or fully authorized by Peter T. Dalliker [sic], Martha H. Dalliker [sic], and Gerda *560 Larras, its ostensible makers, in violation of Connecticut General Statutes Section 53a-139." (Emphasis added.)

The defendant maintains that the evidence adduced at trial did not prove, beyond a reasonable doubt, either that he had "falsely completed" the Dallicker mortgage or that he had possessed the requisite criminal intent to defraud, deceive or injure. On appeal, our review of such a claim of error involves a two step process. We first construe the evidence presented at trial in a light most favorable to sustaining the verdict, and then determine whether the jury could reasonably have found " upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt....'"(Citations omitted.) *State v. Stepney,* 191 Conn. 233, 255, 464 A.2d 758 (1983), cert. denied, 465 U.S. 1084, 104 S. Ct. 1455, 79 L. Ed.2d 772 (1984); *State v. Cavallo,* 200 Conn. 664, 673, 513 A.2d 646 (1986).

The evidence in this case would have permitted the jury to find that the defendant intentionally notarized a false acknowledgement on a mortgage deed. There was, however, no evidence before the jury that the mortgage deed, at the time of the defendant's improper notarization, contained any description whatsoever of the mortgaged property. To the contrary, evidence from the state's own witness indicated that the deed contained only the signatures of the intended mortgagors, the name of the intended mortgagee, and Scafariello's signature as witness.

The question before us is whether this evidence establishes guilt beyond a reasonable doubt of the crime of forgery in the second degree as that crime was particularized in a long form

561  information that repeatedly emphasized the defendant's wrongful completion of a *561 mortgage deed. Once a detailed information has been filed, "the state is limited to proving that the defendant has committed the offense in substantially the manner described." *State v. Ruiz,* 171 Conn. 264, 270, 368 A.2d 222 (1976); *State v. Eason,* 192 Conn. 37, 40-41, 470 A.2d 688 (1984); *State v. Roque,* 190 Conn. 143, 154-55, 460 A.2d 26 (1983).

In approaching this question, we are aided by the provisions of the penal code that provide definitions for forgery and related offenses. "Complete written instrument" is defined in General Statutes § 53a-137 (2) as "one which purports to be a genuine written instrument fully drawn with respect to every essential feature thereof." Consistently, an "incomplete written instrument," under § 53a-137 (3), "requires additional matter in order to render it a complete written instrument." A person "falsely completes" a written instrument, according to § 53a-137 (5), when he "transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be ... fully authorized by its ostensible maker."

Applying these definitions in the present circumstances, we must decide whether a mortgage deed that contains no description of the mortgaged property can reasonably be held to be "fully drawn with respect to every essential feature thereof." We conclude that it cannot. Whether we turn to the requirements of our recordation statutes; General Statutes §§ 47-5, 47-

562  10 and 47-36c; [4] or to those of the statute of frauds; General *562 Statutes § 52-550;[5] it is evident that a mortgage is unenforceable without identification of the mortgaged property. " [C]ontracts for the sale of real estate must contain with certainty, without regard to parol proof, at least the essentials which describe the subject of the sale, its terms, and the parties to the contracts, thereby furnishing evidence of a complete agreement." *Robert Lawrence Associates, Inc. v. Del Vecchio,* 178 Conn. 1, 11, 420 A.2d 1142 (1979); *Montanaro Bros.*

563  *Builders, Inc. v. Snow,* 190 Conn. 481, 485-86, 460 A.2d 1297 (1983). In this state, mortgages are conveyances of legal title; *Conference Center Ltd. v. TRC,* 189 Conn. *563 212, 218, 455 A.2d 857 (1983).*[6] Accordingly, we conclude that there was insufficient evidence to support the defendant's conviction for forgery insofar as he was accused of having falsely completed the Dallicker mortgage.

The state argues that the defendant's conviction can, however, be sustained on an alternate ground, that the defendant falsely completed not the mortgage deed itself but the acknowledgement portion of the deed. The state concedes, as it must, that the long form information charged the defendant only with false completion of the Dallicker mortgage deed. Nonetheless, the state maintains that it can rely on a theory of variance to invoke that part of § 53a-137 (2)'s definition of a "complete written instrument" that states that "[a]n endorsement, attestation, acknowledgement or other similar signature or statement is deemed both a complete written instrument in itself and a part of the main instrument in which it is

564  contained or to which it attaches." The evidence at trial, according to the *564 state, would support a conviction on this latter basis, the defendant having admitted the signature on the acknowledgement portion of the mortgage deed to be his.[7] Arguing that, on this record, an amendment at trial to conform the information to the proof would have been permitted, the state urges us to hold that the defendant was on notice of his potential culpability for his false acknowledgement of the Dallicker mortgage. We are unpersuaded.

This court has, in limited circumstances, permitted a criminal conviction to be grounded on a variance from the precise contours of the crime that the information charged the defendant with having committed. When a defendant at trial has acquiesced in enlargement of the crime charged to include an alternative method of committing it, we have held that a deviation between the pleadings and the proof "does not rise to the level of a constitutional violation unless the record establishes a lack of proper notice or prejudice to the defendant." *State v. Franko,* 199 Conn. 481, 493, 508 A.2d 22 (1986); *State v. Scognamiglio,* 202 Conn. 18, 21-25, 519 A.2d 607 (1987). In those cases, the predicated acquiescence was found in the defendant's failure to object to the admission of evidence on, and instructions to the jury about, the alternative method of committing the crime charged.

565  In this case, the record at trial demonstrates no acquiescence in enlargement of the crime charged. The defendant took vigorous exception, throughout, to the introduction of evidence *565 unrelated to his allegedly felonious completion of a mortgage deed. He similarly excepted to those portions of the trial court's instructions to the jury that went beyond the specific aspects of the statute that he had been charged with having violated, and, continued, indeed, to press this issue in his claims of error on appeal to this court. Furthermore, even the state at trial explicitly justified its evidentiary proffers as consistent with the crime as charged in the long form information. In this vein, the state defended one of its requests for a jury instruction by stating: "One of the elements of the crime is falsely completing a written instrument in order for it to be a deed." On this record, the defendant had fair notice only of a charge of false completion of a mortgage deed and not of false completion of an acknowledgement.

In the absence of evidence sufficient to support the only crime with which the defendant was charged, his conviction of forgery in the second degree cannot stand. The trial court was in error in denying his motions for acquittal.

There is error, the judgment is set aside and the case is remanded with direction to render judgment of acquittal.

In this opinion the other justices concurred.

[1] General Statutes § 53a-139 (a) (1) provides: "FORGERY IN THE SECOND DEGREE: CLASS D FELONY. (a) A person is guilty of forgery in the second degree when, with intent to defraud, deceive or injure another, he falsely makes, completes or alters a written instrument or issues or possesses any written instrument which he knows to be forged, which is or purports to be, or which is calculated to become or represent if completed: (1) A deed, will, codicil, contract, assignment, commercial instrument or other instrument which does or may evidence, create, transfer, terminate or otherwise affect a legal right, interest, obligation or status."

[2] The Dallickers' complaint about their home improvement contract was limited to its financial aspects. Although the work done by East Coast Siding was acceptable, and although they had expected to incur finance charges to pay for the work, they had not understood that the Dartmouth Plan would assume the status of a secured creditor with a mortgage on their home. The identity of the Dartmouth Plan became known to them upon the receipt of payment notices, but they learned of the recordation of the mortgage only when they decided to sell their property.

[3] The record reveals that the statement of essential facts as well as the bill of particulars in this case are identical with the long form information that the state supplied to the defendant.

[4] "[General Statutes] Sec. 47-5. CONVEYANCES TO BE IN WRITING AND ACKNOWLEDGED. All conveyances of land shall be: (1) In writing; (2) if the grantor is a natural person, subscribed, with or without a seal, by the grantor with his own hand or with his mark with his name annexed to it or by his attorney authorized for that purpose by a power executed, acknowledged and witnessed in the manner provided for conveyances or, if the grantor is a corporation or partnership, subscribed by a duly authorized person; (3) acknowledged by the grantor, his attorney or such duly authorized person to be his free act and deed; and (4) attested to by two witnesses with their own hands."

"[General Statutes] Sec. 47-10. DEEDS TO BE RECORDED. No conveyance shall be effectual to hold any land against any other person but the grantor and his heirs, unless recorded on the records of the town in which the land lies. When a conveyance is executed by a power of attorney, the power of attorney shall be recorded with the deed, unless it has already been recorded in the records of the town in which the land lies and reference to the power of attorney is made in the deed."

"[General Statutes] Sec. 47-36c. STATUTORY FORMS FOR DEEDS. The forms set forth in this section may be used and are sufficient for their respective purposes. They shall be known as `Statutory Form' and may be referred to as such. Nothing in this chapter precludes the use of any other legal form of deed or mortgage....

MORTGAGE DEED

... of ... to secure payment of ... dollars with interest payable as provided in a certain promissory note dated ... with final maturity on ... grant to ... of ... with MORTGAGE COVENANTS ... (Description and Encumbrances, if any and any additional provisions) This mortgage is made upon the STATUTORY CONDITION Signed this ... day of ... , 19 ... Witnessed by:

(Acknowledgment)"

[5] "[General Statutes] Sec. 52-550. STATUTE OF FRAUDS; WRITTEN AGREEMENT OR MEMORANDUM. (a) No civil action may be maintained in the following cases unless the agreement, or a memorandum of the agreement, is made in writing and signed by the party, or the agent of the party, to be charged: (1) Upon any agreement to charge any executor or administrator, upon a special promise to answer damages out of his own property; (2) against any person upon any special promise to answer for the debt, default or miscarriage of another; (3) upon any agreement made upon consideration of marriage; (4) upon any agreement for the sale of real property or any interest in or concerning real property; (5) upon any agreement that is not to be performed within one year from the making thereof.

"(b) This section shall not apply to parol agreements for hiring or leasing real property, or any interest therein, for one year or less, in pursuance of which the leased premises have been or are actually occupied by the lessee, or any person claiming under him, during any part of the term."

[6] The state argues that parol evidence is always admissible between the immediate parties to a real property transaction. The cases upon which the state relies for this novel proposition are, however, distinguishable because they involve the use of parol evidence not to establish missing property descriptions but to interpret ambiguous property descriptions in the context of boundary disputes. *F. & AK, Inc. v. Sleeper,* 161 Conn. 505, 510-11, 289 A.2d 905 (1971); *Fogg v. Wakelee,* 40 Conn. Sup. 272, 283, 492 A.2d 843 (1983), aff'd, 196 Conn. 287, 492 A.2d 511 (1985). These cases do not persuade us that a mortgage deed that lacks a property description can properly be characterized as a "complete written instrument."

[7] We recognize that the defendant does not concede that his false acknowledgement suffices to prove his guilt of this alternate method of committing forgery in the second degree. At trial, the defendant vigorously resisted efforts by the state to explore the particulars of the acknowledgement. Mark Scafariello, the defendant's superior at East Coast Siding, testified that part of the acknowledgement was handwritten by someone other than the defendant. In light of our disposition of the defendant's ... need not explore the further ramifications of this argument.

**137**

# Exhibit 14

221 Conn. 185 (1992)

**LOUISE HARLACH ET AL.**

v.

**METROPOLITAN PROPERTY AND LIABILITY INSURANCE COMPANY**

Supreme Court of Connecticut.

Argued October 30, 1991.
Decision released February 11, 1992.

SHEA, GLASS, COVELLO, BORDEN and BERDON, JS.

186 *186 *Donald R. Holtman,* for the appellant (defendant).

*Kerin Margaret Woods,* for the appellees (plaintiffs).

COVELLO, J.

This is an appeal from a declaratory judgment that determined that the plaintiffs were entitled to $300,000 of uninsured motorist coverage pursuant to an automobile insurance policy issued by the defendant. The sole issue is whether the insured was bound by his written request for a lesser amount of uninsured motorist coverage when he later claimed that: (1) he did not understand the nature of his coverage; and (2) he did not intend to request a lesser amount of coverage.

The relevant facts are not in dispute. On December 30, 1986, the named plaintiff, Louise Harlach, was injured in an automobile accident under circumstances that entitled her to present a claim under the uninsured motorist provisions of an automobile liability insurance policy issued by the defendant, Metropolitan Property and Liability Insurance Company, to her husband, the plaintiff, John Harlach (plaintiff).[1] The circumstances concerning the amount of uninsured motorist coverage available under the policy are as follows.

187 *187 On February 18, 1980, the defendant issued an automobile liability insurance policy to the plaintiff. The policy provided single limit liability coverage in the amount of $300,000 and uninsured motorist coverage in the amount of $20,000 per person and $40,000 per accident. Each policy renewal thereafter, to and including December 30, 1986, provided the same levels of coverage. Prior to obtaining automobile insurance with the defendant, the plaintiff had dealt with other carriers. Throughout these dealings, the plaintiff always obtained the minimum amounts of coverage required by law.

On July 5, 1983, the General Assembly enacted Public Acts 1983, No. 83-461, amending General Statutes § 38-175c (now General Statutes § 38a-336). The act required that every automobile liability insurance policy "issued or renewed on and after July 1, 1984," was to have uninsured motorist coverage equal to the liability coverage of the policy *"unless the insured requests in writing a lesser amount."* [2] (Emphasis added.)

In October, 1983, in order to apprise its Connecticut policyholders of the change in the law, and in order to give them an opportunity to request in writing lesser amounts of uninsured motorist coverage, the defendant sent to all its policyholders, including the plaintiff, a computer generated notice. The notice invited the reader to "take a minute to read this important
188 letter about a change of the law in Connecticut." The notice *188 stated: "[T]he law was changed to require that your limits of coverage for uninsured motorist must be the same as your liability limits, *unless you request in writing a lower limit."* (Emphasis added.)

The notice further stated that higher uninsured motorist coverage, equal to the liability limits, would be provided and the "policy premium [would] be adjusted accordingly." The notice advised the policyholders that they could "request a lower limit of coverage at a lower premium" by placing their initials next to the desired option on a tear sheet at the bottom of the notice, signing the same and returning it to the defendant in an envelope that was provided.[3] Finally, the notice provided: "If you have any questions, please contact your sales representative or call our policyholder services department at the toll-free number (800) 422-4272."

On November 8, 1984, the plaintiff, a forty year old college graduate, initialed the minimum coverage option, i.e., "$20,000/$40,000," signed his name "John M. Harlach," dated the form "8 Nov 84," and mailed it to the defendant. On the basis of its receipt of this request, the defendant issued a renewal policy to the plaintiff providing uninsured motorist coverage in the
189 same amount as in prior years, i.e., $20,000 per person *189 and $40,000 per accident. The defendant mailed the renewal policy and five subsequent renewal policies to the plaintiff, each of which reflected the $20,000/$40,000 uninsured motorist coverage limits.

The attorney trial referee found that the plaintiff did not fully understand what protection was provided to him by the uninsured motorist provisions of his policy when he completed and executed the tear sheet, and that he did not understand that "he was giving up his right to insurance coverage of $300,000 for protection for himself and his family in the event he or a family member was injured by an uninsured or underinsured tortfeasor." The attorney trial referee concluded that the plaintiff "did not make a conscious, knowing and purposeful waiver to accept less uninsured motorist coverage."[4] The trial court agreed, concluding that since the plaintiff did not fully perceive what coverage he was surrendering at the time he returned the tear sheet, he had not waived his statutorily mandated right to uninsured motorist coverage equal to the insurance policy's liability coverage. The trial court opined that "[i]nasmuch as the waiver question is a factual one, it is not subject to review by this court." The trial court then rendered judgment in accordance with the referee's report. The defendant appealed to the Appellate Court and we thereafter transferred the matter to ourselves pursuant to Practice Book § 4023.

190 *190 The defendant claims that despite its aleatory nature, a contract of insurance is nonetheless fundamentally a contract. The defendant argues that the trial court has reformed the contract that unambiguously provided uninsured motorist coverage of $20,000 per person and $40,000 per accident because the policyholder was unilaterally mistaken as to what coverage he was surrendering when he requested the lesser amount of coverage. The defendant argues that reformation of a contract is not available when the mistake, if any, is unilateral and is not accompanied by fraud or inequitable conduct on the part of the other party. We agree.

The contractual nature of insurance and the commercial relationship between insurer and insured are not altered by any peculiarities of uninsured motorist coverage. "The relationship between the insured and the insurer clearly is *contractual* in nature, and we find nothing in [the uninsured motorist statute] that alters the traditionally commercial setting in which insurance policies are purchased. Our [uninsured motorist] statute creates no fiduciary obligations .... As offeror, [the carrier] had no contractual duty *voluntarily* to explain the terms of its offer or the advantages and disadvantages to procuring uninsured motorist coverage.... All that is required ... for an effective rejection is a writing signed by the named insured." (Emphasis in original.) *Silver v. Slusher,* 770 P.2d 878, 883 (Okla. 1988), cert. denied, 493 U.S. 817, 110 S. Ct. 70, 107 L. Ed.2d 37 (1989).

191 "Reformation is appropriate in cases of mutual mistake—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2096; 53 C.J. p. 941; Amer. Law Institute *191 Restatement, Contracts, Vol. 2, §§ 504, 505 .... [R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2097; 53 C.J. p. 949...." (Citations omitted.) *Home Owners' Loan Corporation v. Stevens,* 120 Conn. 6, 9-10, 179 A. 330 (1935). Here, there was neither claim nor proof of a mutual mistake, fraud or inequitable conduct on the part of either party.[5] Since none of these elements was present, application of the equitable principle of reformation was not proper.

The plaintiff argues, however, that reformation of the contract here is required since an insurance contract must be read to include provisions which the law requires be included. The plaintiff claims that the 1983 amendment to § 38-175c required that uninsured motorist coverage in automobile liability insurance contracts must thereafter be equal to the limits of

liability coverage unless the insured requested a lesser amount in writing. The plaintiff argues that since his written request for a lesser amount was not a knowing one, the doctrine of waiver, in effect, voids his request for a lesser amount, thereby entitling him to uninsured motorist coverage equal to the $300,000 liability coverage found in this policy. We do not agree.

It is well settled that an insurance contract must be read to include provisions that the law requires be included and to exclude provisions that the law prohibits. See, e.g., _Nicolletta v. Nationwide Ins. Co._, 211 *192 Conn. 640, 645-46, 560 A.2d 964 (1989). "Unless the agreement indicates otherwise, [an applicable] statute existing at the time an agreement is executed becomes a part of it and must be read into it just as if an express provision to that effect were inserted therein." _Hatcho Corporation v. Della Pietra_, 195 Conn. 18, 21, 485 A.2d 1285 (1985).

The amendment to § 38-175c directed that automobile insurance contracts should thereafter provide for equal amounts of liability and uninsured motorist coverage. A statute that establishes contractual rights, however, is equally capable of setting forth the manner in which those rights may be surrendered. In this instance, an insured could relinquish his entitlement to the larger amount of uninsured motorist coverage by "request[ing] in writing a lesser amount." This is exactly what the plaintiff did.

It is uncontroverted that the plaintiff read the defendant's notice explaining the 1983 changes to § 38-175c; that he selected one of five available uninsured motorist coverages offered on the tear sheet; that he indicated his preference by placing his initials next to the coverage selected; that he dated and signed the tear sheet; and that he mailed the same to the defendant. Despite this overwhelming evidence that the plaintiff completely and fully complied with the statute, the plaintiff argued, and the referee agreed, that there had not been a legally effective waiver because of the plaintiff's "lack of understanding of what the coverage provided" and that "the notice sent ... did not in any way increase the [plaintiff's] understanding of the meaning of uninsured motorist coverage."

Although the word "waiver" nowhere appears in the statute, even if we assume, arguendo, that the waiver doctrine was applicable to the circumstances here, application of its principles would not support the plaintiff's position. "Waiver is the voluntary relinquishment *193 of a known right. It involves the idea of assent, and assent is an act of understanding. This presupposes that the person to be affected has knowledge of his rights, but does not wish to assert them. Intention to relinquish must appear, but acts and conduct ... inconsistent with intention to terminate the contract are sufficient. _The rule is applicable that no one shall be permitted to deny that he intended the natural consequences of his acts and conduct._" (Emphasis added.) _MacKay v. Aetna Life Ins. Co._, 118 Conn. 538, 547-48, 173 A. 783 (1934).

"In order to waive a claim of law it is not necessary... that a party be certain of the correctness of the claim and its legal efficacy. It is enough if he knows of the existence of the claim and of its reasonably possible efficacy." _Jenkins v. Indemnity Ins. Co._, 152 Conn. 249, 257-58, 205 A.2d 780 (1964). The plaintiff knew that he was selecting less coverage than that to which he was entitled. The notice made it very clear that increased amounts of coverage were available at a higher premium and that an election to accept less would reduce both the amount of coverage and the policy premium.

"Under the [trial] court's theory, waiver of a claim of law could rarely, if ever, be established, since the [plaintiff] could always claim, as in effect [he] did here, that [he] knew nothing about, or at least did not fully understand [the insurance coverage he was declining].... The conclusion that a party has waived a right is one of fact for the trier and not one which can be drawn by this court, unless, on the subordinate facts found, such a conclusion is required as a matter of law." Id., 258. We hold that such a conclusion is required here.

The judgment is reversed and the matter is remanded with direction to render judgment for the defendant.

In this opinion the other justices concurred.

[1] Although Louise Harlach was the named plaintiff on the complaint, references to the plaintiff throughout the balance of this opinion are to John Harlach.

[2] General Statutes (Rev. to 1983) § 38-175c (a), as amended by Public Acts 1983, No. 83-461, provided in part: "(2) Notwithstanding any provision of this section to the contrary, every such policy issued or renewed on and after July 1, 1984, shall provide uninsured motorist coverage with limits for bodily injury and death equal to those purchased to protect against loss resulting from the liability imposed by law unless the insured requests in writing a lesser amount, but not less than the limits specified in subsection (a) of section 14-112. Such written request shall apply to all subsequent renewals unless changed in writing by the insured."

[3] The tear sheet at the bottom of the notice stated: "I UNDERSTAND MY POLICY LIMITS FOR UNINSURED MOTORISTS COVERAGE MAY BE THE SAME, BUT NOT HIGHER THAN MY LIMITS FOR LIBILITY COVERAGE (CURRENTLY XXX,XXX), AND I ACKNOWEDGE THAT I HAVE BEEN OFFERED THESE LIMITS.

"I HEREBY REQUEST THE UNINSURED MOTORISTS COVERAGE LIMITS INDICATED BELOW WHICH ARE LESS THAN MY CURENT LIABILITY LIMITS. (NOTE: SELECT ONLY ONE OPTION)

____50,000/50,000 ____300,000/300,000 ____20,000/40,000 ____100,000/100,000 ____500,000/500,000 NAME OF POLICY HOLDER POLICY NUMBER: XXX-XX-XXX-X

_____  _____ SIGNATURE DATE "

[4] The referee relied extensively on our holding in _Travelers Indemnity Co. v. Malec_, 215 Conn. 399, 576 A.2d 485 (1990). In _Malec_, we concluded that the American Red Cross did not make a conscious decision to select a lesser amount of uninsured motorist coverage pursuant to General Statutes § 38-175 (c) because the insured's request predated the enactment of the enabling legislation by more than two years. Since the insured was unaware of the statute at the time of its request, we concluded that this did not constitute a request for a lesser amount pursuant to the statute. _Malec_ is distinguishable from the present case where the plaintiff's response was the result of his carrier specifically informing him of the amendment to the statute and the options available to him.

[5] The referee did not conclude that the defendant's conduct was fraudulent or inequitable but that, as a matter of law, "[an] analysis of the case law construing Section 38-175c (a) (2) indicates that [the defendant] was required to provide [the plaintiff] with understandable information concerning his selection of uninsured motorist coverage so as to enable him to intelligently accept or reject the increased limits of coverage...."

# Exhibit 15

JPMorgan Chase Bank, National Association v. Virgulak, 341 Conn. 750 (2022)

267 A.3d 753

341 Conn. 750
Supreme Court of Connecticut.

JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
v.
Robert J. VIRGULAK et al.

(SC 20403)
|
Argued October 22, 2020
|
Officially released January 11, 2022[*]

**Synopsis**

**Background:** After note went into default, mortgagee brought action against mortgagor for foreclosure, reformation of mortgage deed, and unjust enrichment. After a bench trial, the Superior Court, Judicial District of Stamford-Norwalk, David R. Tobin, Judge Trial Referee, found in favor of mortgagor on foreclosure and reformation counts, denied mortgagee's motion to withdraw and amend responses to requests for admissions, determined that mortgagee's responses to requests for admissions precluded any recovery on its unjust enrichment claim, and denied mortgagee's motion for reargument. Mortgagee appealed. The Appellate Court, Keller, J., 192 Conn.App. 688, affirmed. Mortgagee appealed.

**Holdings:** The Supreme Court, Mullins, J., held that:

no mutual mistake warranted reformation of mortgage, and

trial court could not foreclose mortgage without first reforming it.

Affirmed.

**Attorneys and Law Firms**

**\*\*755** Brian D. Rich, with whom, on the brief, was Laura Pascale Zaino, Hartford, for the appellant (substitute plaintiff).

267 A.3d 753

Alexander H. Schwartz, Southport, for the appellee (defendant Theresa Virgulak).

Jeffrey Gentes and J.L. Pottenger, Jr., and Chaarushena Deb, Sophie Laing, Zaria Noble, Stefanie Ostrowski and Emily Coady, law student interns, filed a brief for the Housing Clinic of the Jerome N. Frank Legal Services Organization as amicus curiae.

Robinson, C. J., and McDonald, D'Auria, Mullins, Kahn and Ecker, Js.

**Opinion**

MULLINS, J.

**\*752** The plaintiff, Manufacturers and Traders Trust Company (M&T Bank),[1] appeals from the judgment **\*753** of the Appellate Court in favor of the defendant Theresa Virgulak.[2] On appeal, the plaintiff claims that the Appellate Court improperly affirmed the judgment of the trial court because (1) the trial court improperly declined the plaintiff's request to reform a mortgage deed to reference that the mortgage deed executed by the defendant was given to secure a note executed by her husband, Robert J. Virgulak (Robert), and (2) even if the trial court properly denied the request to reform the mortgage deed, it incorrectly determined that the plaintiff was not entitled to foreclose the mortgage executed by the defendant because the defendant was not a borrower on the note. We disagree with the plaintiff and affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following relevant facts and procedural history. "On or about December 11, 2006, Robert ... executed and delivered to JPMorgan Chase Bank, National **\*\*756** Association (JPMorgan Chase), a note for a loan in the principal amount of $533,000 (note). The defendant was not a signatory on the note. On the same date, the defendant signed a document titled 'Open-End Mortgage Deed' (mortgage [deed]) for residential property she owns at 14 Bayne Court in Norwalk (property). The mortgage [deed] recited that it was given to secure a note dated December 11, 2006, and recited that the note was signed by the defendant as [the] '[b]orrower' in the amount of $533,000. The term '[b]orrower' is defined in the mortgage deed as '[Theresa Virgulak, married].' The mortgage [deed] did not reference Robert. The defendant did not sign any guarantee.

**\*754** "On or about February 1, 2010, after JPMorgan Chase failed to receive payments in accordance with the terms of the note, the note went into default and JPMorgan Chase elected to accelerate the balance due. On January 3, 2011, notices of default were sent to both the defendant and Robert, and, in February, 2013, JPMorgan Chase commenced this foreclosure action against the couple. The action sought to foreclose the mortgage that JPMorgan Chase claimed to have on the property. In September, 2014, JPMorgan Chase withdrew the foreclosure

action against Robert, as he had filed for bankruptcy and been granted an unconditional discharge of the debt.

"Thereafter, JPMorgan Chase filed a motion to substitute party plaintiff, stating that it had assigned the subject mortgage deed and note to Hudson City Savings Bank (Hudson). This motion was granted by the [trial] court on August 18, 2015.

"On September 25, 2015, the defendant filed a motion for summary judgment, arguing that Hudson was precluded from foreclosing the mortgage. In particular, she argued that she had not defaulted under the terms of the note because she was never a party to a promissory note with [Hudson] or any of its predecessors in interest. The motion was denied by the court on January 14, 2016, on the basis of the court's determination that an issue of material fact remained with respect to whether the mortgage deed provided reasonable notice to third parties that the defendant was securing Robert's obligation." *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, 192 Conn. App. 688, 692–93, 218 A.3d 596 (2019).

"On August 9, 2016, the plaintiff, M&T Bank, into which Hudson had merged, filed a motion to substitute itself as the party plaintiff and requested leave to amend the complaint in order to add two additional causes of *755 action. The court granted the motion on August 15, 2016. In the first count of the plaintiff's three count amended complaint, the plaintiff sought a judgment of foreclosure against the [defendant]. In the second count, it sought equitable reformation of the note in order to include the defendant as a borrower on the note. In the third count, the plaintiff pleaded that the defendant had been unjustly enriched because (1) the proceeds of the note were used to pay off loans [that] she was obligated to pay and (2) she had free use of the subject property without satisfying the terms of the mortgage [deed], which she had executed.

"On December 1, 2016, the defendant filed an amended answer denying the essential allegations of the amended complaint regarding her liability for the debt and the claim of unjust enrichment. She also set forth eight special defenses." (Footnote omitted.) Id., at 693–94, 218 A.3d 596.

"The parties tried the case before the court on December 6, 2016. The plaintiff presented three witnesses, including Wilkin Rodriguez, a mortgage banking research officer at JPMorgan Chase, the defendant, **757 and Robert. After the plaintiff rested, the defendant did not present additional evidence; she relied instead on the testimony and exhibits introduced during cross-examination of the witnesses called by the plaintiff." Id., at 694, 218 A.3d 596. The trial court ordered the parties to submit posttrial briefs.

"On April 12, 2017, the court issued its memorandum of decision. The court found in favor of the defendant on the foreclosure and reformation counts of the complaint. In particular, the court stated, among other things, that '[t]he court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it [was] entitled to the equitable remedy of reformation of the mortgage deed[3] .... Accordingly, *756 the court finds the issues on the second

267 A.3d 753

count for [the defendant] and against the plaintiff. [Because] the plaintiff failed to present any authority to the court [that] would allow the plaintiff to prevail on the first count [foreclosure claim] in the absence of reformation of the mortgage deed, the court [also] finds the issues on the first count for [the defendant] and against the plaintiff.'

"The court then proceeded to address the plaintiff's unjust enrichment claim, noting that the defendant had been benefited in several respects as a result of the loan that Robert had obtained .... The court ultimately determined that [Hudson's] responses to the requests for admissions precluded any recovery on [the plaintiff's] unjust enrichment claim, except for the property tax payments that the defendant conceded that she owed to the plaintiff."[4] (Footnote added; footnote omitted.) **\*757** Id., at 695–97, 218 A.3d 596. Thereafter, the plaintiff appealed from the judgment of the trial court to the Appellate Court.

On appeal to the Appellate Court, the plaintiff claimed, inter alia, that the trial court (1) improperly failed to exercise its **\*\*758** discretion to consider the plaintiff's foreclosure claim as independent from its other claims and failed to grant the plaintiff the equitable remedy of foreclosure, (2) improperly declined to reform the mortgage deed, and (3) incorrectly concluded that Hudson's admissions limited the plaintiff's recovery under its unjust enrichment count. See id., at 691–92, 218 A.3d 596. The Appellate Court affirmed the judgment of the trial court. Id., at 722, 218 A.3d 596. It concluded, inter alia, that the trial court (1) "did not ignore the plaintiff's claim for foreclosure"; id., at 700–701, 218 A.3d 596; (2) properly "declined to grant foreclosure of the mortgage without reformation because it determined that the mortgage [deed], as executed, was a nullity because it secured a nonexistent debt"; id., at 703, 218 A.3d 596; see id., at 705, 218 A.3d 596; (3) did not abuse its discretion by declining to reform the mortgage deed because the plaintiff did not meet its burden of proving by clear and convincing evidence that the mortgage deed did not conform to the parties' agreement; see id., at 706, 218 A.3d 596; and (4) "did not abuse its discretion in limiting the award under the unjust enrichment count to the property taxes owed to the plaintiff." Id., at 721, 218 A.3d 596.

We granted the plaintiff's petition for certification to appeal, limited to the following issues: (1) "Did the Appellate Court properly uphold the trial court's decision declining the plaintiff's request to reform the mortgage deed to reference the fact that the mortgage [deed] executed by the defendant was given to secure a note executed by [Robert]?" And (2) "[i]f the answer to the **\*758** first certified question is 'yes,' did the Appellate Court properly uphold the trial court's determination that the plaintiff was not entitled to foreclose the mortgage executed by the defendant because the defendant is not a borrower on the note?" *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, 333 Conn. 945, 219 A.3d 375 (2019). Additional facts will be set forth as necessary.

267 A.3d 753

I

We first consider whether the Appellate Court properly affirmed the judgment of the trial court declining to grant reformation of the mortgage deed. The plaintiff asserts that the trial court improperly did not find that the parties intended for the mortgage deed signed by the defendant to secure the note signed by Robert. Therefore, the plaintiff contends, the mortgage deed should be reformed to reflect the parties' true agreement. The defendant counters that the trial court properly refused to reform the mortgage deed on the basis of the court's factual findings. We agree with the defendant.

"Reformation is appropriate only when the [contract] executed by the parties does not reflect the agreement the parties actually intended. ... Reformation is not granted for the purpose of alleviating a hard or oppressive bargain, but rather to restate the intended terms of an agreement when the writing that memorializes that agreement is at variance with the intent of both parties ...." (Internal quotation marks omitted.) *ARS Investors II 2012-1 HVB, LLC* v. *Crystal, LLC*, 324 Conn. 680, 692–93, 154 A.3d 518 (2017).

"A cause of action for reformation of a contract rests on the equitable theory that the instrument sought to be reformed does not conform to the real contract agreed [on] and does not express the intention of the parties and that it was executed as the result of mutual mistake, or mistake of one party coupled with actual **\*759** or constructive fraud, or inequitable conduct on the part of the other. ... Equity evolved the doctrine because an action at law afforded no relief against an instrument **\*\*759** secured by fraud or as a result of mutual mistake. ... The remedy of reformation is appropriate in cases of mutual mistake—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. ... In short, the mistake, being common to both parties, effects a result [that] neither intended." (Citations omitted; internal quotation marks omitted.) *Lopinto* v. *Haines*, 185 Conn. 527, 531–32, 441 A.2d 151 (1981). Additionally, "[w]here fraud is absent, it must be established that both parties agreed to something different from what is expressed in writing, and the proof on this point should be clear so as to leave no room for doubt." (Emphasis omitted; internal quotation marks omitted.) Id., at 535, 441 A.2d 151. There is no allegation of fraud in this case.

"We have stated the standard of proof for reformation in different ways but all with the same substantive thrust: evidence should be clear, substantial and convincing." (Internal quotation marks omitted.) Id., at 534, 441 A.2d 151. "This is the quality of the evidence required in cases of this type." Id., at 535, 441 A.2d 151. "The burden of proof on the issue of reformation is [on] the party seeking it." Id.

Here, the plaintiff had to establish the parties' clear agreement that the defendant's mortgage deed was intended to secure the note executed by Robert. As this court has recognized, "the trier is the judge of credibility and, specifically ... what the terms of the agreement were [is] a

question of fact for the trier. ... This court is limited to corrections of errors of law ....” (Citations omitted; footnote omitted.) Id., at 536, 441 A.2d 151. The question of whether, on the facts found, the court has held the **\*760** plaintiff, who had the burden of proof on the reformation issue, to the correct standard becomes one of law and is reviewable. See id.

In the present case, the plaintiff does not assert that the trial court improperly required it to prove the parties’ agreement by clear and convincing evidence. Instead, on appeal, the plaintiff challenges the trial court’s determination regarding the terms of the agreement between the parties, which is a factual determination subject to the clearly erroneous standard of review. See id.

The trial court noted that the parties stipulated to the following facts: “On or about December 11, 2006, Robert executed and delivered to [JPMorgan] Chase a note in the principal amount of $533,000 .... [The defendant] did not sign the note. The note was not timely paid, [it] went into default on or about February 1, 2010, and [JPMorgan Chase] elected to accelerate the balance due on the note. The present foreclosure action was commenced by [JPMorgan] Chase in February, 2013, at which time it held the note executed by Robert. ...

“On January 24, 2011, Robert filed for protection under chapter 7 of the [United States] Bankruptcy Code, listing the note as an unsecured debt. The filing listed no real property owned by Robert. ... [O]n April 26, 2011, Robert was granted an unconditional discharge from the bankruptcy court for his obligations under the note.

“[The defendant] signed [the mortgage deed] on December 11, 2006, which recited that it was given to secure a note dated December 11, 2006, signed by [the defendant] as the ‘[b]orrower,’ in the amount of $533,000. The term ‘[b]orrower’ is defined in the mortgage deed as ‘Theresa Virgulak, married.’ ... [The defendant] has never signed a [guarantee] of Robert’s obligations **\*\*760** under the note.” (Footnote omitted.)

**\*761** The trial court heard evidence from the parties over the course of a one day trial. The plaintiff introduced into evidence a copy of the note and mortgage deed. The trial court made the following findings.

The trial court found that the note was signed only by Robert, above a signature line labeled “Robert J. Virgulak,” and that the note does not contain a signature line with the defendant’s name. The trial court further found that “[t]he note ... recites the obligations of the ‘[b]orrower’ and does not otherwise define that term. However, page 3 of the note bears the signature of ‘Robert J. Virgulak—[b]orrower.’ The note does not bear [the defendant’s] signature, nor does it indicate in any way that any person, other than Robert, is obligated under the terms of the note.” (Citation omitted.)

The trial court explained that Rodriguez admitted that JPMorgan Chase’s files did not include

267 A.3d 753

any originals or copies of any note signed by the defendant. Rodriguez did authenticate a United States Department of Housing and Urban Development Settlement Statement (HUD-1A form), a Transfer of Servicing Disclosure Statement, a Truth in Lending Statement, and a Notice of Right To Cancel, which were all signed by the defendant. None of these mortgage documents references the note executed by Robert.

The trial court also relied on the defendant's testimony.[5] At trial, the defendant testified that she had lived at the property for thirty-four years and had owned it for the last thirty years. The defendant further testified that she signed the mortgage deed at Robert's request. She admitted that she signed the HUD-1A form, the Transfer of Servicing Disclosure Statement, the Truth in Lending Statement, and the Notice of Right To Cancel, **\*762** but testified that she had not read the documents before signing them and that she signed them in Robert's presence only. The plaintiff presented no evidence to dispute this testimony.

The trial court explained that the defendant further testified that she had agreed that the proceeds of the subject note would be used to pay off a prior mortgage on the property but that she did not receive any portion of the $155,236.22 shown as paid to the "[b]orrower." The defendant explained that Robert managed the family's bills and paid all real estate taxes. The defendant further testified that she and Robert did not file joint tax returns or have credit cards in their names. The defendant also denied that she had signed any guarantees of Robert's debts.

The trial court also relied on Robert's testimony at trial.[6] He testified that, in his loan application, he included the value of the property, even though he knew that the property was solely in the defendant's name. Robert also testified that he had considered both he and the defendant jointly responsible for the prior mortgages on the property. Robert further testified that he had received the entire $155,236.22 in funds disbursed to the borrower at the closing. Robert explained that he used some of those funds to improve the kitchen and bathroom at the property. Robert testified that he paid the obligations under the note, real estate taxes and property insurance up until the time he filed for bankruptcy in 2010. Robert further testified **\*\*761** that, since that time, he has not made any payments under the note or for real estate taxes but did reinstate the property insurance. According to Robert, the defendant has occupied the property since 2006 but has not made mortgage payments or paid property taxes.

**\*763** During cross-examination, Robert testified that the majority of the documents relating to the mortgage were given to him, not the defendant. He further testified that the defendant was not present at the closing held at the attorney's office. Robert explained that all communications regarding the mortgage were sent to him, not the defendant. Robert also explained that he used $109,070.48 of the proceeds of the note to pay off credit cards that were his exclusive responsibility and that approximately $35,000 of it was used to improve the kitchen and bathroom at the property. Robert also testified that JPMorgan Chase "required that the prior mortgages be paid off as a condition of granting the loan."

The trial court ultimately found: "The documents in evidence and the testimony of the witnesses leave many gaps in the factual record. It is not clear [whether] Robert spoke with any individual representing [JPMorgan] Chase prior to applying for the mortgage. There was no mortgage commitment listing the terms under which [JPMorgan] Chase was prepared to close the loan and what role, if any, [it] intended [the defendant] to play in the transaction. The [HUD-1A form] lists only one disbursement to a law firm—the $525 paid to Bove & Milici. Although Robert testified that the closing took place in John Milici's office, he did not testify as to whether Milici was representing him, [JPMorgan] Chase, or both. There was no testimony as to who prepared or reviewed the closing documents. Both Robert and [the defendant] testified that [the defendant] did not attend the closing and that she signed the mortgage deed and four related documents at the family home. However, there was no explanation of how the mortgage [deed] came to bear the signatures of two witnesses, one of whom, [Milici], also purported to take [the defendant's] acknowledgement.

"The records authenticated by ... Rodriguez are silent as to any understanding [that JPMorgan] Chase **\*764** may have had with [the defendant] regarding her responsibility for the loan being made to Robert. Those records did not include a mortgage commitment letter or closing instructions, both of which typically would describe the transaction in detail and contain a checklist of documents required to be executed prior to disbursement of the proceeds of the loan."

On the basis of the foregoing, the trial court concluded: "The court finds that the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it is entitled to the equitable remedy of reformation of the mortgage deed .... Accordingly, the court finds the issues on the second count for [the defendant] and against the plaintiff." (Citation omitted.)

In a well reasoned opinion, the Appellate Court affirmed the judgment of the trial court, explaining that, "[a]s the [trial] court correctly noted, even with the various documents admitted into evidence at trial and the testimony of the witnesses, many gaps were left in the factual record." *JPMorgan Chase Bank, National Assn.* v. *Virgulak,* supra, 192 Conn. App. at 714, 218 A.3d 596. We agree. Principal among those gaps is that the mortgage deed identifies a "[n]ote" but does not explicitly identify the note signed by Robert. In other words, the plaintiff failed to produce clear and convincing evidence of the particular debt obligation that was being secured by the mortgage deed executed by the **\*\*762** defendant. Indeed, in its posttrial brief, the plaintiff conceded that the parties never intended the mortgage deed to secure a note signed by the defendant.[7] There was no evidence produced or elicited by the plaintiff that required the trial court to find that the defendant intended the mortgage as security for Robert's loan.

**\*765** On appeal to this court, the plaintiff does not assert that any of the trial court's findings of fact are clearly erroneous or that the trial court incorrectly required that mutual mistake be shown by clear and convincing evidence. Instead, we understand the plaintiff's claim on appeal to be that the Appellate Court improperly affirmed the judgment of the trial court because the

trial court failed to find, but should have found, that the parties—and the defendant in particular—intended the mortgage deed to secure Robert's note.

It is well established that "[a] contract is to be construed according to what may be assumed to have been the understanding and intention of the parties. ... The intention of the parties is a question of fact to be determined from the language of the contract, the circumstances attending its negotiation, and the conduct of the parties in relation thereto. ... The trial court's finding of fact with respect to intent is reversible on appeal only if the court's finding was clearly erroneous." (Citations omitted; internal quotation marks omitted.) *Voll* v. *Lafayette Bank & Trust Co.*, 223 Conn. 419, 426, 613 A.2d 266 (1992). We cannot conclude that the absence of a finding by the trial court that the parties intended the mortgage deed signed by the defendant to secure Robert's note was clearly erroneous.

In the present case, the language of the contract does not support the plaintiff's claim that the defendant's mortgage deed was intended to secure the note executed by Robert. Indeed, the language of the mortgage deed does not mention Robert or any note executed by him.

The circumstances attending the negotiation of the mortgage also do not necessarily support the plaintiff's claim that the parties intended the defendant's mortgage deed to secure Robert's note. There is no evidence that the plaintiff or its predecessors in interest ever **\*766** spoke with the defendant prior to her execution of the mortgage deed, or required her to secure the note as a condition of Robert's receiving the funds. The trial court also pointed to the undisputed fact that the defendant did not attend the closing and to the lack of evidence as to whether JPMorgan Chase, or its representative, was present.

Furthermore, the conduct of the parties in relation to the mortgage deed and the note also does not necessarily support the plaintiff's claim that the defendant and JPMorgan Chase intended the defendant's signature on the mortgage deed to secure the note signed by Robert. The trial court found that Robert received all of the net loan proceeds from the note and used most of those funds to pay off credit cards that were his exclusive responsibility. The plaintiff failed to introduce any evidence of communications with the defendant regarding the note and mortgage deed.

The trial court was not persuaded that the parties to the mortgage deed intended it to secure the note signed by Robert. As we have explained, this is a factual finding left to the trial court that can be overturned only if it is clearly erroneous. On the basis of the evidence in the present **\*\*763** case, we cannot conclude that the Appellate Court improperly affirmed the judgment of the trial court.

On appeal to this court, the plaintiff does not challenge the absence of a finding by the trial court that the parties intended the mortgage deed signed by the defendant to secure Robert's note as clearly erroneous or assert that the trial court applied the wrong standard in making its factual

finding. Instead, the plaintiff asserts that, because the defendant signed a mortgage deed that referenced a note with the same date and in the same amount as the note that Robert signed, the trial court incorrectly determined that the plaintiff did **\*767** not meet its high burden of showing that the defendant intended the mortgage deed to secure the note executed by Robert. The plaintiff essentially asserts that common sense dictates that the defendant intended to sign the mortgage deed to secure a note and that there is no other reason to sign a mortgage deed. From there, the plaintiff argues that the note Robert executed on the same day that the defendant signed the mortgage deed must be the note the defendant agreed to secure.

The question before this court, however, is not whether a fact finder could reasonably have concluded that the defendant intended the mortgage deed to secure a note signed by Robert but, rather, whether the trial court's conclusion that it could not make such a finding was clearly erroneous. We conclude that it was not because, as the trial court correctly noted, the evidence presented on that specific question fell short of the very high burden required to demonstrate mutual mistake. Indeed, Hudson, the plaintiff's predecessor in interest, admitted that the defendant did not borrow any money from Hudson or JPMorgan Chase, and the plaintiff conceded that the mortgage deed was not intended to secure any note signed by the defendant. Further, the plaintiff failed to present any testimony regarding whether JPMorgan Chase itself intended the defendant's signature on the mortgage deed to secure the note signed by Robert. Because of this lack of evidence, we cannot conclude that the trial court's inability to find that the parties intended the mortgage deed signed by the defendant to secure Robert's note was clearly erroneous.

This court repeatedly has warned that the power of courts to reform written instruments is one that should be exercised cautiously. See, e.g., *Lopinto* v. *Haines*, supra, 185 Conn. at 539, 441 A.2d 151 ("[t]his standard of proof should operate as a weighty caution upon the minds of all judges, and it forbids relief whenever the evidence is **\*768** loose, equivocal or contradictory" (internal quotation marks omitted)); see also, e.g., *Philippine Sugar Estates Development Co., Ltd.* v. *Philippine Islands*, 247 U.S. 385, 391, 38 S. Ct. 513, 62 L. Ed. 1177 (1918) (stating that reformation will not be granted "unless the proof of mutual mistake [is] of the clearest and most satisfactory character" (internal quotation marks omitted)); cf. 1 Restatement (Second), Contracts § 155, comment (c), p. 410 (1981) ("[b]ecause experience teaches that mistakes are the exception and not the rule ... [c]are is all the more necessary when the asserted mistake relates to a writing, because the law of contracts ... attaches great weight to the written expression of an agreement").

In the present case, it is undisputed that Robert received an unconditional discharge of his obligations under the note through the bankruptcy proceeding in 2011. The defendant was not obligated under the terms of that note, and the plaintiff is not seeking reformation of that note. Moreover, the parties stipulated, and the trial court specifically found, that the defendant **\*\*764** was not a guarantor of the note executed by Robert. Instead, the plaintiff is effectively attempting to make the defendant a surety responsible for Robert's debt in the event of default.

267 A.3d 753

See, e.g., *Bernd* v. *Lynes*, 71 Conn. 733, 736, 43 A. 189 (1899) ("the contract of a surety is a collateral engagement for another, as distinguished from an original and direct agreement for the party's own act" (internal quotation marks omitted)). We cannot conclude that the trial court's refusal to use its equitable power to reform the mortgage deed was improper under these circumstances.

To be sure, identifying the obligation secured by a mortgage deed is not a technical or scrivener's error. Reforming the mortgage deed in the manner sought by the plaintiff without establishing that the change effects the original intention of the parties changes the defendant's **\*769** obligations and creates a new contract between her and the plaintiff. This court has cautioned that "[a]n obstacle to reformation [that] we find insurmountable arises from the fundamental principle that there can be no reformation unless there is an antecedent agreement upon which the minds of the parties have met. The relief afforded in reforming an instrument is to make it conform to the previous agreement of the parties." *Hoffman* v. *Fidelity & Casualty Co. of New York*, 125 Conn. 440, 443, 6 A.2d 357 (1939). Consequently, "a definite agreement on which the minds of the parties have met must have [preexisted] the instrument in question." Id. It is axiomatic that a "court cannot supply an agreement [that] was never made, for it is [a court's] province to enforce contracts, not to make or alter them." Id. The issue here is whether it was clearly erroneous for the trial court not to find that a prior agreement existed between JPMorgan Chase and the defendant that the defendant would execute the mortgage deed in order to secure Robert's debt.

We recognize that the fact the mortgage deed and note have matching dates and refer to matching amounts could have allowed the trial court to infer that the transactions are related. However, based on the other evidence presented, which suggests that the defendant did not intend to secure Robert's debt, and the absence of any direct evidence that either party did intend the mortgage deed to secure a note executed by Robert, we cannot conclude that the absence of a finding by the trial court that JPMorgan Chase and the defendant intended for the defendant to execute the mortgage deed in order to secure Robert's note was clearly erroneous.

In its brief, the plaintiff posits the rhetorical question, what other reason would the defendant have to sign the mortgage deed if not to secure Robert's note? This question and the speculative answer it may yield, however, **\*770** do not provide anything like dispositive evidence of the parties' respective intentions here. The defendant had no burden to demonstrate what other purpose or intent motivated her to sign the mortgage deed. It is the plaintiff, as the party seeking reformation, that must prove the preexisting agreement that it seeks to effectuate, and it must do so by clear and convincing evidence. It did not do so to the satisfaction of the trial court, and we cannot conclude that the trial court's findings in this regard were clearly erroneous.

We cannot conclude, on the basis of the evidence before the trial court, that the absence of a finding by the court that the parties intended the mortgage deed signed by the defendant to secure the note signed by Robert was clearly erroneous. Thus, we conclude that the Appellate

267 A.3d 753

Court properly upheld the trial court's decision to decline to reform the mortgage deed.

**765 II

We next consider whether the Appellate Court properly affirmed the judgment of the trial court determining that the plaintiff was not entitled to foreclose the mortgage executed by the defendant because the defendant is not a borrower on the note. On appeal, the plaintiff contends that, even if this court concludes that the Appellate Court properly upheld the trial court's denial of the request for reformation, the plaintiff is nevertheless entitled to foreclose. The plaintiff argues that this is so because it is undisputed that the defendant entered into a mortgage transaction and common sense dictates that she intended her property interest to be security for the note contemporaneously executed by Robert. The plaintiff contends that, therefore, foreclosure is the proper equitable relief. The defendant counters that the plaintiff cannot foreclose the mortgage without reformation. We agree with the defendant.

*771 As we noted previously, "[a] foreclosure action is an equitable proceeding. ... The determination of what equity requires is a matter for the discretion of the trial court." (Internal quotation marks omitted.) *Deutsche Bank National Trust Co.* v. *Angle*, 284 Conn. 322, 326, 933 A.2d 1143 (2007). Thus, on appeal, we employ the abuse of discretion standard. See, e.g., id.

"In order to establish a prima facie case in a mortgage foreclosure action, the plaintiff must prove by a preponderance of the evidence that it is the owner of the note and mortgage, that the defendant mortgagor has defaulted on the note and that any conditions precedent to foreclosure, as established by the note and mortgage, have been satisfied." GMAC *Mortgage, LLC* v. *Ford*, 144 Conn. App. 165, 176, 73 A.3d 742 (2013), citing *Franklin Credit Management Corp.* v. *Nicholas*, 73 Conn. App. 830, 838, 812 A.2d 51 (2002), cert. denied, 262 Conn. 937, 815 A.2d 136 (2003).

In the present case, it is undisputed that the defendant did not sign the promissory note. Instead, the defendant signed only the mortgage deed, and the mortgage deed does not indicate that it was entered into to secure the note executed by Robert. The mortgage deed mentions only a nonexistent promissory note for which the defendant alone is the borrower. Hudson, the plaintiff's predecessor in interest, conceded that the defendant was not a borrower on any note.

We find the Appellate Court's reasoning persuasive in resolving this claim. The Appellate Court reasoned: "In reviewing the [trial] court's memorandum of decision and subsequent rulings on the plaintiff's motions, it is clear that it declined to grant foreclosure of the mortgage without reformation because it determined that the mortgage [deed], as executed, was a nullity because it secured a nonexistent debt." *772 *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, supra,

192 Conn. App. at 703, 218 A.3d 596. Accordingly, like the Appellate Court majority, we cannot conclude that the plaintiff was entitled to foreclose a mortgage for a debt for which the defendant was not responsible and that was not referenced in the mortgage deed.

On the basis of the foregoing, we conclude that the Appellate Court correctly concluded that the trial court did not abuse its discretion and properly affirmed the judgment of the trial court.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

## All Citations

341 Conn. 750, 267 A.3d 753

Footnotes

| | |
|---|---|
| * | January 11, 2022, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes. |
| 1 | "The named plaintiff, JPMorgan Chase Bank, National Association ... is no longer a party in this matter ... [after filing] a motion to substitute Hudson City Savings Bank as the plaintiff, which the [trial] court granted on August 18, 2015. On August 9, 2016, M&T Bank filed a motion to substitute itself as the plaintiff, noting that it was the successor by merger to Hudson City Savings Bank. That motion was granted on August 15, 2016." *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, 192 Conn. App. 688, 691 n.1, 218 A.3d 596 (2019). For convenience, we refer to M&T Bank as the plaintiff in this opinion. |
| 2 | The original summons and complaint also listed the named defendant, Robert J. Virgulak, and the Department of Revenue Services as defendants. Subsequently, the named plaintiff, JPMorgan Chase Bank, National Association, withdrew the action against Robert J. Virgulak. Additionally, the Department of Revenue Services was defaulted for failure to plead. Therefore, in the interest of simplicity, we refer to Theresa Virgulak as the defendant. |
| 3 | The trial court explained the following in its memorandum of decision: "[I]n the second count of its complaint, the plaintiff seeks reformation of the [note] but not the mortgage deed. However, on page 7 of its posttrial brief ... the plaintiff concedes: 'Quite simply, there is ... no support for any notion that the mortgage [deed] was ever intended to secure a note executed by [the defendant].' According to the [posttrial] brief, it is now the plaintiff's position that the mortgage deed should be reformed 'to reference the fact that the mortgage [deed] executed by [the defendant] was to secure the note executed by Robert.' " (Citation omitted; footnote omitted.)

In its posttrial brief, the plaintiff asserted that the trial court should consider its new position that the mortgage deed, rather than the note, should be reformed because, "in an equitable proceeding such as a mortgage foreclosure, the trial court may consider equitable principles, even though they may not have been specifically pleaded, and may consider all relevant circumstances to [e]nsure that complete justice is done." (Internal quotation marks omitted.)

Even though the plaintiff did not plead in its complaint that it was entitled to reformation of the mortgage deed, the trial court |

considered that claim and ultimately concluded that "the plaintiff has not sustained its burden of proving, by clear and convincing evidence, that it is entitled to the equitable remedy of reformation of the mortgage deed ...." (Citation omitted.) The defendant does not assert that it was improper for the trial court or the Appellate Court to consider reforming the mortgage deed instead of the note, so we also consider that claim.

4    In its response to the defendant's request for admissions, Hudson, the plaintiff's predecessor in interest, admitted, inter alia, that the defendant did not borrow any money from Hudson or JPMorgan Chase and did not owe them any money. See *JPMorgan Chase Bank, National Assn.* v. *Virgulak*, supra, 192 Conn. App. at 715–16, 218 A.3d 596. Approximately two weeks after trial, the plaintiff filed a motion seeking to withdraw and amend the responses to the defendant's request for admissions, which the court ultimately denied. See id., at 695–96, 218 A.3d 596.

5    The trial court elucidated that "[it] has ... consider[ed] all of the testimony given by Robert and [the defendant] to the extent that their credibility is at issue."

6    See footnote 5 of this opinion.

7    In its response to the defendant's request for admissions, Hudson also conceded that the defendant never borrowed any money from Hudson or JPMorgan Chase. See footnote 4 of this opinion.

---

**End of Document**

© 2022 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 16

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Clark, et al. | ) | Civil Case No. 3:22-CV-00039-SVN |
| | ) | |
| vs. | ) | |
| | ) | August 16, 2023 |
| Santander Bank, N.A., et al. | ) | |
| | ) | |

## JUDICIAL NOTICE OF
## PRO SE PLAINTIFF'S CHAPTER 13 BANKRUPTCY FILING

### STATEMENT OF FACTS
*[Bold italic added throughout document for emphasis]*

1.) On Tuesday, August 15, 2023, at 3:16 PM, the *pro se* Plaintiff, Gordon Clark (Mr. Clark), was ***forced***, and/or given ***no other viable legal option***, than to file for Chapter 13 bankruptcy protection, per **11 U.S.C. § 362 – Automatic Stay**, with the *United States Bankruptcy Court District of Connecticut* in Hartford to prevent the pending *Foreclosure by Sale* of Mr. Clark's deceased wife's *beloved and humble* home of 65 years (**Please see attached: Exhibit A**).

All due to the ongoing and nearly four (4) years of ***egregious and malicious*** efforts by *Santander Bank, N.A.* and its battery of attorneys to prevail *at any and all costs* by ***unjustly, unconstitutionally, unlawfully, and immorally*** denying Mr. Clark his ***due process of law rights***. Most recently, by filing an ***unconscionable, unconstitutional, unlawful, and beyond the pale*** **MOTION TO TERMINATE PRESENT AND ANY FUTURE AUTOMATIC STAYS ON APPEAL** with the *Appellate Court of Connecticut*.

### CERTIFICATION

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as ***required by law***, a copy of this **JUDICIAL NOTICE OF PRO SE PLAINTIFF'S CHAPTER 13 BANKRUPTCY FILING** will be mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull, and the *Massachusetts Attorney General*, Ms. Andrea Campbell.

1

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via *USPS Certified Mail***

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, CT 06103-1840
**Mailed via *USPS Certified Mail***

Attorney General Andrea Campbell
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
**Mailed via *USPS Certified Mail***

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on August 16, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

## CERTIFICATE OF SERVICE

I, *pro se* Plaintiff Gordon Clark, certify that a copy of the above **JUDICIAL NOTICE OF PRO SE PLAINTIFF'S CHAPTER 13 BANKRUPTCY FILING** will be served via *electronic service* on August 16, 2023, to the following:

Patrick S. Tracey, Esq. *(Santander Bank, N.A. named Defendants)*
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq. *(Bendett & McHugh, P.C. named Defendants)*
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**


Dated and signed at Enfield, Connecticut, on August 16, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit A

United States Bankruptcy Court
District of Connecticut

## Notice of Bankruptcy Case Filing



A bankruptcy case concerning the debtor(s) listed below was filed
under Chapter 13 of the United States Bankruptcy Code, entered
on 08/15/2023 at 3:19 PM and filed on 08/15/2023.

**Gordon Alexander Clark**
70 Elm Street
Enfield, CT 06082
SSN / ITIN: xxx-xx-5690

The case was assigned case number 23-20642.

In most instances, the filing of the bankruptcy case automatically stays certain collection and other actions against
the debtor and the debtor's property. Under certain circumstances, the stay may be limited to 30 days or not exist at
all, although the debtor can request the court to extend or impose a stay. If you attempt to collect a debt or take
other action in violation of the Bankruptcy Code, you may be penalized. Consult a lawyer to determine your rights
in this case.

If you would like to view the bankruptcy petition and other documents filed by the debtor, they are available at our
*Internet* home page http://www.ecf.ctb.uscourts.gov/ or at the Clerk's Office, 450 Main Street, 7th Floor, Hartford,
CT 06103.

You may be a creditor of the debtor. If so, you will receive an additional notice from the court setting forth
important deadlines.

           **Clerks Office pc**
           **Clerk, U.S. Bankruptcy Court**

# Exhibit 17

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| Gordon Clark, | ) | Civil Case No. 3:22-CV-00039-SVN |
|  | ) |  |
| vs. | ) |  |
|  | ) | August 16, 2023 |
| Santander Bank, N.A., et al. | ) |  |
|  | ) |  |

## PRO SE PLAINTIFF'S BRIEF CONCERNING PRECLUSION DOCTRINES OF COLLATERAL ESTOPPEL OR RES JUDICATA IN THIS INSTANT ACTION

Pursuant to the applicable provisions of the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*, the *Rules of Professional Conduct*, and the *Federal Rules of Civil Procedure*.  The *pro se* Plaintiff, Gordon Clark (Mr. Clark), *respectfully* files with this Court his **BRIEF CONCERNING PRECLUSION DOCTRINES OF COLLATERAL ESTOPPEL OR RES JUDICATA IN THIS INSTANT ACTION**.

## MEMORANDUM OF LAW
*[Bold italic added throughout document for emphasis]*

1.) ***The Ninth (9th) Commandment*** is:

> ***"Thou shalt not bear false witness against thy neighbor."***

Exodus 20:16

2.) ***The Tenth (10th) Commandment*** is:

> ***"Thou shalt not covet thy neighbor's house …,
> nor any thing that is thy neighbor's."***

Exodus 20:17

3.) ***The Second (2nd) Great Commandment*** is:

> ***"… Thou shalt love thy neighbor as thyself."***

Matthew 22:39

1

4.) *"Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh."*

Genesis 2:24

5.) *"For this cause shall a man leave his father and mother, and cleave to his wife; And they twain shall be one flesh: so then they are no more twain, but one flesh. What therefore God hath joined together, let not man put asunder."*

Mark 10:7-9

6.) There is a **Common Law Maxim**, which states the following:

*"Truth is the essence of justice. Without truth justice cannot exist."*

7.) There is a **Common Law Maxim**, which states the following:

*"There is **nothing more sacred, more inviolate, than the house of every citizen**."*

8.) **The Declaration of Independence** – 1776, which states, in part, the following:

"*We hold these **truths to be self-evident**, that all men are created equal, that they are **endowed by their Creator with certain unalienable Rights**, that among these are Life, Liberty and the pursuit of Happiness.*"

9.) *The Constitution of the United States – 1st Amendment*, which reads as follows:

*"Congress shall make no law respecting an establishment of religion, **or prohibiting the free exercise thereof**; or abridging the **freedom of speech**, or of the press; or the right of the people peaceably to assemble, and **to petition the government for a redress of grievances.**"*

10.) *"The Constitution of the United States states only one command **twice**,"* in the *5th Amendment*, and the *14th Amendment*, that is, **the command/clause of due process of law**.

11.) *The Constitution of the United States: Due Process of Law Clause – 5th Amendment*, which states, in part:

2

"... *nor be deprived of life, liberty, or property,* **without due process of law***; nor shall private property be taken for public use, without just compensation*;

and the **14th** **Amendment, Section 1**, *which states, in part:* "... *nor shall any state deprive any person of life, liberty, or property,* **without due process of law***; nor deny to any person within its jurisdiction the equal protection of the laws*."

12.)  *The Constitution of the United States: Freedom to Contract Clause, Article I, Section 10, Clause 1*, which states, in part:

"*No State shall ... pass any ... Law impairing the Obligation of Contracts ...*"

13.)  **The Judiciary Act of 1789 - SEC. 35**, which reads, in part, as follows:

"*And be it further enacted, That in* **all courts of the United States, the parties may plead and manage their own causes personally** *or by assistance of such counsel or attorneys at law as by the rules of the said courts respectively shall be permitted to manage and conduct causes therein*."

14.)  **28 U.S. Code § 1654 – Appearance personally or by counsel**, reads, as follows:

"**In all courts of the United States the parties may plead and conduct their own cases personally** *or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein*."

15.)  The **Connecticut Attorney's Oath** reads as follows:

"*You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do* **nothing dishonest***, and will not knowingly allow* **anything dishonest** *to be done in court, and that you will inform the court of* **any dishonesty** *of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is false or unlawful;* **that you will not obstruct any cause of action for personal gain or malice***; but that you will exercise the office of attorney, in any court in which you may practice, according to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or* **upon penalty of perjury***.*"

***(General Statutes § 1-25 and annotations.)***

3

**165**

## <u>STATEMENT OF FACTS</u>

*[Bold italic added throughout document for emphasis]*

1.) On July 26, 2023, this USDC issued an order at ECF No. [191] that stated, *in part*, the following:

> "In light of Defendants' filing at ECF No. [181] informing the Court that the underlying foreclosure action in the Connecticut Superior Court ***has been resolved***, no later than August 16, 2023, the parties shall submit briefing, not to exceed ten pages, discussing whether any of Plaintiff's pending and/or proposed claims are barred by the doctrines of collateral estoppel or res judicata."

2.) On July 31, 2023, Mr. Clark filed his **PRO SE DEFENDANT-APPELLANT'S MOTION FOR RECONSIDERATION EN BANC** with the *Appellate Court of Connecticut* (**Please see: ECF No. [193] – Exhibit A or AC-46473A02**).

3.) On August 1, 2023, Attorney Jeffrey M. Knickerbocker of *Brock & Scott, PLLC* (as of July 30, 2023) on behalf of their client, *Santander Bank, N.A.*, filed **PLAINTIFF-APPELLEE'S OBJECTION TO DEFENDANT-APPELLANT'S MOTION FOR RECONSIDERATION** with the *Appellate Court of Connecticut* (**Please see: ECF No. [193] – Exhibit B or AC-46473A02**).

4.) On August 15, 2023, Mr. Clark filed his **PRO SE DEFENDANT-APPELLANT'S MOTION TO STRIKE PLAINTIFF-APPELLEE'S INVALID OBJECTION TO MOTION FOR RECONSIDERATION EN BANC** with the *Appellate Court of Connecticut* (**Please see attached: Exhibit A, and/or AC-46473A02**).

5.) Consequently, based on said three (3) aforementioned filings with the *Appellate Court of Connecticut*, the underlying foreclosure action in the *Superior Court of Hartford* ***has not yet been fully resolved***, and is still pending judicial/appellate review.

6.) *Cornell Law School's Legal Information Institute*, concerning preclusion doctrines states, *in part*, the following:

> "*Issue preclusion, also called **collateral estoppel**, means that a **valid and final judgment** binds the plaintiff, defendant, and their privies in subsequent actions on different causes of action between them (or their privies) as to same issues actually litigated and essential to the judgment in the first action.*
>
> *The four essential elements to decide if issue preclusion applies are:*

*1) the former judgment **must be valid and final**;*
*2) the same issue is being brought;*
*3) the issue is essential to the judgement;*
*4) the issue was actually litigated.*

*Issue preclusion is an important legal doctrine. Similar to the doctrine of **res judicata**, which is also called claim preclusion, issue preclusion aims to preserve the longer term stability and reliance on the law. But different from claim preclusion, which bars the relitigating of all issues of a claim, issue preclusion bars only relitigating of the issues that are actually litigated."*

WHEREFORE, based on *all the material facts and relevant law* referenced above, the *pro se* Plaintiff, Mr. Clark, *respectfully* files with this Court his **BRIEF CONCERNING PRECLUSION DOCTRINES OF COLLATERAL ESTOPPEL OR RES JUDICATA IN THIS INSTANT ACTION**; and Mr. Clark concludes, once again, and *with all due respect* to this Court, that until there is a ***valid and final resolution*** in the state courts, that is, through the full appellate process, including judicial review by the ***entire** Appellate Court of Connecticut*, and *Supreme Court of Connecticut*, if necessary, and/or the pending state litigation is remanded back to the *Superior Court of Hartford* for a ***jury trial***, the preclusion doctrines of collateral estoppel or res judicata are not *fully ripe* for this Court to consider at this time, and ultimately may become *moot* pending the final judicial outcome in the state courts.

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on August 16, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

## CERTIFICATE OF SERVICE

I, *pro se* Plaintiff Gordon Clark, certify that a copy of the above **PRO SE PLAINTIFF'S BRIEF CONCERNING PRECLUSION DOCTRINES OF COLLATERAL ESTOPPEL OR RES JUDICATA IN THIS INSTANT ACTION** will be served via *electronic service* on August 16, 2023, to the following:

Patrick S. Tracey, Esq. *(Santander Bank, N.A. named Defendants)*
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq. *(Bendett & McHugh, P.C. named Defendants)*
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on August 16, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit A

AC-46473                           )
AC-46473A02                 )        **Appeal Date: May 2, 2023**
                                   )        **1st Amended Appeal: May 9, 2023**
**Docket No. HHD-CV19-6120472-S**    )        **2nd Amended Appeal: May 26, 2023**
                                   )
Santander Bank, N.A.            )        Appellate Court of Connecticut
        vs.                   )
Clark, Lillian J., et al.          )        **August 15, 2023**

# PRO SE DEFENDANT-APPELLANT'S
# MOTION TO STRIKE PLAINTIFF-APPELLEE'S INVALID
# OBJECTION TO MOTION FOR RECONSIDERATION EN BANC

Pursuant to the applicable provisions of the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*, the *Rules of Professional Conduct*, the Rules of Appellate Procedure Section 66-2; and the *Connecticut Foreclosures Practice and Procedure*.  The *pro se* Defendant-Appellant *respectfully* files with this Court a **MOTION TO STRIKE PLAINTIFF-APPELLEE'S INVALID OBJECTION TO MOTION FOR RECONSIDERATION EN BANC**, based on the following *material facts and relevant law* delineated below.

## MEMORANDUM OF LAW
*[Bold italic added throughout document for emphasis]*

1.) ***The Ninth (9th) Commandment*** is:

> ***"Thou shalt not bear false witness against thy neighbor."***

Exodus 20:16

2.) ***The Tenth (10th) Commandment*** is:

> ***"Thou shalt not covet thy neighbor's house …,***
> ***nor any thing that is thy neighbor's."***

Exodus 20:17

1

3.) **The Second (2nd) Great Commandment** is:

> **"… Thou shalt love thy neighbor as thyself."**

> Matthew 22:39

4.) **"Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh."**

> Genesis 2:24

5.) **"For this cause shall a man leave his father and mother, and cleave to his wife; And they twain shall be one flesh: so then they are no more twain, but one flesh.  What therefore God hath joined together, let not man put asunder."**

> Mark 10:7-9

6.) There is a **Common Law Maxim**, which states the following:

> **"Truth is the essence of justice.  Without truth justice cannot exist."**

7.) There is a **Common Law Maxim**, which states the following:

> **"Justice delayed is justice denied."**

8.) There is a **Common Law Maxim**, which states the following:

"There is **nothing more sacred, more inviolate, than the house of every citizen.**"

9.) *United States Constitution – 1st Amendment*, which reads as follows:

> "Congress shall make no law respecting an establishment of religion, **or prohibiting the free exercise thereof**; **or abridging the freedom of speech**, or of the press; or the right of the people peaceably to assemble, and **to petition the government for a redress of grievances.**"

10.) "The U.S. Constitution states only one command **twice,**" in the 5th

2

**171**

*Amendment,* and the *14th Amendment, that is,* **the command/clause of due process of law**.

11.)     *United States Constitution*: *Due Process of Law Clause* – **5th Amendment**, which states, in part:

> *"… nor be deprived of life, liberty, or property,* **without due process of law***; nor shall private property be taken for public use, without just compensation …"*

and the **14th Amendment, Section 1**, which states, in part:

> *"… nor shall any state deprive any person of life, liberty, or property,* **without due process of law***; nor deny to any person within its jurisdiction the equal protection of the laws*."

12.)     *United States Constitution*: *Freedom to Contract Clause*, *Article I, Section 10, Clause 1*, which states, in part:

> *"No State shall … pass any … Law impairing the Obligation of Contracts ..."*

13.)     **Rules of Appellate Procedure, Section 66-2: Motions, Petitions and Applications; Supporting Memoranda**, reads, in part, as follows:

> " *A party intending to oppose a motion, petition or application shall file*
>
> *a brief statement clearly setting forth in separate paragraphs*
>
> *appropriately captioned the factual and legal grounds for opposition*
>
> **within ten days** *after the filing of the motion, petition or application*."

14.)     The **Connecticut Attorney's Oath** reads as follows:

> *"You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do* **nothing dishonest***, and will not knowingly allow* **anything**

3

*dishonest* to be done in court, and that you will inform the court of *any dishonesty* of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is *false* or unlawful; *that you will not obstruct any cause of action for personal gain or malice*; but that you will exercise the office of attorney, in any court in which you may practice, according to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or *upon penalty of perjury*."

**(General Statutes § 1-25 and annotations.)**

## BRIEF HISTORY
*[Bold italic added throughout document for emphasis]*

1.) *Pro se* Defendant-Appellant Gordon Clark (Mr. Clark) and Lillian Clark (Mrs. Clark) were married for 27 years (married on February 14, 1993), and together for *nearly* 30 years, before Mrs. Clark's *tragic and heart-wrenching* passing on October 18, 2020, after a *long, daily, and courageous* 11-year battle with Parkinson's disease, in her *beloved and humble* home of 65 years in Enfield, Connecticut at the age of 92 (nearly 93).

May she … rest in peace … *forever* …

2.) Plaintiff-Appellee filed an *erroneous and malicious* foreclosure lawsuit against Mr. and Mrs. Clark in November 2019, approximately eleven (11) months before Mrs. Clark's passing.

3.) After nearly four (4) years and four (4) *different* judges in the *Superior Court of Hartford*, and the *repeated denial* of Mr. Clark's *constitutionally protected* due process of law rights, including, but not limited to, the *denial of discover, any*

4

**173**

***exhibits, any witnesses, testimony, cross-examination, and a jury trial, along
with the denial of a full transcript of the Remote Court Trial***.  Mr. Clark was
forced to file a *Second Amended Appeal* with the *Appellate Court of Connecticut* on
May 26, 2023.

4.) On July 19, 2023, the three (3) judge panel of the *Appellate Court of Connecticut*
dismissed Mr. Clark's *Second Amended Appeal*.

5.) On July 31, 2023, Mr. Clark filed a *Motion for Reconsideration En Banc* with the
*Appellate Court of Connecticut*.


## STATEMENT OF FACTS
*[Bold italic added throughout document for emphasis]*

1.) On July 30, 2023, the attorney for the Plaintiff-Appellee, Mr. Jeffrey M.
Knickerbocker (Mr. Knickerbocker) became an employee of a ***new law firm*** known
as *Brock & Scott, PLLC*.


2.) On August 1, 2023, Mr. Knickerbocker filed his **OBJECTION TO DEFENDANT-
APPELLANT'S MOTION FOR RECONSIDERATION EN BANC**, ***before*** correctly
filing his *Motion to File Appearance After Case is Ready* with the *Appellate Court of
Connecticut*.


3.) On August 2, 2023, Mr. Knickerbocker filed his ***out of order*** *Motion to File
Appearance After Case is Ready* with the *Appellate Court of Connecticut*.

5

**174**

4.) Therefore, and **once again**, Mr. Knickerbocker's court filings are **out of order, invalid, and untimely**; and therefore, his **OBJECTION TO DEFENDANT-APPELLANT'S MOTION FOR RECONSIDERATION EN BANC** filed on August 1, 2023, **must be stricken from the record**.


## LEGAL GROUNDS
*[Bold italic added throughout document for emphasis]*

1.) **Rules of Appellate Procedure, Section 66-2: Motions, Petitions and Applications; Supporting Memoranda**, reads, in part, as follows:

> " *A party intending to oppose a motion, petition or application shall file a brief statement clearly setting forth in separate paragraphs appropriately captioned the factual and legal grounds for opposition **within ten days** after the filing of the motion, petition or application*."


WHEREFORE, based on **all the material facts and relevant law** referenced above, as well as all the *related, relevant, and previously* filed documents with this Court and the *Superior Court of Hartford*, the *pro se* Defendant-Appellant, *respectfully* moves this Court to **grant** this **MOTION TO STRIKE PLAINTIFF-APPELLEE'S INVALID OBJECTION TO MOTION FOR RECONSIDERATION EN BANC**.


Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

6

Dated and signed at Enfield, Connecticut, on August 15, 2023, by *pro se* Defendant-Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

## CERTIFICATE OF SERVICE

I, *pro se* Defendant-Appellant Gordon Clark, certify that a copy of the above **PRO SE**

**DEFENDANT-APPELLANT'S MOTION TO STRIKE PLAINTIFF-APPELLEE'S INVALID**

**OBJECTION TO MOTION FOR RECONSIDERATION EN BANC** will be served via

*electronic service* or *USPS Certified Mail* on August 15, 2023, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151
Farmington, CT 06032
860.856.6646
jeffrey.knickerbocker@brockandscott.com
**Served via *electronic service***


It is also certified that this document does not contain any names or other personal

identifying information that is prohibited from disclosure by rule, statute, court order, or

case law.


Dated and signed at Enfield, Connecticut, on August 15, 2023, by *pro se* Defendant-

Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor*

*capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

8

# Exhibit 18

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| Clark, et al. | ) | Civil Case No. 3:22-CV-00039-SVN |
| | ) | |
| vs. | ) | |
| | ) | August 18, 2023 |
| Santander Bank, N.A., et al. | ) | |
| | ) | |

## JUDICIAL NOTICE OF
## PRO SE PLAINTIFF'S ADVERSARY PROCEEDING COMPLAINT FILING

### STATEMENT OF FACTS
*[Bold italic added throughout document for emphasis]*

1.) On Friday, August 18, 2023, at 2:50 PM, the *pro se* Plaintiff, Gordon Clark (Mr. Clark), was ***forced***, and/or given ***no other viable legal option***, than to file an *Adversary Proceeding Complaint* with the *United States Bankruptcy Court District of Connecticut* in Hartford (**Please see attached: Exhibit A and Exhibit B**).


Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on August 18, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

1

## CERTIFICATE OF SERVICE

I, *pro se* Plaintiff Gordon Clark, certify that a copy of the above **JUDICIAL NOTICE OF PRO SE PLAINTIFF'S ADVERSARY PROCEEDING COMPLAINT FILING** will be served via *electronic service* on August 18, 2023, to the following:

Patrick S. Tracey, Esq. *(Santander Bank, N.A. named Defendants)*
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq. *(Bendett & McHugh, P.C. named Defendants)*
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. *(Wells Fargo & Company named Defendants)*
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on August 18, 2023, by *pro se* Plaintiff Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
*(Husband & Executor of the Estate of Lillian J. Clark)*
70 Elm Street, Enfield, CT 06082
860.833.3195

# Exhibit 19

| | | |
|---|---|---|
| SC-230179 | ) | **Appeal File Date: May 2, 2023** |
| AC-46473A02; AC-46473 | ) | **1st Amended Appeal: May 9, 2023** |
| Docket No. HHD-CV19-6120472-S | ) | **2nd Amended Appeal: May 26, 2023** |
| | ) | |
| Santander Bank, N.A. | ) | Supreme Court of Connecticut |
| vs. | ) | |
| Clark, Lillian J., et al. | ) | **February 29, 2024** |
| | ) | **ORAL ARGUMENT REQUESTED** |

## <u>PRO-SE DEFENDANT-APPELLANTS'</u>
## <u>MOTION FOR A WRIT OF MANDAMUS TO COMPEL THE</u>
## <u>CONSTITUTIONAL AND INVIOLATE RIGHT TO A JURY TRAIL</u>

Pursuant to the applicable provisions of the *Connecticut Practice Book*, including, but not

limited to the *Connecticut Attorney's Oath*; the *Rules of Professional Conduct*; the Rules of

Judicial Conduct; the Rules of Appellate Procedure; the *Connecticut Foreclosures Practice*

*and Procedure*; and the *Constitution of the State of Connecticut*. The *pro se* Defendant-

Appellants *respectfully* files with this Court their **MOTION FOR A WRIT OF MANDAMUS**

**TO COMPEL THE CONSTITUTIONAL AND INVIOLATE RIGHT TO A JURY TRAIL**,

based on the following *material facts and relevant law* delineated below.

## <u>MEMORANDUM OF LAW</u>
*[Bold italic added throughout document for emphasis]*

    1.) ***The Ninth (9th) Commandment*** is:

        ***"Thou shalt not bear false witness against thy neighbor."***

Exodus 20:16

    2.) ***The Tenth (10th) Commandment*** is:

        ***"Thou shalt not covet thy neighbor's house …,***
        ***nor any thing that is thy neighbor's."***

Exodus 20:17

1

3.) **The Second (2nd) Great Commandment** is:

> **"… Thou shalt love thy neighbor as thyself."**
>
> Matthew 22:39

4.) **"Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh."**

> Genesis 2:24

5.) **"For this cause shall a man leave his father and mother, and cleave to his wife; And they twain shall be one flesh: so then they are no more twain, but one flesh.  What therefore God hath joined together, let not man put asunder."**

> Mark 10:7-9

6.) There is a **Common Law Maxim**, which states the following:

> **"Truth is the essence of justice.  Without truth justice cannot exist***."*

7.) There is a **Common Law Maxim**, which states the following:

> *"****Justice delayed is justice denied***."*

8.) There is a **Common Law Maxim**, which states the following:

*"There is **nothing more sacred, more inviolate, than the house of every citizen**."*

9.) *United States Constitution – **1st Amendment***, which reads as follows:

> *"Congress shall make no law respecting an establishment of religion, **or prohibiting the free exercise thereof**; **or abridging the freedom of speech**, or of the press; or the right of the people peaceably to assemble, and **to petition the government for a redress of grievances**."*

10.)      *"The U.S. Constitution states only one command **twice**,"* in the 5th

2

**183**

*Amendment,* and the *14th Amendment, that is,* **the command/clause of due process of law**.

11.)    *United States Constitution*: *Due Process of Law Clause –* **5th Amendment**, which states, in part:

"*… nor be deprived of life, liberty, or property,* **without due process of law**; *nor shall private property be taken for public use, without just compensation*; *and the* **14th Amendment, Section 1**, *which states, in part*:

"*… nor shall any state deprive any person of life, liberty, or property,* **without due process of law**; **nor deny to any person within its jurisdiction the equal protection of the laws**."

12.)    *United States Constitution*: *Freedom to Contract Clause*, *Article I, Section 10, Clause 1*, which states, in part:

> "*No State shall … pass any … Law impairing the Obligation of Contracts ...*"

13.)    The *Constitution of the State of Connecticut*, reads, *in part*, as follows:

**CONSTITUTION OF THE STATE OF CONNECTICUT**

**PREAMBLE.**

The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effactually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government.

**ARTICLE FIRST.**
**DECLARATION OF RIGHTS.**

That the great and essential principles of liberty and free government may be recognized and established,

3

**WE DECLARE:**
(**Equality of rights**.)
Sec. 1 All men when they form a social compact, **are equal in rights**; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.


**AMENDMENTS TO THE
CONSTITUTION OF THE STATE OF CONNECTICUT**

**ARTICLE IV**.

(**Trial by jury**. **Challenging of jurors**.)
Section 19 of article first of the Constitution is amended to read as follows:

**The right of trial by jury shall remain inviolate**, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate.


**ARTICLE XXI**.

(**Equal protection**. **No segregation or discrimination**.)
Article fifth of the amendments to the Constitution is amended to read as follows:

**No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.

4

14.) The **Connecticut Attorney's Oath** reads as follows:

*"You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do **nothing dishonest**, and will not knowingly allow **anything dishonest** to be done in court, and that you will inform the court of **any dishonesty** of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is **false** or unlawful; **that you will not obstruct any cause of action for personal gain or malice**; but that you will exercise the office of attorney, in any court in which you may practice, according to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or **upon penalty of perjury**."*

**(General Statutes § 1-25 and annotations.)**

15.) **RULES OF APPELLATE PROCEDURE**

**Sec. 60-1. Rules To Be Liberally Interpreted**
The design of these rules being to facilitate business and **advance justice**, they will be interpreted liberally in any appellate matter where it shall be manifest that a strict adherence to them will work surprise or injustice.

16.) **CODE OF JUDICIAL CONDUCT - PREAMBLE**

(1) **An independent, fair and impartial judiciary is indispensable to our system of justice**. The United States legal system is based on the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, **the judiciary plays a central role in preserving the principles of justice and the rule of law**. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, **must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system**.

5

**186**

## BRIEF HISTORY

*[Bold italic added throughout document for emphasis]*

1.) *Pro se* Defendant-Appellants Gordon Clark (Mr. Clark) and Lillian Clark (Mrs. Clark) were married for 27 years (married on February 14, 1993), and together for *nearly* 30 years, before Mrs. Clark's *tragic and heart-wrenching* passing on October 18, 2020, after a *long, daily, and courageous* 11-year battle with Parkinson's disease, in her *beloved and humble* home of 65 years in Enfield, Connecticut at the age of 92 (nearly 93).

May she … rest in peace … *forever* …

2.) Plaintiff-Appellee filed an ***erroneous and malicious*** foreclosure lawsuit against Mr. and Mrs. Clark in November 2019, approximately eleven (11) months before Mrs. Clark's passing.

3.) After nearly four (4) years and four (4) ***different*** judges in the *Superior Court of Connecticut*, and the ***repeated denial*** of Mr. Clark's ***constitutionally protected due process of law rights***, including, but not limited to, the ***denial of discover, any exhibits, any witnesses, testimony, cross-examination, and a jury trial, along with the denial of a full transcript of the Remote Court Trial***. Mr. Clark was forced to file a *Second Amended Appeal* with the *Appellate Court of Connecticut* on May 26, 2023.

4.) On July 19, 2023, the three (3) judge panel of the *Appellate Court of Connecticut* dismissed Mr. Clark's *Second Amended Appeal*.

5.) On July 31, 2023, Mr. Clark filed a *Motion for Reconsideration En Banc* with the *Appellate Court of Connecticut*.

6.) On August 15, 2023, Mr. Clark was **forced**, and/or given **no other viable legal option**, than to file for Chapter 13 bankruptcy protection, per **11 U.S.C. § 362 – Automatic Stay**, with the *United States Bankruptcy Court District of Connecticut* in Hartford to prevent the pending *Foreclosure by Sale* of Mr. Clark's deceased wife's *beloved and humble* home of 65 years.

7.) **While under Chapter 13 bankruptcy protection**, on Wednesday, September 13, 2023, the *Appellate Court of Connecticut* denied Mr. Clark's *Motion for Reconsideration En Banc*.

8.) Consequently, on Monday, October 2, 2023, Mr. Clark was **forced**, and/or given **no other viable legal option**, than to file a **PETITION BY CERTIFICATION FOR REVIEW** with the *Supreme Court of Connecticut*.

9.) **While under Chapter 13 bankruptcy protection**, on February 20, 2024, the *Supreme Court of Connecticut* returned Mr. Clark's **MOTION FOR A WRIT OF MANDAMUS TO COMPEL THE CONSTITUTIONAL AND INVIOLATE RIGHT TO A JURY TRAIL**, 95-days after being filed on November 17, 2023, for two (2) reasons: 1. Incorrect document type or path; and 2. There is no practice book provision that permits a writ of mandamus to be filed in a pending petition for certification.

## <u>STATEMENT OF FACTS</u>
*[Bold italic added throughout document for emphasis]*

1.) The *Constitution of the State of Connecticut* states, *in part*, the following:

"**The right of trial by jury shall remain inviolate** …"

"**No person shall be denied the equal protection of the law** …"

Please see above ***Memorandum of Law*** and attached ***Constitutionality Notice – Exhibit A***.

2.) On April 29, 2022, the *pro se* Defendant-Appellant, Gordon Clark (Mr. Clark), filed his *Answer, Affirmative/Special Defenses, Counterclaim, and **Jury Demand*** with the *Superior Court of Connecticut* (**Please see attached – Exhibit B**).

3.) On April 26, 2023, the *pro se* Defendant-Appellant, Mr. Clark, filed his *Claim for Jury* form and paid the associated $440 court fee with the *Superior Court of Connecticut* (**Please see attached – Exhibit C**).

4.) On April 28, 2023, Plaintiff-Appellee *Santander Bank, N.A.* through its attorney, Jeffrey M. Knickerbocker filed a *Motion to Strike Jury Demand* with the *Superior Court of Connecticut* (**Please see: Document 272.00**).

5.) On May 2, 2023, Judge Claudia Baio of the *Superior Court of Connecticut* granted Plaintiff-Appellee *Santander Bank, N.A.'s Motion to Strike Jury Demand* (**Please see: Document 272.86**).

6.) Mr. Clark was **denied** his state and federal constitutionally protected rights to due process of law, of equal protection under the law, and his **inviolate right to a jury trial**.

7.) As a *pro se* litigant it is Mr. Clark's understanding that the remedy to this *judicial error* is a *Writ of Mandamus*. Therefore, Mr. Clark files this **MOTION FOR A WRIT OF MANDAMUS TO COMPEL THE CONSTITUTIONAL AND INVIOLATE RIGHT TO A JURY TRAIL** (**Please see attached: *Mandamus as a Remedy for Denial of a Jury Trial – The University of Chicago Law Review* – Exhibit D**).

## <u>LEGAL GROUNDS</u>
*[Bold italic added throughout document for emphasis]*

1.) The *Constitution of the State of Connecticut* states, in part, the following:

    "**The right of trial by jury shall remain inviolate** …"

    "**No person shall be denied the equal protection of the law** …"

**Please see above *Memorandum of Law* and attached *Constitutionality Notice* – Exhibit A**.

WHEREFORE, based on **all the material facts and relevant law** referenced above, as well as all the *related, relevant, and previously* filed documents with this Court, the *Appellate Court of Connecticut*, and the *Superior Court of Connecticut*, the *pro se* Defendant-Appellants, *respectfully* moves this Court to **grant** their **MOTION FOR A WRIT OF MANDAMUS TO COMPEL THE CONSTITUTIONAL AND INVIOLATE RIGHT TO A JURY TRAIL**.

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on February 29, 2024, by *pro se* Defendant-Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____

Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

## CERTIFICATE OF SERVICE

I, *pro se* Defendant-Appellant Gordon Clark, certify that a copy of the above **PRO-SE**

**DEFENDANT-APPELLANT'S MOTION FOR A WRIT OF MANDAMUS**

**TO COMPEL THE CONSTITUTIONAL AND INVIOLATE RIGHT TO A JURY TRAIL**

will be served via *electronic service* and via email on February 29, 2024, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151, Farmington, CT 06032
860.856.6646; jeffrey.knickerbocker@brockandscott.com

David A. Baram, Esq.
c/o O'Malley, Deneen, Leary, Messina & Oswecki
One Regency Drive, Suite 310, Bloomfield, CT 06002
860.242.2221; dbaram@omalleydeneen.com

Roger Calistro, Esq.
c/o Calistro & Airone, LLC
396 Orange Street, Carriage House, New Haven, CT 06511
203.752.1200; rogerc@nptlx.net

It is also certified that this document does not contain any names or other personal

identifying information that is prohibited from disclosure by rule, statute, court order, or

case law.

Dated and signed at Enfield, Connecticut, on February 29, 2024, by *pro se* Appellant

Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

11

# Exhibit A

| | | |
|---|---|---|
| **AC-46473** | ) | **Appeal Date: May 2, 2023** |
| | ) | **1st Amended Appeal: May 9, 2023** |
| **Docket No. HHD-CV19-6120472-S** | ) | **2nd Amended Appeal: May 26, 2023** |
| | ) | |
| Santander Bank, N.A. | ) | Appellate Court of Connecticut |
| vs. | ) | |
| Clark, Lillian J., et al. | ) | May 26, 2023 |
| | ) | |

## PRO SE APPELLANTS' CONSTITUTIONALITY NOTICE

Pursuant to the applicable provisions of the *Constitution of the State of Connecticut*; the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*, the *Rules of Professional Conduct*, and **Section 60-1**; and the *Connecticut Foreclosures Practice and Procedure*. The *pro se* Appellants *respectfully* files with this Court their **CONSTITUTIONALITY NOTICE**, based on the following *material facts and relevant law* delineated below.

## MEMORANDUM OF LAW
*[Bold italic added throughout document for emphasis]*

1.) The *Constitution of the State of Connecticut*, reads, *in part*, as follows:

**CONSTITUTION OF THE STATE OF CONNECTICUT**

**PREAMBLE.**

The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government.

1

**194**

## ARTICLE FIRST.
## DECLARATION OF RIGHTS.

That the great and essential principles of liberty and free government may be recognized and established,

## WE DECLARE:

(**Equality of rights**.)
Sec. 1 All men when they form a social compact, **are equal in rights**; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.

(**Trial by jury**.)
Sec. 19 **The right of trial by jury shall remain inviolate.**
*Amended by Article IV., of the Amendments to the Constitution of the State of Connecticut.*

(**Equal protection**. **No segregation or discrimination**.)
Sec. 20 **No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin.
*Amended by Article V., and Article XXI., of the Amendments to the Constitution of the State of Connecticut.*

## AMENDMENTS TO THE
## CONSTITUTION OF THE STATE OF CONNECTICUT

## ARTICLE IV.

(**Trial by jury**. **Challenging of jurors**.)
Section 19 of article first of the Constitution is amended to read as follows: **The right of trial by jury shall remain inviolate**, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate.

2

**195**

**ARTICLE V**.

(**Equal protection**. **No segregation or discrimination**.)
Section 20 of article first of the Constitution is amended to read as follows:
**No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin or sex.
*Amended by Article XXI., of the Amendments to the Constitution of the State of Connecticut.*

**ARTICLE XXI**.

(**Equal protection**. **No segregation or discrimination**.)
Article fifth of the amendments to the Constitution is amended to read as follows:
**No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.


## STATEMENT OF FACTS
*[Bold italic added throughout document for emphasis]*


1.) From April 25, 2023 through May 19, 2023, *Superior Court of Hartford*, Judge Claudia A. Baio, issued nineteen (19) Court Orders, which denied the *pro se* Appellants' their constitutional rights under the *Constitution of the State of Connecticut*, which include, but are not limited to repeated violations of *pro se* Appellants' ***right to equal protection under the law***, by denying the *pro se* Appellants their ***due process of law rights to a jury trial, discovery, witnesses, exhibits, exculpatory evidence, and testimony***.


2.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 205.86**), denying *pro se* **DEFENDANTS'**

3
**196**

**MOTION FOR JUDGMENT IN ACCORDANCE WITH THREE (3) OPINIONS OF THE SUPREME COURT OF CONNECTICUT** (**Please see: Docket Entries – 205.00, and 205.86**), without issuing a *Memorandum of Decision*.

3.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 221.87**), denying *pro se* **DEFENDANTS' MOTION TO COMPEL PLAINTIFF SANTANDER BANK, N.A. TO PRODUCE DEFENDANTS' FIRST REQUEST FOR PRODUCTION OF DOCUMENTS (Please see: Docket Entries - 221.00, 221.86, and 221.87)**, without issuing a *Memorandum of Decision*.

4.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 222.86**), sustaining **PLAINTIFF'S OBJECTION TO THE REQUEST FOR PRODUCTION (Please see: Docket Entries - 222.00, and 222.86)**, without issuing a *Memorandum of Decision*.

5.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on April 25, 2023, (**Please see: Docket Entry - 247.86**), granting **PLAINTIFF'S MOTION FOR ORDER OF COMPLIANCE (Please see: Docket Entries - 247.00, and 247.86)**, without issuing a *Memorandum of Decision*.

6.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 1, 2023, (**Please see: Docket Entry - 253.86**), overruling *pro se* **DEFENDANTS' OBJECTION TO PLAINTIFF SANTANDER BANK, N.A.'S FRAUDULENT**

4

**FILING OF CERTIFICATE OF CLOSED PLEADINGS; AND DEFENDANTS'
RESERVATION OF RIGHT TO FILE MOTIONS TO AMEND PLEADINGS
UPON COMPLETION OF DISCOVERY, AND RESERVATION OF RIGHT TO A
JURY TRIAL (Please see: Docket Entries - 253.00, and 253.86)**, without
issuing a *Memorandum of Decision*.

7.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May
1, 2023, (**Please see: Docket Entry - 255.86**), denying *pro se* **DEFENDANTS'
MOTION TO STRIKE PLAINTIFF SANTANDER BANK, N.A.'S FILING OF
FRAUDULENT CERTIFICATE OF CLOSED PLEADINGS** (**Please see: Docket
Entries – 255.00, and 255.86**), without issuing a *Memorandum of Decision*.

8.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May
2, 2023, (**Please see: Docket Entry - 256.86**), denying *pro se* **DEFENDANTS'
MOTION FOR SANCTIONS AGAINST ATTORNEYS JEFFREY M.
KNICKERBOCKER, AND ADAM L. BENDETT, AND BENDETT & MCHUGH,
P.C. FOR ITS ONGOING ABUSE OF COURT PROCEEDINGS AGAINST PRO
SE DEFENDANTS, WHICH INCLUDES, BUT IS NOT LIMITED TO THE FILING
OF A FRAUDULENT CERTIFICATE OF CLOSED PLEADINGS** (**Please see:
Docket Entries – 256.00, and 256.86**), without issuing a *Memorandum of
Decision*.

9.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May
2, 2023, (**Please see: Docket Entry - 257.86**), denying *pro se* **DEFENDANTS'**

**MOTION FOR CONTINUANCE OF A JURY TRIAL** (**Please see: Docket Entries – 257.00, and 257.86**), without issuing a *Memorandum of Decision*.

10.)   *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 263.86**), denying *pro se* **EMERGENCY MOTION FOR ORAL ARGUMENT RECONSIDERATION-REARGUMENT OF MOTIONS 205.00, 221.00, AND 247.00** (**Please see: Docket Entries – 263.00, and 263.86**), without issuing a *Memorandum of Decision*.

11.)   *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 272.86**), granting **PLAINTIFF'S MOTION TO STRIKE JURY CLAIM (Please see: Docket Entries - 272.00, and 272.86)**, without issuing a *Memorandum of Decision*.

12.)   *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 2, 2023, (**Please see: Docket Entry - 275.86**), sustaining **PLAINTIFF'S OBJECTION TO DEFENDANTS' MOTIONS 255.00, 256.00, 257.00 AND 263.00 (Please see: Docket Entries - 275.00, and 275.86)**, without issuing a *Memorandum of Decision*.

13.)   *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

6

on May 2, 2023, (**Please see: Docket Entry - 281.86**), granting

**PLAINTIFF'S MOTION FOR ORDER TO FIND NO APPELLATE STAY**

**(Please see: Docket Entries - 281.00, and 281.86)**, without issuing a

*Memorandum of Decision*.

14.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 3, 2023, (**Please see: Docket Entry - 276.86**), granting

**PLAINTIFF'S MOTION FOR THE COURT TO TAKE JUDICIAL NOTICE**

**(Please see: Docket Entries - 276.00, and 276.86)**, without issuing a

*Memorandum of Decision*.

15.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 3, 2023, (**Please see: Docket Entry - 283.86**), denying *pro se*

**DEFENDANTS' EMERGENCY MOTION TO SUBPOENA JOANNA**

**WHEELER OF SANTANDER BANK, N.A.** (**Please see: Docket Entries**

**– 283.00, and 283.86**), without issuing a *Memorandum of Decision*.

16.)      *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order

on May 3, 2023, (**Please see: Docket Entry - 284.86**), overruling *pro se*

**DEFENDANTS' OBJECTION TO ATTORNEY JEFFREY M.**

**KNICKERBOCKER'S FRAUDULENT LIST OF EXHIBITS FILING, AND**

**FAILURE TO SUBMIT A WITNESS LIST TO THE PRO SE**

**DEFENDANTS; AND THIS COURT'S FAILURE TO ENTER A TRIAL**

7

**MANAGEMENT ORDER BEFORE TRIAL TO THE PRO SE DEFENDANTS (Please see: Docket Entries - 284.00, and 284.86)**, without issuing a *Memorandum of Decision*.

17.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 3, 2023, (**Please see: Docket Entry - 285.86**), denying *pro se* **DEFENDANTS' MOTION FOR SANCTIONS AGAINST ATTORNEYS JEFFREY M. KNICKERBOCKER, AND ADAM L. BENDETT, AND BENDETT & MCHUGH, P.C. FOR ITS ONGOING ABUSE OF COURT PROCEEDINGS AGAINST PRO SE DEFENDANTS, WHICH INCLUDES, BUT IS NOT LIMITED TO THE FILING OF A FRAUDULENT LIST OF EXHIBITS FILING, AND FAILURE TO SUBMIT A WITNESS LIST TO THE PRO SE DEFENDANTS** (**Please see: Docket Entries – 285.00, and 285.86**), without issuing a *Memorandum of Decision*.

18.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order (*Memorandum of Decision*) on May 19, 2023, issuing judgment in favor of Plaintiff *Santander Bank, N.A.'s* Complaint, and also issuing judgment of *Foreclosure by Sale* against *pro se* Defendants (**Please see: Docket Entry – 292.00**).

19.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order on May 19, 2023, against *pro se* Defendants, ordering *Foreclosure by Sale* on August 26, 2023 (**Please see: Docket Entry – 292.10**).

20.) *Superior Court of Hartford*, Judge Claudia A. Baio, issued a Court Order (*Judgment*) on May 19, 2023, against *pro se* Defendants, ordering *Judgment of Foreclosure by Sale* (**Please see: Docket Entry – 293.00**).

21.) Lastly, *for what it is worth*, the *pro se* Appellant, Mr. Clark, has **repeatedly experienced first-hand** over the past more than three (3) years, **unfair, unjust, illegal, unlawful, unconstitutional, un-American, and immoral maltreatment**, that is, the **denial of his constitutionally protected due process of law rights** throughout this arduous judicial process; and therefore, Mr. Clark has **first-hand knowledge** that many, *if not most*, judicial officers, who are **supposed to be (speak and act)** public servants, **unashamedly display their disdain, unprofessionalism, incompetency, dishonesty, and even outright discrimination and hatred** for *pro se* litigants.  And if anyone doubts these facts, one only has to ask the **esteemed, distinguished, honorable, and honest** Judge Richard Posner of the *United States Court of Appeals for the Seventh (7th) Circuit* why he retired early, which **tragically and sadly** had to do with how the judiciary and his colleagues (public servants) **repeatedly and systemically mistreated pro se litigants** (**Please see attached article: Exhibit A - *The Backstory Behind Judge Richard Posner's Retirement***).

WHEREFORE, based on **all the material facts and relevant law** referenced above, as well as all the *related, relevant, and previously* filed documents with this Court and the

9

*Superior Court of Hartford*, the *pro se* Appellants, *respectfully* files with this Court their

**CONSTITUTIONALITY NOTICE**.

## CERTIFICATION

I, Gordon Clark, hereby certify that, pursuant to **Connecticut General Statutes § 42-110g(c)**, and as ***required by law***, a copy of this **PRO SE APPELLANTS' CONSTITUTIONALITY NOTICE** will be mailed via *USPS Certified Mail* to the *Connecticut Attorney General*, Mr. William Tong, and the *Connecticut Commissioner of the Department of Consumer Protection*, Ms. Michelle H. Seagull.

Attorney General William Tong
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
**Mailed via *USPS Certified Mail***

Commissioner Michelle H. Seagull
Department of Consumer Protection
450 Columbus Boulevard, Suite 901
Hartford, CT 06103-1840
**Mailed via *USPS Certified Mail***

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours.  Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

10

## CERTIFICATE OF SERVICE

I, *pro se* Appellant Gordon Clark, certify that a copy of the above **PRO SE**

**APPELLANTS' CONSTITUTIONALITY NOTICE** will be served via *electronic service* on

May 26, 2023, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Bendett & McHugh, P.C.
270 Farmington Avenue
Farmington, CT 06032
860.255.5008
jknickerbocker@bmpc-law.com
**Served via *electronic service***


It is also certified that this document does not contain any names or other personal

identifying information that is prohibited from disclosure by rule, statute, court order, or

case law.


Dated and signed at Enfield, Connecticut, on May 26, 2023, by *pro se* Appellant Gordon

Clark, *in both his individual and executorship capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

11

**204**

# Exhibit A

# The Backstory Behind Judge Richard Posner's Retirement

**Judge Posner had some very specific reasons for his surprise retirement from the bench.**

By <u>DAVID LAT</u>
September 7, 2017 at 1:44 PM



*(Photo by Chensiyuan via Wikimedia Commons.)*

In May, when I had lunch with Judge Richard Posner and his clerks in Chicago, the esteemed jurist was in fine form, as enjoyable a conversationalist as ever.

In July — after he made **controversial comments about aging federal judges**, including a call for a mandatory retirement age of 80 — I asked him whether he'd apply that rule to himself. He kept his options open, **telling me**, "It will depend on how I feel [when I turn 80], both in terms of physical and particularly mental health and in terms of interest in the job."

So like much of the legal world, I was taken by surprise when Judge Posner, currently 78, announced his retirement from the Seventh Circuit. He announced the news right before Labor Day weekend, and it took effect immediately.

And it's a *total* retirement, not the usual move to senior status (a sort of quasi-retirement for federal judges), as I learned when we traded emails earlier this week. I wrote:

*Hi Dick. Congratulations on your retirement — major news in the legal world, of course!*

*I haven't been able to glean this from what I've read so far (although I haven't read everything on the news, having just returned from vacation), but I was wondering: will you be*

1

*taking senior status and still hearing cases, or are you departing from the Seventh Circuit completely?*

He responded:

*Nice to hear from you, David. And I'm not taking senior status; my departure is total. It has to do with fact that I don't think the court is treating the pro se appellants fairly, and none of the other judges agrees with me (or rather, they don't like the pro se's and don't want to do anything with them, with occasional exceptions only).*

I wasn't sure if Judge Posner's comments on pro se litigants were fair game for public discussion — but now they are, thanks to this Chicago Daily Law Bulletin piece:

*[Judge Posner] intended to stay on the Chicago-based 7th Circuit until he turned 80... [b]ut "difficulty" with his colleague... moved up that date.*

*"I was not getting along with the other judges because I was (and am) very concerned about how the court treats pro se litigants, who I believe deserve a better shake," Posner wrote.*

*About 55 percent to 60 percent of the litigants who file appeals with the 7th Circuit represent themselves without lawyers. Very few pro se litigants are provided the opportunity to argue their cases in court. The 7th Circuit rules on most of those cases based on the briefs.*

Posner has long been concerned about the plight of pro se litigants. Back in 2015, for example, he benchslapped a trial judge for mistreating a pro se plaintiff.

If you're interested in learning more about Judge Posner's problems with the Seventh Circuit's treatment of pro se litigants, stay tuned:

*Posner wrote that he has a book coming out soon that explains his views on the topic — as well as the views of his former colleagues — "in considerable detail."*

Now *that* should be a juicy read! Judge Posner is famously candid, so don't expect him to go easy on ex-colleagues he disagrees with.

I followed up with Judge Posner and asked how his stepping down would advance the cause of pro se litigants at the Seventh Circuit. Wouldn't it be better for him to remain on the court and continue to advocate for their improved treatment?

Alas, it's a lost cause, in his view: "I had zero support from the other judges; I was a voice crying in the wilderness."

I also asked Posner whether he felt, in light of his comments about superannuated federal judges, whether he himself has been affected negatively by aging. He replied, in Posnerian fashion, "I think there should be compulsory retirement for all federal judges and Justices at age 80; I am as yet a mere child of 78.5."

2

Judge Posner, you will be missed. I don't know that I'd want a judiciary full of Richard Posners, but it sure was great to have one.

**David Lat is a lawyer turned writer.** He publishes Original Jurisdiction, a newsletter on Substack about law and legal affairs, and he writes for newspapers and magazines, including the New York Times, Washington Post, and Wall Street Journal. Prior to launching Original Jurisdiction, David founded Above the Law, one of the nation's most widely read legal news websites, and Underneath Their Robes, a popular blog about federal judges that he wrote under a pseudonym. He is also the author of a novel set in the world of the federal courts, Supreme Ambitions. **Before entering the media world, David worked as a federal prosecutor in Newark, New Jersey; a litigation associate at Wachtell, Lipton, Rosen & Katz, in New York; and a law clerk to Judge Diarmuid F. O'Scannlain of the U.S. Court of Appeals for the Ninth Circuit. David graduated from Harvard College and Yale Law School, where he served as an editor of the Yale Law Journal.**

https://abovethelaw.com/2017/09/the-backstory-behind-judge-richard-posners-retirement/?rf=1

3

**208**

# Exhibit B

| Docket No. HHD-CV19-6120472-S | ) | Return Date: December 17, 2019 |
|---|---|---|
| | ) | Superior Court |
| Santander Bank, N.A. | ) | Judicial District of Hartford |
| vs. | ) | at Hartford |
| Clark, Lillian J., et al. | ) | April 29, 2022 |
| | ) | |

## DEFENDANTS' ANSWER, AFFIRMATIVE/SPECIAL DEFENSES, COUNTERCLAIM, AND JURY DEMAND

The Defendants, Gordon Clark (Mr. Clark), and Lillian J. Clark, hereby files *Defendants' Answer, Affirmative/Special Defenses, Counterclaim, and Jury Demand*.

## ANSWER

### COUNT ONE: REFORMATION OF MORTGAGE

1.) Denied.

2.) Denied.

3.) Denied.

4.) Denied.

5.) Denied.

### COUNT TWO: FORECLOSURE OF THE MORTGAGE AS REFORMED

1.) Denied.

2.) Denied.

3.) Denied.

4.) Without knowledge.

5.) Denied.

6.) Denied.

1

# Exhibit C

## CLAIM FOR JURY

JD-CL-53 Rev. 6-12
C.G.S. §§ 52-215, 52-258
Pr. Bk. §§ 14-4, 14-8, 14-10

### STATE OF CONNECTICUT
### SUPERIOR COURT
*www.jud.ct.gov*

| Court Use Only |
|---|
| **CLAIM6** |



### Instructions
1. This claim must be accompanied by the appropriate jury fee (Section 52-258 of the Connecticut General Statutes).
2. When pleadings are closed, a Certificate of Closed Pleadings (JD-CV-11) must also be filed.

## To: The Superior Court

| | |
|---|---|
| Return date | **Dec-17-2019** |
| Docket number | **HHD-CV-19-6120472-S** |

Name of case *(Full name of Plaintiff v. Full name of Defendant)*
**SANTANDER BANK, N.A.  v. CLARK, LILLIAN J Et Al**

| ☒ Judicial District | ☐ Housing Session | ☐ Geographical Area number ___ | Address of court *(Number, street, town and zip code)* **95 WASHINGTON STREET HARTFORD, CT 06106** |
|---|---|---|---|

## This case is claimed for the inventory of jury cases.
*(A certificate of closed pleadings must be filed before the case named above can be placed on the inventory of jury cases.)*

Claim filed by *("X" one)*
☐ Plaintiff's Attorney ☐ Plaintiff ☐ Defendant's Attorney ☒ Defendant

Name of Law Firm, Attorney, or Self-Represented Party
**GORDON ALEXANDER CLARK**

| Mailing address *(Number, street, town, state and zip code)* **70 ELM STREET ENFIELD, CT 06082** | Telephone number **8608333195** |
|---|---|

## Certification

I certify that this claim is filed in accordance with section 52-215 of the Connecticut General Statutes and that a copy of this document was mailed or delivered electronically or non-electronically on *(date)* **Apr-26-2023** to all attorneys and self-represented parties of record and that written consent for electronic delivery was received from all attorneys and self-represented parties receiving electronic delivery.

| Name and address of each party and attorney that copy was mailed or delivered to* | For Court Use Only |
|---|---|
| **BENDETT & MCHUGH PC - Attorney Jeffrey M. Knickerbocker (via email: jknickerbocker@bmpc-law.com)** **LILLIAN J CLARK (Self Represented) - Deceased** | |

| Signed *(Signature of filer)* ▶ GClark333HSC | Print or type name of person signing **GORDON CLARK** | Date signed **Apr-26-2023** |
|---|---|---|
| Mailing address *(Number, street, town, state and zip code)* **70 ELM STREET ENFIELD, CT 06082** | | Telephone number **8608333195** |

*If necessary, attach additional sheet or sheets with name and address which the copy was mailed or delivered to.

# Exhibit D

# Mandamus as a Remedy for the Denial of Jury Trial

*Nathan A. Forrester*†

The Supreme Court has consistently stated that federal appellate courts may issue the writ of mandamus as an interlocutory remedy only under "extraordinary" circumstances,[1] to correct a lower court order that is "not mere error but usurpation of power."[2] The Court has explained that mandamus cannot serve as a substitute for normal appeal and should be available "only where appeal is a clearly inadequate remedy."[3]

Nevertheless, most federal courts of appeals now routinely use mandamus to compel the lower court to conduct a jury trial.[4] These appellate courts typically cite two Supreme Court decisions—*Beacon Theatres, Inc. v Westover*[5] and *Dairy Queen, Inc. v Wood*[6]—as authority for the proposition that the denial of a jury trial is not subject to the traditionally strict standards for the availability of mandamus. The Seventh Circuit alone has interpreted these decisions differently, holding that mandamus is the appropriate remedy only when the petitioner would be unable to appeal effectively the district court's denial of jury trial at the conclusion of the trial.[7] Although it has had the opportunity, the Supreme Court has not yet resolved this circuit split.[8]

---

† B.S. 1988, University of Florida; J.D. Candidate 1992, The University of Chicago.

[1] *Ex parte Fahey*, 332 US 258, 260 (1947) ("As extraordinary remedies, they are reserved for really extraordinary causes.").

[2] *De Beers Consolidated Mines, Ltd. v United States*, 325 US 212, 217 (1945).

[3] *Fahey*, 332 US at 260. See also *Roche v Evaporated Milk Ass'n*, 319 US 21, 26-29 (1943); *Allied Chemical Corp. v Daiflon, Inc.*, 449 US 33, 34-35 (1980) (per curiam).

[4] See, for example, *In re Zweibon*, 565 F2d 742 (DC Cir 1977); *In re Union Nacional de Trabajadores*, 502 F2d 113 (1st Cir 1974); *Lee Pharmaceuticals v Mishler*, 526 F2d 1115 (2d Cir 1975) (per curiam); *Eldredge v Gourley*, 505 F2d 769 (3d Cir 1974) (per curiam); *General Tire & Rubber Co. v Watkins*, 331 F2d 192 (4th Cir 1964); *In re Pan-American Life Ins. Co.*, 188 F2d 833 (5th Cir 1951); *Black v Boyd*, 248 F2d 156 (6th Cir 1957); *In re Vorpahl*, 695 F2d 318 (8th Cir 1982); *Mondor v U.S. Dist. Court for the Central Dist. of California*, 910 F2d 585 (9th Cir 1990); *Bruce v Bohanon*, 436 F2d 733 (10th Cir 1970).

[5] 359 US 500 (1959).

[6] 369 US 469 (1962).

[7] *First National Bank of Waukesha v Warren*, 796 F2d 999, 1006 (7th Cir 1986).

[8] See *Kamen v Nordberg*, 485 US 939 (1988) (White dissenting from denial of certiorari).

This Comment aims to identify the circumstances under which a federal appellate court may issue mandamus as an interlocutory remedy to compel a district court to recognize a litigant's right to jury trial. Section I describes the two statutes that constitute the primary sources of authority for the availability of mandamus: the Final Decisions Rule[9] and the All Writs Act.[10] This Section notes that the Final Decisions Rule—which expresses the congressional policy in favor of appeal only after a final decision at trial—significantly limits the power that the All Writs Act grants to appellate courts to use mandamus as an interlocutory appellate remedy. Section I also reviews general Supreme Court doctrine on the availability of mandamus. Section II presents the five Supreme Court cases that have addressed the availability of mandamus to compel jury trial, and analyzes the various circuit court decisions that attempt to interpret these decisions. The lower courts have followed two basic approaches: the majority views the denial of jury trial as a "special circumstance," which per se justifies a mandamus remedy, while the Seventh Circuit limits the use of mandamus in the jury context to cases of "necessity," only granting mandamus when there is no other effective appellate remedy.

Section III argues that neither the majority nor the Seventh Circuit approach is consistent with Supreme Court precedent. The Comment concludes that the Supreme Court has not created a separate category for the right to trial by jury, and that the same categories of mandamus should therefore be available to remedy the denial of jury trial as to correct any other district court error. In addition to the traditional use of mandamus under conditions of necessity, to which the Seventh Circuit would limit the availability of mandamus, the Supreme Court has recognized the existence of "supervisory" and "advisory" strains of mandamus. By limiting mandamus as a remedy for the denial of jury trial to these already-recognized categories, the proposed regime accommodates both the congressional policy disfavoring interlocutory appeals in the Final Decisions Rule and the discretion granted the appellate courts to issue mandamus under the All Writs Act.

## I. An Introduction to Mandamus

In the First Judiciary Act of 1789, Congress laid down the general rule that litigants may appeal only the final decisions of dis-

---

[9] 28 USC § 1291 (1988).
[10] Id at § 1651 (1988).

trict courts.[11] Federal courts and commentators have commonly understood that the purpose of this "Final Decisions Rule" is to avoid the piecemeal litigation of both civil and criminal claims in federal courts and to avoid the disruption and expense that would result from frequent interlocutory appeals.[12] This rule, however, has a number of statutory and common law exceptions,[13] one of which is the writ of mandamus. The All Writs Act, which also derives from the First Judiciary Act,[14] authorizes the federal appellate courts to use mandamus as an interlocutory remedy.[15] This statute imposes only very loose limitations on the availability of mandamus, however, and, for the most part, relies on the common

---

[11] Id at § 1291. The Final Decisions Rule provides in relevant part: "The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States . . . , except where a direct review may be had in the Supreme Court."

[12] See, for example, *Cobbledick v United States*, 309 US 323, 325 (1940) ("Congress from the very beginning has, by forbidding piecemeal disposition on appeal of what for practical purposes is a single controversy, set itself against enfeebling judicial administration. Thereby is avoided the obstruction to just claims that would come from permitting the harassment and cost of a succession of separate appeals."); *Will v United States*, 389 US 90, 96 (1967) ("This general policy against piecemeal appeals takes on added weight in criminal cases, where the defendant is entitled to a speedy resolution of the charges against him."). For academic commentary on the Final Decisions Rule, see Carleton M. Crick, *The Final Judgment as a Basis for Appeal*, 41 Yale L J 539 (1932); Comment, *The Use of Extraordinary Writs for Interlocutory Appeals*, 44 Tenn L Rev 137 (1976).

[13] See, for example, 28 USC § 1292 (1988) (statutory exception that grants litigants the right to appeal certain interlocutory orders and grants appellate courts the discretion to hear appeals of certain other interlocutory orders); *Cohen v Beneficial Industrial Loan Corp.*, 337 US 541, 546 (1949) (judicially created exception under which certain district court orders "which finally determine claims of right separable from, and collateral to, rights asserted in the action" are appealable). See also *Cobbledick*, 309 US at 324-25 ("Finality as a condition of review . . . was written into the first Judiciary Act and has been departed from only when observance of it would practically defeat the right to any review at all.").

[14] The All Writs Act had its genesis in § 13 of the First Judiciary Act of 1789, 1 Stat 80, 81. See *Marbury v Madison*, 5 US 137 (1803).

[15] The All Writs Act provides in relevant part: "The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 USC § 1651(a). Congress passed this statute on June 25, 1948, consolidating and repealing three former provisions of the Judiciary and Judicial Procedure section of the United States Code. See 62 Stat 944 (1948).

The phrase "in aid of their respective jurisdictions" codifies the traditional limitation that mandamus must be an exercise of authority that is auxiliary to the court's independently existing jurisdiction. See *Roche*, 319 US at 25; *In re Josephson*, 218 F2d 174, 179-80 (1st Cir 1954). However, the Supreme Court has never required that mandamus be an exercise of jurisdiction "already acquired by appeal"; rather it has always permitted mandamus to "extend[] to those cases which are within [the court's] appellate jurisdiction although no appeal has been perfected." *Roche*, 319 US at 25; see also *McClellan v Carland*, 217 US 268 (1910); *Insurance Company v Comstock*, 83 US 258 (1872).

law to specify the conditions under which a court may grant a petition for the writ.[16]

The federal courts, then, have the task of resolving the tension between the All Writs Act and the Final Decisions Rule. The case law on mandamus is rife with maxims about when mandamus will issue. For instance, the Supreme Court has repeatedly stated that the appropriate use of mandamus by the appellate courts is "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so."[17] The federal courts, however, have typically applied a less than technical definition of what constitutes such a "jurisdictional" error. The Supreme Court has frequently held that mandamus will lie to correct not mere error but instead usurpation of power by a district court.[18] Moreover, not just any "judicial usurpation of power" will merit the remedy of mandamus. The petitioner also has the "burden of showing that its right to issuance of the writ is 'clear and indisputable.' "[19]

Such cliches provide little guidance as to when mandamus is an appropriate remedy. Without further limitations, any instance of a district court improperly rejecting a litigant's demand for jury trial could be construed as a usurpation of power justifying the issuance of the writ. Therefore, the most useful approach is to categorize the sorts of jurisdictional errors that the Supreme Court has historically recognized as worthy of the remedy of mandamus.

The Supreme Court has recognized essentially two categories of mandamus: mandamus under conditions of necessity, and mandamus under special circumstances. The paradigm necessity case is where the petitioner has no other effective means of relief from the

---

[16] The phrase "agreeable to the usages and principles of law," which appeared in substantially the same form in two of the three predecessor provisions, indicates that Congress intended neither to displace the already developed common law standards for mandamus nor to preclude further development of these standards in the federal courts. Compare 64 Stat 944 (1948), with 36 Stat 1156 (1911); 36 Stat 1162 (1911).

[17] *Bankers Life & Casualty Co. v Holland*, 346 US 379, 382 (1953) (quoting *Roche*, 319 US at 26). See also *Allied Chemical*, 449 US at 35; *Will v Calvert Fire Insurance Co.*, 437 US 655, 661 (1978); *Kerr v U.S. Dist. Court for the Northern Dist. of California*, 426 US 394, 402 (1976); *Will v United States*, 389 US at 95; *United States Alkali Export Ass'n, Inc. v United States*, 325 US 196, 202 (1945); *Ex parte Republic of Peru*, 318 US 578, 583 (1943).

[18] *De Beers Consolidated Mines*, 325 US at 217. See also Note, *Supervisory and Advisory Mandamus Under the All Writs Act*, 86 Harv L Rev 595, 598-600 (1973).

[19] *Bankers Life & Casualty*, 346 US at 384 (quoting *United States v Duell*, 172 US 576, 582 (1899)). Whether the district court error is "clear and indisputable" is a separate issue from whether mandamus is an appropriate remedy in the first place. This Comment is only concerned with the latter issue, the propriety of mandamus for a given type of error.

district court's error.[20] The classic example is *Maryland v Soper (No. 1),*[21] in which the State of Maryland sought mandamus to vacate a federal district court order requiring the removal of a criminal prosecution from a Maryland court to a federal court. The State of Maryland was prosecuting federal prohibition agents for murder, but the agents claimed that they were entitled to federal jurisdiction because they had allegedly committed the murders in their capacity as federal agents.[22] The Supreme Court granted mandamus to vacate the removal, noting that Maryland had no other effective remedy to force the district court to remand the indictment to the state court, because "[t]he order of the United States District Judge refusing to remand is not open to review on a writ of error, and a judgment of acquittal in that court is final."[23]

The Supreme Court has often intimated that this condition of necessity constitutes the only situation for which mandamus is appropriate.[24] The Final Decisions Rule provides the rationale for such a limitation. To grant mandamus to a petitioner who has an alternative avenue of appeal would "thwart the congressional policy against piecemeal appeals."[25]

This necessity rule has never been without its exceptions, however. Even prior to the expansion of the availability of mandamus in the late 1950s and early 1960s, the Supreme Court sometimes issued the writ under circumstances not constituting necessity but which the Court nonetheless deemed "special" and thus worthy of mandamus.[26] For example, in *Ex parte Republic of Peru,*[27] the Supreme Court granted mandamus compelling the dis-

---

[20] *Roche*, 319 US at 27-28 ("Ordinarily mandamus may not be resorted to as a mode of review where a statutory method of appeal has been prescribed or to review an appealable decision of record.").

[21] 270 US 9 (1926).

[22] Id at 22.

[23] Id at 30.

[24] See, for example, *Allied Chemical*, 449 US at 35; *Thermtron Products, Inc. v Hermansdorfer*, 423 US 336, 352-53 (1976). For further historical examples of the "necessity" principle, see *Bankers Life & Casualty*, 346 US at 383; *Fahey*, 332 US at 260; *United States Alkali Export Ass'n*, 325 US at 203; *Roche*, 319 US at 26-28; *Ex parte Rowland*, 104 US 604, 617 (1881).

[25] *Parr v United States*, 351 US 513, 520-21 (1956).

[26] In *Roche*, the Supreme Court noted a number of prior Supreme Court cases that had granted mandamus under "special circumstances which would justify the issuance of the writ," although they did not constitute a condition of necessity. 319 US at 31. These cases included *McCullough v Cosgrave*, 309 US 634 (1940), in which the special circumstance was "the persistent disregard of the Rules of Civil Procedure"; and *Ex parte United States*, 287 US 241 (1932), in which the special circumstance was "the refusal to perform a plain ministerial duty."

[27] 318 US 578.

trict court to recognize the sovereign immunity of a vessel owned by the Peruvian government. Although the Court admitted that the foreign sovereign would still have the option to appeal its claim of sovereign immunity at the end of the trial, the Court concluded that this claim was one of "such public importance and exceptional character" as to justify issuing the writ.[28] In short, the lack of another effective remedy for the district court error has historically provided a sufficient, but not a necessary, condition under which mandamus is an appropriate remedy. In the late 1950s and early 1960s, the Supreme Court expanded the special circumstances category with two landmark decisions—*La Buy v Howes Leather Co., Inc.*[29] and *Schlagenhauf v Holder*.[30] These two cases introduced the use of mandamus for supervisory and advisory purposes.

In *La Buy*, the Supreme Court authorized a supervisory strand of mandamus to correct chronic abuses of discretion by a district court.[31] The Court held that it was within the discretion of the Seventh Circuit to issue a writ of mandamus that would prevent the district court judge from using a special master to resolve a pair of antitrust cases.[32] In so ruling, the Court rejected the argument that mandamus was inappropriate because the litigants could appeal the district court's use of a special master after the final judgment.[33] Instead, the Court particularly emphasized two facts that it found justified issuing mandamus in this case. The Seventh Circuit had repeatedly warned the district courts not to use special masters except in extreme cases, and, in spite of this admonition, the district court judge had referred eleven cases over a six year period to special masters.[34] Thus, under these "exceptional circumstances" of chronic abuse, the Court concluded that mandamus was appropriate as an exercise of "supervisory control . . . necessary to proper judicial administration in the federal system."[35]

Four years later, in *Schlagenhauf*, the Supreme Court recognized another advisory strand of mandamus, for use when deciding

---

[28] Id at 586.

[29] 352 US 249 (1957).

[30] 379 US 104 (1964).

[31] 352 US at 259-60. See also Note, 86 Harv L Rev at 602-13 (cited in note 18); Comment, 44 Tenn L Rev at 147-49 (cited in note 12).

[32] *LaBuy*, 352 US at 250-51.

[33] Id at 254-55. The Supreme Court noted that " 'the common law writs, like equitable remedies, may be granted or withheld in the sound discretion of the court.' " Id at 255 (quoting *Roche*, 319 US at 25).

[34] Id at 258.

[35] Id at 259-60.

."new and important problems of law."[36] A district court had ordered Schlagenhauf to submit to nine mental and physical examinations pursuant to Rule 35 of the Federal Rules of Civil Procedure. Schlagenhauf sought mandamus to overturn this order.[37] Acknowledging that the writ of mandamus should not serve as a "substitute for appeal," the Court nonetheless ruled that mandamus was an appropriate remedy in this case.[38] The Court emphasized that the district court's lack of power to order such examinations was "underscored by the fact that the challenged order requiring examination of a defendant appears to be the first of its kind in a reported decision in the federal courts under Rule 35 . . . ."[39] Thus, held the Court, the court of appeals below did in fact have the power to use mandamus to resolve this "issue[] of first impression" concerning the scope of Rule 35.[40]

## II.  THE USE OF MANDAMUS TO ORDER JURY TRIALS

Five Supreme Court decisions have specifically addressed the availability of mandamus as an interlocutory appellate remedy to compel jury trial. In each of these decisions, the Court approved such a use of mandamus; in none of them, however, did the Court provide much reasoning to justify its conclusion. Most courts of appeals have accordingly interpreted these Supreme Court decisions to allow the mandamus remedy whenever jury trial is denied, but the Seventh Circuit allows use of the writ only in cases of necessity.

### A.  Supreme Court Decisions

The first set of Supreme Court opinions on the use of mandamus to order jury trial includes *Ex parte Simons*,[41] *Ex parte Peterson*,[42] and *Ex parte Skinner & Eddy Corp.*,[43] all decided prior to the passage of the All Writs Act in 1948.[44] In *Simons*, the peti-

---

[36] 379 US at 111. See also Note, 86 Harv L Rev at 613-19 (cited in note 18).

[37] 379 US at 108-09.

[38] Id at 110.

[39] Id. The precise issues of first impression in *Schlagenhauf* were the interpretation of the "good cause" and "in controversy" requirements in FRCP 35. Id at 111.

[40] Id.

[41] 247 US 231 (1918).

[42] 253 US 300 (1920).

[43] 265 US 86 (1924).

[44] The First Circuit has argued that the 1948 All Writs Act narrowed the Supreme Court's power to issue mandamus by adding the limiting phrase that the federal courts could issue the writ only when "necessary or appropriate in aid of their respective jurisdic-

tioner for mandamus had filed a civil action in two counts, the first of which the district court had transferred to the equity side of its docket.[45] Thereafter the petitioner sought mandamus to compel the district court to resolve both counts with a jury trial. The Supreme Court, in an opinion by Justice Holmes, granted the petition for mandamus.[46] Two years later, in *Peterson*, the Supreme Court affirmed *Simons* in dicta.[47] Although the Court denied mandamus in *Peterson* on the grounds that the district court had not in fact denied the petitioner's right to a jury trial, the Court stated that mandamus would have been the appropriate remedy to compel jury trial.[48] Finally, in *Skinner & Eddy*, the Court cited both *Simons* and *Peterson* as authority for granting mandamus to compel the district court to issue an order of dismissal.[49] The Court

---

tions." See *In re Josephson*, 218 F2d 174, 179 (1st Cir 1954). Prior to the All Writs Act, the Supreme Court had derived its power to grant mandamus from 28 USC § 342, which did not include this limitation. Congress lifted the limiting phrase from the catch-all provision in 28 USC § 377, although it loosened the phrase by changing "necessary" to "necessary or appropriate." See note 15. The *Josephson* court therefore reasoned that all pre-1948 Supreme Court decisions in which the Court issued mandamus to a lower court could not serve as authority for an appellate court issuing mandamus. 218 F2d at 179.

However, the Court has continued to recognize the validity of its pre-1948 mandamus decisions. See, for example, *Will v United States*, 389 US at 95-96; *Schlagenhauf*, 379 US at 109-10; *Beacon Theatres*, 359 US at 511 n 20; *Bankers Life & Casualty*, 346 US at 383-84. Moreover, the Court has explicitly ruled that the revision did not narrow the common law standards for the availability of mandamus. See *La Buy*, 352 US at 255 ("[t]he recodification of the All Writs Act in 1948 . . . did not affect the power of the Courts of Appeals to issue writs of mandamus in aid of jurisdiction"). The All Writs Act, therefore, does not appear to have altered the federal common law standards for issuing mandamus. For further analysis supporting this conclusion, see Note, 86 Harv L Rev at 603 n 42 (cited in note 18).

[45] 247 US at 238. The petitioner had originally brought suit in two counts against the executor of the decedent's estate for payment on a promise that the decedent had allegedly made to the petitioner. The first count alleged that the decedent had promised to pay $50,000 for services rendered by the petitioner; the second count claimed the reasonable value for those services, also equal to $50,000. Id.

[46] Id at 240.

[47] 253 US at 305-06.

[48] Id at 305, 310-11. The district court had appointed a special auditor to hear and simplify some of the factual issues involved in a contract dispute over a coal delivery. Id at 304. The petitioner, the plaintiff in the dispute, in turn sought mandamus compelling the district judge to restore the case to the normal trial calendar, on the grounds that the order deprived the petitioner of his Seventh Amendment right to jury trial. Id at 305. The Supreme Court rejected the petitioner's request, finding that the referral to an auditor did not deprive the petitioner of his right to jury trial, because the referral specifically stated that the auditor could not "finally determine any of the issues in this action." Id at 304, 310-11. The Court did state, however, that "if proceedings pursuant to the appointment of an auditor would deprive petitioner of his right to a trial by jury, the order should, as was said in [*Simons*], 'be dealt with now, before the plaintiff is put to the difficulties and the courts to the inconvenience that would be raised by' a proceeding 'that ultimately must be held to have been required under a mistake.'" Id at 305-06.

[49] *Skinner & Eddy*, 265 US at 96. The petitioner had sued the United States in the Court of Claims for over $17,000,000 in lost profits that the petitioner allegedly stood to

*Mandamus and Jury Trial*

reasoned that the non-suit was appropriate to avoid depriving the petitioner of his right to a jury trial of the same claim in a state court.[50]

The second and more important set of decisions is *Beacon Theatres* and *Dairy Queen*, which the Supreme Court decided in 1959 and 1962, respectively. In *Beacon Theatres*, the district court had decided to conduct a bench trial of the plaintiff's equitable claim first, which would have collaterally estopped jury trial resolution of the factual issues that were common to the defendant's legal counterclaim.[51] The Supreme Court ruled that this collateral estoppel effect unconstitutionally deprived the defendant of its right to a jury trial, and granted mandamus to compel the district court to conduct the jury trial first.[52] Just three years later, in *Dairy Queen*, the Supreme Court similarly granted a petitioner's request for a writ of mandamus.[53] The district court had denied the petitioner's demand for a jury trial on the grounds that any legal issues raised by their claim were purely "incidental" to the equitable issues and thus could be resolved in a single bench trial.[54] Again, the Supreme Court ruled that the petitioner was en-

---

gain on a contract to build and repair ships for the United States Emergency Fleet Corporation. Later, however, the petitioner moved for a non-suit on the action in the Court of Claims and then reinitiated substantially the same suit in a Washington state court. At first, the Court of Claims granted the non-suit, but after the suit in state court, the Court of Claims vacated the order of dismissal. Accordingly, the petitioner sought mandamus compelling the Court of Claims to reinstate the order of dismissal. Id at 91-92.

[50] Id at 96.

[51] 359 US 500, 503-04 (1959). The plaintiff, Fox West Coast Theatres, Inc., had sought both declaratory relief and an injunction against the defendant, Beacon Theatres. The declaration Fox sought would have upheld the validity of contracts between Fox and certain movie distributors, under which Fox held the exclusive right to show certain movies for a stated period of time. The injunction Fox sought would have prevented Beacon Theatres from bringing an antitrust claim against Fox on these contracts. In turn, Beacon Theatres counterclaimed that the contracts violated the antitrust laws and demanded a jury trial on the factual issues raised by the antitrust dispute. The district court, however, liberally construed Fox's complaint seeking declaratory and injunctive relief to provide a basis for equitable jurisdiction. More significantly, the court ordered the bench trial of Fox's equitable claim to be conducted before the jury trial of Beacon Theatres' antitrust claim. Thus, the district court's order had the potential to deny Beacon Theatres a jury trial of the common factual issues, since the bench trial resolution of those issues would preclude any jury trial consideration of the same issues under the doctrine of collateral estoppel. Id at 502-04.

[52] Id at 511.

[53] 369 US 469, 479-80 (1962).

[54] Id at 470. The plaintiffs, H.A. and H.F. McCullough, had a business partnership under the name of McCullough's Dairy Queen. They sued Dairy Queen for failing to make payments on a 1949 contract in which the McCulloughs had granted Dairy Queen the right to use the "Dairy Queen" trademark in Pennsylvania. Id at 473. In a procedural setting very similar to that in *Beacon Theatres*, the McCulloughs sought (1) permanent injunctions

titled to a jury trial of all the legal issues in its claim and so issued mandamus compelling the district court to conduct a jury trial first.[55]

## B.   Circuit Court Approaches

The Supreme Court has left to the federal appellate courts the task of determining whether the above cases establish that the denial of jury trial is a "special circumstance" per se, or simply serve as examples of other recognized uses of mandamus. Federal courts of appeals have disagreed in interpreting these decisions. Most courts have held mandamus routinely available to compel the district court to recognize a petitioner's right to jury trial. The sole exception is the Seventh Circuit, which has limited the use of mandamus in this context to conditions of necessity.

### 1.   The majority rule: Routine use of mandamus to compel jury trial.

Most courts of appeals have routinely allowed mandamus to compel jury trial.[56] To justify this approach, they usually cite, without further reasoning, one or both of the above two sets of Supreme Court decisions as authority for treating the improper denial of jury trial as an "exceptional" circumstance that per se merits the remedy of mandamus.[57] Some courts, however, have identified a pair of possible rationales for the above five Supreme Court decisions that might justify making mandamus available as a matter of course to compel jury trial.

The first rationale is that the constitutional nature of the right to a jury trial is an exceptional circumstance justifying the use of mandamus. A number of circuit courts, either implicitly or explicitly, have interpreted the Supreme Court decisions as authorizing

---

preventing Dairy Queen from using and profiting from the "Dairy Queen" trademark and (2) an accounting for money owed plaintiffs for past use of the trademark. Id at 475. Dairy Queen denied that they had breached the contract and demanded a jury trial.

[55] Id at 479-80.

[56] See cases cited in note 4.

[57] A typical example of the depth of analysis given to this issue is *Lee Pharmaceuticals*, in which the court justified the use of the extraordinary writ as follows: "It is well-settled that a writ of mandamus is an appropriate means to redress the incorrect denial of a jury trial." 526 F2d at 1116 (citing *Beacon Theatres*). See also *Vorpahl*, 695 F2d at 319 (citing *Dairy Queen, Beacon Theatres*) ("The remedy of mandamus in determining the right to a jury trial is firmly settled."); *Jewell v Ohio River Co.*, 431 F2d 691, 692 (3d Cir 1970) (citing *Dairy Queen, Beacon Theatres*) ("Mandamus is appropriate to require a district court to grant petitioner a jury trial.").

mandamus to protect the petitioner's important constitutional right to trial by jury.[58] For example, in *Black v Boyd*, a case decided before *Beacon Theatres* and *Dairy Queen*, the Sixth Circuit determined that "it was the exceptional circumstances involved in [*Simons*], namely the deprivation of the constitutional right of trial by jury, that accounted for the issuance of the writ."[59] And in *General Tire & Rubber Co. v Watkins*, the Fourth Circuit, while denying the petition for mandamus on other grounds, cited both *Beacon Theatres* and *Dairy Queen* for the proposition that mandamus would have been an appropriate remedy "since the question presented pertains to a denial of the constitutional right to trial by jury."[60]

The second rationale is that mandamus is justifiable to avoid the inconvenience of an unnecessary trial. Some circuit courts have interpreted the Supreme Court authority as permitting mandamus on grounds of administrative efficiency—to avoid conducting a trial that would later be overturned on appeal anyway.[61]

2.    The Seventh Circuit rule: "Necessity" required for mandamus to compel jury trial.

The one court of appeals that has more narrowly construed the Supreme Court authority is the Seventh Circuit. In *First National Bank of Waukesha v Warren*, the court refused to grant mandamus to reverse a district court's order denying a jury trial.[62]

---

[58] See, for example, *Filmon Process Corp. v Sirica*, 379 F2d 449, 451 (DC Cir 1967) ("Other circuit courts of appeals have taken the view that the denial of a jury trial in contravention of a party's constitutional rights automatically presents 'such an exceptional situation as to call for the issuance of mandamus to review the ruling' [quoting *Black v Boyd*, 248 F2d 156, 160 (6th Cir 1957)]."); *Higgins v Boeing Co.*, 526 F2d 1004, 1006 (2d Cir 1975) (per curiam) (citing *Beacon Theatres*) ("Our power to preserve the important right to trial by jury . . . by mandamus is clear."); *Owens-Illinois, Inc. v U.S. Dist. Court for the Western Dist. of Washington*, 698 F2d 967, 969 (9th Cir 1983) (per curiam) (citing *Dairy Queen*) ("Where the constitutional right to a jury trial is drawn in question, mandamus is an appropriate remedy."). See also *In re Union Nacional de Trabajadores*, 502 F2d 113, 116 n 1 (1st Cir 1974) ("It would appear that the lower court would be equally unlawful . . . in denying either a constitutional or a statutory right to a jury trial, . . . at least insofar as it would influence a decision to grant mandamus.").

[59] 248 F2d at 161.

[60] 331 F2d 192, 194 (4th Cir 1964).

[61] See, for example, *Whittel v Roche*, 88 F2d 366, 369 (9th Cir 1937).

[62] 796 F2d 999, 1006 (7th Cir 1986). The plaintiff, the FDIC, acting in its corporate capacity on behalf of a defunct Milwaukee bank, sued the First National Bank of Waukesha (FNB) on theories of fraud and unjust enrichment. The FDIC alleged that the FNB had induced the Milwaukee bank to loan money to a FNB depositor that FNB knew he could never repay. FNB in turn had allegedly used the loan money to repay a fraudulent check drawn by the depositor against his FNB account, a check the Bank had certified despite the

In contrast to the opinions of other circuit courts, the *First National Bank* opinion spends only a page considering the tangled arguments as to whether the petitioner was entitled to jury trial on the merits.[63] The court devoted most of the opinion to what it considered to be the real issue—whether mandamus was an appropriate remedy in the first place.[64] Ultimately, the court held that mandamus was inappropriate in this case because it was not a situation of necessity—the petitioner could appeal the district court order at the conclusion of the trial.[65]

To square this holding with Supreme Court precedent, the *First National Bank* court narrowly interpreted *Simons*, *Beacon Theatres*, and *Dairy Queen* as cases of necessity. The Supreme Court, the Seventh Circuit argued, had granted mandamus because later appeals would have been unable to cure the collateral estoppel effects of the denial of jury trial.[66] The Seventh Circuit dismissed outright the notion that the constitutional nature of the right to jury trial itself justified mandamus.[67] Furthermore, the Seventh Circuit posited that the inconvenience rationale suggested in *Simons* "has been rejected in subsequent cases too numerous to count."[68] Finally, the *First National Bank* court asserted that the Supreme Court in more recent years had overruled the supervisory strain of mandamus recognized in *La Buy*. To the extent that *Beacon Theatres* and *Dairy Queen* may have represented supervisory mandamus, these decisions were no longer applicable.[69] If the district court had wrongly denied the petitioner's right to jury trial or, for that matter, had committed any other appealable error, the Seventh Circuit concluded that mandamus was available only in the absence of another effective remedy for that error.[70]

---

fact that the depositor had no money in the account. Before trial, the FDIC elected to drop its fraud theory and proceed only on the theory of unjust enrichment, in order to avoid a jury trial. The FNB then petitioned the Seventh Circuit for a writ of mandamus. The bank argued that the FDIC's claim for money damages under an unjust enrichment theory was at best a guise for a fraud claim, a common law theory requiring resolution by jury trial. Id at 999-1000.

[63] Id at 1000-01.

[64] Id at 1001-06.

[65] Id at 1006.

[66] Id at 1002-04.

[67] Id at 1002 ("Much federal litigation involves constitutional rights, but the nature of the right does not dictate whether review comes in mid-course or at the end of the district court's proceedings.").

[68] Id at 1003.

[69] Id at 1004-06.

[70] Id at 1006. In the five years since *First National Bank*, the Seventh Circuit has slightly modulated its strict rule. In *Maloney v Plunkett*, 854 F2d 152, 153 (7th Cir 1988),

## III. Refining the Use of Mandamus to Compel Jury Trial

The circuit split created by the Seventh Circuit in *First National Bank* is a broad one. Most circuits routinely allow mandamus to compel a jury trial, while the Seventh Circuit allows it only in cases of necessity. This Section demonstrates that neither of these approaches faithfully reflects Supreme Court precedent, and argues that the best approach is to allow mandamus to compel jury trial in the same categories of cases that the Court has allowed in other contexts.

### A. The Overly Broad Majority Rule

Two policy considerations counsel against expanding the availability of mandamus beyond what has already been recognized by the Supreme Court. First, the Supreme Court has pointed out that any petition for mandamus has " 'the unfortunate consequence of making the [district court] judge a litigant, obliged to obtain personal counsel or to leave his defense to one of the litigants [appearing] before him' in the underlying case."[71] The awkwardness of making a federal judge a frequent party to appellate litigation thus argues strongly against the routine availability of mandamus as an interlocutory appellate remedy in any context.

Second, and more importantly, any expansion in the use of mandamus runs counter to the Final Decisions Rule and its opposition to interlocutory appeals and piecemeal litigation. Policy judgments about administrative efficiency cannot provide a sound basis for establishing new strains of mandamus. Congress expressed its disapproval of such judgments when it enacted the Fi-

---

the court granted mandamus vacating a district court order that would have discharged the selected jury, ordered the selection of a new jury, and forbidden the litigants' use of peremptory challenges in the selection. In granting the petition, the court acknowledged that "ordinarily the inconvenience, lost time, and sunk costs of such further proceedings as could have been avoided by [mandamus] are not considered the kind of irremediable harm that will satisfy the stringent requirements for issuing a writ of mandamus." Id at 154-55. But the court then added that this rule was not "unwavering" and that the district court order had imposed such "exceptional burdens . . . on the orderly resolution of this lawsuit" as to justify mandamus. Id at 155-56. Strictly speaking, *Maloney* was not a case in which the Court of Appeals issued mandamus to prevent the petitioner from being wrongly deprived of jury trial. In fact, the *Maloney* court admitted that the judge had not "den[ied] either side its Seventh Amendment right to trial by jury, but he did deny a statutory [right] incident to jury trial . . . ." Id at 154. However, the looser standard announced by *Maloney* might be applicable to cases like *First National Bank*; the precise nature of the Seventh Circuit doctrine is presently unclear.

[71] *Kerr*, 426 US at 402 (quoting *Bankers Life & Casualty*, 346 US at 384-85 (quoting *Fahey*, 332 US at 260)).

nal Decisions Rule in 1789. Moreover, although the Final Decisions Rule has never been interpreted to preclude the development of common law exceptions to the rule against interlocutory appeals, administrative efficiency arguments depend on open empirical questions. It is impossible to know whether making mandamus available to catch district court errors early will, on balance, prevent much unnecessary litigation or simply clog the dockets of the appellate courts with frivolous interlocutory appeals. Indeed, courts have invoked administrative efficiency to support decisions expanding *or* contracting the availability of mandamus.[72]

In view of these considerations, the majority approach, which routinely approves of mandamus to order a jury trial, should be closely scrutinized. Courts embracing that approach have relied on the constitutional nature of the right to a jury trial and on administrative efficiency. Neither rationale justifies the courts' expansive use of mandamus.

.1.   The constitutional nature of the right to jury trial as an invalid basis for mandamus.

Supreme Court authority provides exceedingly thin support for the interpretation that the nature of the right to trial by jury constitutes a special circumstance that per se justifies mandamus. In *Beacon Theatres*, the Court, after establishing that the petitioner was entitled to jury trial on the merits, determined in one sentence that mandamus rather than a normal appeal was the appropriate remedy: "Whatever differences of opinion there may be in other types of cases, we think the right to grant mandamus to require jury trial where it has been improperly denied is settled."[73] While this sentence obviously offered no explicit basis for its conclusion, the Court did include a footnote that cited a number of Supreme Court and circuit court cases as authority for the above

---

[72] Compare *Canister Co. v Leahy*, 191 F2d 255, 257 (3d Cir 1951) ("Appeal, after an abortive trial to the court, would be clearly inadequate remedy."), and *Eldredge v Gourley*, 505 F2d 769, 770 (3d Cir 1974) (citing *Beacon Theatres* for the proposition that mandamus would allow "the issues between these parties [to] be settled in one suit"), with some of "the vices of an interlocutory appeal" recited by the Seventh Circuit:

How many future litigants will seek interlocutory review? . . . If most decisions by district courts are correct, then the costs of reviewing the many cases (including the mistakes introduced by hasty appellate review) exceed the costs of allowing the few mistaken decisions to go uncorrected until after final judgment.

*First National Bank*, 796 F2d at 1003.

[73] 359 US at 511.

proposition.[74] And in *Dairy Queen*, the Court added some credence to this interpretation of *Beacon Theatres*, justifying the issuance of mandamus as follows: "Our decision reversing that case . . . emphasizes the responsibility of the Federal Courts of Appeals to grant mandamus where necessary to protect the constitutional right to trial by jury."[75]

But neither of these decisions provides a sound basis for concluding that the denial of a constitutional right, without more, is an exceptional circumstance justifying mandamus. Given that the federal courts traditionally have determined the availability of mandamus based on the procedural context of the error, rather than on the nature of the substantive right at issue, it would be anomalous to read *Beacon Theatres* and *Dairy Queen* to hinge on the constitutional nature of the right to a jury trial.

Indeed, each of the three categories of mandamus described above—mandamus under conditions of necessity, supervisory mandamus, and advisory mandamus—relies on the procedural context of the error. In defining the limits of advisory mandamus, for example, the Court in *Schlagenhauf* cautioned that although it sanctioned the use of mandamus to overrule the district court's incorrect interpretation of Rule 35, the commission of such an error in the future would not necessarily justify mandamus: "This [use of mandamus] is not to say, however, that, following the setting of guidelines in this opinion, any future allegation that the District Court was in error in applying these guidelines to a particular case makes mandamus an appropriate remedy."[76] Thus, *Schlagenhauf* has been interpreted to authorize advisory mandamus to settle "new and important" legal issues and not to authorize mandamus to overturn improper interpretations of FRCP 35 or of the Federal Rules in general.[77] The nature of the substantive right at issue is simply irrelevant for purposes of determining the availability of mandamus. As the Seventh Circuit explained in *First National Bank*, "much federal litigation involves constitutional rights, but the nature of the right does not dictate whether review comes in

---

[74] Id at 511 n 20. Significantly, this footnote included a citation of *Black*, the Sixth Circuit decision that identified the constitutional nature of the right to trial by jury as the rationale for the remedy of mandamus. The note also cited the Supreme Court decisions in *Simons, Peterson*, and *La Buy*.

[75] 369 US at 472.

[76] 379 US at 112.

[77] See Comment, 44 Tenn L Rev at 149-50 (cited in note 12); Note, 86 Harv L Rev at 613-19 (cited in note 18).

mid-course or at the end of the district court's proceedings."[78]

. In the absence of explicit affirmation by the Court, there is little reason to presume that the constitutional nature of the right to trial by jury justifies mandamus. Nor has the Court relaxed the traditional mandamus standards in cases where the petitioner is asserting other constitutional rights. For instance, in *Helstoski v Meanor*, a former congressman sought mandamus to reverse an indictment that he alleged violated the Speech or Debate Clause.[79] Without addressing the merits of the petitioner's claim, the Court refused to issue the writ, because the defendant had an alternative path of appellate review.[80] Given the policy of the Final Decisions Rule that mandamus should not automatically be available, and that the Seventh Amendment right to jury trial has not even been incorporated through the Fourteenth Amendment,[81] the nature of the right to jury trial alone cannot justify mandamus.

2.  "Inconvenience" as an invalid basis for mandamus.

The Supreme Court has more explicitly endorsed the inconvenience rationale in *Simons*, *Peterson*, and *Skinner & Eddy*. In *Simons*, the Court allowed the issuance of mandamus because the denial of jury trial was "an order that should be dealt with now, before the plaintiff is put to the difficulties and the Courts to the inconvenience that would be raised by a severance that ultimately must be held to have been required under a mistake."[82] Two years later, in *Peterson*, the Supreme Court affirmed the *Simons* reasoning in dicta by quoting the above passage.[83] And, in *Skinner & Eddy*, the Court similarly found that the "useless waste of time and effort to enforce a trial" justified using mandamus.[84]

Subsequent Supreme Court decisions, however, have rejected inconvenience as a rationale for permitting mandamus. In *Roche v Evaporated Milk Association*, the petitioners for mandamus, who were challenging the validity of their grand jury indictment, argued that failure to grant mandamus would subject them to a po-

---

[78] 796 F2d at 1002.

[79] 442 US 500, 504-05 (1979).

[80] Id at 506.

[81] See *Walker v Sauvinet*, 92 US 92, 92-93 (1875) (jury trial at common law was neither part of due process nor a privilege or immunity of citizenship).

[82] 247 US at 239. The Court also noted that this use of mandamus satisfied the traditional standards because "the order may be regarded as having repudiated jurisdiction of the first count . . . ." Id at 240.

[83] 253 US at 305-06.

[84] 265 US at 96.

tentially unnecessary trial before appellate review of the indictment.[85] The Court squarely rejected this ground for mandamus:

> [T]hat inconvenience is one which we must take it Congress contemplated in providing that only final judgments should be reviewable. Where the appeal statutes establish the conditions of appellate review, an appellate court cannot rightly exercise its discretion to issue a writ whose only effect would be to avoid those conditions and thwart the Congressional policy against piecemeal appeals in criminal cases.[86]

Later, in *Bankers Life & Casualty Co. v Holland*, the Court again rejected the argument that mandamus was appropriate "to prevent 'judicial inconvenience and hardship' occasioned by appeal being delayed until after final judgment."[87] Acknowledging that refusal to issue the writ would "give rise to a myriad of legal and practical problems as well as inconvenience to both courts," the Court again observed that "Congress must have contemplated those conditions in providing that only final judgments are reviewable."[88]

In short, the Supreme Court in the last sixty years has rejected administrative efficiency arguments like those made in *Simons*, *Peterson*, and *Skinner & Eddy* because they permit judicial second-guessing of the Final Decisions Rule. Even just one year after *Dairy Queen*, in *Schlagenhauf*, the Court noted "that the writ is not to be used as a substitute for appeal, even though hardship may result from delay and perhaps unnecessary trial."[89] Thus, although the Court has not done so formally, it has effectively overruled all three of these decisions to the extent that they represent the proposition that mandamus will lie to prevent the "inconvenience" to petitioners and courts of awaiting an appeal from a final judgment.

---

[85] 319 US 21, 30 (1943).

[86] Id.

[87] 346 US 379, 383 (1953).

[88] Id. See also *United States Alkali Export Ass'n v United States*, 325 US 196, 202 (1945), a certiorari case in which the Supreme Court expounded upon the doctrine applicable to all extraordinary writs:

> It is evident that hardship is imposed on parties who are compelled to await the correction of an alleged error at an interlocutory stage by an appeal from a final judgment. But such hardship does not necessarily justify resort to certiorari or other of the extraordinary writs as a means of review.

[89] 379 US at 110.

B.   The Overly Narrow Seventh Circuit Rule

The Seventh Circuit's rule of limiting mandamus to cases of necessity is attractive as a bright-line rule that clearly satisfies the Final Decisions Rule. It is not faithful, however, to the Supreme Court's decisions in *Simons, Beacon Theatres,* and *Dairy Queen,* and it does not comport with broader Supreme Court precedent on the availability of mandamus. The Seventh Circuit is correct that neither the constitutional nature of the right to jury trial nor potential inconvenience to the petitioner and to the courts will justify the broad availability of mandamus to compel jury trial. The narrow rule that mandamus is available only to compel jury trial in cases of necessity, however, depends on two further arguments made explicitly by the Seventh Circuit in *First National Bank*: (1) that supervisory mandamus is effectively dead; and (2) that *Simons, Beacon Theatres,* and *Dairy Queen* were themselves cases of necessity. This narrow interpretation also depends on a third implicit argument of the Seventh Circuit: that, even if *Simons, Beacon Theatres,* and *Dairy Queen* are cases of necessity, such necessity is the only category of mandamus available to compel jury trial. None of these three arguments withstands analysis.

1.   The continued validity of "supervisory" mandamus.

In *First National Bank*, the Seventh Circuit prematurely announced the death of the supervisory strand of mandamus introduced by the Supreme Court in *La Buy*. The *First National Bank* court acknowledged that the Supreme Court may have used mandamus in both *Beacon Theatres* and *Dairy Queen* as a means of the supervisory control authorized by the Supreme Court in *La Buy*.[90] After all, the Court in *Beacon Theatres* had cited *La Buy* in support of its conclusion that "the right to grant mandamus to require jury trial where it has been improperly denied is settled."[91] The Seventh Circuit contended, however, that *La Buy* and its use of mandamus for supervisory control was "defunct."[92] Therefore, concluded the Seventh Circuit, "[t]o the extent [that *Beacon Theatres* and *Dairy Queen*] stand for the proposition that appellate courts should issue 'supervisory' mandamus to spare the par-

---

[90]   796 F2d at 1004.

[91]   359 US at 511 n 20.

[92]   796 F2d at 1004. The court conceded that the Supreme Court had not formally overruled *La Buy*, but added that "[a]lthough the Court has not yet erected the tombstone, it has ordered flowers." Id.

ties the need to go through the trial and present a claim of error on appeal, they have been undermined."[93]

The Seventh Circuit was indeed correct that *Beacon Theatres* and *Dairy Queen* cannot serve as examples of supervisory mandamus. Neither case contains any evidence that the Court was correcting a systematic error by the district court. In *Beacon Theatres*, the district judge had been, at worst, guilty of following Supreme Court precedent, which the Court overruled in *Beacon Theatres* because of a change in standards under the Federal Rules of Civil Procedure.[94] This behavior contrasts sharply with that of Judge La Buy, who had ignored repeated warnings from the Seventh Circuit about his practice of referring cases to a special master.[95] Similarly, in *Dairy Queen*, there was no evidence of chronic abuse.

Nevertheless, supervisory mandamus as defined by *La Buy* should still be available to correct a district court's chronic disregard of a litigant's right to a jury trial, even if *Beacon Theatres* and *Dairy Queen* are not specific examples. In the thirty years since *La Buy*, the Supreme Court has indeed imposed some bounds on the use of supervisory mandamus by the appellate courts—limits that are to be expected in light of the Final Decisions Rule and the traditional constraints on mandamus. Contrary to the Seventh Circuit's arguments in *First National Bank*, the Court has not overruled *La Buy*, explicitly or implicitly.[96]

In particular, the Seventh Circuit relied on the Supreme Court's decision in *Will v United States*,[97] the most important post-*La Buy* case in which the Supreme Court addressed the use of supervisory mandamus.[98] In *Will*, the district court had ordered the prosecuting attorney to submit a detailed and burdensome bill of particulars. The appellate court had ruled that this bill was in

---

[93] Id at 1006.

[94] 359 US at 505-09.

[95] *La Buy*, 352 US at 258.

[96] See, for example, *Will v Calvert Fire Insurance*, 437 US 655 (1978), and *Kerr v U.S. Dist. Court for the Northern Dist. of California*, 426 US 394 (1976), both of which the *First National Bank* court noted as examples of the Court's disapproval of *La Buy*. 796 F2d at 1005-06. In *Calvert Fire Insurance*, the Court noted only that its decision in *Will v United States*, 389 US 90, 98 n 6 (1967), had admonished against an expansive reading of *La Buy*. *Will v Calvert Fire Insurance*, 437 US at 665-66 n 7. The *Calvert Fire Insurance* Court did not explicitly overrule *La Buy*, however, and the imposition of limitations on *La Buy* is consistent with the warnings in *La Buy* itself against "the indiscriminate use of prerogative writs." *La Buy*, 352 US at 255. See also Note, 86 Harv L Rev at 602-13 (cited in note 18); Comment, 44 Tenn L Rev at 147-49 (cited in note 12).

[97] 389 US 90.

[98] *First National Bank*, 796 F2d at 1005.

fact an improper discovery device and had granted mandamus to the government reversing the district court order.[99] The Supreme Court ruled that mandamus was not the appropriate remedy for this type of error. Although such a use of the writ could certainly fit into a broad definition of supervision, the government had not demonstrated that the defendant "had adopted a deliberate policy in open defiance of the federal rules in matters of pretrial criminal discovery."[100] Most importantly, instead of overruling *La Buy*, the *Will* Court reaffirmed a narrow interpretation of *La Buy* as a case "where a district judge [had] displayed a persistent disregard" for the Federal Rules of Civil Procedure.[101] *First National Bank* thus read the Supreme Court precedent too narrowly.

    2.   The Seventh Circuit's misinterpretation of *Simons*, *Beacon Theatres*, and *Dairy Queen*.

    In *First National Bank*, the Seventh Circuit interpreted the Supreme Court decisions in *Simons*, *Beacon Theatres*, and *Dairy Queen* as cases of necessity—in which the petitioners would have lost their right to jury trial if the Court had waited until the end of the proceeding to order a jury trial.[102] In *Simons*, for example, the Seventh Circuit argued that the district court's judgment on the plaintiff's equitable claim could have collaterally estopped a subsequent jury trial of the same factual issues in plaintiff's legal claim.[103] Because, the Seventh Circuit asserted, the court's judgment on the equitable claim would be "invulnerable on appeal," the plaintiff would never have received a jury trial of the factual issues in her claim.[104] The Seventh Circuit's analysis of *Beacon Theatres* and *Dairy Queen* similarly emphasized the collateral estoppel effect on the factual issues in the legal claims if mandamus were not available.[105]

    In the Seventh Circuit's view, the collateral estoppel effect of the bench trial resolution of the equitable claims in all three of these cases made them cases of necessity because the common factual findings would be "invulnerable on appeal."[106] The Seventh Circuit further noted that certain language in the *Dairy Queen*

---

[99] 389 US at 91-94.
[100] Id at 102.
[101] Id at 96.
[102] 796 F2d at 1002-04.
[103] Id at 1003-04.
[104] Id at 1003.
[105] See id at 1004-05.
[106] Id at 1003-04.

opinion hinted at this necessity interpretation of both *Beacon Theatres* and *Dairy Queen*, reasoning that both opinions had established "the responsibility of the Federal Courts of Appeals to grant mandamus *where necessary* to protect the constitutional right to trial by jury."[107]

It is true that such "foreclosure of review" as hypothesized by the Seventh Circuit would constitute a classic instance of necessity justifying mandamus. But the Seventh Circuit's premise is, in all three cases, the disposition of factual issues during the bench trial would be "invulnerable on appeal" is questionable. The opinion simply provides no authority for this anomalous constraint on the power of the appellate courts.

In fact, there is Supreme Court precedent holding that an appellate court may order a complete retrial of all the factual issues common to legal and equitable claims, without residual collateral estoppel effects. In *Lytle v Household Manufacturing, Inc.*, the plaintiff had brought both a Title VII and a § 1981 claim, but the district court had dismissed the § 1981 claim and had resolved the Title VII claim with a bench trial.[108] In reversing the district court's dismissal of the § 1981 claim, the Supreme Court also held that the petitioner was entitled to a jury trial of all the factual issues in the § 1981 claim without any collateral estoppel effect from the bench trial resolution of the same issues in the Title VII claim:

> Our conclusion is consistent with this Court's approach in cases involving a wrongful denial of a petitioner's right to a jury trial on legal issues. In such cases, we have never accorded collateral-estoppel effect to the trial court's factual determinations. Instead, we have reversed and remanded each case in its entirety for a trial before a jury.[109]

Thus, contrary to the Seventh Circuit's interpretation, collateral estoppel effects do not render these mandamus decisions cases of necessity.

---

[107] Id at 1004, quoting *Dairy Queen*, 369 US at 472 (emphasis added).

[108] 110 S Ct 1331, 1334-35 (1990).

[109] Id at 1337 (citing *Meeker v Ambassador Oil Corp.*, 375 US 160 (1963) (per curiam)); *Tull v United States*, 481 US 412 (1987); *Granfinanciera, S.A. v Nordberg*, 492 US 33 (1989)). See also *Simons*, 247 US at 239, where Justice Holmes admitted that even if the Supreme Court did not grant mandamus, an appellate court might later overturn the results of the bench trial.

3.   The other available categories of mandamus.

The most serious flaw with the Seventh Circuit's argument is its assumption that, even if *Simons, Beacon Theatres*, and *Dairy Queen* served as examples of necessity, this condition constitutes the only circumstance under which mandamus is appropriate to compel jury trial. As noted above, besides necessity, the Court has recognized the use of advisory and supervisory mandamus, as well as mandamus in other exceptional circumstances.[110] Thus, the conclusion that the petitioners had no other effective remedy for the denial of jury trial would not, even if true, by itself support the proposition that mandamus should be limited to such cases of necessity.

### C.   A Proposed Standard: Use of the Traditionally Recognized Categories of Mandamus to Compel Jury Trial

As demonstrated above, both sides of the circuit split examined by this Comment reach unsatisfactory conclusions. The majority of the circuits routinely grant mandamus to order jury trials. But this expansive use of mandamus is inconsistent with Supreme Court precedent. Subsequent decisions have overruled the Court's earlier cases granting mandamus to order jury trial on grounds of administrative efficiency, and there is no support for considering the constitutional nature of the right in determining the availability of the writ. The Seventh Circuit approach is more narrow, confining the use of mandamus to cases of necessity. But this narrow use of mandamus is also inconsistent with Supreme Court precedent. The Court's approval of supervisory mandamus has never been overruled, *Simons, Beacon Theatres*, and *Dairy Queen* are not cases of necessity, and those three cases do not preclude the traditional categories of mandamus.

Supreme Court precedent requires rejection of both sides of the circuit split; instead, the same categories of mandamus should be available to order jury trial as are used to correct any other error. This conclusion is consistent with the view that the availability of mandamus is determined by the procedural context of the error, not by the nature of the substantive right at issue. It is also consistent with the policy expressed in the Final Decisions Rule of avoiding piecemeal litigation.

The proposed standard would permit the use of mandamus in

---

[110] See text at notes 26-40.

cases of necessity as well as in exceptional circumstances, including supervisory and advisory mandamus. If, for example, mandamus were the only effective remedy because the petitioners could not later appeal the denial of a jury trial, mandamus would be available under the necessity category. Or, if the district court has a history of improperly denying jury trials, supervisory mandamus would be available to remedy this abuse. If the denial of the jury trial raises important issues of first impression about the jury trial right, advisory mandamus might be available. Finally, other exceptional circumstances, such as the issues of "public importance" raised in *Republic of Peru*, might also justify the use of mandamus.[111]

There remains the task of categorizing the Court's decisions in *Beacon Theatres* and *Dairy Queen*. While *Simons*, *Peterson*, and *Skinner & Eddy* are doubtful authority for the use of mandamus to compel jury trial, the Supreme Court has not similarly cast doubt on *Beacon Theatres* and *Dairy Queen*. If they do not fit an accepted category of mandamus, they support the conclusion that the denial of a jury trial is not subject to the traditional strict standards for the availability of mandamus. However, the best interpretation of *Beacon Theatres* and *Dairy Queen* is that they merely demonstrate the advisory use of mandamus that the Supreme Court explicitly recognized one year later in *Schlagenhauf*. In all three cases—*Beacon Theatres*, *Dairy Queen*, and *Schlagenhauf*—the Supreme Court was deciding important issues of first impression about the construction and application of the Federal Rules of Civil Procedure.[112] Admittedly, in both *Beacon Theatres* and *Dairy Queen*, the Court held that a federal court sitting in equity could not resolve factual issues relating to a litigant's legal claim and thereby preclude the later resolution of those issues before a jury.[113] But the similarity of these holdings does not refute this novel interpetation. Each case presented a different aspect of this basic principle, so that each may properly be understood as resolving issues of first impression.

---

[111] See text at notes 26-28.

[112] *Beacon Theatres*, 359 US at 509 (court was reevaluating scope of equitable jurisdiction "in the light of the liberal joinder provisions of the Federal Rules"); *Dairy Queen*, 369 US at 471-72 (court ruled that Federal Rules did not displace earlier holding that "the right to trial by jury of legal claims must be preserved" (footnote omitted)); *Schlagenhauf*, 379 US at 109 ("We granted certiorari to review undecided questions concerning the validity and construction of Rule 35.").

[113] *Beacon Theatres*, 359 US at 510-11; *Dairy Queen*, 369 US at 472-73.

In *Beacon Theatres*, the court of appeals had invoked the traditional rule that a court sitting in equity could retain jurisdiction over a later legal counterclaim by the defendant, if the plaintiff alleged that the defendant was threatening to harass the plaintiff with a "multiplicity of lawsuits."[114] The Supreme Court concluded, however, that the trial court had no discretion to shift the entire case to the equitable side of its docket because the liberal joinder provisions of Rule 18 permitted the district court to join both legal and equitable claims in the same action.[115] In contrast, the district court in *Dairy Queen* had attempted to invoke a "clean up" doctrine, which would have allowed the Court to treat the plaintiff's entire claim as equitable if the legal issues raised by the claim were only incidental to the equitable ones, in order to justify conducting a bench trial first.[116] This time the Supreme Court concluded that the liberal joinder provisions of the new Rule 18 did not overrule its earlier holding[117] that a court of equity could not so treat the plaintiff's claim, even if the complaint presented both legal and equitable issues.[118]

In short, *Beacon Theatres* and *Dairy Queen* each resolved "new and important problems" about the interaction of law and equity under the recently adopted Federal Rules. The fact that both opinions extensively discussed the merits of the petitioner's claims and only briefly reviewed the mandamus issue reinforces this interpretation. In *Beacon Theatres*, the Court particularly emphasized the novelty of the issue before it, acknowledging that, prior to the federal rules, the district court "traditionally" could have invoked equitable principles "to take jurisdiction and settle the case in one suit."[119] It is thus a fair reading that these cases exemplified the advisory mandamus that the Supreme Court more formally recognized one year later in *Schlagenhauf*.

## CONCLUSION

All the categories of mandamus should be available to compel jury trial. If the newer exceptional categories of supervisory and advisory mandamus are properly constrained to the procedural contexts that the Court found significant in *La Buy* and *Schlagenhauf*, this standard would still reject most of the typical petitions

---

[114] 359 US at 506.
[115] Id at 508.
[116] 369 US at 470.
[117] See *Scott v Neely*, 140 US 106 (1891).
[118] *Dairy Queen*, 369 US at 471-72.
[119] 359 US at 506.

for mandamus. Indeed, if the Seventh Circuit had applied this standard in *First National Bank*, it could have denied the writ of mandamus because the facts of the case did not indicate that the district court had a history of misconstruing fraud claims as unjust enrichment claims or that this run-of-the-mill monetary dispute presented any "novel and important" legal issues to resolve.

The strength of this rather unexciting conclusion—that the same categories of mandamus are available to compel jury trial as to correct any other kind of district court error—is that it avoids the "vices of interlocutory appeal" that the Seventh Circuit decried in *First National Bank* while remaining faithful to the Supreme Court authority on mandamus. Ensuring that mandamus remains as "extraordinary" a remedy for these errors as for all other errors avoids the awkwardness of making the district judge a frequent party to a legal action, deters the inevitable frivolous appeals that would arise from the routine availability of the writ, and satisfies the congressional policy disfavoring interlocutory appeals embodied in the Final Decision Rule. This regime resolves the tension between the Final Decisions Rule and the All Writs Act in a manner that is most faithful to Supreme Court precedent.

# Exhibit 20

| | | |
|---|---|---|
| SC-230179 | ) | **Appeal File Date: May 2, 2023** |
| AC-46473A02; AC-46473 | ) | **1st Amended Appeal: May 9, 2023** |
| Docket No. HHD-CV19-6120472-S | ) | **2nd Amended Appeal: May 26, 2023** |
| | ) | |
| Santander Bank, N.A. | ) | Supreme Court of Connecticut |
| vs. | ) | |
| Clark, Lillian J., et al. | ) | **February 29, 2024** |
| | ) | **ORAL ARGUMENT REQUESTED** |

# PRO SE DEFENDANT-APPELLANTS' MOTION FOR RECONSIDERATION OF PETITION TO THE SUPREME COURT OF CONNECTICUT BY CERTIFICATION FOR REVIEW

Pursuant to the applicable provisions of the *Connecticut Practice Book*, including, but not limited to the *Connecticut Attorney's Oath*; the *Rules of Professional Conduct*; the Rules of Judicial Conduct; the Rules of Appellate Procedure; the *Connecticut Foreclosures Practice and Procedure*; and the *Constitution of the State of Connecticut*.  The *pro se* Defendant-Appellants *respectfully* files with this Court their **MOTION FOR RECONSIDERATION OF PETITION TO THE SUPREME COURT OF CONNECTICUT BY CERTIFICATION FOR REVIEW**, based on the following *material facts and relevant law* delineated below.

# MEMORANDUM OF LAW

1.) ***The Ninth (9th) Commandment*** is:

> ***"Thou shalt not bear false witness against thy neighbor."***

> Exodus 20:16

2.) ***The Tenth (10th) Commandment*** is:

> ***"Thou shalt not covet thy neighbor's house …,***
> ***nor any thing that is thy neighbor's."***

> Exodus 20:17

1

3.) **The Second (2nd) Great Commandment** is:

> **"… Thou shalt love thy neighbor as thyself."**
>
> Matthew 22:39

4.) **"Therefore shall a man leave his father and his mother, and shall cleave unto his wife: and they shall be one flesh."**

> Genesis 2:24

5.) **"For this cause shall a man leave his father and mother, and cleave to his wife; And they twain shall be one flesh: so then they are no more twain, but one flesh.  What therefore God hath joined together, let not man put asunder."**

> Mark 10:7-9

6.) There is a **Common Law Maxim**, which states the following:

> "**Truth is the essence of justice.  Without truth justice cannot exist**."

7.) There is a **Common Law Maxim**, which states the following:

> "**Justice delayed is justice denied**."

8.) There is a **Common Law Maxim**, which states the following:

"There is **nothing more sacred, more inviolate, than the house of every citizen**."

9.) *United States Constitution – **1st Amendment***, which reads as follows:

> "Congress shall make no law respecting an establishment of religion, **or prohibiting the free exercise thereof**; or abridging **the freedom of speech**, or of the press; or the right of the people peaceably to assemble, and **to petition the government for a redress of grievances**."

10.)      "The U.S. Constitution states only one command **twice**," in the 5th

2

**241**

*Amendment,* and the *14th Amendment, that is,* **the command/clause of due process of law**.

11.)     *United States Constitution*: *Due Process of Law Clause – 5th Amendment*, which states, in part:

"… nor be deprived of life, liberty, or property, **without due process of law**; *nor shall private property be taken for public use, without just compensation*; and the **14th Amendment, Section 1**, which states, in part:

"… *nor shall any state deprive any person of life, liberty, or property,* **without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws**."

12.)     *United States Constitution*: *Freedom to Contract Clause*, *Article I, Section 10, Clause 1*, which states, in part:

> "No State shall … pass any … Law impairing the Obligation of Contracts ..."

13.)     The *Constitution of the State of Connecticut*, reads, *in part*, as follows:

**CONSTITUTION OF THE STATE OF CONNECTICUT**

**PREAMBLE.**

The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government.

**ARTICLE FIRST.**
**DECLARATION OF RIGHTS.**

That the great and essential principles of liberty and free government may be recognized and established,

**WE DECLARE:**
(**Equality of rights**.)
Sec. 1 All men when they form a social compact, **are equal in rights**; and no man or set of men are entitled to exclusive public emoluments or privileges from the community.


**AMENDMENTS TO THE
CONSTITUTION OF THE STATE OF CONNECTICUT**

**ARTICLE IV**.

(**Trial by jury**. **Challenging of jurors**.)
Section 19 of article first of the Constitution is amended to read as follows:

**The right of trial by jury shall remain inviolate**, the number of such jurors, which shall not be less than six, to be established by law; but no person shall, for a capital offense, be tried by a jury of less than twelve jurors without his consent. In all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, the number of such challenges to be established by law. The right to question each juror individually by counsel shall be inviolate.


**ARTICLE XXI**.

(**Equal protection**. **No segregation or discrimination**.)
Article fifth of the amendments to the Constitution is amended to read as follows:

**No person shall be denied the equal protection of the law** nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability.


14.) The *U.S. Supreme Court* ruled, *in part*, the following:

"***The party alleging the mistake*** *must show exactly in what it consists*

4

*and the correction that should be made. The evidence must be such as to leave no reasonable doubt upon the mind of the court as to either of these points. **The mistake must be mutual, and common to both parties to the instrument.** It must appear that both have done what neither intended. **A mistake on one side may be a ground for rescinding, but not for reforming, a contract. Where the minds of the parties have not met there is no contract, and hence none to be rectified**.*" **Moffett, Hodgkins, and Clarke Company v. Rochester, 178 U.S. 373 (1900).**

15.)     The *Supreme Court of Connecticut* ruled, *in part*, the following:

"*Applying these definitions in the present circumstances, **we must decide whether a mortgage deed that contains no description of the mortgaged property can reasonably be held to be "fully drawn with respect to every essential feature thereof." We conclude that it cannot.** Whether we turn to the requirements of our recordation statutes; General Statutes §§ 47-5, 47-10 and 47-36c; or to those of the statute of frauds; General Statutes § 52-550; **it is evident that a mortgage is unenforceable without identification of the mortgaged property.***" **State of Connecticut v. Hahn, 207 Conn. 555 (1988).**

16.)     The *Supreme Court of Connecticut* ruled, *in part*, the following:

"***Reformation is appropriate in cases of mutual mistake**—that is where, in reducing to writing an agreement made or transaction entered into as intended by the parties thereto, through mistake, common to both parties, the written instrument fails to express the real agreement or transaction. 5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2096; 53 C.J. p. 941; Amer. Law Institute Restatement, Contracts, Vol. 2, §§ 504, 505 .... **[R]eformation is also available in equity when the instrument does not express the true intent of the parties owing to mistake of one***

*party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other*. *5 Pomeroy, Equity Jurisprudence (2d Ed.) § 2097; 53 C.J. p. 949...." (Citations omitted.) Home Owners' Loan v. Stevens, 120 Conn. 6, 9-10, 179 A. 330 (1935).* **Here, there was neither claim nor proof of a mutual mistake, fraud or inequitable conduct on the part of either party. Since none of these elements was present, application of the equitable principle of reformation was not proper***.*** <u>**Harlach v. Metropolitan Property**</u>**, 221 Conn. 185 (1992).**

17.)     The *Supreme Court of Connecticut* ruled, *in part*, the following:

**"To be sure, identifying the obligation secured by a mortgage deed is not a technical or scrivener's error. Reforming the mortgage deed in the manner sought by the plaintiff without establishing that the change effects the original intention of the parties changes the defendant's *769 obligations and creates a new contract between her and the plaintiff. This court has cautioned that "[a]n obstacle to reformation [that] we find insurmountable arises from the fundamental principle that there can be no reformation unless there is an antecedent agreement upon which the minds of the parties have met. The relief afforded in reforming an instrument is to make it conform to the previous agreement of the parties."** *Hoffman v. Fidelity & Casualty Co. of New York, 125 Conn. 440, 443, 6 A.2d 357 (1939).* **Consequently, "a definite agreement on which the minds of the parties have met must have [preexisted] the instrument in question."** *Id.* **It is axiomatic that a "court cannot supply an agreement [that] was never made, for it is [a court's] province to enforce contracts, not to make or alter them."** <u>**JPMorgan Chase Bank v. Robert J. Virgulak, et al.**</u>**, 341 Conn. 750 (2022).**

6

18.) The ***Connecticut Attorney's Oath*** reads as follows:

*"You solemnly swear or solemnly and sincerely affirm, as the case may be, that you will do **nothing dishonest**, and will not knowingly allow **anything dishonest** to be done in court, and that you will inform the court of **any dishonesty** of which you have knowledge; that you will not knowingly maintain or assist in maintaining any cause of action that is **false** or unlawful; **that you will not obstruct any cause of action for personal gain or malice**; but that you will exercise the office of attorney, in any court in which you may practice, according to the best of your learning and judgment, faithfully, to both your client and the court; so help you God or **upon penalty of perjury**."*

***(General Statutes § 1-25 and annotations.)***

19.) **RULES OF APPELLATE PROCEDURE**

**Sec. 60-1. Rules To Be Liberally Interpreted**
The design of these rules being to facilitate business and ***advance justice***, they will be interpreted liberally in any appellate matter where it shall be manifest that a strict adherence to them will work surprise or injustice.

20.) **CODE OF JUDICIAL CONDUCT - PREAMBLE**

(1) ***An independent, fair and impartial judiciary is indispensable to our system of justice***. The United States legal system is based on the principle that an independent, impartial, and competent judiciary, composed of men and women of integrity, will interpret and apply the law that governs our society. Thus, ***the judiciary plays a central role in preserving the principles of justice and the rule of law***. Inherent in all the Rules contained in this Code are the precepts that judges, individually and collectively, ***must respect and honor the judicial office as a public trust and strive to maintain and enhance confidence in the legal system***.

## **LEGAL GROUNDS**

1.) **With all due respect** to the *Supreme Court of Connecticut*, the *pro se* Defendant-Appellant Gordon Clark (Mr. Clark) files his **MOTION FOR RECONSIDERATION OF PETITION TO THE SUPREME COURT OF CONNECTICUT BY CERTIFICATION FOR REVIEW** based on the six (6) following **legal grounds**:

    1. **While under Chapter 13 bankruptcy protection**, on February 20, 2024, the *Supreme Court of Connecticut* denied Mr. Clark's **PETITION TO THE SUPREME COURT BY CERTIFICATION FOR REVIEW**.

    2. **Ab initio**, the *Superior Court of Connecticut* **lacked subject-matter jurisdiction** in this matter, based on the following facts, which are:

*Plaintiff-Appellee Santander Bank, N.A.* knowingly or unknowingly **admitted against interest**, and without any claims of fraud nor mutual mistake by the Defendant-Appellants, that they have an **invalid, unenforceable, and unreformable** *alleged* mortgage; and therefore, an **invalid, unenforceable, and unreformable** *alleged* mortgage that the *Superior Court of Connecticut* **NEVER** had any jurisdiction whatsoever to consider. Consequently, the *Superior Court of Connecticut* had **NO** jurisdictional authority to reform said **invalid, unenforceable, and unreformable** *alleged* mortgage. That is, **without completely disregarding and violating the law**, our federal and state Constitutions, equal protection under the law, due process of law, the rule of law, their *Oath of Office*, their *Attorney's Oath*, their *Rules of Professional and Judicial Conduct*, basic contract law, and their **clear absence of ALL jurisdiction**, and **all done under the color of law and with impunity**.

Additionally, Plaintiff-Appellee *Santander Bank, N.A.* **lacks standing** due to a **failure to state a claim upon which relief can be granted**.

More *specifically, clearly, and simply* this case would be akin to an

*unsecured alleged creditor* filing a foreclosure claim with the *Superior Court of Connecticut* on a property with a **blank piece of paper** or **without a valid, enforceable, or reformable mortgage**.

Therefore, due to the Plaintiff-Appellee's said **invalid, unenforceable, and unreformable** *alleged* mortgage, and the resultant Plaintiff-Appellee's **lack of proper and lawful standing due to a failure to state a claim upon which relief can be granted**, the *Superior Court of Connecticut* "**ab initio**" **lacked any and all subject matter and in personam jurisdiction in this matter**; and consequently, all said Court's previous judgments are "**forever a nullity**" and/or are "**void ab initio**."

**Please see:** *Rhode Island v. Massachusetts*, **37 U.S. 657 (1838); and** *Joyce v. United States*, **474 U.S. 215 (1973)**.

**Ab initio**, the *Superior Court of Connecticut* **lacked subject-matter jurisdiction**, **which cannot be waived**, based on four (4) *SCOTUS and Supreme Court of Connecticut* **cited and binding** precedents (**Please see above: *Memorandum of Law* – Paragraphs 14, 15, 16, and 17**).

3. The *Superior Court of Connecticut* denied Mr. Clark's **inviolate right to a jury trial** (**Please see above: *Memorandum of Law* – Paragraph 13, and/or *The Constitution of the State of Connecticut*).

4. The *Superior Court of Connecticut* denied Mr. Clark's right to **equal protection under the law** (**Please see above: *Memorandum of Law* – Paragraphs 10, 11, and 13, and/or *The Constitution of the United States, and The Constitution of the State of Connecticut*).

5. The *Superior Court of Connecticut* denied Mr. Clark's right to **due process of law** (**Please see above: *Memorandum of Law* – Paragraphs 10, 11, and 13, and/or *The Constitution of the United States, and The Constitution of the State of Connecticut*).

9

6. Lastly, Mr. Clark also seeks *reconsideration* by the *Supreme Court of Connecticut*, due to the ***legal grounds*** that this Court failed to address, recognize, and/or *"**secure or maintain the uniformity**"* and/or its conflicting and/or overturning of four (4) previously ***cited and binding*** *SCOTUS and Supreme Court of Connecticut* precedents, which are:

***Moffett, Hodgkins, and Clarke Company v. Rochester*, 178 U.S. 373 (1900).**
***State of Connecticut v. Hahn*, 207 Conn. 555 (1988).**
***Harlach v. Metropolitan Property*, 221 Conn. 185 (1992).**
***JPMorgan Chase Bank v. Robert J. Virgulak, et al.*, 341 Conn. 750 (2022).**

WHEREFORE, based on ***all the material facts and relevant law*** referenced above, as well as all the *related, relevant, and previously* filed documents with this Court, the *Appellate Court of Connecticut*, and the *Superior Court of Connecticut*, the *pro se* Defendant-Appellants, *respectfully* moves this Court to ***grant*** their **MOTION FOR RECONSIDERATION OF PETITION TO THE SUPREME COURT OF CONNECTICUT BY CERTIFICATION FOR REVIEW**.

Thank you for your time, consideration and understanding of this *urgent and critically important* legal matter, and blessings *always* to you and yours. Please continue to stay healthy and be safe.

Dated and signed at Enfield, Connecticut, on February 29, 2024, by *pro se* Defendant-Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

10

## CERTIFICATE OF SERVICE

I, *pro se* Defendant-Appellant Gordon Clark, certify that a copy of the above **PRO SE DEFENDANT-APPELLANTS' MOTION FOR RECONSIDERATION OF PETITION TO THE SUPREME COURT OF CONNECTICUT BY CERTIFICATION FOR REVIEW** will be served via *electronic service* and via email on February 29, 2024, to the following:

Jeffrey M. Knickerbocker, Esq.
c/o Brock & Scott, PLLC
270 Farmington Avenue, Suite 151, Farmington, CT 06032
860.856.6646; jeffrey.knickerbocker@brockandscott.com

David A. Baram, Esq.
c/o O'Malley, Deneen, Leary, Messina & Oswecki
One Regency Drive, Suite 310, Bloomfield, CT 06002
860.242.2221; dbaram@omalleydeneen.com

Roger Calistro, Esq.
c/o Calistro & Airone, LLC
396 Orange Street, Carriage House, New Haven, CT 06511
203.752.1200; rogerc@nptlx.net

It is also certified that this document does not contain any names or other personal identifying information that is prohibited from disclosure by rule, statute, court order, or case law.

Dated and signed at Enfield, Connecticut, on February 29, 2024, by *pro se* Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

11

**250**

# Exhibit 21

FEATURE | APPELLATE LAW

# Civil Interlocutory Appeals in Federal Court

BY MARCY G. GLENN

252

*This article discusses jurisdictional bases for federal interlocutory appeals in civil matters and procedures relevant to those appeals. It focuses on US Supreme Court and Tenth Circuit Court of Appeals case law.*

The jurisdiction of federal courts of appeals is generally limited to the review of final judgments.[1] Yet various statutes, rules, and jurisprudential doctrines either require or permit those courts to hear appeals from non-final, or interlocutory, district court orders. This article presents the most significant jurisdictional bases for federal interlocutory appeals in civil cases and discusses procedures relevant to those appeals. It focuses on US Supreme Court and Tenth Circuit Court of Appeals case law applying relevant statutes, rules, and doctrines.[2]

## Interlocutory Appeals as of Right

Appeals as of right are appeals that the federal courts of appeals must resolve if they are timely filed and comply with other jurisdictional requirements.

### Appeals from Interlocutory Orders on Injunctions under 28 USC § 1292(a)(1)

The dominant category of federal interlocutory appeals as of right is from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions," pursuant to 28 USC § 1292(a)(1). As a general rule, § 1292(a)(1) "should be narrowly construed to 'ensure that appeal as of right under § 1292(a)(1) will be available only in [limited] circumstances.'"[3] The Tenth Circuit, like other courts of appeals, looks to "the actual, practical effect of an order" before exercising jurisdiction under § 1292(a)(1), "consider[ing] the substance rather than the form of the motion and caption of the order."[4]

These general interpretive rules have generated abundant authority, often conflicting,

as to whether particular appeals fall within the scope of § 1292(a)(1). With that caveat, Supreme Court and Tenth Circuit cases have held:

- Absent "extraordinary circumstances," § 1292(a)(1) does not apply to orders granting or denying temporary restraining orders (TROs).[5]
- However, TROs that remain in effect more than 10 days may be treated as preliminary injunctions.[6] And TROs will be treated as appealable injunctions where they effectively resolve the dispute.[7] Also, the Tenth Circuit will review orders denying TROs "when an appellant will suffer irreparable harm absent immediate review."[8]
- Section 1292(a)(1) applies to permanent injunctions that are not otherwise appealable as final orders.[9]
- Orders *modifying* injunctions are appealable, but orders merely *clarifying* or *interpreting* injunctions are not.[10]
- Section 1292(a)(1) has been extended to orders not expressly styled as injunctions but having the practical effect of injunctions, but only if such orders have "'serious, perhaps irreparable, consequence'" and "can be 'effectually challenged' only by immediate appeal."[11]
- Section 1292(a)(1) does not apply to orders relating to the conduct or progress of cases, even if they have injunctive effect.[12] Under this principle, for example, the Tenth Circuit has held that a stay order in a civil forfeiture proceeding "relate[d] only to the internal progress of the forfeiture litigation" and, therefore, could not be challenged in an interlocutory appeal under § 1292(a)(1).[13]
- If the court of appeals has jurisdiction over an interlocutory appeal related to

an injunction order, it may—but is not required to—consider other issues interrelated with the injunction under its discretionary pendent appellate jurisdiction.[14] Relevant factors include (1) "whether the otherwise nonappealable issue is sufficiently developed, both factually and legally, for [its] review," (2) "whether review of the appealable issue involves consideration of factors closely related or relevant to the otherwise nonappealable issue," and (3) "whether judicial economy will be better served by resolving the otherwise nonappealable issue, notwithstanding the federal policy against piecemeal appeals[.]"[15]

### Appeals from Interlocutory Receivership Orders under 28 USC § 1292(a)(2)

Title 28 USC § 1292(a)(2) authorizes appeals as of right from interlocutory orders related to receiverships, but "[c]ourts narrowly construe § 1292(a)(2) 'to permit appeals only from the three discrete categories of receivership orders specified in the statute, namely [1] orders appointing a receiver, [2] orders refusing to wind up a receivership, and [3] orders refusing to take steps to accomplish the purposes of winding up a receivership.'"[16] The statute permits immediate review of the conduct of appointed receivers only "when there has been a complete failure to act in furtherance of the receivership," but does not vest the court of appeals with jurisdiction to undertake "ongoing supervision of every action a receiver might be ordered to take."[17]

### Appeals from Interlocutory Orders in Admiralty Cases under 28 USC § 1292(a)(3)

Given the geographic location of the Tenth Circuit,

it's unsurprising that the court has apparently issued only one published decision applying 28 USC § 1292(a)(3), which authorizes appeals as of right from interlocutory decrees "determining the rights and liabilities of the parties to admiralty cases in which appeals from final decrees are allowed."[18] That case, *In re Aramark Sports & Entertainment Services, LLC,*[19] however, makes clear that, in contrast to the narrow jurisdictional grants under 28 USC § 1292(a)(1) and (2), appellate jurisdiction over admiralty orders is broadly construed. "[T]o allow ship owners to seek an appeal to halt litigation at an early stage, in the hope of eliminating the need for further proceedings[,]" "all that is required is that a right or liability of a party have been determined[ ]" in an admiralty case.[20]

### Appeals as of Right under Other Statutes

Various other federal statutes provide for appeals as of right from specifically defined interlocutory orders. For example, without waiting for a final judgment, a party may appeal under the Federal Arbitration Act from an order denying a motion to stay proceedings, denying a motion to compel arbitration, confirming or denying confirmation of an arbitration award, or modifying, correcting, or vacating an award;[21] the Federal Deposit Insurance Corporation may appeal from orders remanding cases removed to federal court;[22] and a party may appeal an order remanding a removed case where a federal officer or agency is sued or certain claims are made under the federal civil rights laws.[23]

### A Variation on Interlocutory Appeals as of Right: The Collateral Order Doctrine

Appeals from collateral orders "feel" like interlocutory appeals, because they generally challenge a discrete order while the remainder of the case continues in the district court. In fact, they are more properly viewed as a subset of appeals from final judgments, with jurisdiction arising under 28 USC § 1291 (permitting "appeals from all final decisions of the district courts"), rather than pursuant to a statute or rule providing for interlocutory appeals.

As the Supreme Court first recognized in *Cohen v. Beneficial Industrial Loan Corp.,* collateral orders "finally determine claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated."[24]

> "
> The dominant category of federal interlocutory appeals as of right is from interlocutory orders 'granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions,' pursuant to 28 USC § 1292(a)(1).
> "

To constitute a collateral order, a district court decision must (1) "conclusively determine the disputed question," (2) "resolve an important issue completely separate from the merits of the action," and (3) "be effectively unreviewable on appeal from a final judgment."[25]

The most common immediately appealable collateral orders are those that deny motions to dismiss based on claimed immunity from suit—including based on Eleventh Amendment immunity,[26] qualified immunity,[27] absolute immunity,[28] and tribal immunity.[29] Among other collateral orders recognized by the Supreme Court or the Tenth Circuit are orders remanding a case to state court based on abstention;[30] requiring the plaintiffs to post a substantial bond, under a state statute, to proceed with a shareholder derivative action filed in federal court;[31] and imposing on the defendants 90% of the costs of providing notice to class members in a class action.[32]

### Procedural Requirements

The procedural requirements for interlocutory appeals as of right, including under the collateral order doctrine, are the same as for traditional appeals from final judgments as set forth in the Federal Rules of Appellate Procedure (FRAP) and the Tenth Circuit Rules. Accordingly, the notice of appeal must be filed within the governing time period for appeals from final judgments,[33] and the rules related to briefing, appendices, and oral argument apply.[34]

### Practice Tips

Practitioners filing interlocutory appeals as a matter of right should consider the following:

- Parties often have considerable leeway in how they characterize their requested relief. A litigant anticipating a potential interlocutory appeal under § 1292(a)(1) (concerning interlocutory orders on injunctions) should structure the relief sought as injunctive in nature if the facts and the law support that characterization.

- The fact that a party has a right to file an interlocutory appeal does not necessarily mean that it should do so. A party is not required to seek permission to take an interlocutory appeal to avoid waiving whatever ultimate appeal right the party may have.[35] Some cases may present good reasons to defer appealing until the case has proceeded to final judgment, including to avoid the expense and delay associated with an interlocutory appeal, or to obtain the benefit of a better developed record.

**Permissive Interlocutory Appeals**

Various statutory provisions, court rules, and cases authorize permissive appeals, which the courts of appeals may, but are not required to, accept.

### Permissive Appeals under 28 USC § 1292(b)

Under 28 USC § 1292(b), the appellant must persuade two courts that an interlocutory appeal is appropriate. Initially, the district court must certify in writing that (1) an interlocutory order "involves a controlling question of law[,]" (2) "there is substantial ground for difference of opinion" on that legal issue, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation[.]"[36] A party who clears this first hurdle must then petition and convince the court of appeals to accept the appeal.[37]

Section 1292(b) does not state factors a court of appeals should consider in deciding whether to review on an interlocutory basis an order that could be challenged instead as part of an eventual appeal from a final judgment. As a result, the court of appeals has unbridled discretion under § 1292(b). Litigants generally advocate based on the three prerequisites for district court certification: (1) a novel and purely legal issue; (2) a substantial ground for difference of opinion, ideally demonstrated through conflicting conclusions reached by different district courts within the circuit; and (3) that the court of appeals' resolution of the issue will likely be dispositive of all or part of the case.

The Tenth Circuit has granted § 1292(b) petitions on diverse procedural and substantive issues in a broad range of cases, including, for example, an oil and gas royalty class action;[38] a constitutional challenge to Colorado's Taxpayer Bill of Rights;[39] and cases brought under the Employee Retirement Income Security Act of 1974,[40] the Americans With Disabilities Act,[41] and 42 USC § 1983.[42]

If the district court certifies its order as meeting the § 1292(b) standards for interlocutory appeal, a petition for review must be filed in the court of appeals within 10 days of that certification.[43] When a party wishes to file a permissive appeal from a district court order that does not include the required certification under § 1292(b), the putative appellant may ask the district court to modify its order to recite the necessary conclusions and certification,

> "
> The most common immediately appealable collateral orders are those that deny motions to dismiss based on claimed immunity from suit—including based on Eleventh Amendment immunity, qualified immunity, absolute immunity, and tribal immunity.
> "

and the 10 days will run from the date of the reissued order.[44]

### Appeals from Orders Granting or Denying Class Certification Pursuant to Rule 23(f)

Under Federal Rule of Civil Procedure (FRCP) 23(f), "[a] court of appeals may permit an appeal from an order granting or denying class-action certification[.]"[45] Unlike § 1292(b) appeals, there is no prerequisite of district court certification. But like § 1292(b) appeals, the court of appeals has absolute discretion to accept or reject the appeal. Although the Tenth Circuit has recognized the important reason for permitting interlocutory appeals from class certification decisions—because "a class-certification determination can force a resolution of the case that is independent of the merits"[46]—it has exercised its discretion sparingly, apparently granting FRCP 23(f) petitions only four times in the past six years.[47]

"[N]o rigid test" governs the Tenth Circuit's exercise of its "unfettered" discretion, but review "is generally appropriate" in cases that "involve an unresolved issue of law relating to class actions that is likely to evade end-of-case review" and is "significant to the case at hand, as well as to class action cases generally," and in cases where the certification order "is manifestly erroneous," usually on an issue of law.[48]

Rule 23(f) sets a 14-day deadline for petitioning for review of an order granting or denying class certification; when the United States or a federal agency or officer is a party to the case, that deadline is extended to 45 days.[49] Because that time limitation appears in a procedural rule, not a statute, it is classified as a nonjurisdictional claim-processing rule that an opposing party can waive or forfeit.[50] Nevertheless, the FRAP "express a clear intent to compel rigorous enforcement of Rule 23(f)'s deadline," and, therefore, neither the district court nor the court of appeals may extend the 14-day deadline.[51]

Under limited circumstances, a motion for reconsideration may affect the timing of an appeal from a class certification order. The Tenth Circuit has assumed without deciding that a motion for reconsideration of a certification order, if filed *before the deadline* under Rule 23(f), will toll the deadline for petitioning to the Tenth Circuit until 14 days after the order on the reconsideration motion.[52] But a motion for reconsideration filed *more than 14 days* after the original certification order will not restart the clock for seeking Tenth Circuit review unless the district court issues a new certification order;

**FEATURE** | APPELLATE LAW

thus, an order denying a late-filed reconsideration motion will accomplish nothing.[53]

### Appeals from Remand Orders in Removed Class Actions under 28 USC § 1453(c)(1)

Federal law generally provides that an order remanding a case to the state court from which it was removed is not reviewable on appeal.[54] However, under 28 USC § 1453(c)(1), part of the Class Action Fairness Act, a party may seek permission to appeal from orders granting or denying remand in most removed class actions.[55]

The appellant must apply to the court of appeals within 10 days after entry of the order granting or denying remand.[56] If the court accepts the appeal, it must decide the appeal quickly: (1) within 60 days after the appeal was "filed"[57] (which the courts of appeals have construed as the date the court accepted the appeal[58]); (2) within a longer time if agreed to by the parties[59]; or (3) if the parties cannot agree to an extension, within an extended period of up to only 10 days, upon a showing of good cause and in the interests of justice.[60] If the court does not issue a timely judgment, the appeal is deemed denied.[61]

### A Variation on Permissive Interlocutory Appeals: Pendent Appellate Jurisdiction

In *Swint v. Chambers*,[62] the US Supreme Court indicated, without deciding, that if courts of appeals are permitted to consider additional issues in permissive interlocutory appeals, pendent jurisdiction would be confined to cases where the pendent issue "was inextricably intertwined with" the issue over which the court had interlocutory appellate jurisdiction.[63] The Tenth Circuit has adopted the *Swint* formulation for pendent appellate jurisdiction.[64] Only when the pendent issue "is coterminous with, or subsumed in, the claim before the court on interlocutory appeal—that is, when the appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well[,]" will the court reach a pendent claim in a permissive interlocutory appeal.[65]

The exercise of pendent jurisdiction in interlocutory appeals is discretionary,[66] and the Tenth Circuit exercises that discretion sparingly.[67]

### Procedural Requirements

Petitions for permissive appeals must comply with FRAP 5 and Tenth Circuit Rule 5, which address the required form and content of petitions, cross-petitions, responses, and replies.[68]

> " Section 1292(b) does not state factors a court of appeals should consider in deciding whether to review on an interlocutory basis an order that could be challenged instead as part of an eventual appeal from a final judgment. As a result, the court of appeals has unbridled discretion under § 1292(b). "

FRAP 5(a)(2) requires the petition to be filed within the time set by the statute authorizing the interlocutory appeal or, if the statute includes no filing deadline, within the time for filing a notice of appeal.[69] As noted above, these deadlines may not be extended.[70]

Petitions are generally submitted without oral argument.[71] If the petition is granted, no notice of appeal need be filed, the date of the order granting the petition is treated as the date of the notice of appeal, and the parties file briefs on the merits as in a traditional appeal.[72]

### Practice Tips

Practitioners filing permissive interlocutory appeals may find these tips helpful:

- A district court order stating strong reasons for certification under § 1292(b) will be more persuasive to the court of appeals than one merely parroting the statutory elements, so a motion for certification in the district court should persuasively argue how each element is met.
- Even short amicus briefs may be useful in persuading the court to accept the appeal, much as amicus briefs in support of a Supreme Court petition for writ of certiorari can be helpful to a petitioner.
- A petitioner should avoid overstating the bases for a permissive appeal because the court of appeals may vacate its order granting permission to appeal and dismiss the appeal at any time before its decision.
- Advocates should always remember the distinction between the petition and the eventual appeal, if accepted. At the petition stage, the focus is on whether the court of appeals should exercise its discretion to take the appeal—which will typically turn on considerations in addition to the merits of the issues on appeal. If the court grants the petition, the focus typically shifts exclusively to the merits.

### Extraordinary Writs

The All Writs Act vests all federal courts with jurisdiction to "issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."[73] However, a writ is an extraordinary means of obtaining interlocutory review, and a court will grant it only in truly compelling circumstances:

The Supreme Court has made it clear that mandamus is a "drastic" remedy that is "to be invoked only in extraordinary situations.

… [T]he writ of mandamus has traditionally been used in the federal courts only to confine an inferior court to a lawful exercise of its prescribed jurisdiction or to compel it to exercise its authority when it is its duty to do so. . . . Petitioners must show that their right to the writ is "clear and indisputable."[74]

The criteria for issuance of an extraordinary writ are that (1) "the party seeking the writ has no other adequate means to secure the relief desired"; (2) "the petitioning party will be damaged or prejudiced in a way not correctable on appeal"; (3) "the district court's order constitutes an abuse of discretion"; (4) "the district court's order represents an often repeated error and manifests a persistent disregard of federal rules"; and (5) "the district court's order raises new and important problems or issues of law of the first impression."[75] Despite these high bars for interlocutory intervention, the Tenth Circuit has on exceedingly rare occasions granted extraordinary writs.[76]

FRAP 21 and Tenth Circuit Rule 21.1 provide procedures for the filing and disposition of extraordinary writs.[77] There is no filing deadline, but the petition should be filed as promptly as possible.[78] The rules prescribe the content and form of a petition[79] and permit the court of appeals to deny a petition without an answer or to order an answer within a set time.[80] Petitions for extraordinary writs receive preference over "ordinary civil cases."[81]

### Practice Tips

Practitioners filing for extraordinary writs should keep the following points in mind:

- Given the remote chance of success, lawyers should consider all available alternatives before filing an extraordinary writ. Specifically, is there any way to change the district court judge's mind on the issue in question? Is an interlocutory appeal under § 1292(a) or (b) available? Can the party obtain adequate relief through an eventual appeal from a final judgment?

- The stringent standards for filing an extraordinary writ generally demand a fairly direct and aggressive attack on the district court—yet those rigorous criteria

also generally result in writs being denied. Advocates should think hard before maligning an action or inaction of the district court judge before whom they likely will need to continue to prosecute or defend the case during and after the (likely unsuccessful) extraordinary writ proceeding.

- Note that, unlike permissive interlocutory appeals discussed above, when a writ is filed and the court of appeals exercises its discretion to decide the issue on the merits, it may do so based on the writ and answer (if ordered), instead of ordering separate merits briefing. Therefore, the writ (and answer) must address both why the court of appeals should accept (or reject) the appeal and why the court should overturn (or approve) the challenged action or inaction.

### Conclusion

Despite the strong presumption that cases should proceed to final judgment before appeal, the law's strict limits on interlocutory appeals, the sundry procedural traps for the unwary, and the Tenth Circuit's historical reluctance to accept permissive appeals—despite all these hurdles, federal interlocutory appeals can be invaluable in the right case and under the right circumstances. ⬛



**Marcy G. Glenn** is a partner in the Appellate Practice Group at Holland & Hart LLP. For more than 30 years, she has litigated appeals in the US Supreme Court, federal courts of appeals, Colorado appellate courts, and other states' appellate courts. She also regularly handles complex trial-level briefing—mglenn@hollandhart.com.

**Coordinating Editor:** Judge Christina Finzel Gomez, christina.gomez@judicial.state.co.us

### NOTES

1. *See* 28 USC § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States, . . . except where a direct review may be had in the Supreme Court."); *Cobbledick v. United States*, 309 U.S. 323, 324–25 (1940) ("Finality as a condition of review is an historic characteristic of federal appellate procedure. It was written into the first Judiciary Act, and has been departed from only when observance of it would practically defeat the right to any review at all.") (Footnotes omitted).

2. For a discussion of civil interlocutory appeals in the Colorado appellate courts, *see* Masciocchi and Van Bockern, "Civil Interlocutory Appeals in State Courts," 49 *Colo. Law.* 38 (Oct. 2020), https://cl.cobar.org/features/civil-interlocutory-appeals-in-colorado-state-courts.

3. *Pimentel & Sons Guitar Makers, Inc. v. Pimentel*, 477 F.3d 1151, 1153 (10th Cir. 2007) (quoting *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 84 (1981) (alteration in *Pimentel*).

4. *Id.*

5. *Caddo Nation of Okla. v. Wichita and Affiliated Tribes*, 877 F.3d 1171, 1173 n.1 (10th Cir. 2017). *See also S. Wind Women's Ctr. LLC v. Stitt*, 808 F. App'x 677, 680 (10th Cir. 2020) (unpublished); *Office of Pers. Mgmt. v. Am. Fed'n of Gov't Employees*, 473 U.S. 1301, 1304–05 (1985) (Burger, C.J. in chambers); *Populist Party v. Herschler*, 746 F.2d 656, 661 n.2 (10th Cir. 1984) (per curiam).

6. *Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund*, 500 U.S. 72, 75–76 (1991); *Tooele Cty. v. United States*, 820 F.3d 1183, 1187 (10th Cir. 2016).

7. *See, e.g., Populist Party*, 746 F.2d at 661 n.2.

8. *Duvall v. Keating*, 162 F.3d 1058, 1062 (10th Cir. 1998) (reviewing denial of TRO to block impending execution). *But see S. Wind Women's Ctr.*, 808 F. App'x at 681 (TRO prohibiting enforcement of state executive order postponing non-emergency medical procedures, including abortions, due to COVID-19 pandemic was not appealable under § 1292(a)(1), in part because, unlike Duvall, "[a]ppellants' rights will not be irretrievably lost absent immediate review").

9. *E.g., Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc.*, 874 F.2d 1346, 1351 and n.6 (10th Cir. 1989).

10. *See, e.g., Pimentel*, 477 F.3d at 1154.

11. *Carson*, 450 U.S. at 84 (citations omitted). *See also, e.g., Hutchinson v. Pfeil*, 105 F.3d 566, 569 (10th Cir. 1997); *Keyes v. Sch. Dist. No. 1*, 895 F.2d 659, 663 (10th Cir. 1990). *See generally Hatten-Gonzales v. Hyde*, 579 F.3d 1159, 1167 (10th Cir. 2009) ("[W]e do not foreclose the possibility that a motion may seek to dissolve or modify an injunction in effect without seeking relief in those precise terms.").

12. *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 279 (1988).

13. *United States v. Section 17 Twp. 23 N., Range 22 E.*, 40 F.3d 320, 322–23 (10th Cir. 1994). *See also, e.g., Zou v. Linde Eng'g N. Am., Inc.*, No. 20-5099, 2020 WL 8175757 at *1 (10th Cir. Dec. 2, 2020) ("[T]he magistrate judge's order[,]

which imposes limits on discovery, prohibits further discovery requests absent leave of court, and prohibits further contempt/sanctions motions with respect to discovery, is not considered an injunction and is not appealable under § 1292(a)(1).”), *cert. denied*, No. 20-6882, 2021 WL 1072385 at *1 (U.S. Mar. 22, 2021).

14. *See, e.g., Tri-State*, 874 F.2d at 1353 (exercising pendent jurisdiction over otherwise nonappealable issues connected to interlocutory appeal from denial of an injunction).

15. *Colo. v. Idarado Mining Co.*, 916 F.2d 1486, 1491 (10th Cir. 1990) (declining to exercise pendent jurisdiction in interlocutory appeal from injunctive order, where additional issues were highly factual in nature), *cert. denied*, 499 U.S. 960 (1991).

16. *United States. v. Solco I, LLC*, 962 F.3d 1244, 1250 (10th Cir. 2020) (citation omitted and bracketed numerals in original).

17. *Fed. Trade Comm'n v. Peterson*, 3 Fed. App'x 780, 782 (10th Cir. 2001) (unpublished).

18. 28 USC § 1292(a)(3).

19. *In re Aramark Sports and Entm't Servs., LLC*, 831 F.3d 1264 (10th Cir. 2016).

20. *Id.* at 1275–76.

21. 9 USC § 16(a)(1). *See also, e.g., Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1274, 1278 n.3 (10th Cir. 2017).

22. 12 USC § 1819(b)(2)(C).

23. 28 USC § 1447(d). *See also, e.g., First Union Mortg. Corp. v. Smith*, 229 F.3d 992, 994 (10th Cir. 2000).

24. *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 546 (1949).

25. *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 468 (1978), *superseded by statute on other grounds*.

26. *P.R. Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146–47 (1993).

27. *Mitchell v. Forsyth*, 472 U.S. 511, 524–30 (1985).

28. *Nixon v. Fitzgerald*, 457 U.S. 731, 742–43 (1982).

29. *Osage Tribal Council v. United States Dep't of Labor*, 187 F.3d 1174, 1179–80 (10th Cir. 1999).

30. *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 711–15 (1996).

31. *Cohen*, 337 U.S. at 545–47.

32. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 170–72 (1974). For a more expansive discussion of the collateral order doctrine, *see* Glenn, “Appellate Review of Collateral Orders Under Federal and Colorado Law,” 43 *Colo. Law.* 69 (Dec. 2014).

33. *See* FRAP 4.

34. *See* FRAP 28 to 32, 34.

35. *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 74 (1996).

36. 28 USC § 1292(b).

37. *Id.*

38. *Pelt v. Utah*, 539 F.3d 1271, 1273–74 (10th Cir. 2008).

39. *Kerr v. Hickenlooper*, 744 F.3d 1156, 1162 (10th Cir. 2014), *vacated on other grounds*, 576 U.S. 1079 (2015).

40. *Millsap v. McDonnell Douglas Corp.*, 368 F.3d 1246, 1247–48 (10th Cir. 2004); *Kidneigh v. UNUM Life Ins. Co of Am.*, 345 F.3d 1182, 1184 (10th Cir. 2003).

41. *Lusk v. Ryder Integrated Logistics*, 238 F.3d 1237, 1238 (10th Cir. 2001).

42. *Trigalet v. City of Tulsa*, 239 F.3d 1150, 1150–51 (10th Cir. 2001).

43. 28 USC § 1292(b).

44. FRAP 5(a)(3).

45. FRCP 23(f).

46. *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1189 (10th Cir. 2006).

47. *See Rivera v. Exeter Fin. Corp.*, No. 19-704, Order (10th Cir. Jan. 29. 2020), *denial of certification aff'd*, 829 F. App'x 887 (10th Cir. 2020) (unpublished); *Chaparral Energy LLC v. Naylor Farms Inc.*, No. 17-601, Order (10th Cir. June 7, 2017); *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 913 (10th Cir. 2018); *Soseeah v. Sentry Ins.*, 808 F.3d 800, 803, 807 (10th Cir. 2015).

48. *Vallario v. Vandehey*, 554 F.3d 1259, 1263–64 (10th Cir. 2009) (citations omitted).

49. FRCP 23(f).

50. *Nutraceutical Corp. v. Lambert*, __ U.S. __, 139 S.Ct. 710, 714 (2019).

51. *Id.* at 715 (holding that court of appeals could not extend deadline as equitably tolled); FRAP 26(b)(1) (“the court [of appeals] may not extend the time to file . . . a petition for permission to appeal”). *See also Delta Airlines v. Butler*, 383 F.3d 1143, 1145 (10th Cir. 2004) (district court lacked authority to extend time period and FRAP 26(b)(1) “specifically foreclose[s] appellate courts from granting an extension of time to file a petition for permission to appeal”).

52. *Carpenter*, 456 F.3d at 1191–92 (decided under FRCP's 23(f) previous 10-day deadline).

53. *Id.* at 1190–92.

54. 28 USC § 1447(d).

55. This exception does not apply to certain securities and corporate governance class actions. 28 USC § 1453(d).

56. 28 USC § 1453(c)(1).

57. 28 USC § 1453(c)(2).

58. *See Pritchett v. Office Depot, Inc.*, 420 F.3d 1090, 1093 (10th Cir. 2005).

59. 28 USC § 1453(c)(3)(A).

60. 28 USC § 1453(c)(3)(B).

61. 28 USC § 1453(c)(4).

62. *Swint v. Chambers Cty. Comm'n*, 514 U.S. 35 (1995).

63. *Id.* at 51.

64. *Moore v. City of Wynnewood*, 57 F.3d 924, 929–30 (10th Cir. 1995) (exercising pendent appellate jurisdiction over city's appeal from denial of summary judgment on state law claim, which was inextricably intertwined with police chief's permissible appeal (under the collateral order doctrine) from denial of qualified immunity on federal civil rights claim). *But see Estate of Ceballos v. Husk*, 919 F.3d 1204, 1221 (10th Cir. 2019) (distinguishing *Moore* and declining to exercise pendent jurisdiction where issues raised in city's appeal from denial

of summary judgment on inadequate training claim “do no[t] overlap with the issue Officer Husk permissibly raised in his interlocutory appeal”).

65. *Moore*, 57 F.3d at 930.

66. *United Transp. Union Local 1745 v. City of Albuquerque*, 178 F.3d 1109, 1114 (10th Cir. 1999).

67. *Stewart v. Okla.*, 292 F.3d 1257, 1260 (10th Cir. 2002), *cert. denied sub nom., Okla. Dep't of Corrs. v. Stewart*, 537 U.S. 1104 (2003).

68. FRAP 5(b), (c); 10th Cir. R. 5.1. Responses, cross-petitions, and replies are all optional—not mandatory. FRAP 5(b)(2).

69. FRAP 5(a)(2).

70. *See supra* note 51.

71. FRAP 5(b)(3).

72. FRAP 5(d)(2).

73. 28 USC § 1651(a).

74. *In re Antrobus*, 519 F.3d 1123, 1124 (10th Cir. 2008) (citations omitted).

75. *Pacificare of Okla., Inc. v. Burrage*, 59 F.3d 151, 153 (10th Cir. 1995) (internal quotation marks and citation omitted).

76. *E.g., Clyma v. Sunoco, Inc.*, 594 F.3d 777, 782–83 (10th Cir. 2010); *Sheet Metal Workers Int'l Ass'n, AFL-CIO v. Seay*, 693 F.2d 1000, 1005–06 (10th Cir. 1982), *reh'g denied and op. modified*, 696 F.2d 780 (10th Cir. 1983).

77. FRAP 21; 10th Cir. R. 21.1.

78. *See Cheney v. Dist. Ct.*, 542 U.S. 367, 378–79 (2004) (in dictum, assuming that laches may apply to a petition).

79. FRAP 21(a), (d).

80. FRAP 21(b)(1).

81. FRAP 21(b)(6).

# Exhibit 22

LII > U.S. Constitution Annotated > Article III. Judicial Branch > Section II > Clause I > Ripeness
> Overview of Ripeness Doctrine

## ArtIII.S2.C1.7.1 Overview of Ripeness Doctrine

Article III, Section 2, Clause 1:

> The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority;—to all Cases affecting Ambassadors, other public Ministers and Consuls;—to all Cases of admiralty and maritime Jurisdiction; to Controversies to which the United States shall be a Party;—to Controversies between two or more States; between a State and Citizens of another State, between Citizens of different States,—between Citizens of the same State claiming Lands under Grants of different States, and between a State, or the Citizens thereof, and foreign States, Citizens or Subjects.

Like the other justiciability doctrines, the ripeness doctrine defines the limits of a federal court's jurisdiction to adjudicate certain disputes.[1] Ripeness concerns "the timing of judicial intervention," and prevents federal courts "from entangling themselves in abstract disagreements" by adjudicating disputes too early.[2] Any party to the litigation—as well as the judge—may challenge a case as unripe at any stage in the litigation, including for the first time on appeal.[3] To determine whether a particular dispute is ripe for judicial resolution, courts employ the Abbott Laboratories test, named after the Supreme Court's decision in Abbott Laboratories v. Gardner.[4] The Abbott Laboratories standard requires courts to evaluate two factors to determine whether a dispute is ripe: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration" until a later time.[5] A claim may be unripe if it is based upon future events that may not occur as predicted or at all.[6] If waiting to decide a case would put the court in a better position to resolve the dispute, such as when further factual development would help the court adjudicate the case, the case may be unripe and therefore nonjusticiable.[7] As discussed below, ripeness issues arise in a wide variety of contexts, including challenges to administrative agencies' actions or policies and pre-enforcement challenges to criminal statutes.[8]

The ripeness doctrine stems partly from Article III's constitutional command that the federal courts only hear "Cases" and "Controversies."[9] To the extent that ripeness derives from Article III of the Constitution, it overlaps with other justiciability doctrines that are also derived from the "Case" or "Controversy" requirement, especially the standing doctrine.[10] Thus, in recent years, the Supreme Court has increasingly recognized that because standing and ripeness are based on the same constitutional limitations on the federal courts' jurisdiction, they frequently "boil down to the same question."[11] In particular, the Supreme Court has observed that the standing doctrine's temporal inquiry into whether the plaintiff has suffered an imminent injury overlaps substantially with the ripeness doctrine's inquiry into whether withholding judicial consideration of a dispute would cause "the parties a sufficient 'hardship.'"[12]

In addition to its constitutional dimension, the ripeness doctrine is also partly based on prudential considerations that do not directly derive from the Constitution.[13] The Supreme Court has recognized that, even when Article III of the U.S. Constitution does not forbid a court from deciding an issue, it may nonetheless be appropriate for courts to postpone adjudicating that issue because subsequent events may make it easier or unnecessary to resolve that dispute.[14] Thus, to determine whether a case is ripe for adjudication, the court must assess not only whether the case is presently justiciable within the meaning of Article III's case or controversy requirement, but also whether it would be prudent to decide the case at the present time.[15] The Supreme Court, however, has not squarely articulated which aspects of the ripeness doctrine are mandated by the Constitution and which are instead based solely on prudential concerns.[16] Moreover, as explained in greater detail below, the Supreme Court has recently questioned the continuing vitality of the ripeness doctrine's prudential dimension.[17] As a result, presently it is unclear whether—and, if so, when—federal courts should dismiss a case as prudentially unripe.

**1** Footnotes
See, e.g., Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 670 n.2 (2010) ( "Ripeness reflects constitutional considerations that implicate 'Article III limitations on judicial power,' as well as 'prudential reasons for refusing to exercise jurisdiction.'" ) (quoting Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)). ⏎

**2** Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568, 580 (1985) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977)). See also Renne v. Geary, 501 U.S. 312, 320 (1991) ( "Justiciability concerns not only the standing of litigants to assert particular claims, but also the appropriate timing of judicial intervention." ); Anderson v. Green, 513 U.S. 557, 559 (1995) (per curiam) (

"[R]ipeness is peculiarly a question of timing." ) (quoting Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 140 (1974)); Buckley v. Valeo, 424 U.S. 1, 114 (1976) (per curiam) (same). Statutory and other non-constitutional restrictions may limit the appropriate timing of judicial intervention as well. *See, e.g.*, Woodford v. Ngo, 548 U.S. 81, 88–89 (2006) ( "[N]o one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." ) (quoting McKart v. United States, 395 U.S. 185, 193 (1969)); Dalton v. Specter, 511 U.S. 462, 469 (1994) (holding that, as a general matter, only "final agency action[s]" are subject to judicial review under the Administrative Procedure Act) (quoting 5 U.S.C. § 704). ⤴

**3** *E.g.*, DBSI/TRI IV Ltd. P'ship v. United States, 465 F.3d 1031, 1038 (9th Cir. 2006) ( "[R]ipeness [is a] jurisdictional issue[ ] that may be raised at any time, even for the first time on appeal." ); Utah v. U.S. Dep't of Interior, 210 F.3d 1193, 1196 n.1 (10th Cir. 2000) (similar). *See also* Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003) ( "[T]he question of ripeness may be considered on a court's own motion." ). ⤴

**4** 387 U.S. 136. ⤴

**5** Nat'l Park Hosp. Ass'n, 538 U.S. at 808. *See also, e.g.*, Stolt-Nielsen S.A., 559 U.S. at 670 n.2 (same); Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998) (same); Texas v. United States, 523 U.S. 296, 300–01 1998); Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 201 (1983) (same).

**6** *See* Texas, 523 U.S. at 300 ( "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" ) (quoting Thomas, 473 U.S. at 580–81). *See also* Trump v. New York, No. 20-366, slip op. at 4 (U.S. Dec. 18, 2020) (applying this rule). ⤴

**7** *See, e.g.*, Nat'l Park Hosp. Ass'n, 538 U.S. at 812 ( "[F]urther factual development would 'significantly advance our ability to deal with the legal issues presented.'" ) (quoting Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 82 (1978)); Ohio Forestry Ass'n, 523 U.S. at 737 (same); Webster v. Reprod. Health Servs., 492 U.S. 490, 506 (1989) ( "It will be time enough for federal courts to address the meaning of the preamble [to the challenged statute] should it be applied to restrict the activities of appellees in some concrete way." ).

**8** *See* ArtIII.S2.C1.7.1 Overview of Ripeness Doctrine through ArtIII.S2.C1.7.10 Continuing Vitality of Ripeness Doctrine. ⤴

**9** *See* U.S. Const. art. III, § 2, cl. 1. *See also, e.g.*, Trump, No. 20-366, slip op. at 3–4 (explaining that the ripeness doctrine "originat[es] in the case-or-controversy requirement of Article III" ); Stolt-Nielsen S.A., 559 U.S. at 670 n.2 ( "Ripeness reflects constitutional considerations that implicate 'Article III limitations on judicial power.'" ) (quoting Reno v. Catholic Soc. Servs., Inc., 509 U.S. 43, 57 n.18 (1993)); Blanchette v. Conn. Gen. Ins. Corps., 419 U.S. 102, 138 (1974) ( "Issues of ripeness involve, at least in part, the existence of a live 'Case or Controversy.'" ).

**10** *See* Warth v. Seldin, 422 U.S. 490, 499 n.10 (1975) ( "The standing question thus bears close affinity to questions of ripeness—whether the harm asserted has matured sufficiently to warrant judicial intervention." ); Trump, No. 20-366, slip op. at 3–4 (describing standing and ripeness as "related doctrines" ); DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352 (2006) ( "The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does." ). *See generally* ArtIII.S2.C1.6.1 Overview of Standing through ArtIII.S2.C1.11.6 Supplemental Jurisdiction (analyzing the various justiciability doctrines).

**11** MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 128 n.8 (2007) (quoting Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992)); Susan B. Anthony List v. Driehaus, 573 U.S. 149, 157 n.5 (2014) (similar); Trump, No. 20-366, slip op. at 7 (dismissing case on both standing and ripeness grounds). ⤴

**12** MedImmune, 549 U.S. at 128 n.8 (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 149 (1967), *abrogated on other grounds by* Califano v. Sanders, 430 U.S. 99 (1977)).*See* ArtIII.S2.C1.6.1 Overview of Standing (discussing the standing doctrine's imminent injury requirement); Lujan, 504 U.S. at 560 (applying that requirement).

**13** Duke Power Co. v. Carolina Envtl. Study Grp., Inc., 438 U.S. 59, 82 (1978). *See also, e.g.*, Nat'l Park Hosp. Ass'n v. Dep't of Interior, 538 U.S. 803, 808 (2003) ( "The ripeness doctrine is 'drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction.'" ) (quoting Reno, 509 U.S. at 57 n.18).

**14** *See, e.g.*, Suitum v. Tahoe Reg'l Planning Agency, 520 U.S. 725, 733 n.7 (1997) ( "The agency does not question that Suitum properly presents a genuine 'case or controversy' sufficient to satisfy Article III, but maintains only that Suitum's action fails to satisfy our prudential ripeness requirements." ); Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 735 (1998) ( "The ripeness doctrine reflects a judgment that the disadvantages of premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of . . . postimplementation litigation." ). ⤴

**15** *See, e.g.*, Duke Power, 438 U.S. at 81 (concluding that the case presented a ripe "Case or Controversy" as a constitutional matter, and that "[t]he prudential considerations embodied in the ripeness doctrine also argue[d] strongly for a prompt resolution of the claims presented" ). ⤴

**16** *See, e.g.*, Armstrong World Indus., Inc. *ex rel.* Wolfson v. Adams, 961 F.2d 405, 411 n.12 (3d Cir. 1992) (observing that "[t]he Supreme Court itself has not been consistent" with respect to the constitutional and prudential aspects of ripeness). ⤴

**17** ArtIII.S2.C1.6.1 Overview of Standing through ArtIII.S2.C1.11.6 Supplemental Jurisdiction. ⤴

**261**

# Exhibit 23

520 F.2d 255 (1975)

**Fred LOWENSCHUSS, Trustee for Fred Lowenschuss Associates Pension Plan, Individually and on behalf of all other persons and shareholders of Great Atlantic & Pacific Tea Co., Inc. who are similarly situated, Plaintiff-Appellant,**

**v.**

**W. J. KANE et al., Defendants-Appellees,**
**Rachel C. Carpenter, Appellant.**

Nos. 497, 498, Dockets 74-2156, 74-2216.

**United States Court of Appeals, Second Circuit.**

Argued February 27, 1975.
Decided May 27, 1975.

258    *256 *257 *258 Charles Sovel, New York City (Abraham E. Freedman, New York City, Fred Lowenschuss, William D. Parry, Robert P. Snyder, Fred Lowenschuss Associates, Philadelphia, Pa., of counsel), for plaintiff-appellant.

Milton Paulson, New York City, for appellant Carpenter.

John A. Guzzetta, New York City (Bernhardt K. Wruble, Anthony E. Satula, Jr., Dennis G. Jacobs, Simpson Thacher & Bartlett, New York City, of counsel), for defendants-appellees Gulf & Western Industries, Inc. and C. G. Bluhdorn.

Mark I. Fishman, New York City (William E. Willis, Sullivan & Cromwell, New York City, of counsel), for defendant-appellee Kidder, Peabody & Co., Inc.

Before MANSFIELD, OAKES and TIMBERS, Circuit Judges.

MANSFIELD, Circuit Judge:

The central issue on this appeal is whether a stockholder who has tendered his shares in response to a tender offer may recover damages from the offeror for failure to consummate the transaction where the failure is attributable to the intervening issuance by the court of a preliminary injunction barring the proposed acquisition. We must also decide whether genuine issues of material fact were presented which precluded summary judgment dismissing the shareholders' complaint.

Plaintiff Fred Lowenschuss is a shareholder of Great Atlantic & Pacific Tea Co., Inc. ("A & P") who tendered A & P shares to Gulf & Western Industries, Inc. ("G & W") in response to G & W's tender offer for A & P shares, announced on February 2, 1973. On February 15, 1973, after the issuance of a preliminary injunction barring consummation of the tender offer, he brought a class suit on behalf of himself and all similarly situated A & P shareholders against A & P and certain of its officers and directors, G & W and its chief operating officer, C. G. Bluhdorn, and the dealer-manager of the tender offer, Kidder, Peabody & Co., Inc., alleging breach by G & W of the tender offer contract allegedly resulting from his tender and violation

259    of the antifraud provision of the Williams Act, § 14(e), 15 U.S.C. § 78n(e),[1] by all defendants. The A & P *259 defendants were dismissed from the action without prejudice by stipulation entered July 16, 1973.

The instant proceeding is an appeal by Lowenschuss and by another tendering shareholder, Rachel C. Carpenter, who intervened in the proceedings, from an order of the United States District Court for the Southern District of New York, Kevin T. Duffy, *Judge,* entered on May 10, 1974, and supported by an opinion dated July 25, 1973, 367 F.Supp. 911 (S.D.N.Y.1973). Judge Duffy permitted Lowenschuss to maintain the action as a class suit pursuant to Rule 23, F.R. Civ.P., granted summary judgment dismissing the complaint as to all remaining defendants and denied plaintiff's motion for summary judgment. Only the latter two portions of Judge Duffy are challenged on this appeal, with both plaintiff and the intervenor arguing that summary judgment for defendants was inappropriate at this stage of the proceedings because of the existence of genuine questions of material fact, that the complaint properly stated two causes of action and that the motion of plaintiff class for summary judgment was improperly denied. We agree with appellants' first two contentions and hold, for the reasons set forth below, that the complaint does state a cause of action against G & W in contract and against all defendants under the Williams Act, and that summary judgment was improperly granted because of the existence of questions of material fact concerning both causes of action.

This is the second time that litigation arising from G & W's tender offer of February 2, 1973, has been before this Court. In a previous opinion, Gulf & Western Industries, Inc. v. Great A. & P. Tea Co., Inc., 476 F.2d 687 (2d Cir. 1973), this court (per Timbers, *C. J.*) affirmed Judge Duffy's decision of February 13, 1973, reported at 356 F.Supp. 1066 (S.D. N.Y.1973), granting a preliminary injunction against the consummation of the tender offer after concluding that A & P had demonstrated a probability of success in proving Williams Act and antitrust violations. Since the facts surrounding the tender offer and the issuance of the preliminary injunction are set out fully in that previous opinion, they will only be briefly summarized here.

The tender offer was announced by G & W on February 1, 1973, and communicated to the public on the following morning. G & W offered to purchase up to 3,750,000 shares of A & P common stock (15% of A & P's outstanding shares) at $20 per share net. Upon learning of the offer Lowenschuss decided to purchase 2,000 shares of A & P stock at 18 5/8 on behalf of a pension plan for which he is trustee.[2] His acknowledged intention was to purchase the A & P shares and tender them to G & W.

On that same morning, February 2, 1973, A & P's management decided to oppose the G & W tender offer. It issued a press release stating its intentions and giving reasons, which was carried over the stock exchange ticker tape. Lowenschuss learned of this action shortly thereafter and attempted to cancel his purchase order. He soon rescinded this cancellation,

260    however, when he had satisfied himself that the litigation could not constitute grounds for refusal of his tender or for rescission of the offer, *260 since the tender offer terms did not include a "litigation-out" clause.[3] He eventually tendered his 2,000 shares to G & W on February 13, 1973, the last day upon which tender was permissible under G & W's offer.

In the meantime litigation was instituted on February 5, 1973, by G & W against A & P alleging that A & P had made false and misleading statements in the course of its opposition to the tender offer, in violation of §§ 10(b), 14(d) and 14(e) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. §§ 78j(b), 78n(d) and 78n(e). A & P counterclaimed, seeking preliminary injunctive relief and alleging that G & W's proposed acquisition of A & P stock would violate § 1 of the Sherman Act, 15 U.S.C. § 1, and § 7 of the Clayton Act, 15 U.S.C. § 18, and that G & W's tender offer was in violation of §§ 14(d) and 14(e) of the 1934 Act, as amended. Following an expedited hearing upon the application for injunctive relief, Judge Duffy preliminarily enjoined the consummation of the tender offer on February 13, 1973, for substantially the reasons set out in A & P's counterclaim.

Upon an expedited appeal to this court we, on March 12, 1973, affirmed the grant of preliminary injunctive relief, holding that A & P had made probable demonstrated probability of success in proving (1) that G & W's acquisition of A & P stock would result in a substantial decrease in competition in violation of § 7 of the Clayton Act because of market foreclosure,[4] and (2) that G & W had violated § 14(e) of the 1934 Act, as amended, by failing to disclose (a) G & W's intention to acquire a controlling position in A & P or at least to exercise influence over A & P's management and policies and (b) G & W's conglomerate holdings in food processors and distributors which indicated that its acquisition of A & P stock would probably result in violation of the antitrust laws by both companies. See 476 F.2d at 693-97. Mr. Lowenschuss filed an *amicus curiae* brief on that appeal on behalf of the tendering shareholders, arguing that completion of the transaction should be allowed.

261    On March 16, 1973, immediately after our decision affirming the issuance of the preliminary injunction, G & W announced that the offer would be extended *261 to June 16, 1973, pending the progress of the litigation and that no new shares would be accepted. It reiterated that all tendered shares could be withdrawn on or after March 14, 1973. While we had indicated in our opinion that trial of the case should proceed at an accelerated pace, the parties evidently determined that trial preparation and trial would be too burdensome. On May 29 they agreed to stay discovery, with district court approval, for a period of 45 days. That period was subsequently extended on July 19. The tender offer, after being extended into the summer, was finally withdrawn on July 25, 1973, the date on which the district court issued its opinion granting summary judgment herein.

The instant litigation was commenced in the Eastern District of Pennsylvania on February 15, 1973, two days after Judge Duffy preliminarily enjoined the tender offer. It was ordered transferred to the Southern District on defendants' motions on April 2, 1973. None of the present defendants answered the complaint before or after transfer, choosing instead to move in June, 1973, for dismissal on the ground that no cause of action had been stated. Plaintiff Lowenschuss subsequently cross-moved for summary judgment. Judge Duffy disposed of the motions in his opinion of July 25, 1973, granting a pending motion for class determination, but dismissing the complaint on the merits. For reasons which do not concern us here a final order granting judgment on the basis of the July 25 opinion was not entered until May 10, 1974.

Diverse reasons were given by the district court for dismissal of the action. First, the complaint was interpreted to state only a claim for breach of contract. Since Williams Act claims were presented in another class action brought by Lowenschuss against the same defendants, Judge Duffy held that they were not encompassed within the complaint in this suit. With the action thus limited to contract claims, the district court found that, assuming a binding contract between G & W and the tenderor as a result of a tender pursuant to the terms of the offer, G & W was excused from performance because the preliminary injunction issued thereafter made it both impossible and illegal to consummate the transaction. Moreover, the court found that the plaintiff class had suffered no damages cognizable at law. The complaint as to Kidder, Peabody was dismissed on the ground that it was not a party to the contract allegedly breached. Plaintiffs attack essentially every aspect of the district court opinion on this appeal.

## DISCUSSION

Before analyzing the issues we must emphasize this appeal's peculiar procedural posture. None of the defendants has answered the complaint, having preferred to move for dismissal under Rule 12(b)(6), F.R.Civ.P. Nor did any of the defendants request the summary judgment granted below. The only summary judgment motion was made by plaintiff Lowenschuss.

We have sanctioned a *sua sponte* award by the court of summary judgment to a non-moving party where it appeared from the papers, affidavits and other proofs submitted by the parties that there were no disputed issues of material fact and that judgment for the non-moving party would be appropriate as a matter of law. Local 33, Int'l Hod Carriers Union v. Mason Tenders Dist. Council, 291 F.2d 496, 505 (2d Cir. 1961). However, as in the case of cross-motions for summary judgment, a moving party's failure to establish that the facts are undisputed does not entitle the non-moving party to summary judgment. American Manufacturers Mutual Ins. Co. v. American Broadcasting-Paramount Theatres, Inc., 388 F.2d 272, 279 (2d Cir. 1967), cert. denied, 404 U.S. 1063, 92 S.Ct. 737, 30 L.Ed.2d 752 (1972). Nor is a cross-motion for dismissal of the complaint for insufficiency on its face necessarily to be 262 treated as a motion for summary judgment, at least without giving *262 all parties a full opportunity to present pertinent matters dehors the pleadings. A complaint will be dismissed for insufficiency only upon a showing that plaintiff could prove no facts entitling him to relief, Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), rather than because of the absence of any material factual issue, which is essential to a grant of summary judgment.

Because of this procedural posture, we must be careful, in analyzing the award of summary judgment, not to assume that plaintiff's failure to submit affidavits or other proofs on a particular issue means that it was not genuinely disputed. Plaintiff has been faced with no contentions concerning the undisputed character of the facts and understandably has not put in any affidavits or other proofs to establish his version. Therefore, the absence of any offer of proof by one or all parties on factual issues that we deem to be material and genuine should not imply that the matter is undisputed, but merely that it has not yet been resolved.

Turning first to the question of whether the district court properly construed the complaint as stating only a contract claim, the bulk of the complaint's allegations were unquestionably aimed at A & P and its management for alleged wrongdoing in connection with opposition to the tender offer. Once A & P's position was upheld by this court's affirmance of the preliminary injunction, these contentions, of course, became unsupportable and the action as to A & P was dropped. There remained allegations with respect to G & W, Bluhdorn and Kidder, Peabody which undisputably asserted a claim for breach of contract. In addition there were some allegations, admittedly sketchy, which were apparently made in support of a portion of the caption describing the suit as one arising under the "Securities Act of 1933" and the "Securities Exchange Act of 1934 and Rules Promulgated Thereunder," with jurisdiction invoked on the basis of that legislation. The complaint (Par. 22) charges that G & W and its chief operating officer Bluhdorn "warranted to the general public that the purchase of the 3,750,000 shares in question was for investment purposes and that said defendants had complied with all laws, rules and regulations pertaining to said tender offer and that there were no legal impediments to the purchase of said shares from the general public." (App. 13a).

These allegations of violation of our federal securities laws are indeed extremely general and obviously vulnerable to attack for lack of the particularity required by Rule 9(b), F.R.Civ.P., especially in the absence of any allegations of scienter or fraudulent intent, see Felton v. Walston and Co., Inc., 508 F.2d 577 (2d Cir. 1974); Segal v. Gordon, 467 F.2d 602 (2d Cir. 1972); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442 (2d Cir. 1971); but cf. Schlick v. Penn-Dixie Cement Corp., 507 F.2d 374, 378-79 (2d Cir. 1974), cert. denied, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). However, dismissal of the complaint on such grounds would not necessarily be final, as was the order here, but could be without prejudice to the filing of an amended complaint specifying the facts forming the basis of the claims of fraud, cf. Felton v. Walston and Co., Inc., *supra*; Mooney v. Vitolo, 435 F.2d 839 (2d Cir. 1970). In our view sufficient notice was given of the plaintiff's claim and the grounds upon which it rested, see Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), to entitle plaintiff to amend, cf. Schlick v. Penn-Dixie Cement Corp., *supra*.

In dismissing the complaint Judge Duffy did not proceed on the basis that the complaint could under no circumstances be construed as alleging a Williams Act claim. He noted that "[i]f this were the only action filed by this plaintiff, I might consider that it could be construed as including the Williams Act claims," 367 F.Supp. at 913 n.2. He based his dismissal on the 263 mistaken impression that another action filed by Lowenschuss in the Eastern District of Pennsylvania, which had also been transferred *263 to the Southern District of New York, where it is pending before Judge Duffy, had been brought on behalf of the same plaintiff class against the same defendants arising out of the same conduct and would therefore permit the Williams Act claims to be adjudicated separately in that action as to all parties. However, an examination of the pleadings in the two cases reveals that the classes sought to be represented, while overlapping, are not the same[5] and that adjudication in one action, therefore, would not be dispositive as to all class members. Under these circumstances the proper course was to permit Lowenschuss to pursue his Williams Act claims in the present action rather than dismiss them entirely. We have no doubt that Judge Duffy would have reached this result if he had known the true nature of the two actions.[6] Otherwise he would face the necessity of permitting amendment of the other complaint to make the plaintiff classes co-extensive. Since, as we hold below, it was error to have dismissed the breach of contract claim from the complaint in the present action, it is clear that the present action provides as suitable a vehicle as the other for adjudication of the Williams Act claims, with consolidation of both suits likely as the most expeditious means of disposing of the actions.

Furthermore, both we and the district court concluded in G & W v. A & P that there appeared to be a reasonable probability that A & P would succeed in proving the Williams Act claims, which were discussed in detail both there and in defendants' briefs in this action. Thus defendants appear to be aware of the nature of the claims and have not shown any prejudice to themselves as a result of the lack of specificity in Lowenschuss' complaint. Under these circumstances we are satisfied that sufficient notice of the Williams Act claims was given to permit their being pursued here. See Rule 8(f), F.R.Civ.P.; Maty v. Grasselli Chemical Co., 303 U.S. 197, 200-01, 58 S.Ct. 507, 82 L.Ed. 745 (1938) (per curiam); Levenson v. B & M Furniture Co., Inc., 120 F.2d 1009 (2d Cir. 1941). Should Lowenschuss fail, in response to the court's order, to particularize his fraud claims as required by Rule 9(b), F.R.Civ.P., his complaint would then be dismissible without leave to amend. See Felton v. Walston and Co., Inc., *supra*.

Kidder, Peabody further contends that there can be no cause of action against it under the Williams Act both because of the minor role it played in the tender offer as dealer-manager and because there are insufficient allegations in the complaint to state a claim against it as an aider and abettor. Since we have already held that Lowenschuss has given sufficient notice to permit him to pursue his Williams Act claims in the present action, subject to dismissal if he should fail to satisfy the particularity requirements of Rule 9(b), the latter argument 264 must be rejected. As to the former, Kidder, Peabody relies upon a footnote in Chris-Craft Industries, Inc. v. *264 Piper Aircraft Corp., 480 F.2d 341, 373 n.27 (2d Cir.), cert. denied, 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973), which indicates that an investment banker merely providing services to a defendant but not involved in the decisions that led to the securities laws violations could not be held liable under § 14(e) for those violations.

Assuming this to be the rule, Kidder, Peabody cannot take advantage of it at this point in the litigation. Although there was no showing that Kidder, Peabody knew or had reason to know of any infraction, its involvement in the tender offer was never the subject of a hearing, was never raised in conjunction with any summary judgment motion and was never explained or denied in any affidavits. The only "evidence" on the issue is the assertion in its own brief (unsupported by affidavits) and in Judge Duffy's statement in the original preliminary injunction proceeding (to which plaintiffs were not parties) that there was no showing that Kidder, Peabody had acted as anything but a stockbroker for G & W. Neither this court nor the district court can resolve this factual issue, i.e., the nature and extent of Kidder, Peabody's involvement, by summary judgment upon such a meagre and conflicting record. In addition, as

**264**

explained above, plaintiff has had no reasonable opportunity to present proof as to Kidder, Peabody's involvement because there was never a contention that its non-involvement was undisputed. Kidder, Peabody cannot, therefore, be dismissed from the action at this time.

## CONTRACT CLAIM

Turning to the complaint, plaintiff's most clearly defined claim is that G & W's tender offer was a unilateral offer which the class members accepted by tendering their shares, thus creating a binding contract requiring G & W to purchase the tendered shares under the terms of the tender offer. This contract was allegedly breached by G & W when it failed to purchase the properly tendered shares, thereby damaging the plaintiff class.

The tender offer reveals significant support for this position. The offer was in firm and specific written terms, beginning with the unambiguous statement that G & W "hereby offers to purchase 3,750,000 shares of Common Stock" of A & P. There was no requirement that a minimum number of shares be tendered before the obligation to purchase would be triggered nor were there any other terms which would relieve G & W of this obligation upon the occurrence or non-occurrence of any event. The only possible modification of G & W's obligation to purchase was a clause which required that G & W purchase shares on a pro rata basis if more than 3,750,000 were tendered by February 13, 1973. There is no evidence that this clause ever became applicable. In addition, the offer specifically stated that delivery of the Letter of Tender to the Depositary would create an agreement between G & W and the tenderor under the terms of the offer.[7] There was no requirement that the tender be accepted by G & W and we cannot imply one. Finally, the offer stated that all shares tendered by February 13, 1973, would be accepted, making the offer irrevocable until that date, see N.Y. General Obligations Law, § 5-1109, McKinney's Consol. Laws, c. 24-A.

265 The view that these events gave rise to a binding contract is supported by *265 respected authority.[8] Williston recites the rule as follows:

"The terms of the offer generally state that holders of a specified number of shares, or a stated percentage of the stock outstanding, shall agree, before a set date, to sell their stock to the purchaser for a certain price. Acceptance by the owners of the requisite number of shares, in accordance with the terms of the offer, is the condition which must happen before the duty of payment, i.e., of immediate performance, arises. *Upon the fulfillment of the condition, however, the contract is binding and enforceable.*"

8 Williston on Contracts § 948C, at 152 (3d ed. 1964) (footnote omitted) (emphasis added); see R. E. Crummer & Co. v. Nuveen, 147 F.2d 3, 5-6 (7th Cir. 1945); Levenburg v. Merrill, Lynch, Pierce, Fenner & Beane, 334 Mich. 508, 54 N.W.2d 626 (1952). There having been no condition that a minimum number or percentage of shares must be tendered, a binding and enforceable contract arose simply upon tender. Accordingly we find that a binding contract between G & W and the tenderor under the terms of the tender offer was created upon proper tender.[9]

Lacking a "litigation-out" clause, G & W, in an effort to avoid the contracts that resulted from the tenders, advances several legal theories for excusing it from performance. First, invoking the doctrine of impossibility, it argues that affirmance of the preliminary injunction made performance of the offer impossible as a practical matter. The district court accepted this argument, finding that the impossibility attributable to the injunction was not caused by G & W.

We agree that the preliminary injunction affirmed by this court probably rendered performance by G & W impossible for all practical purposes. Such an injunction is not in a formal sense final. However, in view of the large amount of time and money usually required to attack it and the consequent tie-up of the offeror's capital, such an attack generally may be viewed as an impractical venture. Thus, we are prepared for present purposes to hold that these circumstances give rise to "impossibility" as that term is defined in the Restatement of Contracts § 454 (1932), which includes "impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."

G & W's "defense" of impossibility should not necessarily be sustained at this stage in the proceedings, however. ==Impossibility caused by a judicial order prohibiting performance will excuse a party's performance only if the fault of the party owing performance did not contribute to the order.== See Kama Rippa Music, Inc. v. Schekeryk, 510 F.2d 837, 842-43 (2d Cir. 1975); Seedman v. Friedman, 132 F.2d 290, 296-97 (2d Cir. 1942); Frenchman & Sweet, Inc. v. Philco Discount Corp., 21 A.D.2d 180, 249 N.Y.S.2d 611 (1964); Restatement of Contracts §§ 457 & 458 (1932); 10 N.Y. Jurisprudence § 373, at 362 (1960). Here plaintiff contends that the injunction resulted from defendants' own conduct. Resolution of the defense
266 of impossibility requires an examination into the conduct of the party pleading the defense in order to determine the presence or absence of such fault. In all but the clearest *266 cases this will involve issues of fact that must be resolved by the district court only after the parties have had adequate opportunity to investigate and present their evidence.

The present record reveals that the district court improperly resolved or ignored genuine issues of material fact in finding that G & W's fault did not contribute to the issuance of the preliminary injunction. The court found that the possible antitrust violation, which was one reason for the preliminary injunction, could not be attributed to any party's fault, but was simply "the result of the juxtaposition of facts which were not intentionally incurred by defendants." This ignores the real issues as to fault. Although G & W cannot be blamed for the mere existence of facts which would prevent consummation of the tender offer, it may be blamed for making the tender offer with knowledge of facts that would entitle the target company to injunctive relief on antitrust grounds. In that event knowledge of its vulnerability to injunctive relief would bar G & W from later pleading the resulting injunction as an impossibility defense. The issue of G & W's knowledge in the present case is therefore one of material fact precluding summary judgment. See, e.g., Harwell v. Growth Programs, Inc., 451 F.2d 240, 245 (5th Cir. 1971), cert. denied, 409 U.S. 876, 93 S.Ct. 126, 34 L.Ed.2d 129 (1972).

Similarly, since the injunction was grounded in part upon G & W's failure to disclose its intention to acquire dominance over A & P and its failure to disclose its holdings in other companies which would have indicated that G & W's acquisition of A & P stock was likely to result in antitrust violations, proof that G & W knew of these undisclosed facts would preclude its availing itself of the injunction as an impossibility defense.

The same principles govern G & W's possible interposition of a defense, alluded to by the parties in their briefs, that the tender offer contract was illegal. Under the doctrine of illegality a party to an unlawful bargain cannot recover damages for its breach. Restatement of Contracts § 598 (1932). Where the illegality of the bargain, however, arises from facts which are known to one party but are justifiably unknown to the other, an important exception to the rule holds that illegality will not bar a suit by the ignorant party for damages for breach. Restatement of Contracts § 599 (1932). Assuming that the bargain here was rendered illegal by reason of facts known to G & W (e.g., the likelihood of antitrust violations) but not reasonably expected to be known to plaintiff, G & W would not be excused from performance by reason of illegality.

To resolve the issues of impossibility and illegality, plaintiff is entitled to his day in court. It was error for the district court to hold that plaintiff's mere knowledge of the institution of litigation before tender amounted to knowledge of the actual facts causing impossibility or illegality, thus estopping plaintiff from contesting these affirmative defenses. There is no evidence that plaintiff had knowledge of the actual facts underlying the litigation. Indeed, some members of the plaintiff class such as Mrs. Carpenter, intervenor here, might not even have had knowledge of the institution of litigation. On the contrary A & P stockholders were advised by G & W that there was no factual support for the entry of an injunction. G & W can hardly claim now that they should have disbelieved its representation and assumed the worst to be true. Absent any specific knowledge of G & W affairs and intentions, A & P stockholders were entitled to rely upon G & W's representations and therefore cannot be said to have had any knowledge of facts giving rise to either illegality or impossibility before their irrevocable tender of A & P shares.

G & W, relying principally upon our language in Pepsico, Inc. v. FTC, 472 F.2d 179, 187-90 (2d Cir. 1972), cert. denied, 414 U.S. 876, 94 S.Ct. 44, 38 L.Ed.2d 122 (1973), argues that,
267 since the finding of illegality of the tender offer *267 contract was grounded on federal policies underlying the antitrust laws, public interest considerations should preclude enforcement of the contract by plaintiff through recovery of damages. In Pepsico we indicated that a court should not enforce a contract where performance has been enjoined by a federal administrative agency on antitrust grounds as to some but not all parties. This represented no more than a federal variant of the doctrine of impossibility which is necessarily dependent in its operation, in the federal sphere as elsewhere, upon equitable considerations, such as fault. Indeed Judge Clark specifically noted that the "contractual duty is discharged, in the absence of circumstances showing . . . contributing fault on the part of the person subject to the duty, where performance is subsequently prohibited by an administrative order. . . ." L. N. Jackson & Co. v. Royal Norwegian Government, 177 F.2d 694, 697 (2d Cir. 1949), cert. denied, 339 U.S. 914, 70 S.Ct. 574, 94 L.Ed. 1340 (1950); see, e.g., Texas Co. v. Hogarth Shipping Co., 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123 (1921); New York Trust Co. v. SEC, 131 F.2d 274 (2d Cir. 1942), cert. denied, 318 U.S. 786, 63 S.Ct. 981, 87 L.Ed. 1153 (1943).

The district court also based its grant of summary judgment to the defendants on the ground that the plaintiff class suffered "no damage cognizable at law." However, the court's reasoning with respect to the absence of damage, at least insofar as it pertains to plaintiff's suit for breach of contract, is unclear. At one point Judge Duffy asserted that the tendering stockholders did not suffer loss of use of their shares, which would be a relevant criterion for measuring Williams Act damages, but not those attributable to breach of contract. At another point he asserted, erroneously in our view, that we rejected the contention that G & W should be required to make any payment for the tendered shares in our G & W v. A & P opinion. Our decision there merely held that the tendering shareholders had no right to consummate an illegal tender offer. We were not called upon to decide whether damages might be awarded for breach of the tender offer contract. That problem was left for another day, which now seems to have arrived.

While we cannot finally decide the issue of damages at this time because of the dearth of relevant facts, it appears that for breach of contract the damages recoverable would be the normal measure, i.e., "the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages. . .." N.Y. Uniform Commercial Code § 2-708(1), McKinney's Consol. Laws, c. 38.

## WILLIAMS ACT CLAIM

Since the district court's dismissal of the complaint must, in view of the sufficiency of its claim for breach of contract, be reversed and leave to amend should be granted for the purpose of stating plaintiff's claim for violation of § 14(e) of the Williams Act, we need not linger long over defendants' contention that plaintiff could not in any event state a valid Williams Act claim.

The essence of plaintiff's claim as described in the briefs is that G & W and Bluhdorn omitted material facts from the tender offer which defendants knew or should have known were necessary to make it not misleading namely (1) G & W's intention to acquire a controlling position in A & P or at least to exercise influence over A & P's management and policies, and (2) G & W's holdings in other companies, which rendered it likely that its acquisition of A & P stock would result in violation of the antitrust laws by both companies, see 476 F.2d at 695. Plaintiff further claims that Kidder, Peabody aided and abetted these omissions and "warranted" to the general public that G & W's actions were legal and proper.

268 As tendering stockholders the class members have standing to sue under the Williams Act, see, e.g., Electronic Specialty Co. v. International Controls Corp., 295 F.Supp. 1063, 1071-72 (S.D.N.Y.1968), aff'd in part, rev'd in part on *268 other grounds, 409 F.2d 937 (2d Cir. 1969). Section 14(e) was designed to insure full and fair disclosure by the offeror to public shareholders, see Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra, 480 F.2d at 358; Electronic Specialty Co. v. International Controls Corp., 409 F.2d 937, 945 (2d Cir. 1969). Of course mere allegation or proof of omissions from G & W's tender offer statement will not state a claim under § 14(e); plaintiff must establish culpability on the part of the defendants, see Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra, 480 F.2d at 362-64,[10] and the materiality of the alleged omissions, see id., 480 F.2d at 362-63; SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir. 1968) (en banc), cert. denied, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969); cf. Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 353 F.Supp. 264, 272-73 (S.D.N.Y.1972), aff'd, 495 F.2d 228 (2d Cir. 1974). The intention to exercise control over a target company and the knowledge of antitrust violations that might result from acquisition of the tendered stock are normally both matters of importance to prospective tenderors, see 476 F.2d at 696 n.16 & 697. In addition plaintiff must be prepared to allege and prove causation, see Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972).[11]

269 Finally plaintiff must be able to show that the tenderor class was damaged as a result of the Williams Act violations. Defendants contend that on this issue alone dismissal is mandated by our decision in Levine v. Seilon, Inc., 439 F.2d 328, 333-34 (2d Cir. 1971), which held that damages for fraud are not recoverable under Rule 10b-5 when the only loss suffered by the plaintiff is the opportunity to sell to others at high prices induced by defendant's fraud. Plaintiff here would certainly not be entitled to profits which would capitalize upon defendants' alleged fraud. However, plaintiff seeks damages of a different sort, i.e., losses attributable to the tenderors' inability to sell their shares in the declining market that followed the district court's issuance of its preliminary injunction and decision that gave notice to all shareholders of the probable *269 omissions of material fact from the tender offer. Assuming that some shareholders purchased in the open market and tendered on the basis of G & W's tender offer, their shares were tied up during the declining market until G & W released them on March 14. Since sales during this period, had such tenderors been free to sell, would have been made to persons who had been advised of the alleged G & W omissions, the sellers would not have been taking advantage of G & W's fraud (which was the evil condemned in Levine v. Seilon, Inc.). However, because of their inability to sell in a declining market the tenderors, having tendered in reliance upon G & W's omissions, would have suffered damages as victims rather than as coat-tail riders.

All of this does not mean that plaintiff, should he prevail, could simply recover the difference between the market price of A & P shares on the first day the shares could have been withdrawn from tender and the highest market price in the period during which they were tied up. Damages cannot be based upon mere speculation or guesswork. PSG Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 417 F.2d 659, 663 (9th Cir. 1969), cert. denied, 397 U.S. 918, 90 S.Ct. 924, 25 L.Ed.2d 99 (1970); James Wood General Trading Establishment v. Coe, 297 F.2d 651, 658 (2d Cir. 1961). To recover anything the class members must assume the burden of proving with reasonable certainty, see W. L. Hailey & Co. v. Niagara County, 388 F.2d 746, 753 (2d Cir. 1967), that they would have sold their shares at a particular price or time if the shares had not been frozen.

## OTHER CLAIMS

We find appellants' other claims to lack merit. Damages for the period after plaintiff's shares were released and after plaintiff had knowledge of the alleged omissions from the tender offer as a result of this court's affirmance of the injunction are not recoverable. Once the shares were released by G & W, plaintiff was free to sell at any time in the market. He cannot recover losses suffered as a result of his retention of his shares in the hope that the tender offer would eventually be consummated.

In view of the existence of the several disputed issues of material fact noted above, plaintiff's argument that summary judgment should have been granted in his favor is meritless. Additionally having reviewed the record, we are satisfied that Lowenschuss' complaint of bias on the part of the district judge is wholly lacking in substance.

For the foregoing reasons the judgment of the district court is reversed and the case is remanded for further proceedings consistent with this opinion.

[1] 15 U.S.C. § 78n(e) provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative."

[2] Mr. Lowenschuss is an attorney actively engaged in law practice in Philadelphia, Pennsylvania, with the firm Fred Lowenschuss Associates. The firm has established a trust known as Fred Lowenschuss Associates Pension Plan to provide pension benefits for employees of the firm and Mr. Lowenschuss is the sole trustee of that trust. Mr. Lowenschuss is suing in his capacity as trustee of the pension fund.

[3] A "litigation-out" clause is a provision commonly included in the terms of a tender offer which relieves the offeror of any obligation to purchase or pay for any of the tendered shares if, before the time of payment therefor, litigation relating to the offer shall have been instituted or threatened before any court or governmental agency by any governmental agency or person. Another provision usually included in a tender offer but also not included in G & W's offer is one relieving the offeror of the obligation to purchase tendered shares upon the occurrence of other adverse events which cannot be foreseen or controlled, such as a drastic change in the target company's business, a national emergency or a physical disaster. See Aranow & Einhorn, Tender Offers for Corporate Control 53 (1973).

[4] The antitrust problems arose from two different factors. First, G & W is a large conglomerate with substantial business interests in several areas of food processing and distributing. It was proved by A & P that a reasonably likely result of the acquisition would be the development of vertical reciprocal dealing between plaintiff G & W subsidiaries in the food industry and A & P itself or A & P suppliers, with resultant foreclosure of the A & P market (a significant one since A & P is one of the country's largest food retailers) to non-G & W food processors and distributors. The danger of this market foreclosure was found to exist whether or not G & W actually exercised control over A & P because A & P suppliers might independently determine that it would be in their best interest to purchase whenever possible from G & W subsidiaries.

Second, the chief operating officer of G & W, C. G. Bluhdorn, was the largest single shareholder of the Bohack Corporation, one of A & P's major competitors in the New York City area, in the period immediately preceding the tender offer. Although Bluhdorn's shares were placed in a trust on February 14, 1973, to be sold within one year after the expiration of the tender offer if the offer were

consummated, A & P alleged that Bluhdorn's relationship with Bohack would cause horizontal market foreclosure and price-fixing between A & P and Bohack. While we did not specifically find a probability of success on this antitrust claim, it is clear from our opinion that this claim was not considered insubstantial as we found that G & W should have disclosed this circumstance and its antitrust implications in the tender offer. 476 F.2d at 693-97.

[5] The class in the present action is defined as all A & P shareholders who tendered their shares to G & W. The class sought to be represented in the second action includes all persons or entities who purchased shares of common stock of A & P between February 1, 1973, and March 13, 1973, inclusive, up to the time when trading in the common shares of A & P on the New York Stock Exchange was suspended. It is obvious that while many persons may be members of both classes, a large number of persons will be in one and not the other.

[6] Judge Duffy's construction of the pleadings was influenced by certain representations contained in the complaint filed in the second Lowenschuss action to the effect that it was the only action between the parties stemming from the misrepresentations and omissions in the tender offer. That complaint characterizes the instant action as one to enforce consummation of the tender offer. See ¶¶ 18 & 32 of the complaint in 73 Civ. 2931, Southern District of New York. While such representations would certainly be important in determining the scope of the complaint if the two actions were brought on behalf of the same class, we cannot allow them to deny the adjudication of claims to members of a different class when their complaint does encompass the disputed cause of action.

[7] The fourth subparagraph of paragraph 4 of the published offer provided:

"The delivery of the Letter of Tender and the acceptance of this Offer will constitute an agreement between the tendering stockholder and G & W in accordance with the terms of this Offer, only when the duly signed Letter of Tender, or a telegram or letter (as provided above) from a member of a national securities exchange or the National Association of Securities Dealers, Inc. or a bank or trust company in the United States, is received by the Depositary."

[8] We do not find it necessary to determine whether New York law or, as defendants suggest, federal law applies on this issue. Our research has not revealed any decisions or statutes addressing this problem in either jurisdiction. Accordingly, we will apply the rule developed in other jurisdictions, which appears to be reasonable.

[9] The suggestion by the district court that a tender offer is simply an "offer for an offer," see 367 F.Supp. at 914 n.4, seems to be based upon a misreading of Williston. The section quoted in support, 1 Williston on Contracts § 31, at 82 (3d ed. 1957), deals with advertisements for competitive bids to purchase goods or provide services. That is clearly a different situation from a tender offer, as competitive bidding is more in the nature of an auction sale where bid prices are solicited and only one or a few of the bids tendered can be accepted. Here, on the other hand, G & W did not seek bids for prices for A & P shares but offered to purchase up to 3,750,000 shares at a set price on stated, non-negotiable terms.

[10] Although it is clear that some showing of culpability is necessary to find a defendant liable either as a principal or as an aider and abettor under § 14(e) the operative definition of culpability is unsettled. The standard with regard to a principal has been variously described as "recklessness that is equivalent to wilful fraud," Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 393 (Gurfein, *D. J.*, concurring), and as failure to disclose known essential facts or failure, after being put on notice, to discover material facts which could reasonably have been ascertained and disclosed without extraordinary effort, *Chris-Craft, supra*, 480 F.2d at 398 (Mansfield, *C. J.*, concurring and dissenting). See also *Chris-Craft, supra*, 480 F.2d at 363 (Timbers, *C. J.*). Similarly, an aider and abettor will be held liable if he assisted the principal with knowledge of material falsity or was reckless in determining the existence of material falsity in a registration statement, see *Chris-Craft, supra*, 480 F.2d at 370, or if he "knowingly and substantially assisted the violation," SEC v. Coffey, 493 F.2d 1304, 1316 (6th Cir. 1974).

There is no need at this time for us to engage in detailed analysis of these standards or to determine which, if any, should be applied here. In this evaluation of plaintiff's cause of action we only observe that some allegation of facts implying knowledge or reckless disregard is necessary and that a mere negligence standard cannot be used. The actual contours of the standards can be developed later when the nature of defendants' knowledge, or lack thereof, becomes clear.

[11] Here again, the character of the proof necessary to make out a violation is in dispute. Compare Judge Timbers' formulation in Chris-Craft Industries, Inc. v. Piper Aircraft Corp., *supra*, 480 F.2d at 373-77 (proof of materiality provides only a presumption of reasonable reliance sufficient to establish causation) with that of Judge Mansfield, 480 F.2d at 399-400 (concurring and dissenting) (proof of materiality establishes reasonable reliance and causation as a matter of law). See also Schlick v. Penn-Dixie Cement Corp., *supra*, 507 F.2d at 380-81; Note, The Reliance Requirement in Private Actions Under SEC Rule 10b-5, 88 Harv.L.Rev. 584, 597-606 (1975).

Save trees - read court opinions online on Google Scholar.

# Exhibit 24

# The Backstory Behind Judge Richard Posner's Retirement

**Judge Posner had some very specific reasons for his surprise retirement from the bench.**

By <u>DAVID LAT</u>
September 7, 2017 at 1:44 PM



*(Photo by Chensiyuan via Wikimedia Commons.)*

In May, when I had lunch with Judge Richard Posner and his clerks in Chicago, the esteemed jurist was in fine form, as enjoyable a conversationalist as ever.

In July — after he made **controversial comments about aging federal judges**, including a call for a mandatory retirement age of 80 — I asked him whether he'd apply that rule to himself. He kept his options open, **telling me**, "It will depend on how I feel [when I turn 80], both in terms of physical and particularly mental health and in terms of interest in the job."

So like much of the legal world, I was taken by surprise when Judge Posner, currently 78, announced his retirement from the Seventh Circuit. He announced the news right before Labor Day weekend, and it took effect immediately.

And it's a *total* retirement, not the usual move to senior status (a sort of quasi-retirement for federal judges), as I learned when we traded emails earlier this week. I wrote:

*Hi Dick. Congratulations on your retirement — major news in the legal world, of course!*

*I haven't been able to glean this from what I've read so far (although I haven't read everything on the news, having just returned from vacation), but I was wondering: will you be*

1

*taking senior status and still hearing cases, or are you departing from the Seventh Circuit completely?*

He responded:

*Nice to hear from you, David. And I'm not taking senior status; my departure is total. It has to do with fact that I don't think the court is treating the pro se appellants fairly, and none of the other judges agrees with me (or rather, they don't like the pro se's and don't want to do anything with them, with occasional exceptions only).*

I wasn't sure if Judge Posner's comments on pro se litigants were fair game for public discussion — but now they are, thanks to this Chicago Daily Law Bulletin piece:

*[Judge Posner] intended to stay on the Chicago-based 7th Circuit until he turned 80… [b]ut "difficulty" with his colleague… moved up that date.*

*"I was not getting along with the other judges because I was (and am) very concerned about how the court treats pro se litigants, who I believe deserve a better shake," Posner wrote.*

*About 55 percent to 60 percent of the litigants who file appeals with the 7th Circuit represent themselves without lawyers. Very few pro se litigants are provided the opportunity to argue their cases in court. The 7th Circuit rules on most of those cases based on the briefs.*

Posner has long been concerned about the plight of pro se litigants. Back in 2015, for example, he benchslapped a trial judge for mistreating a pro se plaintiff.

If you're interested in learning more about Judge Posner's problems with the Seventh Circuit's treatment of pro se litigants, stay tuned:

*Posner wrote that he has a book coming out soon that explains his views on the topic — as well as the views of his former colleagues — "in considerable detail."*

Now *that* should be a juicy read! Judge Posner is famously candid, so don't expect him to go easy on ex-colleagues he disagrees with.

I followed up with Judge Posner and asked how his stepping down would advance the cause of pro se litigants at the Seventh Circuit. Wouldn't it be better for him to remain on the court and continue to advocate for their improved treatment?

Alas, it's a lost cause, in his view: "I had zero support from the other judges; I was a voice crying in the wilderness."

I also asked Posner whether he felt, in light of his comments about superannuated federal judges, whether he himself has been affected negatively by aging. He replied, in Posnerian fashion, "I think there should be compulsory retirement for all federal judges and Justices at age 80; I am as yet a mere child of 78.5."

2

Judge Posner, you will be missed. I don't know that I'd want a judiciary full of Richard Posners, but it sure was great to have one.

**David Lat is a lawyer turned writer**. He publishes Original Jurisdiction, a newsletter on Substack about law and legal affairs, and he writes for newspapers and magazines, including the New York Times, Washington Post, and Wall Street Journal. Prior to launching Original Jurisdiction, David founded Above the Law, one of the nation's most widely read legal news websites, and Underneath Their Robes, a popular blog about federal judges that he wrote under a pseudonym. He is also the author of a novel set in the world of the federal courts, Supreme Ambitions. **Before entering the media world, David worked as a federal prosecutor in Newark, New Jersey; a litigation associate at Wachtell, Lipton, Rosen & Katz, in New York; and a law clerk to Judge Diarmuid F. O'Scannlain of the U.S. Court of Appeals for the Ninth Circuit. David graduated from Harvard College and Yale Law School, where he served as an editor of the Yale Law Journal.**

https://abovethelaw.com/2017/09/the-backstory-behind-judge-richard-posners-retirement/?rf=1

# Exhibit 25

# Lawyers, the Legal Profession & Access to Justice in the United States: A Brief History

## Robert W. Gordon

*Abstract: Ideally, justice is a universal good: the law protects equally the rights of the rich and powerful, the poor and marginal. In reality, the major share of legal services goes to business entities and wealthy people and the prestige and prosperity to the lawyers who serve them. This essay deals with the history of access to justice – chiefly civil justice – and with the role of lawyers and organized legal professions in promoting and restricting that access. In the last century, legal professionals and others have taken small steps to provide access to legal processes and legal advice to people who could not otherwise afford them. By doing so, they have inched closer to the ideals of universal justice. Though the organized bar has repeatedly served its own interests before those of the public, and has restricted access to justice for the poor, it has been a relatively constructive force.*

In no profession is the gulf greater between ideals and practices than it is for lawyers. Ideally, justice is a universal good: the law protects equally the rights of the rich and the poor, the giant corporation and the small business, the innocent and the criminal accused. The ethical imperative that lawyers must zealously serve the interests of their clients can be justified, and reconciled with the goal of universal justice, only if all other affected parties (including the clients' adversaries) will be competently represented as well. In practice, of course, access to the complex and expensive procedures of law and the services of lawyers is largely determined by clients' ability to pay: the major share of legal services goes to business entities and wealthy people. The lawyers who enjoy the greatest professional success and prestige do most of their work on behalf of the rich and powerful.[1]

This essay examines the history of access to justice – chiefly civil justice, with a brief note on criminal defense – and the role of lawyers and organized

ROBERT W. GORDON is Professor of Law at Stanford Law School and Chancellor Kent Professor Emeritus of Law and Legal History and Professor (Adjunct) of Law at Yale Law School. He is the author of *Taming the Past: Essays on Law in History and History in Law* (2017) and editor of *Law, Society, and History: Themes in the Legal Sociology and Legal History of Lawrence M. Friedman* (with Morton J. Horowitz, 2011) and *The Legacy of Oliver Wendell Holmes, Jr.* (1992).

© 2019 by Robert W. Gordon
doi:10.1162/DAED_a_00551

177

**273**

*A Brief History*

legal professions in promoting and re-stricting that access. Traditionally, access to justice has meant at minimum the effective capacity to bring claims to a court, or to defend oneself against such claims. Although many courts allow parties to represent themselves, it is clear that effective access usually requires the services of a competent lawyer, since lawyers hold the monopoly of rights of practice in courts and the skills and experience that accrue from that practice. The costs of litigation, however, are very high – in court costs, administrative costs, witness fees, and lawyers' fees – so much so that even middle-class parties are foreclosed from using the courts for any but routine transactions unless they can tap into financing from some other source, such as contingent fees and attorney-fee awards paid by the adverse party, or state-subsidized legal services.

In the modern world, access to justice requires more than the capacity to litigate in courts. It requires help with navigating the mazes of bureaucratic government and filling out its forms, and with contesting adverse government actions. It requires help in planning for major life events, like founding a business, adopting a child, or divorcing a spouse. It requires effective assistance with challenging adverse actions of business corporations or professionals, say, as employees or customers. It requires access to powerful decision-makers, or agents in a position to influence them. Lawyers are not exclusive providers of such out-of-court services – they have to compete with accountants, financial consultants, and lobbyists, among others – but they tend to dominate.

In the last century, legal professions, governments, and charitable providers have taken small, partial steps to provide access to legal processes and legal advice to people who could not otherwise afford them. By doing so, they have inched closer to the ideals of universal justice. They have also, on occasion, acted to restrict access to law by the poor and powerless. Despite inspiring rhetoric – and more inspiring models and exemplars – that American lawyers use to trumpet their commitment to equal justice for all, they have generally served their own interests before those of the public, in particular the poor and economically struggling. They serve best the rich and powerful, serve some middle-class clients and interests to the extent that it generates adequate fees, and, with notable exceptions, either serve minimally or not at all virtually everyone else.

Before 1900, mentions in Anglo-American legal records of aid to the poor are scattered. Most of the references are to judges who appointed counsel to poor clients or to lawyers who voluntarily took their cases.

Medieval canon law was full of injunctions to lawyers to serve persons too poor to pay their fees, and "persons of humble status" were frequent enough litigants to suggest that some lawyers did.[2] Common lawyers also recognized some duties to the poor, codified in statute in 1495, when

> Parliament provided . . . that poor persons could petition to plead *in forma pauperis* in all courts of record without the payment of any court fees, and provided further that the Chancellor and Justices should assign to such poor persons attorneys and learned counsel who should give their counsels without taking any reward.[3]

Lawyers' fees in medieval times were not high per case (most serjeants-at-law made their serious money via retainers), but English law was already so technical that no one could navigate pleading rules without a lawyer. Scattered reports refer to poor litigants represented by appointed

or volunteer counsel: there is no way to know how frequently. It is likely that most poor persons' disputes were heard in more informal courts like the Court of Requests, or manorial or borough courts. Before the early eighteenth century, middle-class litigants like tradesmen and well-off farmers appeared frequently in common-law courts. But as long ago as the mid-eighteenth century, lawyers' fees and court costs had escalated above even most middle-class pocketbooks.[4]

Until the mid-eighteenth century, a criminal accused was not allowed a lawyer to contest the facts of the cases against him, but had to conduct his own defense. This began to change around the mid-eighteenth century, when lawyers were permitted, but without pay.

With respect to criminal defense, reflecting the colonists' experience on the receiving end of imperial prosecution, the new republic definitively rejected earlier English practice by providing federal and state constitutional rights to counsel in criminal cases. They provided no funding to support the right, but in serious felony cases, especially for murder, courts would often appoint prominent lawyers to defend without pay. They often welcomed the chance for publicity in notorious trials.

Most small claims for civil justice in the earlier nineteenth century were pursued without lawyers in local informal tribunals, like justice of the peace courts or county courts. Anyone, including wives, minors, and slaves, could come under the jurisdiction of these courts, which were regulatory agencies and enforcers of local laws as well as dispute-settlers. Yet even in regular trial and appellate courts, the reports show many cases with lawyers litigating relatively small sums like $50 to $100. Entry barriers to the profession were almost nil in most states, so litigants could have the benefit of low-cost advice.

Subsidized advice in the United States to help poor people deal with social and legal problems began with the Working Women's Protective Union in 1863 in New York, which helped workers collect fraudulently withheld wages. The union's example gradually spread to other cities. Staffed, at first, mostly by volunteer women nonlawyers, the Chicago Protective Agency for Women and Children expanded the model. By 1905, it had a paid staff and was handling four thousand cases. The Protective Agency also brought wage claims, but specialized in helping victims of domestic violence, who were often ignored by courts. Around the same time, the Chicago Bureau of Justice was founded. Its clients were mostly poor people with small debts to tradesmen, landlords, and mortgage lenders. Like the Protective Agency, it distrusted the formal legal system: it saw many judges as corrupt and the lower bar as incompetent. The two Chicago organizations merged in 1905 to form the Legal Aid Society of Chicago.[5]

New York City opened its own Legal Aid Society in 1900, largely to aid floods of newly arrived Jewish immigrants. The society grew out of an earlier bureau giving legal advice to German immigrants. Unlike the women's protective unions, New York Legal Aid was mostly staffed by lawyers and defined its work as strictly legal rather than social work. But it was also strongly paternalistic, seeking to educate in American values those whom the lawyers saw as quarrelsome litigious Jews. It generally sought only money damages for clients rather than seeking broader solutions to their family problems, and refused to act if defendants had no assets.

In the early-twentieth-century wave of professionalization, social work emerged as a recognized credentialed profession. Lawyers, spearheaded by new national and local bar associations, sought to raise

Robert W. Gordon

*A Brief History*

their own professional standards with new educational and bar exam requirements. Among lawyers, Reginald Heber Smith of Boston became the most prominent advocate for legal aid with his Carnegie Foundation Report on *Justice and the Poor* (1919), an indictment of unequal access to justice that was the leading manifesto for the legal-aid movement for the rest of the century.[6] Smith maintained that providing lawyers for the poor and people of moderate means was an elementary requirement of justice, which the legal profession had an obligation to supply rather than leave to charity.

His report ignored the existence of substantial women's legal-aid organizations. He and his disciples fought a running battle with the social workers, insisting that law was a masculine sphere in which clients could exercise legal rights only with the help of a trained lawyer. Eventually, these quarrels were resolved by compromise, with the recognition that many poor clients' problems could not be addressed solely by means of the law. Smith estimated in 1919 that about $600,000 would suffice to fund adequate legal-aid services in the nation's cities – a contribution of $5 per lawyer – but complained that lawyers and their guilds were mostly indifferent to the responsibility to supply it.

Some bar leaders continued to promote legal aid, but the rank-and-file remained apathetic and sometimes actively hostile. Until the mid-1960s, the American Bar Association (ABA) condemned as socialism the idea of state-funded – as opposed to bar- and charity-funded – civil legal services, just as the American Medical Association had condemned Medicare. Most urban legal-aid programs remained severely underfunded, unable to accept most potential clients, and prohibited from helping clients divorce or go bankrupt for fear of offending charitable funders. These programs were averse to taking adversarial stances against landlords or businesses, favoring conciliation rather than the vindication of rights.[7]

The landscape changed in 1965 with the funding of the Office of Equal Opportunity Legal Services Program (since reorganized as the Legal Services Corporation, or LSC) as a component of Lyndon B. Johnson's war on poverty. In a major shift of policy, national bar leaders at the ABA supported this program at the time and have since become its stalwart defenders against multiple political attacks. Federal services expanded the total national legal-aid budget from under $5 million per year to $321 million in 1980 – 1981.

Program lawyers, including many top graduates of elite law schools, saw a much more ambitious role for the LSC than traditional legal aid. Rather than simply trying to help clients solve their problems one by one, they favored bringing strategic test-case suits before sympathetic liberal federal judges, and helping client groups like welfare recipients to form organizations capable of making their own demands. Their most controversial efforts were the work of program-funded California Rural Legal Assistance lawyers for Cesar Chavez's farmworkers and program lawyers' support for the militant National Welfare Rights Organization, which lobbied for a right to universal basic income.

The lawyers made fierce enemies among those interests that their clients sued. These included Governor Ronald Reagan of California (as president, he tried to abolish the program in 1981, and succeeded in cutting its budget by 25 percent); local and national welfare officials; real-estate interests targeted by new tenants' organizations; established city patronage machines; and – not least – local lawyers and bar associations unhappy about competition from the new legal-

services bar. The battle over federal legal services has continued since.

The LSC survives with the backing of elite lawyers, the ABA, and the judiciary, but under many and increasing restrictions on the kinds of clients and cases it can accept. The legal-services offices it funds may not bring class actions, lobby legislators, or represent unions, noncitizens, prisoners, or organizations promoting abortion, school desegregation, or welfare reform.[8] The general aim of conservatives has been to limit LSC-funded lawyers to individual personal aid, and to steer them away from actions with collective consequences like law reform, class actions, impact litigation, or aid to political organizing.[9]

In the same political moment as the founding of the Legal Services Program, the Ford Foundation and other grantors supplied funding to create "public interest" law firms that would supply the resources to pursue systemic reform projects affecting the poor. Ford also funded clinical legal education in law schools. The clinics have supplied a significant proportion of liberal-progressive lawyering. These efforts supplemented the longstanding work of the NAACP Legal Defense Fund (LDF) and the American Civil Liberties Union (ACLU), venerable nonprofits funded by subscribers, to seek court decisions favorable to their causes (African American equality for LDF; first, labor organizing and, later, free expression generally and women's rights for the ACLU).

Institutionalized pro bono lawyering – although still sparse in relation to the perceived need – came out of the same generation as the lawyers who staffed the Legal Services Program. It has persisted and expanded, in part as a means to attract new associates to corporate practice and give them some on-the-job training with real clients. Most pro bono work is performed by lawyers in large firms, who often collaborate effectively with established public interest firms to fund and staff major litigation efforts. Law firm pro bono services now exceed in value the entire federal legal-services budget. Some firms also fund public interest fellowships, as the global Skadden firm does with the Skadden Fellowships.

Like LSC lawyers, however, though for different reasons, law firm pro bono lawyers are restricted in the types of work they are allowed to take on: they generally have to avoid clients such as environmental or labor interests whose general aims may be adverse to the firm's paying clients.[10] Many bar associations have flirted with proposals to make some pro bono service mandatory, but have abandoned the idea in the face of member opposition.[11] Some state court judges, however, have strongly supported pro bono work. In 2012, New York State made performance of at least fifty hours of pro bono work by students during law school a condition of their admission to the bar. Yet reliable estimates are that, nationwide, American lawyers, on average, perform about half an hour of pro bono work, broadly defined, per year. They make only derisory financial contributions to legal-aid and public interest organizations.[12]

At the same time that bar associations – formed and dominated for the early part of the twentieth century by elite lawyers – were mostly ignoring calls for civil justice for the poor and middle-class, they were actively campaigning against lawyers for a particular kind of client: plaintiffs' personal-injury lawyers. Personal-injury lawsuits proliferated in the late nineteenth century as a response to the large-scale carnage of the industrial age: injuries and deaths from mining operations, railroads, street railways,

*Robert W. Gordon*

*A Brief History*

and, eventually, automobiles. A specialized bar, mostly Jewish and night-school-trained, developed to serve the injured and their families. They took a contingent fee: 30 to 40 percent of any damages recovered, nothing if they lost. The elite lawyers who represented businesses like railroads and streetcar companies tried to close down the night schools. They used the new bar associations to restrict entry to practice, to draw up ethical codes targeting personal-injury lawyers with prohibitions on advertising and soliciting clients, and to discipline the lawyers for violating the codes.[13] (The Supreme Court struck down the prohibitions on advertising in 1977, though the Court has upheld most restrictions on soliciting paying clients.[14])

After World War II, the personal-injury lawyers seemed to have prevailed in that battle. They formed a powerful trade association, the American Trial Lawyers Association (ATLA; since renamed the American Association for Justice), that lobbied legislatures and argued in courts for broader theories of liability and damage awards. The ATLA portrayed the plaintiffs' lawyers as populist champions, representing the little guy against wealthy and well-lawyered corporations.[15] Their cause was aided by the expansions of liability to include strict liability for defective products (such as pharmaceuticals) and changes in the civil procedure rules to favor class actions and multiparty litigation; and by the Supreme Court decision invalidating the bar's prohibition on advertising.

The defense bar struck back during the general business revolt against regulation beginning in the 1970s and 1980s. Corporate and insurance practitioners warned of a "litigation explosion" of worthless claims that would make American businesses uncompetitive. The trial lawyers were portrayed as greedy exploiters of naive or opportunistic plaintiffs, looking to score settlements out of nuisance suits supported by "junk science."[16] Some of the critiques were valid, such as that plaintiff and defendant class action lawyers sometimes colluded against the interests of the injured to settle cases early and cheaply, assisted by trial judges trying to clear their dockets.[17] The "litigation explosion" claims have proved mostly mythic, and "junk science" was surely as widely used by defendants (think tobacco) as plaintiffs. But the propaganda of the "tort reform" movement was a huge public relations and political success.[18] Federal and state legislation and court decisions have put limits on both punitive and ordinary damage claims, sometimes imposing strict caps on liability that have the effect of removing lawyers' incentives to take complex cases.[19] Congress has allowed class action defendants to remove cases to federal courts that are expected to treat plaintiffs less generously.[20]

Most observers have concluded that the chief defect of the personal-injury contingent-fee system for handling tort claims is not that it encourages frivolous claims, but that it filters out too many meritorious claims because they do not promise to yield an adequate recovery.[21] Its other main defect is its inefficiency: about 50 percent of recoveries are eaten up by administrative costs, including lawyers' fees.[22] Some reforms have been proposed, such as enabling outside investors to fund litigation for the big, mass tort claims, which would require loosening ethical prohibitions on fee-sharing with nonlawyers.[23]

In the American legal system, in which courts have ample authority to make law through precedent and constitutional rulings, it is not surprising that interest groups should use lawsuits as vehicles

*Dædalus, the Journal of the American Academy of Arts & Sciences*

of policy-making. In the heyday of what is now called classical legalism (1870 – 1932), many such suits were brought by corporations to invalidate Progressive Era legislation adverse to their interests. But social movements for subordinated groups have used the same vehicles. In the nineteenth century, antislavery lawyers brought freedom suits for their slave clients and sought to invalidate the fugitive slave laws and prevent the extension of slavery into new territories.

The most famous and effective uses of lawsuits to create new rights were, of course, those of civil rights and civil liberties organizations like the NAACP Legal Defense Fund, the National Lawyers' Guild, and the ACLU, among others, on behalf of African Americans, women, political and religious dissenters, labor, the disabled, and gays and lesbians. This was lawyering for a cause, but also lawyering for clients who could not find other lawyers. The NAACP and other movement lawyers represented black criminal defendants whom no Southern lawyer, black or white, could act for without risking loss of all his other clients, as well as movement activists and demonstrators served with injunctions or thrown into jail. Guild lawyers acted for accused communists shunned by the respectable bar. The ACLU was founded to represent pariahs like labor organizers and anti–World War I protestors.[24] These movements were largely staffed by lawyers marginal to the higher reaches of their profession: racial minorities, Jews, women, and a few maverick patricians.

As with federal legal services, the successes of these legal strategies on behalf of social movements inspired attempts to cripple the lawyers and legal organizations that staffed them. In the civil rights era after *Brown v. Board of Education*, the cream of the establishment bar in the South worked with officials to hobble the public interest lawyers who brought claims to challenge racial segregation and defend protestors from arrest and prosecution. The states demanded lists of NAACP members, accused lawyers in group practices of ethical violations like soliciting clients, and brought suits for stirring up litigation.[25] Most of these efforts were ultimately rebuffed by the Supreme Court, which carved out an exception to the antisolicitation rules for nonprofit public interest lawyers.[26] In the civil rights era, liberal Congresses and judges also created new avenues for private plaintiffs to enforce antidiscrimination statutes, often through the incentive that, if successful, their lawyers could recover attorney fees from the losing side.

"Equal justice under law" sounds like an uncontroversial slogan. But claims to equal rights are also claims to redistribution of resources, status, and authority: when groups shut out of the justice system get lawyers to make those claims effective, the result can be to sharply challenge existing hierarchies of wealth, power, and status. The rights revolution provoked a severe backlash.

Conservative Supreme Courts since the 1980s have cut back the doctrines and remedies favored by liberal courts in the 1960s and 1970s. Conservative judges are generally reluctant to find that Congress has authorized private rights of action unless it has said so explicitly.[27] They are more likely to insist on proof of discriminatory intent, as well as disparate impact, in hiring practices; and to disfavor comprehensive remedies such as structural orders to desegregate school systems or to institute compensatory affirmative action hiring plans.

The Court has also made plaintiffs' cases more difficult to prove and finance. It has tightened pleading rules to impose more procedural roadblocks to get

*Robert W. Gordon*

*A Brief History*

to discovery; heightened plaintiffs' burdens of proof while enlarging defenses; severely cut back on punitive damages awards; and made it much harder for public interest plaintiffs to recover attorney's fees by denying fee awards if defendants agree to settle.[28] In an important string of recent decisions, the Court has approved the now widespread practices of mandatory arbitration clauses in employment and consumer contracts, by which employers require their employees, and consumer products and financial services sellers require their customers, to submit all of their disputes to arbitration and to forgo class actions. The Court has held that federal law preempts and invalidates many state laws that attempt to regulate such practices.[29] By denying plaintiffs the ability to aggregate claims, the Court effectively precludes them from addressing and trying to deter and remedy widespread small violations (such as imposing hidden fees). In some contexts – such as nursing homes that mistreat or neglect their vulnerable patients – that removes any incentive for lawyers to accept cases even to avert horrendous harms.

Criminal prosecution is the sharp end of the state, its most coercive process short of war. Lawyers have long been aware that having a good lawyer who can afford to challenge the state's evidence and sway a jury confers significant advantages on a criminal defendant. So important was the right to counsel considered that it was enshrined in the early constitutions. Yet the great majority of defendants are indigent. They cannot buy an adequate defense on the market. Nineteenth-century courts gave some recognition to the problem by appointing counsel in serious felony cases, especially capital cases. Some of the law reform–minded bar groups formed in the Progressive Era (not the ABA) began to recognize the problem. There followed a long history of reports and initiatives to try to solve it.

A new urgency to fund criminal defense came from Supreme Court decisions requiring states to provide for indigent defense of federal felony defendants (1938), state felony defendants (1963), and, finally, all accused facing loss of liberty (1972). States responded variously: some expanded existing public defender offices, others (like most states of the Old Confederacy) assigned counsel – often the dregs of the bar – to represent accused persons, but paid so little (like $500 for a capital case) that all any counsel could hope to get for her client was a hastily negotiated guilty plea. Meanwhile, the wars on crime and on drugs, following a spike in violent crime peaking around 1990, effectively transferred charging and sentencing discretion from judges to prosecutors, reducing even further defense counsel's only leverage – the credible threat to take a case to trial – in plea negotiations. Now, fifty-five years after *Gideon v. Wainwright*, criminal defense remains in a state of crisis.[30] Despite many publicized exonerations of defendants in capital cases wrongly convicted by the state's misconduct or mistakes, funding for criminal defense has little popular support – in part because most defendants are black or brown – and almost no effective political lobby, though by now the organized bar has taken up its cause.

Contrast England and Wales. After World War II, under pressure to reduce enormous class disparities among a people who had shared equally in wartime sacrifice, the government resolved to try to make the common-law courts, which had been priced far out of the range of most citizens, more accessible. (The prewar and wartime governments tried to compensate by funding Citizens Advice

Bureaus that dispensed informal advice to people with legal, or potentially legal, problems. These still exist: there is no law in England giving the profession the monopoly over advice-giving.) The route chosen was a form of judicare: Parliament provided a generous system of state support for solicitors and barristers to represent the indigent. By the 1960s, barristers were receiving over half their collective income from legal-aid cases.

A series of governments, beginning with Margaret Thatcher's conservative one and followed by conservative and neoliberal ones, decided this scheme was too costly and wasteful, and have gradually dismantled it in favor of central state control over lawyers' costs and outsourcing to nonprofit providers of more "holistic" services that favor mediation and conciliation over adversarialism in family cases. Personal-injury cases are now, as in the United States, financed by contingent fees. Since 2000, control over providers has been tightened further, subordinating clients' welfare and rights entirely to budgetary concerns, abandoning audits of quality, and leaving to providers how to deal with exploding caseloads.[31] The legal profession's responses to these changes have been mixed. Initially, they were outraged by some of the reforms targeting their traditional privileges, like barristers' monopoly of rights of audience in courts, and solicitors' monopoly of conveyancing practices.[32] More recently, however, lawyers and judges have rallied to protest cuts in legal services budgets and to try to protect rule-of-law values in a system of administrative controls.

The highest barriers to access to the legal system are its complexity and costs.[33] Complexity calls for personnel with the training to deal with it, and their time and that of the other experts who support their work – forensic accountants, scientific and medical experts, and the like – is expensive. Some blame the complexity of law on lawyers themselves, and there is probably some truth to that charge. But the most likely cause is that a pluralist, fragmented political system like the United States' proliferates multiple and conflicting laws, and interpretations of those laws, to satisfy the demands of interest groups. Legal procedures are distended to meet the capacities and budgets of their highest-end users: business corporations.[34] The adversary system adds extra expense because investigating facts is left to the parties, their lawyers, and their hired experts rather than to a neutral magistrate as in Europe. Litigation seems not to have been expensive in the nineteenth century, but became much more so in the twentieth, even though actual trials have almost vanished in civil and criminal cases.

Cost and complexity naturally give rise to counterpressures to reduce both. Some well-known studies of litigation rates over time show that with industrialization, they rise sharply, but then start to decline. The reason suggested is that many areas traditionally handled in courts become routinized in administrative procedures, or shunted off to more informal dispute-settlement.[35]

There are several examples within the American judicial system:

Compensation for employee injuries beginning around 1910 was shifted out of the tort system into administrative workers' compensation systems. (Lawyers were at first excluded from the claims system, but forced themselves, and then were allowed, back in.)

Claims for auto accident compensation were, early in the twentieth century, largely relegated to insurance agency adjusters, who determined the merit and value of claims, with the courts as

*Robert W. Gordon*

*A Brief History* a backstop for unsettled cases.[36] Minor "soft-tissue" injuries from accidents are increasingly the province of settlement mills, which send demands for compensation to insurance companies, take a cut of the proceeds, and never try cases.[37]

The veterans benefits claim system from the Civil War to 1988 excluded lawyers by providing they could be paid no more than $10 per case.[38]

Divorce has been mostly delegalized, taken out of the court system by no-fault divorce, and self-help form-filling in uncontested cases. Many divorce lawyers' offices now offer mediation services to clients.[39]

More ominously, as mentioned above, many tort and contract claims that might otherwise be heard in courts have been relegated to arbitration by mandatory arbitration clauses in most consumer and employee contracts.

Federal immigration rules permit certain kinds of nonlawyer advisors to act for immigrants.[40]

Another project of the organized bar that has obstructed access to justice, broadly conceived, has been its sustained efforts to maintain its monopoly over advice-giving that has any legal component. Throughout the twentieth century, using statutes prohibiting the "unauthorized practice of law," the bar has fought turf wars with many competitors, some won and some lost.[41] The bar ceded most tax preparation work to accountants, and real-estate closings in many states to title companies and realtors. It is currently challenging firms like LegalZoom and RocketLawyer, which supply mostly standardized legal services for relatively routine transactions.

Many current proposals are in the air to relax unauthorized practice rules to allow paraprofessionals who have gone through a short training and certification program to help clients navigate disputes and adverse government actions. Segments of the organized bar, although still mounting phalanxes of resistance, have begun to perceive the inutility and bad public relations of resisting nonlawyer involvement in markets its monopoly does not serve. There are many areas of practice in which specialized paraprofessional providers could give better service than barely competent generalist graduates of law schools (immigration law is a prime example).

An ABA Commission on Nonlawyer Practice recommended in 1995 that unauthorized-practice rules be relaxed to permit the licensing of paraprofessionals.[42] The ABA ignored the report. In 2012, the Supreme Court of Washington State agreed to license paralegals, but, as of 2018, they were limited to twenty-eight paralegals in family practice, regulated by the state bar, and not allowed to appear in court; and they face hostility from family lawyers.[43] In general, it is unrealistic to expect bar associations, representing a profession facing high levels of unemployment among recent law graduates, to go very far to welcome competing providers.

In the profession's long history, leading lawyers and judges have recognized and sporadically acted on the profession's public obligations to open paths to legal services for relatively poor people. They have frequently acknowledged that the ideal of the rule of law requires universal access to justice. The profession's ideals have inspired some of its exceptional members to devote their careers to serving and promoting service to poor or unpopular clienteles. Those ideals and their heroic exemplars still lead students to apply to law schools and, once in practice, to seek out occasions for pro bono work or charitable or government service.

186      *Dædalus, the Journal of the American Academy of Arts & Sciences*

But most lawyers, most of the time, are concerned with making a profitable living, and not much interested in supplying or financing legal services for others: they put their own interests first, then their clients', and only as an afterthought, the public's and nonpaying clienteles'. More disturbing, lawyers for powerful clients facing opposition from weaker adversaries have proved all too willing to subvert the ideals of equal access to law, under the pretext of economic efficiency, by denying a level playing field to lawyers for the other side. Remember, for example, the campaigns against the tort plaintiff's bar and for mandatory arbitration clauses in employment and consumer contracts, and the attacks on law reform efforts of legal services and on fee awards supporting the public interest and civil rights bars.[44]

Professional organizations such as bar associations have always had a dual character: they are official spokesmen for the public aspirations of the profession to serve the ideals of the rule of law and universal justice, and often sponsors of programs to make the ideals effective; but they are primarily guilds whose aim is to protect and expand monopoly domains for their members' work, demand for their services, and their fees and profits. When those public aims and the guild's interests conflict, the leaders and the rank-and-file of the bar tend, not surprisingly, to favor the guild's. Initiatives to make justice more accessible have been more likely, when they come, to originate with those marginal to or outside of the profession.

European societies have long accepted the responsibilities of providing legal services, just as they provide health care, to people who cannot afford them as basic responsibilities of the state.[45] In the United States, the government underwrites over half of the cost of health care (through Medicare, Medicaid, and programs of the U.S. Department of Veterans Affairs). But for legal services, we are still depending on direct client funding plus a stingy and hobbled federal program and a mishmash of volunteer and philanthropic efforts. That is no way to run a system that aspires to equal justice.

*Robert W. Gordon*

ENDNOTES

[1] If empirical support is needed for so obvious a proposition, see the classic study of the Chicago Bar: John P. Heinz, Robert L. Nelson, Rebecca L. Sandefur, and Edward O. Laumann, *Urban Lawyers: The New Social Structure of the Bar* (Chicago: University of Chicago Press, 2005).

[2] James A. Brundage, "Legal Aid for the Poor and the Professionalization of Law in the Middle Ages," *American Journal of Legal History* 9 (169) (1988): 171, 174.

[3] David J. Seipp, "Legal Services for the Poor in the Early Common Law," in *Law and Society in Later Medieval England and Ireland: Essays in Honour of Paul Brand* (Abingdon, United Kingdom: Routledge, 2018), discussing An Act to Admit Such Persons as Are Poor to Sue in Forma Pauperis, Statute 11 Hen. 7, chap. 12, reprinted in Statutes of the Realm, vol. 2 (1495), 578.

[4] See Christopher W. Brooks, "Litigation and Society in England, 1200–1996," in *Lawyers, Litigation and English Society Since 1450* (London: Hambledon Press, 1998), 63, 94–95.

[5] For the pioneering role of the women's societies, see Felice Batlan, *Women and Justice for the Poor: A History of Legal Aid, 1863–1945* (Cambridge: Cambridge University Press, 2015).

[6] Reginald Heber Smith, *Justice and the Poor: A Study of the Present Denial of Justice to the Poor and of the Agencies Making More Equal Their Position Before the Law with Particular Reference to Legal*

*A Brief History*   *Aid Work in the United States* (New York: Carnegie Foundation for the Advancement of Learning, 1919).

7 See Earl Johnson Jr., *To Establish Justice for All: The Past and Future of Civil Legal Aid in the United States*, vol. 1 (Santa Barbara, Calif: Praeger, 2014), 3–43.

8 The restrictions on LSC-funded lawyers are summarized at Legal Services Corporation, "About Statutory Restrictions on LSC-Funded Programs," https://www.lsc.gov/about -statutory-restrictions-lsc-funded-programs. For more information on their effects, see Brennan Center for Justice, *Restricting Legal Services: How Congress Left the Poor with Only Half a Lawyer* (New York: Brennan Center for Justice, New York University School of Law, 2000).

9 The definitive history of OEO-LSP and LSC is by one of the program's early directors, Earl Johnson Jr., *To Establish Justice for All*.

10 See Scott Cummings, "The Politics of Pro Bono," *UCLA Law Review* 52 (1) (2004): 116–123.

11 Deborah L. Rhode, *Access to Justice* (Oxford: Oxford University Press, 2004), 148–151.

12 Ibid., 154–155.

13 Jerold Auerbach, *Unequal Justice: Lawyers and Social Change in Modern America* (Oxford: Oxford University Press, 1976).

14 *Bates v. State Bar of Arizona,* 433 U.S. 350 (1977); and *Ohralik v. Ohio State Bar,* 446 U.S. 447 (1978).

15 John Fabian Witt, *Patriots and Cosmopolitans: Hidden Histories of American Law* (Cambridge, Mass.: Harvard University Press, 2009), chap. 4.

16 See, for example, Walter K. Olson, *The Litigation Explosion: What Happened When America Unleashed the Lawsuit* (New York: Truman Talley Books/St. Martin's, 1991); Walter K. Olson, *The Rule of Lawyers: How the New Litigation Elite Threatens America's Rule of Law* (New York: Truman Talley Books/St. Martin's, 2003); and Philip K. Howard, *The Death of Common Sense: How Law is Suffocating America* (New York: Random House, 1994).

17 See, for example, John C. Coffee Jr., "Class Wars: The Dilemma of the Mass Tort Class Action," *Columbia Law Review* 95 (1343) (1995).

18 See, for example, Marc Galanter, "Reading the Landscape of Disputes: What We Know and Don't Know (and Think We Know) about our Allegedly Contentious and Litigious Society," *UCLA Law Review* 31 (4) (1983).

19 See Stephen Daniels and Joanne Martin, "Evidence on the Link Between Damage Caps and Access to the Civil Justice System," *DePaul Law Review* 55 (635) (2006).

20 Class Action Fairness Act of 2005 (CAFA), 28 U.S. Code § 1332(d).

21 Richard L. Abel, "The Real Tort Crisis–Too Few Claims," *Ohio State Law Journal* 48 (443) (1987).

22 See Deborah R. Hensler, Mary E. Vaiana, James S. Kakalik, and Mark A. Peterson, *Trends in Tort Litigation: The Story Behind the Statistics* (Santa Monica, Calif.: RAND Corporation, 1987), 29, Table 4.1.

23 ABA Model Rules of Professional Conduct § 5.4.

24 See Mark Tushnet, "The Rights Revolution in the Twentieth Century," in *The Cambridge History of Law in America*, vol. 3, ed. Michael Grossberg and Christopher Tomlins (Cambridge: Cambridge University Press, 2008), 377–402.

25 See, for example, the Virginia antisolicitation statute invalidated in *NAACP v. Button,* 371 U.S. 415 (1963).

26 *In Re Primus,* 436 U.S. 412 (1978).

27 Pamela S. Karlan, "Disarming the Private Attorney General," *University of Illinois Law Review* 183 (2002).

28 See Stephen B. Burbank and Sean Farhang, "Retrenching Civil Rights Litigation : Why the *Robert W.* Court Succeeded Where Congress Failed," in *The Rights Revolution Revisited : Institutional Per-* *Gordon* *spectives on the Private Enforcement of Civil Rights in the U.S.*, ed. Lynda G. Dodd (Cambridge : Cambridge University Press, 2018), 197–223.

29 *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740 (2011) ; *American Express Co. v. Italian Colors Restaurant*, 133 S. Ct. 2304 (2013) ; and *Epic Systems Corp. v. Lewis*, 584 U.S. ___ (2018).

30 Stephen B. Bright and Sia M. Sanneh, "Fifty Years of Defiance and Resistance after *Gideon v. Wainwright*," *Yale Law Journal* 122 (2150) (2013).

31 See Hilary Sommerlad, "Some Reflections on the Relationship between Citizenship, Access to Justice, and the Reform of Legal Aid," *Journal of Law and Society* 31 (345) (2004).

32 Richard L. Abel, *English Lawyers between Market and State : The Politics of Professionalism* (Oxford : Oxford University Press, 2004).

33 The most comprehensive analysis of legal complexity and costs and their causes is Gillian K. Hadfield, *Rules for a Flat World : Why Humans Invented Law and How to Reinvent It for a Complex Global Economy* (Oxford : Oxford University Press, 2016), chap. 7.

34 See Robert A. Kagan, "Do Lawyers Cause Adversarial Legalism ? A Preliminary Inquiry," *Law and Social Inquiry* 19 (1) (1994).

35 See Lawrence M. Friedman, "Access to Justice : Social and Historical Context," in *Access to Justice : Promising Institutions*, vol. 2, ed. Mauro Cappelletti and John Weisner (Alphen aan den Rijn, The Netherlands : Sijtoff and Noordhoff, 1978).

36 H. Laurence Ross, *Settled Out of Court : The Social Process of Insurance Claims Adjustment* (Piscataway, N.J. : Transaction Publishers, 1970).

37 Nora Freeman Engstrom, "Sunlight and Settlement Mills," *NYU Law Review* 86 (805) (2011).

38 Codified in 38 U.S. Code § 3404(c)(2).

39 Rhode, *Access to Justice*, 81–82.

40 U.S. Citizenship and Immigration Services, "Representation before USCIS," in *Adjudicator's Field Manual* (Washington, D.C. : U.S. Citizenship and Immigration Services, 2012), https :// www.uscis.gov/ilink/docView/AFM/HTML/AFM/0-0-0-1/0-0-0-2201/Chptr12_1.html (revised April 23, 2012).

41 Deborah L. Rhode, "Policing the Professional Monopoly : A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions," *Stanford Law Review* 14 (1) (1981) ; and Richard L. Abel, *American Lawyers* (Oxford : Oxford University Press, 1989), 112–126.

42 ABA Commission on Nonlawyer Practice, "Nonlawyer Activity in Law-Related Situations" (Chicago : American Bar Association, 1995), https://www.paralegals.org/files/ABA_Commission_on_Non-Lawyer_Practice.pdf.

43 Washington State Bar Association, "Limited License Legal Technicians," https://www.wsba .org/for-legal-professionals/join-the-legal-profession-in-wa/limited-license-legal-technicians ; and Nicole Shilling, "Loosening a Legal Monopoly : Perspectives from Paraprofessional Pioneers," unpublished interview study of Washington LLLTs, Stanford Law School, 2018.

44 For a catalog of several such efforts, see David Luban, "Taking Out the Adversary : The Assault on Progressive Public-Interest Lawyers," *California Law Review* 91 (209) (2003).

45 See Richard L. Abel, "Law without Politics : Legal Aid Under Advanced Capitalism," *UCLA Law Review* 32 (474) (1985): 492–494.

# Exhibit 26

AUGUST 1963

# Letter from Birmingham Jail

**by Martin Luther King, Jr.**

*From the Birmingham jail, where he was imprisoned as a participant in nonviolent demonstrations against segregation, Dr. Martin Luther King, Jr., wrote in longhand the letter which follows. It was his response to a public statement of concern and caution issued by eight white religious leaders of the South. Dr. King, who was born in 1929, did his undergraduate work at Morehouse College; attended the integrated Crozer Theological Seminary in Chester, Pennsylvania, one of six black pupils among a hundred students, and the president of his class; and won a fellowship to Boston University for his Ph.D.*

WHILE confined here in the Birmingham city jail, I came across your recent statement calling our present activities "unwise and untimely." Seldom, if ever, do I pause to answer criticism of my work and ideas. If I sought to answer all of the criticisms that cross my desk, my secretaries would be engaged in little else in the course of the day, and I would have no time for constructive work. But since I feel that you are men of genuine good will and your criticisms are sincerely set forth, I would like to answer your statement in what I hope will be patient and reasonable terms.

I think I should give the reason for my being in Birmingham, since you have been influenced by the argument of "outsiders coming in." I have the honor of serving as president of the Southern Christian Leadership Conference, an organization operating in every Southern state, with headquarters in Atlanta, Georgia. We have some eighty-five affiliate organizations all across the South, one being the Alabama Christian Movement for Human Rights. Whenever necessary and possible, we share staff, educational and financial resources with our affiliates. Several months ago our local affiliate here in Birmingham invited us to be on call to engage in a nonviolent direct-action program if such were deemed necessary. We readily consented, and when the hour came we lived up to our promises. So I am here, along with several members of my staff, because we were invited here. I am here because I have basic organizational ties here.

Beyond this, I am in Birmingham because injustice is here. Just as the eighth-century prophets left their little villages and carried their "thus saith the Lord" far beyond the boundaries of their hometowns; and just as the Apostle Paul left his little village of Tarsus and carried the gospel of Jesus Christ to practically every hamlet and city of the Greco-Roman world, I too am compelled to carry the gospel of freedom beyond my particular hometown. Like Paul, I must constantly respond to the Macedonian call for aid.

Moreover, I am cognizant of the interrelatedness of all communities and states. I cannot sit idly by in Atlanta and not be concerned about what happens in Birmingham. Injustice anywhere is a threat to justice everywhere. We are caught in an inescapable network of mutuality, tied in a single garment of destiny. Whatever affects one directly affects all indirectly. Never again can we afford to live with the narrow, provincial "outside agitator" idea. Anyone who lives inside the United States can never be considered an outsider.

You deplore the demonstrations that are presently taking place in Birmingham. But I am sorry that your statement did not express a similar concern for the conditions that brought the demonstrations into being. I am sure that each of you would want to go beyond the superficial social analyst who looks merely at effects and does not grapple with underlying causes. I would not hesitate to say that it is unfortunate that so-called demonstrations are taking place in Birmingham at this time, but I would say in more emphatic terms that it is even more unfortunate that the white power structure of this city left the Negro community with no other alternative.

IN ANY nonviolent campaign there are four basic steps: collection of the facts to determine whether injustices are alive, negotiation, self-purification, and direct action. We have gone through all of these steps in Birmingham. There can be no gainsaying of the fact that racial injustice engulfs this community. Birmingham is probably the most thoroughly segregated city in the United States. Its ugly record of police brutality is known in every section of this country. Its unjust treatment of Negroes in the courts is a notorious reality. There have been more unsolved bombings of Negro homes and churches in Birmingham than in any other city in this nation. These are the hard, brutal, and unbelievable facts. On the basis of them, Negro leaders sought to negotiate with the city fathers. But the political leaders consistently refused to engage in good-faith negotiation.

Then came the opportunity last September to talk with some of the leaders of the economic community. In these negotiating sessions certain promises were made by the merchants, such as the promise to remove the humiliating racial signs from the stores. On the basis of these promises, Reverend Shuttlesworth and the leaders of the Alabama Christian Movement for Human Rights agreed to call a moratorium on any type of demonstration. As the weeks and months unfolded, we realized that we were the victims of a broken promise. The signs remained. As in so many experiences of the past, we were confronted with blasted hopes, and the dark shadow of a deep disappointment settled upon us. So we had no alternative except that of preparing for direct action, whereby we would present our very bodies as a means of laying our case before the conscience of the local and national community. We were not unmindful of the difficulties involved. So we decided to go through a process of self-purification. We

started having workshops on nonviolence and repeatedly asked ourselves the questions, "Are you able to accept blows without retaliating?" and "Are you able to endure the ordeals of jail?" We decided to set our direct-action program around the Easter season, realizing that, with exception of Christmas, this was the largest shopping period of the year. Knowing that a strong economic withdrawal program would be the by-product of direct action, we felt that this was the best time to bring pressure on the merchants for the needed changes. Then it occurred to us that the March election was ahead, and so we speedily decided to postpone action until after election day. When we discovered that Mr. Conner was in the runoff, we decided again to postpone action so that the demonstration could not be used to cloud the issues. At this time we agreed to begin our nonviolent witness the day after the runoff.

This reveals that we did not move irresponsibly into direct action. We, too, wanted to see Mr. Conner defeated, so we went through postponement after postponement to aid in this community need. After this we felt that direct action could be delayed no longer.

You may well ask, "Why direct action, why sit-ins, marches, and so forth? Isn't negotiation a better path?" You are exactly right in your call for negotiation. Indeed, this is the purpose of direct action. Nonviolent direct action seeks to create such a crisis and establish such creative tension that a community that has consistently refused to negotiate is forced to confront the issue. It seeks so to dramatize the issue that it can no longer be ignored. I just referred to the creation of tension as a part of the work of the nonviolent resister. This may sound rather shocking. But I must confess that I am not afraid of the word "tension." I have earnestly worked and preached against violent tension, but there is a type of constructive nonviolent tension that is necessary for growth. Just as Socrates felt that it was necessary to create a tension in the mind so that individuals could rise from the bondage of myths and half-truths to the unfettered realm of creative analysis and objective appraisal, we must see the need of having nonviolent gadflies to create the kind of tension in society that will help men to rise from the dark depths of prejudice and racism to the majestic heights of understanding and brotherhood. So, the purpose of direct action is to create a situation so crisis-packed that it will inevitably open the door to negotiation. We therefore concur with you in your call for negotiation. Too long has our beloved Southland been bogged down in the tragic attempt to live in monologue rather than dialogue.

One of the basic points in your statement is that our acts are untimely. Some have asked, "Why didn't you give the new administration time to act?" The only answer that I can give to this inquiry is that the new administration must be prodded about as much as the outgoing one before it acts. We will be sadly mistaken if we feel that the election of Mr. Boutwell will bring the millennium to Birmingham. While Mr. Boutwell is much more articulate and gentle than Mr. Conner, they are both segregationists, dedicated to the task of maintaining the status quo. The hope I see in Mr. Boutwell is that he will be reasonable enough to see the futility of massive resistance to desegregation. But he will not see this without pressure from the devotees of civil rights. My friends, I must say to you that we have not made a single gain in civil rights without determined legal and nonviolent pressure. History is the long and tragic story of the fact that privileged groups seldom give up their privileges voluntarily. Individuals may see the moral light and voluntarily give up their unjust posture; but, as Reinhold Niebuhr has reminded us, groups are more immoral than individuals.

We know through painful experience that freedom is never voluntarily given by the oppressor; it must be demanded by the oppressed. Frankly, I have never yet engaged in a direct-action movement that was "well timed" according to the timetable of those who have not suffered unduly from the disease of segregation. For years now I have heard the word "wait." It rings in the ear of every Negro with a piercing familiarity. This "wait" has almost always meant "never." It has been a tranquilizing thalidomide, relieving the emotional stress for a moment, only to give birth to an ill-formed infant of frustration. We must come to see with the distinguished jurist of yesterday that "justice too long delayed is justice denied." We have waited for more than three hundred and forty years for our God-given and constitutional rights. The nations of Asia and Africa are moving with jetlike speed toward the goal of political independence, and we still creep at horse-and-buggy pace toward the gaining of a cup of coffee at a lunch counter. I guess it is easy for those who have never felt the stinging darts of segregation to say "wait." But when you have seen vicious mobs lynch your mothers and fathers at will and drown your sisters and brothers at whim; when you have seen hate-filled policemen curse, kick, brutalize, and even kill your black brothers and sisters with impunity; when you see the vast majority of your twenty million Negro brothers smothering in an airtight cage of poverty in the midst of an affluent society; when you suddenly find your tongue twisted and your speech stammering as you seek to explain to your six-year-old daughter why she cannot go to the public amusement park that has just been advertised on television, and see tears welling up in her little eyes when she is told that Funtown is closed to colored children, and see the depressing clouds of inferiority begin to form in her little mental sky, and see her begin to distort her little personality by unconsciously developing a bitterness toward white people; when you have to concoct an answer for a five-year-old son asking in agonizing pathos, "Daddy, why do white people treat colored people so mean?"; when you take a cross-country drive and find it necessary to sleep night after night in the uncomfortable corners of your automobile because no motel will accept you; when you are humiliated day in and day out by nagging signs reading "white" and "colored"; when your first name becomes "nigger" and your middle name becomes "boy" (however old you are) and your last name becomes "John," and when your wife and mother are never given the respected title "Mrs."; when you are harried by day and haunted by night by the fact that you are a Negro, living constantly at tiptoe stance, never knowing what to expect next, and plagued with inner fears and outer resentments; when you are forever fighting a degenerating sense of "nobodyness" -- then you will understand why we find it difficult to wait. There comes a time when the cup of endurance runs over and men are no longer willing to be plunged into an abyss of injustice where they experience the bleakness of corroding despair. I hope, sirs, you can understand our legitimate and unavoidable impatience.

Y OU express a great deal of anxiety over our willingness to break laws. This is certainly a legitimate concern. Since we so diligently urge people to obey the Supreme Court's decision of 1954 outlawing segregation in the public schools, it is rather strange and paradoxical to find us consciously breaking laws. One may well ask, "How can you advocate breaking some laws and obeying others?" The answer is found in the fact that there are two types of laws: there are just laws, and there are unjust laws. I would agree with St. Augustine that "An unjust law is no law at all."

Now, what is the difference between the two? How does one determine when a law is just or unjust? A just law is a man-made code that squares with the moral law, or the law of God. An unjust law is a code that is out of harmony with the moral law. To put it in the terms of St. Thomas Aquinas, an unjust law is a human law that is not rooted in eternal and natural law. Any law that uplifts human personality is just. Any law that degrades human personality is unjust. All segregation statutes are unjust because segregation distorts the soul and damages the personality. It gives the segregator a false sense of superiority and the segregated a false sense of inferiority. To use the words of Martin Buber, the great Jewish philosopher, segregation substitutes an "I - it" relationship for the "I - thou" relationship and ends up relegating persons to the status of things. So segregation is not only politically, economically, and sociologically unsound, but it is morally wrong and sinful. Paul Tillich has said that sin is separation. Isn't segregation an existential expression of man's tragic separation, an expression of his awful estrangement, his terrible sinfulness? So I can urge men to obey the 1954 decision of the Supreme Court because it is morally right, and I can urge them to disobey segregation ordinances because they are morally wrong.

Let us turn to a more concrete example of just and unjust laws. An unjust law is a code that a majority inflicts on a minority that is not binding on itself. This is difference made legal. On the other hand, a just law is a code that a majority compels a minority to follow, and that it is willing to follow itself. This is sameness made legal.

Let me give another explanation. An unjust law is a code inflicted upon a minority which that minority had no part in enacting or creating because it did not have the unhampered right to vote. Who can say that the legislature of Alabama which set up the segregation laws was democratically elected? Throughout the state of Alabama all types of conniving methods are used to prevent Negroes from becoming registered voters, and there are some counties without a single Negro registered to vote, despite the fact that the Negroes constitute a majority of the population. Can any law set up in such a state be considered democratically structured?

These are just a few examples of unjust and just laws. There are some instances when a law is just on its face and unjust in its application. For instance, I was arrested Friday on a charge of parading without a permit. Now, there is nothing wrong with an ordinance which requires a permit for a parade, but when the ordinance is used to preserve segregation and to deny citizens the First Amendment privilege of peaceful assembly and peaceful protest, then it becomes unjust.

Of course, there is nothing new about this kind of civil disobedience. It was seen sublimely in the refusal of Shadrach, Meshach, and Abednego to obey the laws of Nebuchadnezzar because a higher moral law was involved. It was practiced superbly by the early Christians, who were willing to face hungry lions and the excruciating pain of chopping blocks before submitting to certain unjust laws of the Roman Empire. To a degree, academic freedom is a reality today because Socrates practiced civil disobedience.

We can never forget that everything Hitler did in Germany was "legal" and everything the Hungarian freedom fighters did in Hungary was "illegal." It was "illegal" to aid and comfort a Jew in Hitler's Germany. But I am sure that if I had lived in Germany during that time, I would have aided and comforted my Jewish brothers even though it was illegal. If I lived in a Communist country today where certain principles dear to the Christian faith are suppressed, I believe I would openly advocate disobeying these anti-religious laws.

I MUST make two honest confessions to you, my Christian and Jewish brothers. First, I must confess that over the last few years I have been gravely disappointed with the white moderate. I have almost reached the regrettable conclusion that the Negro's great stumbling block in the stride toward freedom is not the White Citizens Councillor or the Ku Klux Klanner but the white moderate who is more devoted to order than to justice; who prefers a negative peace which is the absence of tension to a positive peace which is the presence of justice; who constantly says, "I agree with you in the goal you seek, but I can't agree with your methods of direct action"; who paternalistically feels that he can set the timetable for another man's freedom; who lives by the myth of time; and who constantly advises the Negro to wait until a "more convenient season." Shallow understanding from people of good will is more frustrating than absolute misunderstanding from people of ill will. Lukewarm acceptance is much more bewildering than outright rejection.

In your statement you asserted that our actions, even though peaceful, must be condemned because they precipitate violence. But can this assertion be logically made? Isn't this like condemning the robbed man because his possession of money precipitated the evil act of robbery? Isn't this like condemning Socrates because his unswerving commitment to truth and his philosophical delvings precipitated the misguided popular mind to make him drink the hemlock? Isn't this like condemning Jesus because His unique God-consciousness and never-ceasing devotion to His will precipitated the evil act of crucifixion? We must come to see, as federal courts have consistently affirmed, that it is immoral to urge an individual to withdraw his efforts to gain his basic constitutional rights because the quest precipitates violence. Society must protect the robbed and punish the robber.

I had also hoped that the white moderate would reject the myth of time. I received a letter this morning from a white brother in Texas which said, "All Christians know that the colored people will receive equal rights eventually, but is it possible that you are in too great of a religious hurry? It has taken Christianity almost 2000 years to accomplish what it has. The teachings of Christ take time to come to earth." All that is said here grows out of a tragic misconception of time. It is the strangely irrational notion that there is something in the very flow of time that will inevitably cure all ills. Actually, time is neutral. It can be used either destructively or constructively. I am coming to feel that the people of ill will have used time much more effectively than the people of good will. We will have to repent in this generation not merely for the vitriolic words and actions of the bad people but for the appalling silence of the good people. We must come to see that human progress never rolls in on wheels of inevitability. It comes through the tireless efforts and persistent work of men willing to be coworkers with God, and without this hard work time itself becomes an ally of the forces of social stagnation.

You spoke of our activity in Birmingham as extreme. At first I was rather disappointed that fellow clergymen would see my nonviolent efforts as those of an extremist. I started thinking about the fact that I stand in the middle of two opposing forces in the Negro community. One is a force of complacency made up of Negroes who, as a result of long years of oppression, have been so completely drained of self-respect and a sense of "somebodyness" that they have adjusted to segregation, and, on the other hand, of a few Negroes in the middle class who, because of a degree of academic and economic security and because at points they profit by segregation, have unconsciously become insensitive to the problems of the masses. The other force is one of bitterness and hatred and comes perilously close to advocating violence. It is expressed in the various black nationalist groups that are springing up over the nation, the largest and best known being Elijah Muhammad's Muslim movement. This movement is nourished by the contemporary frustration over the continued existence of racial discrimination. It is made up of people who have lost faith in America, who have absolutely repudiated Christianity, and who have concluded that the white man is an incurable devil. I have tried to stand between these two forces, saying that we need not follow the do-nothingism of the complacent or the hatred and despair of the black nationalist. There is a more excellent way, of love and nonviolent protest. I'm grateful to God that, through the Negro church, the dimension of nonviolence entered our struggle. If this philosophy had not emerged, I am convinced that by now many streets of the South would be flowing with floods of blood. And I am further convinced that if our white brothers dismiss as "rabble-rousers" and "outside agitators" those of us who are working through the channels of nonviolent direct action and refuse to support our nonviolent efforts, millions of Negroes, out of frustration and despair, will seek solace and security in black nationalist ideologies, a development that will lead inevitably to a frightening racial nightmare.

Oppressed people cannot remain oppressed forever. The urge for freedom will eventually come. This is what has happened to the American Negro. Something within has reminded him of his birthright of freedom; something without has reminded him that he can gain it. Consciously and unconsciously, he has been swept in by what the Germans call the *Zeitgeist,* and with his black brothers of Africa and his brown and yellow brothers of Asia, South America, and the Caribbean, he is moving with a sense of cosmic urgency toward the promised land of racial justice. Recognizing this vital urge that has engulfed the Negro community, one should readily understand public demonstrations. The Negro has many pent-up resentments and latent frustrations. He has to get them out. So let him march sometime; let him have his prayer pilgrimages to the city hall; understand why he must have sit-ins and freedom rides. If his repressed emotions do not come out in these nonviolent ways, they will come out in ominous expressions of violence. This is not a threat; it is a fact of history. So I have not said to my people, "Get rid of your discontent." But I have tried to say that this normal and healthy discontent can be channeled through the creative outlet of nonviolent direct action. Now this approach is being dismissed as extremist. I must admit that I was initially disappointed in being so categorized.

But as I continued to think about the matter, I gradually gained a bit of satisfaction from being considered an extremist. Was not Jesus an extremist in love? -- "Love your enemies, bless them that curse you, pray for them that despitefully use you." Was not Amos an extremist for justice? -- "Let justice roll down like waters and righteousness like a mighty stream." Was not Paul an extremist for the gospel of Jesus Christ? -- "I bear in my body the marks of the Lord Jesus." Was not Martin Luther an extremist? -- "Here I stand; I can do no other so help me God." Was not John Bunyan an extremist? -- "I will stay in jail to the end of my days before I make a mockery of my conscience." Was not Abraham Lincoln an extremist? -- "This nation cannot survive half slave and half free." Was not Thomas Jefferson an extremist? -- "We hold these truths to be self-evident, that all men are created equal." So the question is not whether we will be extremist, but what kind of extremists we will be. Will we be extremists for hate, or will we be extremists for love? Will we be extremists for the preservation of injustice, or will we be extremists for the cause of justice?

I had hoped that the white moderate would see this. Maybe I was too optimistic. Maybe I expected too much. I guess I should have realized that few members of a race that has oppressed another race can understand or appreciate the deep groans and passionate yearnings of those that have been oppressed, and still fewer have the vision to see that injustice must be rooted out by strong, persistent, and determined action. I am thankful, however, that some of our white brothers have grasped the meaning of this social revolution and committed themselves to it. They are still all too small in quantity, but they are big in quality. Some, like Ralph McGill, Lillian Smith, Harry Golden, and James Dabbs, have written about our struggle in eloquent, prophetic, and understanding terms. Others have marched with us down nameless streets of the South. They sat in with us at lunch counters and rode in with us on the freedom rides. They have languished in filthy roach-infested jails, suffering the abuse and brutality of angry policemen who see them as "dirty nigger lovers." They, unlike many of their moderate brothers, have recognized the urgency of the moment and sensed the need for powerful "action" antidotes to combat the disease of segregation.

LET me rush on to mention my other disappointment. I have been disappointed with the white church and its leadership. Of course, there are some notable exceptions. I am not unmindful of the fact that each of you has taken some significant stands on this issue. I commend you, Reverend Stallings, for your Christian stand this past Sunday in welcoming Negroes to your Baptist Church worship service on a nonsegregated basis. I commend the Catholic leaders of this state for integrating Springhill College several years ago.

But despite these notable exceptions, I must honestly reiterate that I have been disappointed with the church. I do not say that as one of those negative critics who can always find something wrong with the church. I say it as a minister of the gospel who loves the church, who was nurtured in its bosom, who has been sustained by its Spiritual blessings, and who will remain true to it as long as the cord of life shall lengthen.

I had the strange feeling when I was suddenly catapulted into the leadership of the bus protest in Montgomery several years ago that we would have the support of the white church. I felt that the white ministers, priests, and rabbis of the South would be some of our strongest allies. Instead, some few have been outright opponents, refusing to understand the freedom movement and misrepresenting its leaders; all too many others have been more cautious than courageous and have remained silent behind the anesthetizing security of stained-glass windows.

In spite of my shattered dreams of the past, I came to Birmingham with the hope that the white religious leadership of this community would see the justice of our cause and with deep moral concern serve as the channel through which our just grievances could get to the power structure. I had hoped that each of you would understand. But again I have been disappointed.

I have heard numerous religious leaders of the South call upon their worshipers to comply with a desegregation decision because it is the law, but I have longed to hear white ministers say, follow this decree because integration is morally right and the Negro is your brother. In the midst of blatant injustices inflicted upon the Negro, I have watched white churches stand on the sidelines and merely mouth pious irrelevancies and sanctimonious trivialities. In the midst of a mighty struggle to rid our nation of racial and economic injustice, I have heard so many ministers say, "Those are social issues which the gospel has nothing to do with," and I have watched so many churches commit themselves to a completely otherworldly religion which made a strange distinction between bodies and souls, the sacred and the secular.

There was a time when the church was very powerful. It was during that period that the early Christians rejoiced when they were deemed worthy to suffer for what they believed. In those days the church was not merely a thermometer that recorded the ideas and principles of popular opinion; it was the thermostat that transformed the mores of society. Wherever the early Christians entered a town the power structure got disturbed and immediately sought to convict them for being "disturbers of the peace" and "outside agitators." But they went on with the conviction that they were "a colony of heaven" and had to obey God rather than man. They were small in number but big in commitment. They were too God-intoxicated to be "astronomically intimidated." They brought an end to such ancient evils as infanticide and gladiatorial contest.

Things are different now. The contemporary church is so often a weak, ineffectual voice with an uncertain sound. It is so often the arch supporter of the status quo. Far from being disturbed by the presence of the church, the power structure of the average community is consoled by the church's often vocal sanction of things as they are.

But the judgment of God is upon the church as never before. If the church of today does not recapture the sacrificial spirit of the early church, it will lose its authentic ring, forfeit the loyalty of millions, and be dismissed as an irrelevant social club with no meaning for the twentieth century. I meet young people every day whose disappointment with the church has risen to outright disgust.

I hope the church as a whole will meet the challenge of this decisive hour. But even if the church does not come to the aid of justice, I have no despair about the future. I have no fear about the outcome of our struggle in Birmingham, even if our motives are presently misunderstood. We will reach the goal of freedom in Birmingham and all over the nation, because the goal of America is freedom. Abused and scorned though we may be, our destiny is tied up with the destiny of America. Before the Pilgrims landed at Plymouth, we were here. Before the pen of Jefferson scratched across the pages of history the majestic word of the Declaration of Independence, we were here. For more than two centuries our foreparents labored here without wages; they made cotton king; and they built the homes of their masters in the midst of brutal injustice and shameful humiliation -- and yet out of a bottomless vitality our people continue to thrive and develop. If the inexpressible cruelties of slavery could not stop us, the opposition we now face will surely fail. We will win our freedom because the sacred heritage of our nation and the eternal will of God are embodied in our echoing demands.

I must close now. But before closing I am impelled to mention one other point in your statement that troubled me profoundly. You warmly commended the Birmingham police force for keeping "order" and "preventing violence." I don't believe you would have so warmly commended the police force if you had seen its angry violent dogs literally biting six unarmed, nonviolent Negroes. I don't believe you would so quickly commend the policemen if you would observe their ugly and inhuman treatment of Negroes here in the city jail; if you would watch them push and curse old Negro women and young Negro girls; if you would see them slap and kick old Negro men and young boys, if you would observe them, as they did on two occasions, refusing to give us food because we wanted to sing our grace together. I'm sorry that I can't join you in your praise for the police department.

It is true that they have been rather disciplined in their public handling of the demonstrators. In this sense they have been publicly "nonviolent." But for what purpose? To preserve the evil system of segregation. Over the last few years I have consistently preached that nonviolence demands that the means we use must be as pure as the ends we seek. So I have tried to make it clear that it is wrong to use immoral means to attain moral ends. But now I must affirm that it is just as wrong, or even more, to use moral means to preserve immoral ends.

I wish you had commended the Negro demonstrators of Birmingham for their sublime courage, their willingness to suffer, and their amazing discipline in the midst of the most inhuman provocation. One day the South will recognize its real heroes. They will be the James Merediths, courageously and with a majestic sense of purpose facing jeering and hostile mobs and the agonizing loneliness that characterizes the life of the pioneer. They will be old, oppressed, battered Negro women, symbolized in a seventy-two-year-old woman of Montgomery, Alabama, who rose up with a sense of dignity and with her people decided not to ride the segregated buses, and responded to one who inquired about her tiredness with ungrammatical profundity, "My feets is tired, but my soul is rested." They will be young high school and college students, young ministers of the gospel and a host of their elders courageously and nonviolently sitting in at lunch counters and willingly going to jail for conscience's sake. One day the South will know that when these disinherited children of God sat down at lunch counters they were in reality standing up for the best in the American dream and the most sacred values in our Judeo-Christian heritage.

Never before have I written a letter this long -- or should I say a book? I'm afraid that it is much too long to take your precious time. I can assure you that it would have been much shorter if I had been writing from a comfortable desk, but what else is there to do when you are alone for days in the dull monotony of a narrow jail cell other than write long letters, think strange thoughts, and pray long prayers?

If I have said anything in this letter that is an understatement of the truth and is indicative of an unreasonable impatience, I beg you to forgive me. If I have said anything in this letter that is an overstatement of the truth and is indicative of my having a patience that makes me patient with anything less than brotherhood, I beg God to forgive me.

*Yours for the cause of Peace and Brotherhood,*

MARTIN LUTHER KING, JR.

------------------------------------------------------------------------

Copyright © 1963 *Martin Luther King  Jr. All rights reserved.*

The Atlantic Monthly; *August 1963  The Negro Is Your Brother  Volume 212  No. 2  pages 78 - 88.*

# CERTIFICATE OF SERVICE

I, *pro se* Plaintiff-Appellant Gordon Clark, certify that a copy of the above **PRO SE PLAINTIFF-APPELLANT'S APPENDIX** will be served via *electronic service* on March 1, 2024, to the following:

Patrick S. Tracey, Esq. ***(Santander Bank, N.A. named Defendants)***
c/o Saul Ewing, LLP
131 Dartmouth Street, Suite 501
Boston, MA 02116
**Served via Electronic Service**

Jeffrey M. Knickerbocker, Esq. ***(Bendett & McHugh, P.C. named Defendants)***
c/o Bendett & McHugh, P.C.
270 Farmington Avenue, Suite 151
Farmington, CT 06032
**Served via Electronic Service**

Sean R. Higgins, Esq. ***(Wells Fargo & Company named Defendants)***
c/o K&L Gates, LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
**Served via Electronic Service**

Dated and signed at Enfield, Connecticut, on March 1, 2024, by *pro se* Plaintiff-Appellant Gordon Clark, *in his individual, spousal, executor, beneficiary, and creditor capacities.*

_____
Gordon Clark
(*Husband & Executor of the Estate of Lillian J. Clark*)
70 Elm Street, Enfield, CT 06082
860.833.3195

**293**